## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SPEAR PHARMACEUTICALS, INC. and SPEAR DERMATOLOGY PRODUCTS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. _____ |
| v. | ) ) | |
| WILLIAM BLAIR & COMPANY, L.L.C., and VALEANT PHARMACEUTICALS INTERNATIONAL, | ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiffs, Spear Pharmaceuticals, Inc. and Spear Dermatology Products, Inc. (collectively, "Plaintiffs"), by their undersigned attorneys, hereby allege the following for their Complaint against Defendants, William Blair & Company, L.L.C. ("William Blair") and Valeant Pharmaceuticals International ("Valeant") (collectively, "Defendants"):

## NATURE OF THE ACTION

1.     This is an action by Plaintiffs for breach of contract, breach of the implied covenant of good faith and fair dealing, trade secret misappropriation, unjust enrichment, and negligence against Defendants arising from, *inter alia*, the improper disclosure by William Blair to Valeant of Plaintiffs' confidential information concerning the fluorouracil product that Plaintiffs had under development and Valeant's subsequent misuse of that information.

## THE PARTIES

2.     Spear Pharmaceuticals, Inc. ("Spear") is a corporation organized and existing under the laws of the State of Florida, having its principal place of business at 11924

Fairway Lakes Drive, Fort Myers, Florida 33913.  Spear is a small company specializing in the development of generic pharmaceutical products in the dermatological area.  Spear was founded in 1993 by Dr. K.L. Spear ("Dr. Spear"), who still serves as its President.  Dr. Spear was a practicing dermatologist from 1983 through 2001, when he decided to leave clinical practice to work full time in the research and development of prescription dermatologic generic drugs.  Since its founding, Spear has successfully developed and obtained United States Food & Drug Administration ("FDA") approval for six pharmaceutical products -- an unusually successful track record for a company of its small size and youth.

3.    Spear Dermatology Products, Inc. ("SDP") is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at 1247 Sussex Turnpike, Suite 120, Randolph, New Jersey 07869.  SDP was established in 2001 and is now the exclusive seller of the products developed by Spear.  Dr. Spear also serves as President of SDP and has since its inception.

4.    Upon information and belief, Defendant William Blair is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business at 222 W. Adams Street, Chicago, Illinois, 60606.  Upon information and belief, William Blair is a leading investment firm with a net worth of more than $144 million.

5.    Upon information and belief, Defendant Valeant is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 1 Enterprise, Aliso Viejo, California, 92656.  Valeant is engaged in the manufacture and marketing of pharmaceutical products worldwide, with 2006 annual sales totaling $907 million.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1332(a)(1) and (c)(1).   As set forth below, the amount in controversy exceeds $75,000.00, exclusive of interest and costs and complete diversity exists among the parties.

7.     Venue is proper in this judicial district pursuant to the provisions of 28 U.S.C. §§ 1391(a) and (c).

8.     Defendants William Blair and Valeant are Delaware corporations and, on information and belief, are conducting business and/or business-related activities within the State of Delaware.

9.     This Court has personal jurisdiction over Defendants.

## FACTUAL BACKGROUND

A.     **Plaintiffs' Tretinoin Products**

10.     Spear developed and was the first to obtain FDA approvals for generic versions of the brand name Retin-A® tretinoin cream products used in the treatment of acne. Spear filed three Abbreviated New Drug Applications ("ANDA's") for 0.025%, 0.05% and 0.1% cream strengths, respectively, and all were approved by the FDA on December 24, 1998.

11.     After the successful development and approval of the three tretinoin cream products, Spear pursued FDA approval for the manufacture and sale of other generic dermatological tretinoin products.   On February 22, 2000, Spear was the first to receive FDA approval to manufacture and sell a 0.025% gel, a generic version of Johnson and Johnson's Ortho Dermatological Division's Retin-A® Gel for the treatment of acne.   Subsequently, on June 11, 2002, Spear was the first to receive FDA approval to market a 0.01% strength generic version of the Retin-A® Gel for the treatment of acne. Also, on September 15, 2005, Spear was

3

the first to receive FDA approval to market a 0.05% strength generic version of the brand name

Renova® (tretinoin emollient cream) product.  All told, Spear received five FDA approvals for

the first generic versions of Retin-A® creams and gels, as well as FDA approval for the first

generic version of the Renova® emollient cream product.

**B.     Plaintiffs' Decision to Begin Pursuing FDA Approval of a Generic Equivalent to Efudex® and the Continued Efforts Towards that End**

        12.     In approximately February 1999, Plaintiffs began the process of

developing a generic equivalent to Defendant Valeant's fluorouracil cream, USP 5% product,

sold under the tradename Efudex®.

        13.     According to the Efudex® package insert, the product is approved for and

"indicated" in the treatment of actinic keratosis ("AK") and is also "useful" in the treatment of

superficial basal cell carcinoma ("sBCC") when conventional methods are impractical, such as

with multiple lesions or difficult treatment sites.  AK is a lesion of the epidermis, the outer layer

of the skin.  It is considered pre-cancerous and requires treatment according to the American

Academy of Dermatology.  Pre-cancerous AK lesions are common and are most often caused by

over-exposure to sunlight.  sBCC, on the other hand, is a skin cancer which is localized in the

epidermis.  Over 98% of the prescriptions written for Efudex® are used for patients with AK.

The patents covering Efudex® expired over twenty years ago and, upon information and belief,

Plaintiffs were the first to develop and seek approval of a generic fluorouracil product.

        14.     For ANDAs with multiple uses, the FDA requires that only one indication

need be studied to prove bioequivalence.  During the fluorouracil product's development phase,

beginning in June 1999, Plaintiffs consulted directly with the FDA in an effort to ensure that the

clinical trial performed in support of the proposed ANDA was correctly designed and would be

performed in accordance with the rigorous standards required.  Because Efudex® is used

overwhelmingly for AK, Plaintiffs proposed a clinical trial in the treatment of AK, and the FDA agreed that such a trial would prove bioequivalence to the brand product with respect to both treatment indications, AK and sBCC.  Once they had received that guidance from the FDA, Plaintiffs planned, developed and implemented the clinical trial.

15.    In connection with the development and clinical testing of the fluorouracil cream, USP 5% product, Plaintiffs have invested more than $6 million over the past eight years.

**C.    The Decision to Sell the Tretinoin Line to a Third Party and the Engagement of William Blair**

16.    During the Spring of 2004, while Plaintiffs were actively engaged in the development of the generic Efudex® product, they decided that they wished to sell the Retin-A® generic tretinoin product line (that is, all three of the cream product strengths and the two gel product strengths) to a third party.

17.    In pursuit of this end goal, on or about April 27, 2004, Dr. Spear began to communicate with Defendant William Blair through one of its Vice Presidents, Brian Scullion, M.D. ("Scullion").

18.    After discussion of general information about the Plaintiff companies and the business, Dr. Spear determined that, in order to disclose fully the information and trade secrets necessary for Defendant William Blair to evaluate the opportunity, a confidentiality agreement should be executed.

19.    On May 6, 2004, Dr. Spear, on behalf of Plaintiff companies, and Scullion, on behalf of Defendant William Blair, executed a confidentiality agreement ("Confidentiality Agreement").  The purpose of the Confidentiality Agreement was to permit Plaintiffs to disclose their confidential information to Defendant William Blair, through its

officer, Scullion, in connection with its evaluation of a potential transaction, with the assurance that William Blair would protect the confidentiality of the disclosed information.

20.    In the Confidentiality Agreement, Defendant William Blair agreed, through Scullion, "that all Confidential Information will be held and treated by you, your agents and employees in confidence and will not, except as required by law or as hereinafter provided, without the prior written consent of the [Plaintiffs], be disclosed by you or your agents or employees, in any manner whatsoever, in whole or in part, and will not be used by you or your agents or employees other than in connection with your evaluation of a possible transaction." Confidentiality Agreement, at p. 1.

21.    On the morning of May 10, 2004, Dr. Spear sent Scullion an e-mail specifically stating, "[a]s you are thinking of the presentation and how to promote and sell to other companies, I request that you not include Information to any of them on our pipeline that I had mentioned to you.  I wish to keep confidential in this very connected industry our Pipeline."

22.    Later that same afternoon, Scullion responded by e-mail to Dr. Spear's request with one simple word -- "[u]nderstood."

23.    In an e-mail on May 24, 2004, Dr. Spear stated that, in the presentation and discussion with the companies considering the opportunity, "we do not say what the R and D products are or where they are" in the development process.

24.    Just two days later, in an e-mail dated May 26, 2004, Dr. Spear again stressed to Scullion, that he was "very ill at ease to let companies 'peek under the curtain' at our R and D line."

25.    On August 2, 2004, Scullion, on behalf of Defendant William Blair, sent an e-mail with an attached letter to Plaintiffs detailing the terms of its engagement (the

"Engagement Letter") for "render[ing] certain investment banking services in connection with a possible sale of tretinoin related assets of the company to another party or with the possible business combination . . . of the [Plaintiffs] with another party or a recapitalization of the [Plaintiffs] or similar restructuring." Engagement Letter, p. 1.

26.     In the Engagement Letter, William Blair reaffirmed its obligations under the Confidentiality Agreement signed on May 6, 2004. Further, William Blair also represented, in the Engagement Letter, "that its healthcare investment banking group is not as of the date of this letter engaged to advise or represent any of the parties contemplated as of this date as potential parties to the Possible Transaction. Should it become so engaged by any of the parties that submit an indication of interest, it will inform Spear." *Id.*, at ¶ 8.

**D.     William's Blair's Process for Screening and Eventually Choosing Proposed Purchasers for the Spear Tretinoin Line of Products**

27.     In the Engagement Letter, William Blair set forth its plan with regard to the services that would be rendered in connection with the proposed transaction. Specifically, William Blair and Scullion undertook the responsibility, *inter alia*, to assist Plaintiffs "in (i) developing a strategy for pursuing a Possible Transaction involving the [Plaintiffs] and a list of possible participants in the Possible Transaction . . . (ii) preparing a descriptive memorandum . . . and (iii) contacting and eliciting interest from those possible participants expressly approved by the [Plaintiffs]." *Id.*, at ¶ 1b.

28.     Further, in the Engagement Letter, William Blair set forth its expectation that Scullion would "lead and supervise the Possible Transaction." *Id.*, at ¶ 1c.

29.     Plaintiffs' trust in Scullion was so strong that Plaintiffs negotiated and won inclusion of a specific term that permitted, in the event that Scullion did not continue with William Blair and Plaintiffs decided to terminate the engagement, the required cooling off period

before Plaintiffs could sign with another company to be cut by half to nine months to permit Plaintiff to follow Scullion to any new employer. Engagement Letter, ¶ 5.

30.     As part of the process of screening possible purchasers, Scullion forwarded what he called the "A-list parties" *via* e-mail on September 3, 2004. Among those companies was Defendant Valeant. William Blair did not disclose the nature and extent of its business relationship with Valeant at that time. Upon information and belief, William Blair had an investment banking relationship with Valeant and followed Valeant stock closely. Indeed, according to the Quarterly Schedule of Portfolio Holdings (Form N-Q) filed with the Securities and Exchange Commission on November 22, 2004, the William Blair Growth Fund held over $1.7 million in Valeant stock as of September 30, 2004.

31.     During the search for a possible participant in the proposed transaction, Scullion, sent to Plaintiffs, on a regular (*i.e.*, weekly, or near weekly) basis, a list of contacts he had made in furtherance of his search. Additionally, as required by the Engagement Letter, Plaintiffs expressly approved the specific possible participants prior to the disclosure of any confidential information to them. *See* Engagement Letter, ¶ 1b.

**E.     Valeant's Evaluation Agreement and Refusal of the Opportunity**

32.     On September 23, 2004, William Blair, through its officer Scullion, executed an agreement with Defendant Valeant in order to permit Valeant's evaluation of Plaintiffs' confidential information with a guarantee that Valeant would hold such information secret and would not use such information for any other purpose than to evaluate the proposed transaction (the "Evaluation Agreement").

33.     Specifically, by executing the Evaluation Agreement, Valeant agreed, *inter alia*, "to treat any information, knowledge or data concerning the [Plaintiffs] which is

furnished to [it] by or on behalf of [Plaintiffs], whether furnished before, on or after the date of this Agreement [defined as the "Evaluation Material"], in accordance with the provisions of this Agreement. . . .   [T]he Evaluation Material will be used by you solely for the purpose of evaluating a Possible Transaction between the [Plaintiffs] and you.  In addition, you agree not to disclose the Evaluation Material to any person and agree to keep the evaluation material confidential." Evaluation Agreement, p. 1.

34.    As evidenced by the Evaluation Agreement, it was Defendants' intent that Plaintiffs be third party beneficiaries to the Evaluation Agreement and the obligations set forth therein.  Indeed, the Evaluation Agreement specifically provided that Plaintiffs were third-party beneficiaries of the Evaluation Agreement.  Evaluation Agreement, p. 2 ("The terms, conditions and covenants of this Agreement shall be binding upon you, your Agents, and each of your respective successors, and *is for the benefit of Company [i.e., Plaintiffs]* and William Blair. . . .") (emphasis added).

35.    On October 11, 2004, Scullion sent, as part of the status update, a list of prospective participants to Plaintiffs.  The list noted that Valeant had received the memorandum and was assessing its interest in the opportunity.  Further, the status chart identified October 14, 2004, as the "Indication Due Date" for Valeant.

36.    On or about October 15, 2004, during a discussion with Dr. Spear, Scullion stated that Valeant was interested in the opportunity but had dropped out because of the price.

37.    On October 18, 2004, Plaintiffs received an updated status chart from Scullion.  This update included an indication that since the last update, and in keeping with the "Indication Due Date" set forth in the previous update, Valeant had "declined" the offer.

**F.     Plaintiffs' Communication of Confidential Information to Scullion and Plaintiffs'
        Subsequent Filing of Their ANDA**

38.     Following execution of the Confidentiality Agreement, on May 13, 2004, at their first face-to-face meeting in Ft. Myers, Florida, Plaintiffs provided Scullion with confidential information that the generic Efudex® product was in Spear's product development pipeline. Additional information about the pipeline was presented to Scullion -- at his request -- during a July 28, 2004 meeting in Chicago between Spear and Scullion. On October 31, 2004, Dr. Spear sent Scullion an e-mail that included additional confidential information revealing that the generic Efudex® fluorouracil cream, USP 5% product was in development, that a "318 patient Bioequivalence study [was] completed," and that Plaintiffs expected that an ANDA for the product would be filed in late November 2004. *Id.* Dr. Spear prefaced this information with the comment that he didn't "really want to talk about the next two but for your information." *Id.* Dr. Spear also told Scullion that the clinical trial was for actinic keratosis. Thus, by October 31, 2004, Scullion knew not only Spear's anticipated ANDA filing date but key details concerning Spear's bioequivalence study -- and that Plaintiffs had conducted only a single study.

39.     On information and belief, throughout the summer and fall of 2004 (at which time the William Blair Growth Fund held over $1.7 Million in Valeant stock), Scullion repeatedly flew to California to meet with Valeant on the Spear opportunity, as well as other business relationships. Scullion was familiar with upper level management at Valeant and, on information and belief, had worked with them before on other matters.

40.     Plaintiffs filed their ANDA with the FDA seeking approval to manufacture and sell their fluorouracil cream, USP 5% product, a generic version of Valeant's Efudex® product, on January 3, 2005, and it was accepted for filing by the FDA on January 6, 2005.

G.     **Valeant's Filing of a Citizen's Petition to Block Approval**

41.     On information and belief, prior to December 21, 2004, Scullion communicated to Valeant the confidential information he had received from Dr. Spear concerning Plaintiffs' expected filing of their ANDA seeking approval to manufacture and market the generic fluorouracil cream, USP 5% product. On December 21, 2004, Valeant filed a Citizen's Petition in an attempt to block the approval of a generic equivalent to its Efudex® product.

42.     The December 21, 2004 Citizen's Petition filed by Valeant was the first and only instance in the more than twenty years since Efudex® had gone off patent (thus opening the product up for generic competition) that Valeant had filed a Citizen's Petition with respect to Efudex®. On information and belief, the timing of the Citizen's Petition was not coincidental -- it was reflective of the confidential information that had been improperly leaked to Valeant.

43.     In the Citizen's Petition, Valeant requested that the FDA "[r]efrain from approving an [Abbreviated New Drug] application unless an application includes a sBCC study." The specificity of the requested relief reflects that Valeant had learned not only of Plaintiffs' confidential information with respect to Plaintiffs' plan for filing an ANDA, but also the precise nature of the clinical trial they had conducted.

44.     Congress has recognized that the Citizen Petition process has been used by certain pharmaceutical companies for the improper purpose of delaying FDA approval of generic products, as evidenced by the recent introduction, passage and enactment into law on September 27, 2007 of amendments to the Federal Food, Drug, and Cosmetic Act directing the FDA not to delay approval of ANDAs based on the filing of a Citizen Petition. *See* Food and Drug Administration Amendments Act of 2007 § 914(a), 21 U.S.C. § 355. Remedying past

abuse of the Citizen Petition process was a primary motivation for passage of the legislation, as evidenced by the following comments from the legislative history of the Act and other related legislation before Congress at the time:

From legislative history of Food and Drug Administration Amendments Act of 2007:

> "Let us be clear: The citizen petition provision is designed to address attempts to derail generic drug approvals. Those attempts, when successful, hurt consumers and the public health." 153 Cong. Rec. S11841 (daily ed. Sept. 20, 2007) (statement of Sen. Kennedy).

> "The bill also takes action on the abuse of citizen petitions. . . . This procedure should be used to protect public health -- but too often, it is subverted by those who seek only to delay the entry onto the market of generic drugs. Even if the petitions are found to be meritless, they will have accomplished their mission -- delaying access for consumers to safe and lower cost medicines." 153 Cong. Rec. S11938 (daily ed. Sept. 21, 2007) (statement of Sen. Kennedy).

From legislative history of the Citizen Petition Fairness and Accuracy Act of 2007 -- introduced on January 4, 2007:

> "The legislation I introduce today . . . targets one particularly pernicious practice by brand name drug companies to impeded or block the marketing of generic drugs -- abuse of the FDA citizen petition process." 153 Cong. Rec. S64 (daily ed. Jan. 4, 2007) (statement of Sen. Kohl).

> "While this citizen petition process was put in place for a laudable purpose, unfortunately in recent years it has been abused by frivolous petitions submitted by brand name drug manufacturers (or individuals acting on their behest) whose only purpose is to delay the introduction of generic competition." 153 Cong. Rec. S64 (daily ed. Jan. 4, 2007) (statement of Sen. Kohl).

> "Indeed, brand name drug manufacturers often wait to file citizen petitions until just before the FDA is about to grant the application to market the new generic drug solely for the purpose of delaying the introduction of the generic competitor for the maximum amount of time possible. This gaming of the system should not be tolerated." 153 Cong. Rec. S65 (daily ed. Jan. 4, 2007) (statement by Sen. Kohl).

> "Of the 21 citizen petitions for which the FDA has reached a decision since 2003, 20 -- or 95 percent of them -- have been found to be without merit. Of these, ten were identified as "eleventh hour petitions," defined as those filed less than 6 months prior to the estimated entry date of the generic drug. None of these ten "eleventh hour petitions" were found to have merit, but each caused unnecessary delays in the marketing of the generic drug by months or over a year. . . ." 153 Cong. Rec. S65 (daily ed. Jan. 4, 2007) (statement by Sen. Kohl).

**H.      Valeant's Change of Heart With Respect to the Tretinoin Product Opportunity**

45.     Only eight days after Valeant filed its Citizen Petition, on December 29, 2004, Valeant submitted a "preliminary, non-binding indication of interest" to William Blair, through its officer Scullion, to purchase Plaintiffs' tretinoin product line (the "Offer Letter"). Scullion subsequently presented the Offer Letter to Plaintiffs.  The Offer Letter included general terms for the purchase of the assets, offering an up-front payment as well as royalties based on sales milestones for the five years following the proposed purchase.

46.     This Offer Letter was sent more than two months after Valeant declined the proposed transaction and a mere eight days after it had filed its Citizen Petition on December 21, 2004.  Upon information and belief, this offer was a pretense so that Valeant could gain more information on Spear -- the potential competitor to Valeant's Efudex 5% cream product, which represented Valeant's single largest revenue-producing product in the United States in 2004.  At the time the Offer Letter was sent, Plaintiffs were already in negotiations with another company to sell the tretinoin product line, and Valeant's offer was rejected.

**I.      Plaintiffs' Discovery of the Citizen Petition and Activity Thereafter**

47.     Plaintiffs first learned of Valeant's Citizen Petition from the FDA on April 19, 2005, when they called the FDA to check on the status of their application.  Plaintiffs were told by the FDA on that date that Valeant had filed a Citizen Petition requesting that no ANDA be approved if the bioequivalence study supporting the ANDA had been done only in AK patients, and that the FDA was reviewing that Citizen Petition.

48.     Given that the FDA had reviewed, provided guidance and approved Plaintiffs' planned clinical trial addressing treatment of AK and agreed that such a trial would be

sufficient to demonstrate bioequivalence to the brand product, the news of the Citizen Petition was a shock to Plaintiffs.

49.     Because of the delay caused by Valeant's filing of its Citizen Petition, Plaintiffs have been awaiting FDA approval for their generic fluorouracil cream, USP 5% product since January 6, 2005 -- nearly three years -- more than twice the 16.6 month average time for approval of such applications.  Had Valeant not filed its Citizen Petition, Plaintiffs' ANDA would have been approved long ago.

50.     In December 2006, Valeant launched an authorized generic fluorouracil cream, USP 5% product through Oceanside, another generic pharmaceutical company.  Because of the delay in FDA approval for the Spear product caused by the filing of Valeant's Citizen Petition, the Valeant-sponsored Oceanside generic remains the only generic Efudex® equivalent approved for marketing by the FDA.   Upon information and belief, Valeant launched this authorized generic product only because of its access to Plaintiffs' confidential information.

## COUNT I

### BREACH OF CONTRACT
### AGAINST WILLIAM BLAIR
### (THE CONFIDENTIALITY AGREEMENT)

51.     Plaintiffs incorporate by reference paragraphs 1-50 as if fully set forth herein.

52.     Plaintiffs performed their obligations under the Confidentiality Agreement.

53.     Under the Confidentiality Agreement, William Blair was obligated to hold Plaintiffs' confidential information in confidence and not disclose such information without Plaintiffs' prior written consent.

54.     In the Engagement Letter, William Blair reaffirmed its obligation under the Confidentiality Agreement.

55.     On information and belief, William Blair breached its obligations and, contrary to Plaintiffs' repeated instructions, revealed to Valeant Plaintiffs' confidential information regarding, *inter alia*, at least, Plaintiffs' plans to file an ANDA for a generic fluorouracil product and Plaintiffs' bioequivalence testing.

56.     This breach of the Confidentiality Agreement has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT II

### BREACH OF CONTRACT
### AGAINST WILLIAM BLAIR
### (THE ENGAGEMENT LETTER)

57.     Plaintiffs incorporate by reference paragraphs 1-56 as if fully set forth herein.

58.     Plaintiffs have performed all of their obligations under the Engagement Letter.

59.     In the Engagement Letter, William Blair reaffirmed its obligation under the Confidentiality Agreement to keep confidential all information communicated to it during the performance of its duties and obligations pursuant to that engagement.

60.     In addition, under the terms of the Engagement Letter, William Blair was obligated to inform Plaintiffs if it had any preexisting business relationship with any party requesting to evaluate the transaction.  William Blair did not disclose the nature and extent of its business relationship with Valeant.

61.     On information and belief, William Blair breached its obligations by failing to disclose the nature and extent of its business relationship with Valeant and by revealing to Valeant Plaintiffs' confidential information regarding, *inter alia*, Plaintiffs' plans for a future FDA filing and Plaintiffs' bioequivalence testing.

62.     This breach of the Engagement Letter has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT III

## BREACH OF CONTRACT AGAINST VALEANT
## (THE EVALUATION AGREEMENT)

63.     Plaintiffs incorporate by reference paragraphs 1-62 as if fully set forth herein.

64.     Valeant and William Blair intended that Plaintiffs benefit from the Evaluation Agreement and specifically identified Plaintiffs as third-party beneficiaries of that Agreement.

65.     The benefit of the Evaluation Agreement to Plaintiffs was in furtherance of a pre-existing obligation that William Blair owed Plaintiffs under various agreements.

66.     The benefit of the Evaluation Agreement to Plaintiffs was a material part of Defendants' purpose in entering into the Evaluation Agreement, *i.e.*, the confidential disclosure of information, and the evaluation thereof, in connection with the possible purchase of Plaintiffs' tretinoin product line.

67.     Valeant was obligated under the Evaluation Agreement, *inter alia*, to keep confidential all information communicated to it, either by William Blair or Plaintiffs, during the evaluation of the proposed transaction and to use the confidential information provided to it only for such evaluation.

68.     On information and belief, Valeant breached its obligation and, *inter alia*, used Plaintiffs' confidential information as a basis for filing its Citizen Petition with the FDA and as a basis for determining its own strategies with respect to the launch of an "authorized generic" product.

69.     This breach of the Evaluation Agreement has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT IV

### BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING
### AGAINST WILLIAM BLAIR

70.     Plaintiffs incorporate by reference paragraphs 1-69 as if fully set forth herein.

71.     On information and belief, William Blair and Valeant had previously partnered in substantial financial transactions.  On information and belief, these transactions included, at least, William Blair serving as an investment banker for Valeant.  As of September 30, 2004, the William Blair Growth Fund held over $1.7 million in Valeant stock.

72.     On information and belief, William Blair, through its agent, Scullion, disclosed Plaintiffs' confidential information with respect to Plaintiffs' upcoming ANDA filing and its bioequivalence testing.

73.     Under the Engagement Letter and the Confidentiality Agreement, William Blair had an implied obligation of good faith and fair dealing to Plaintiffs.

74.     On information and belief, William Blair breached its obligation of good faith and fair dealing by communicating Plaintiffs' confidential information concerning its upcoming fluorouracil cream, USP 5% product ANDA filing to Valeant, a known competitor,

with whom William Blair had previous financial dealings, and which it knew to be the seller of the corresponding brand Efudex® product, and by delivering to Plaintiffs a sham offer from Valeant to purchase Plaintiffs' tretinoin product line that was made in bad faith.  Specifically, the Valeant offer was made with the objective of permitting Valeant to obtain additional confidential information about Plaintiffs' competitive product and plans.

75.    On  information  and  belief,  William  Blair,  through  Scullion, communicated this information to Valeant in an attempt to enrich both itself and Valeant at the expense of Plaintiffs by warning Valeant of the threat to its monopoly on the sale of Efudex®. Both Valeant and William Blair were in fact so enriched.

76.    This breach of the implied covenant of good faith and fair dealing has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT V

## TRADE SECRET MISAPPROPRIATION AGAINST DEFENDANTS

77.    Plaintiffs  incorporate by reference paragraphs 1-76 as if fully set forth herein.

78.    The information relating to the bioequivalence study and the nature and timing of its ANDA filing constituted Plaintiffs' trade secrets.

79.    Plaintiffs took reasonable precautions to protect their trade secrets, by, *inter alia*, requiring that any company evaluating the proposed transaction, including Valeant, as well as, William Blair, agree in writing to keep such information confidential and to use it only for the purposes for which it was revealed.

80.    Plaintiffs communicated their trade secrets to William Blair, and on information and belief, William Blair communicated those trade secrets to Valeant.

18

81.     The confidentiality obligations undertaken by William Blair and Valeant were in full force and effect from at least the time Plaintiffs disclosed their trade secrets to William Blair to at least the time Valeant filed its Citizen Petition with the FDA challenging the adequacy of a bioequivalence study of the type conducted by Plaintiffs.

82.     On information and belief, William Blair misappropriated Plaintiffs' trade secrets by disclosing confidential information about Plaintiffs' generic fluorouracil product, including, *inter alia*, details concerning the bioequivalence study and the timing of the ANDA filing, to Valeant without Plaintiffs' prior written consent, and Valeant misappropriated Plaintiffs' trade secrets by using them for a purpose other than evaluation of the purchase of the Plaintiffs' tretinoin product line, in violation of one or more of the following statutes: 6 Del. C. § 2001, et seq. (Delaware Trade Secrets Act), and 765 I.L.C.S. 1065 (Illinois Trade Secrets Act).

83.     This misappropriation of the Plaintiffs' trade secrets has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT VI

## UNJUST ENRICHMENT AGAINST VALEANT

84.     Plaintiffs incorporate by reference paragraphs 1-83 as if fully set forth herein.

85.     Valeant has been enriched as a result of its improper use of Plaintiffs' confidential information because, *inter alia*, Valeant's filing of its Citizen Petition has operated to delay approval of Plaintiffs' ANDA thereby resulting in the extension of Valeant's monopoly hold on the Efudex® market and Valeant's subsequent successful startup of Oceanside, its authorized generic, enabling Valeant to benefit substantially from being the first generic entrant to the market and positioning Valeant for long term benefit.

86. As a result of Valeant's enrichment, Plaintiffs have been harmed by not being able to capitalize on their investment in the research and development and capital expenditures that were incurred to support and file their ANDA.

87. Plaintiffs' losses are directly related to, and, in fact, are a direct result of, the actions Valeant took after, on information and belief, it acquired Plaintiffs' confidential information.

88. There is no justification for Valeant's actions.

89. The losses Plaintiffs have suffered as a result of Valeant's actions and consequential enrichment are not addressable by a remedy at law.

## COUNT VII

## NEGLIGENCE AGAINST WILLIAM BLAIR

90. Plaintiffs incorporate by reference paragraphs 1-89 as if fully set forth herein.

91. William Blair represented that the firm had extensive experience in locating and developing potential purchasers and/or backers for pharmaceutical based investments.

92. As a result of its extensive experience, Plaintiffs put special trust in William Blair to protect their interests and advise them with respect to the proposed transaction.

93. As a firm of professionals, holding themselves out as specialists in the applicable field, in addition to the duties and obligations required under the various contracts, William Blair owed Plaintiffs a duty to, *inter alia*, protect their confidential information and to act in the best interests of their clients, Plaintiffs.

94.     William Blair breached its duty of care by, *inter alia*, negligently and in a grossly negligent fashion: (a) failing to disclose the nature and extent of its preexisting business relationship with Valeant; (b) on information and belief, revealing the Plaintiffs' confidential information to a known competitor; and (c) delivering to Plaintiffs an offer from Valeant for the tretinoin product line that, on information and belief, William Blair knew or should have known was made in bad faith.

95.     The breach of the duty of care committed by William Blair proximately caused substantial damage to Plaintiffs, in an amount exceeding $125 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Spear Pharmaceuticals, Inc. and Spear Dermatology Products, Inc., pray that the Court award them the following relief:

A.     a judgment that William Blair has breached the Confidentiality Agreement;

B.     a judgment that William Blair has breached the Engagement Letter;

C.     a judgment that Valeant has breached the Evaluation Agreement;

D.     a judgment that William Blair has breached the implied duty of good faith and fair dealing;

E.     a judgment that Defendants misappropriated Plaintiffs' trade secrets;

F.     a judgment that Defendant Valeant was unjustly enriched;

G.     a judgment that William Blair was negligent;

H.     an award of compensatory damages in the amount of $125 million;

I.     an award of punitive damages in an amount to be determined at trial;

J.     an award of reasonable attorneys' fees and costs; and

K.      such further relief as this Court may deem necessary, just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com

*Attorneys for Plaintiffs Spear Pharmaceuticals, Inc.*
*and Spear Dermatology Products, Inc.*

Of Counsel:

Steven Lieberman
Jason M. Shapiro
Lisa N. Phillips
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K Street, N.W.
Suite 800
Washington, DC  20005
(202) 783-6040

Dated:  December 17, 2007