IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SPEAR PHARMACEUTICALS, INC. and SPEAR DERMATOLOGY PRODUCTS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 07-821-JJF |
| WILLIAM BLAIR & COMPANY, L.L.C., and VALEANT PHARMACEUTICALS INTERNATIONAL, | ) ) ) ) | |
| Defendants. | ) | |

**STIPULATED MOTION AND ORDER**

WHEREAS, Plaintiffs Spear Pharmaceuticals, Inc. and Spear Dermatology Products, Inc. (collectively, "Spear") seek leave to file a Supplemental Complaint pursuant to Fed. R. Civ. P. 15(d);

IT IS HEREBY STIPULATED AND AGREED, subject to the approval of the Court, that:

1.      Spear moves pursuant to Fed. R. Civ. P. 15(d) for leave to file a Supplemental Complaint, which is attached hereto as Exhibit 1.  Pursuant to D. Del. LR 15.1, attached hereto as Exhibit 2 is a redline version of the Supplemental Complaint indicating those respects in which the Supplemental Complaint differs from plaintiffs' original Complaint.

2.      Defendants do not oppose Spear's motion for leave to file the Supplemental Complaint.

3.      The Supplemental Complaint shall be entered in this case and deemed filed and served upon entry of this Stipulated Motion as an Order of the Court.

4.    Defendants shall have 30 days from the entry of this Stipulated Motion as an Order of the Court to respond to the Supplemental Complaint.

5.    The time for plaintiffs to respond to the pending motions to dismiss (D.I. 8 & 10) is extended until such time as either:  (a) the Court enters this Stipulated Motion as an Order of the Court, in which case the pending motions to dismiss the original Complaint will be moot and no responses will be required; or (b) five business days after the Court otherwise rules on this Stipulated Motion.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com
  *Attorneys for Plaintiffs*
  *Spear Pharmaceuticals, Inc. and*
  *Spear Dermatology Products, Inc.*

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Steven J. Fineman*

_____

Gregory V. Varallo (#2242)
Steven J. Fineman (#4025)
One Rodney Square
920 King Street
Wilmington, DE  19801
(302) 651-7700
fineman@rlf.com
  *Attorneys for Defendant*
  *William Blair & Company, L.L.C.*

POTTER ANDERSON & CORROON LLP

*/s/ David E. Moore*

_____

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000
dmoore@potteranderson.com
  *Attorneys for Defendant*
  *Valeant Pharmaceuticals International*

SO ORDERED this ___ day of _____ 2008.

_____

United States District Court Judge

2296416

2

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

SPEAR PHARMACEUTICALS, INC. and    )
SPEAR DERMATOLOGY PRODUCTS,    )
INC.,    )
    )
             Plaintiffs,    )
    )    Civil Action No. 07-821-JJF
     v.    )
    )
WILLIAM BLAIR & COMPANY, L.L.C.,    )    **JURY TRIAL DEMANDED**
and VALEANT PHARMACEUTICALS    )
INTERNATIONAL,    )
    )
             Defendants.    )

## <u>SUPPLEMENTAL COMPLAINT</u>

       Plaintiffs, Spear Pharmaceuticals, Inc. and Spear Dermatology Products, Inc. (collectively, "Plaintiffs"), by their undersigned attorneys, hereby allege the following for their Supplemental Complaint against Defendants, William Blair & Company, L.L.C. ("William Blair") and Valeant Pharmaceuticals International ("Valeant") (collectively, "Defendants"):

## <u>NATURE OF THE ACTION</u>

       1.     This is an action by Plaintiffs for breach of contract, breach of the implied covenant of good faith and fair dealing, trade secret misappropriation, unjust enrichment, and negligence against Defendants arising from, *inter alia*, the improper disclosure by William Blair to Valeant of Plaintiffs' confidential information concerning the fluorouracil product that Plaintiffs had under development and Valeant's subsequent misuse of that information.

## <u>THE PARTIES</u>

       2.     Spear Pharmaceuticals, Inc. ("Spear") is a corporation organized and existing under the laws of the State of Florida, having its principal place of business at 11924

Fairway Lakes Drive, Fort Myers, Florida 33913. Spear is a small company specializing in the development of generic pharmaceutical products in the dermatological area. Spear was founded in 1993 by Dr. K.L. Spear ("Dr. Spear"), who still serves as its President. Dr. Spear was a practicing dermatologist from 1983 through 2001, when he decided to leave clinical practice to work full time in the research and development of prescription dermatologic generic drugs. Since its founding, Spear has successfully developed and obtained United States Food & Drug Administration ("FDA") approval for seven pharmaceutical products -- an unusually successful track record for a company of its small size and youth.

3.      Spear Dermatology Products, Inc. ("SDP") is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at 1247 Sussex Turnpike, Suite 120, Randolph, New Jersey 07869. SDP was established in 2001 and is now the exclusive seller of the products developed by Spear. Dr. Spear also serves as President of SDP and has since its inception.

4.      Upon information and belief, Defendant William Blair is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business at 222 W. Adams Street, Chicago, Illinois 60606. Upon information and belief, William Blair is a leading investment firm with a net worth of more than $144 million.

5.      Upon information and belief, Defendant Valeant is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 1 Enterprise, Aliso Viejo, California, 92656. Valeant is engaged in the manufacture and marketing of pharmaceutical products worldwide, with 2006 annual sales totaling $907 million.

2

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1332(a)(1) and (c)(1).   As set forth below, the amount in controversy exceeds $75,000.00, exclusive of interest and costs and complete diversity exists among the parties.

7.    Venue is proper in this judicial district pursuant to the provisions of 28 U.S.C. §§ 1391(a) and (c).

8.    Defendants William Blair and Valeant are Delaware corporations and, on information and belief, are conducting business and/or business-related activities within the State of Delaware.

9.    This Court has personal jurisdiction over Defendants.

## FACTUAL BACKGROUND

**A.    Plaintiffs' Tretinoin Products**

10.    Spear developed and was the first to obtain FDA approvals for generic versions of the brand name Retin-A® tretinoin cream products used in the treatment of acne. Spear filed three Abbreviated New Drug Applications ("ANDA's") for 0.025%, 0.05% and 0.1% cream strengths, respectively, and all were approved by the FDA on December 24, 1998.

11.    After the successful development and approval of the three tretinoin cream products, Spear pursued FDA approval for the manufacture and sale of other generic dermatological tretinoin products.  On February 22, 2000, Spear was the first to receive FDA approval to manufacture and sell a 0.025% gel, a generic version of Johnson and Johnson's Ortho Dermatological Division's Retin-A® Gel for the treatment of acne.  Subsequently, on June 11, 2002, Spear was the first to receive FDA approval to market a 0.01% strength generic

version of the Retin-A® Gel for the treatment of acne.  Also, on September 15, 2005, Spear was

the first to receive FDA approval to market a 0.05% strength generic version of the brand name

Renova® (tretinoin emollient cream) product.  All told, Spear received five FDA approvals for

the first generic versions of Retin-A® creams and gels, as well as FDA approval for the first

generic version of the Renova® emollient cream product.

**B.      Plaintiffs' Decision to Begin Pursuing FDA Approval of a Generic Equivalent to Efudex® and the Continued Efforts Towards that End**

12.     In approximately February 1999, Plaintiffs began the process of

developing a generic equivalent to Defendant Valeant's fluorouracil cream, USP 5% product,

sold under the tradename Efudex®.

13.     According to the Efudex® package insert, the product is approved for and

"indicated" in the treatment of actinic keratosis ("AK") and is also "useful" in the treatment of

superficial basal cell carcinoma ("sBCC") when conventional methods are impractical, such as

with multiple lesions or difficult treatment sites.  AK is a lesion of the epidermis, the outer layer

of the skin.  It is considered pre-cancerous and requires treatment according to the American

Academy of Dermatology.  Pre-cancerous AK lesions are common and are most often caused by

over-exposure to sunlight.  sBCC, on the other hand, is a skin cancer which is localized in the

epidermis.  Over 98% of the prescriptions written for Efudex® are used for patients with AK.

The patents covering Efudex® expired over twenty years ago and, upon information and belief,

Plaintiffs were the first to develop and seek approval of a generic fluorouracil product.

14.     For ANDAs with multiple uses, the FDA requires that only one indication

need be studied to prove bioequivalence.  During the fluorouracil product's development phase,

beginning in June 1999, Plaintiffs consulted directly with the FDA in an effort to ensure that the

clinical trial performed in support of the proposed ANDA was correctly designed and would be performed in accordance with the rigorous standards required. Because Efudex® is used overwhelmingly for AK, Plaintiffs proposed a clinical trial in the treatment of AK, and the FDA agreed that such a trial would prove bioequivalence to the brand product with respect to both treatment indications, AK and sBCC. Once they had received that guidance from the FDA, Plaintiffs planned, developed and implemented the clinical trial.

15.    In connection with the development and clinical testing of the fluorouracil cream, USP 5% product, Plaintiffs have invested more than $6 million over the past eight years.

## C.    The Decision to Sell the Tretinoin Line to a Third Party and the Engagement of William Blair

16.    During the Spring of 2004, while Plaintiffs were actively engaged in the development of the generic Efudex® product, they decided that they wished to sell the Retin-A® generic tretinoin product line (that is, all three of the cream product strengths and the two gel product strengths) to a third party.

17.    In pursuit of this end goal, on or about April 27, 2004, Dr. Spear began to communicate with Defendant William Blair through one of its Vice Presidents, Brian Scullion, M.D. ("Scullion").

18.    After discussion of general information about the Plaintiff companies and the business, Dr. Spear determined that, in order to disclose fully the information and trade secrets necessary for Defendant William Blair to evaluate the opportunity, a confidentiality agreement should be executed.

19.    On May 6, 2004, Dr. Spear, on behalf of Plaintiff companies, and Scullion, on behalf of Defendant William Blair, executed a confidentiality agreement

5

("Confidentiality Agreement").  The purpose of the Confidentiality Agreement was to permit Plaintiffs to disclose their confidential information to Defendant William Blair, through its officer, Scullion, in connection with its evaluation of a potential transaction, with the assurance that William Blair would protect the confidentiality of the disclosed information.

20.    In the Confidentiality Agreement, Defendant William Blair agreed, through Scullion, "that all Confidential Information will be held and treated by you, your agents and employees in confidence and will not, except as required by law or as hereinafter provided, without the prior written consent of the [Plaintiffs], be disclosed by you or your agents or employees, in any manner whatsoever, in whole or in part, and will not be used by you or your agents or employees other than in connection with your evaluation of a possible transaction." Confidentiality Agreement, at p. 1.

21.    On the morning of May 10, 2004, Dr. Spear sent Scullion an e-mail specifically stating, "[a]s you are thinking of the presentation and how to promote and sell to other companies, I request that you not include Information to any of them on our pipeline that I had mentioned to you.  I wish to keep confidential in this very connected industry our Pipeline."

22.    Later that same afternoon, Scullion responded by e-mail to Dr. Spear's request with one simple word -- "[u]nderstood."

23.    In an e-mail on May 24, 2004, Dr. Spear stated that, in the presentation and discussion with the companies considering the opportunity, "we do not say what the R and D products are or where they are" in the development process.

6

24.    Just two days later, in an e-mail dated May 26, 2004, Dr. Spear again stressed to Scullion, that he was "very ill at ease to let companies 'peek under the curtain' at our R and D line."

25.    On August 2, 2004, Scullion, on behalf of Defendant William Blair, sent an e-mail with an attached letter to Plaintiffs detailing the terms of its engagement (the "Engagement Letter") for "render[ing] certain investment banking services in connection with a possible sale of tretinoin related assets of the company to another party or with the possible business combination . . . of the [Plaintiffs] with another party or a recapitalization of the [Plaintiffs] or similar restructuring."  Engagement Letter, p. 1.

26.    In the Engagement Letter, William Blair reaffirmed its obligations under the Confidentiality Agreement signed on May 6, 2004.  Further, William Blair also represented, in the Engagement Letter, "that its healthcare investment banking group is not as of the date of this letter engaged to advise or represent any of the parties contemplated as of this date as potential parties to the Possible Transaction.  Should it become so engaged by any of the parties that submit an indication of interest, it will inform Spear."  *Id.* at ¶ 8.

**D.    William's Blair's Process for Screening and Eventually Choosing Proposed Purchasers for the Spear Tretinoin Line of Products**

27.    In the Engagement Letter, William Blair set forth its plan with regard to the services that would be rendered in connection with the proposed transaction.  Specifically, William Blair and Scullion undertook the responsibility, *inter alia*, to assist Plaintiffs "in (i) developing a strategy for pursuing a Possible Transaction involving the [Plaintiffs] and a list of possible participants in the Possible Transaction . . . (ii) preparing a descriptive memorandum

. . . and (iii) contacting and eliciting interest from those possible participants expressly approved by the [Plaintiffs]."  *Id.* at ¶ 1b.

28.    Further, in the Engagement Letter, William Blair set forth its expectation that Scullion would "lead and supervise the Possible Transaction."  *Id.* at ¶ 1c.

29.    Plaintiffs' trust in Scullion was so strong that Plaintiffs negotiated and won inclusion of a specific term that permitted, in the event that Scullion did not continue with William Blair and Plaintiffs decided to terminate the engagement, the required cooling off period before Plaintiffs could sign with another company to be cut by half to nine months to permit Plaintiff to follow Scullion to any new employer.  Engagement Letter, ¶ 5.

30.    As part of the process of screening possible purchasers, Scullion forwarded what he called the "A-list parties" *via* e-mail on September 3, 2004.  Among those companies was Defendant Valeant.  William Blair did not disclose the nature and extent of its business relationship with Valeant at that time.  Upon information and belief, William Blair had an investment banking relationship with Valeant and followed Valeant stock closely.  Indeed, according to the Quarterly Schedule of Portfolio Holdings (Form N-Q) filed with the Securities and Exchange Commission on November 22, 2004, the William Blair Growth Fund held over $1.7 million in Valeant stock as of September 30, 2004.

31.    During the search for a possible participant in the proposed transaction, Scullion sent to Plaintiffs, on a regular (*i.e.*, weekly, or near weekly) basis, a list of contacts he had made in furtherance of his search.  Additionally, as required by the Engagement Letter, Plaintiffs expressly approved the specific possible participants prior to the disclosure of any confidential information to them.  *See* Engagement Letter, ¶ 1b.

8

E.        **Valeant's Evaluation Agreement and Refusal of the Opportunity**

32.      On September 23, 2004, William Blair, through its officer Scullion executed an agreement with Defendant Valeant in order to permit Valeant's evaluation of Plaintiffs' confidential information with a guarantee that Valeant would hold such information secret and would not use such information for any other purpose than to evaluate the proposed transaction (the "Evaluation Agreement").

33.      Specifically, by executing the Evaluation Agreement, Valeant agreed, *inter alia*, "to treat any information, knowledge or data concerning the [Plaintiffs] which is furnished to [it] by or on behalf of [Plaintiffs], whether furnished before, on or after the date of this Agreement [defined as the "Evaluation Material"], in accordance with the provisions of this Agreement. . . .   [T]he Evaluation Material will be used by you solely for the purpose of evaluating a Possible Transaction between the [Plaintiffs] and you.  In addition, you agree not to disclose the Evaluation Material to any person and agree to keep the evaluation material confidential."  Evaluation Agreement, p. 1.

34.      As evidenced by the Evaluation Agreement, it was Defendants' intent that Plaintiffs be third party beneficiaries to the Evaluation Agreement and the obligations set forth therein.  Indeed, the Evaluation Agreement specifically provided that Plaintiffs were third-party beneficiaries of the Evaluation Agreement.   Evaluation Agreement, p. 2 ("The terms, conditions and covenants of this Agreement shall be binding upon you, your Agents, and each of your respective successors, and *is for the benefit of Company [i.e., Plaintiffs]* and William Blair. . . ") (emphasis added).

35.    On October 11, 2004, Scullion sent, as part of the status update, a list of prospective participants to Plaintiffs.  The list noted that Valeant had received the memorandum and was assessing its interest in the opportunity.  Further, the status chart identified October 14, 2004, as the "Indication Due Date" for Valeant.

36.    On or about October 15, 2004, during a discussion with Dr. Spear, Scullion stated that Valeant was interested in the opportunity but had dropped out because of the price.

37.    On October 18, 2004, Plaintiffs received an updated status chart from Scullion.  This update included an indication that since the last update, and in keeping with the "Indication Due Date" set forth in the previous update, Valeant had "declined" the offer.

**F.    Plaintiffs' Communication of Confidential Information to Scullion and Plaintiffs' Subsequent Filing of Their ANDA**

38.    Following execution of the Confidentiality Agreement, on May 13, 2004, at their first face-to-face meeting in Ft. Myers, Florida, Plaintiffs provided Scullion with confidential information that the generic Efudex® product was in Spear's product development pipeline.  Additional information about the pipeline was presented to Scullion -- at his request -- during a July 28, 2004 meeting in Chicago between Spear and Scullion.  On October 31, 2004, Dr. Spear sent Scullion an e-mail that included additional confidential information revealing that the generic Efudex® fluorouracil cream, USP 5% product was in development, that a "318 patient Bioequivalence study [was] completed," and that Plaintiffs expected that an ANDA for the product would be filed in late November 2004.  *Id.*  Dr. Spear prefaced this information with the comment that he didn't "really want to talk about the next two but for your information."  *Id.*  Dr. Spear also told Scullion that the clinical trial was for actinic keratosis.  Thus, by October 31,

2004, Scullion knew not only Spear's anticipated ANDA filing date but key details concerning

Spear's bioequivalence study -- and that Plaintiffs had conducted only a single study.

39.    On information and belief, throughout the summer and fall of 2004 (at

which time the William Blair Growth Fund held over $1.7 Million in Valeant stock), Scullion

repeatedly flew to California to meet with Valeant on the Spear opportunity, as well as other

business relationships.  Scullion was familiar with upper level management at Valeant and, on

information and belief, had worked with them before on other matters.

40.    Plaintiffs filed their ANDA with the FDA seeking approval to

manufacture and sell their fluorouracil cream, USP 5% product, a generic version of Valeant's

Efudex® product, on January 3, 2005, and it was accepted for filing by the FDA on January 6,

2005.

## G.    Valeant's Filing of a Citizen's Petition to Block Approval

41.    On information and belief, prior to December 21, 2004, Scullion

communicated to Valeant the confidential information he had received from Dr. Spear

concerning Plaintiffs' expected filing of their ANDA seeking approval to manufacture and

market the generic fluorouracil cream, USP 5% product.  On December 21, 2004, Valeant filed a

Citizen's Petition in an attempt to block the approval of a generic equivalent to its Efudex®

product.

42.    The December 21, 2004 Citizen's Petition filed by Valeant was the first

and only instance in the more than twenty years since Efudex® had gone off patent (thus opening

the product up for generic competition) that Valeant had filed a Citizen's Petition with respect to

Efudex®. On information and belief, the timing of the Citizen's Petition was not coincidental --
it was reflective of the confidential information that had been improperly leaked to Valeant.

43. In the Citizen's Petition, Valeant requested that the FDA "[r]efrain from
approving an [Abbreviated New Drug] application unless an application includes a sBCC study."
The specificity of the requested relief reflects that Valeant had learned not only of Plaintiffs'
confidential information with respect to Plaintiffs' plan for filing an ANDA, but also the precise
nature of the clinical trial they had conducted.

44. Congress has recognized that the Citizen Petition process has been used by
certain pharmaceutical companies for the improper purpose of delaying FDA approval of generic
products, as evidenced by the recent introduction, passage and enactment into law on
September 27, 2007 of amendments to the Federal Food, Drug, and Cosmetic Act directing the
FDA not to delay approval of ANDAs based on the filing of a Citizen Petition. *See* Food and
Drug Administration Amendments Act of 2007 § 914(a), 21 U.S.C. § 355. Remedying past
abuse of the Citizen Petition process was a primary motivation for passage of the legislation, as
evidenced by the following comments from the legislative history of the Act and other related
legislation before Congress at the time:

From legislative history of Food and Drug Administration Amendments Act of 2007:

> "Let us be clear: The citizen petition provision is designed to address attempts to derail
> generic drug approvals. Those attempts, when successful, hurt consumers and the public
> health." 153 Cong. Rec. S11841 (daily ed. Sept. 20, 2007) (statement of Sen. Kennedy).

> "The bill also takes action on the abuse of citizen petitions. . . . This procedure should be
> used to protect public health -- but too often, it is subverted by those who seek only to
> delay the entry onto the market of generic drugs. Even if the petitions are found to be
> meritless, they will have accomplished their mission -- delaying access for consumers to
> safe and lower cost medicines." 153 Cong. Rec. S11938 (daily ed. Sept. 21, 2007)
> (statement of Sen. Kennedy).

From legislative history of the Citizen Petition Fairness and Accuracy Act of 2007 -- introduced on January 4, 2007:

> "The legislation I introduce today . . . targets one particularly pernicious practice by brand name drug companies to impeded or block the marketing of generic drugs -- abuse of the FDA citizen petition process."  153 Cong. Rec. S64 (daily ed. Jan. 4, 2007) (statement of Sen. Kohl).

> "While this citizen petition process was put in place for a laudable purpose, unfortunately in recent years it has been abused by frivolous petitions submitted by brand name drug manufacturers (or individuals acting on their behest) whose only purpose is to delay the introduction of generic competition."  153 Cong. Rec. S64 (daily ed. Jan. 4, 2007) (statement of Sen. Kohl).

> "Indeed, brand name drug manufacturers often wait to file citizen petitions until just before the FDA is about to grant the application to market the new generic drug solely for the purpose of delaying the introduction of the generic competitor for the maximum amount of time possible.  This gaming of the system should not be tolerated."  153 Cong. Rec. S65 (daily ed. Jan. 4, 2007) (statement by Sen. Kohl).

> "Of the 21 citizen petitions for which the FDA has reached a decision since 2003, 20 -- or 95 percent of them -- have been found to be without merit.  Of these, ten were identified as "eleventh hour petitions," defined as those filed less than 6 months prior to the estimated entry date of the generic drug.  None of these ten "eleventh hour petitions" were found to have merit, but each caused unnecessary delays in the marketing of the generic drug by months or over a year. . . ."  153 Cong. Rec. S65 (daily ed. Jan. 4, 2007) (statement by Sen. Kohl).

**H**.    **Valeant's Change of Heart With Respect to the Tretinoin Product Opportunity**

45.    Only eight days after Valeant filed its Citizen Petition, on December 29, 2004, Valeant submitted a "preliminary, non-binding indication of interest" to William Blair, through its officer Scullion, to purchase Plaintiffs' tretinoin product line (the "Offer Letter"). Scullion subsequently presented the Offer Letter to Plaintiffs.  The Offer Letter included general terms for the purchase of the assets, offering an up front payment as well as royalties based on sales milestones for the five years following the proposed purchase.

46.     This Offer Letter was sent more than two months after Valeant declined the proposed transaction and a mere eight days after it had filed its Citizen Petition on December 21, 2004.  Upon information and belief, this offer was a pretense so that Valeant could gain more information on Spear -- the potential competitor to Valeant's Efudex 5% cream product, which represented Valeant's single largest revenue-producing product in the United States in 2004.  At the time the Offer Letter was sent, Plaintiffs were already in negotiations with another company to sell the tretinoin product line, and Valeant's offer was rejected.

**I.     Plaintiffs' Discovery of the Citizen Petition and Activity Thereafter**

47.     Plaintiffs first learned of Valeant's Citizen Petition from the FDA on April 19, 2005, when they called the FDA to check on the status of their application.  Plaintiffs were told by the FDA on that date that Valeant had filed a Citizen Petition requesting that no ANDA be approved if the bioequivalence study supporting the ANDA had been done only in AK patients, and that the FDA was reviewing that Citizen Petition.

48.     Given that the FDA had reviewed, provided guidance and approved Plaintiffs' planned clinical trial addressing treatment of AK and agreed that such a trial would be sufficient to demonstrate bioequivalence to the brand product, the news of the Citizen Petition was a shock to Plaintiffs.

49.     Because of the delay caused by Valeant's filing of its Citizen Petition, Plaintiffs have been awaiting FDA approval for their generic fluorouracil cream, USP 5% product since January 6, 2005 -- over three years -- more than twice the 16.6 month average time for approval of such applications.  Had Valeant not filed its Citizen Petition, Plaintiffs' ANDA would have been approved long ago.

14

50.     In December 2006, Valeant launched an authorized generic fluorouracil cream, USP 5% product through Oceanside, another generic pharmaceutical company.  Because of the delay in FDA approval for the Spear product caused by the filing of Valeant's Citizen Petition, the Valeant-sponsored Oceanside generic remains the only generic Efudex ® equivalent approved for marketing by the FDA.  Upon information and belief, Valeant launched this authorized generic product only because of its access to Plaintiffs' confidential information.

**J.      Approval of the Spear Fluorouracil ANDA and Denial of Valeant's Citizen Petition**

51.     On April 11, 2008, more than three years after its filing, the FDA approved the Spear Fluorouracil ANDA because the ANDA was supported by "adequate information . . . to demonstrate that the drug is safe and effective for use in the submitted labeling" (*see* Exhibit A).

52.     On that same day, the FDA denied Valeant's Citizen Petition (*see* Exhibit B).

**COUNT I**

**BREACH OF CONTRACT**
**AGAINST WILLIAM BLAIR**
**(THE CONFIDENTIALITY AGREEMENT)**

53.     Plaintiffs incorporate by reference paragraphs 1-52 as if fully set forth herein.

54.     Plaintiffs performed their obligations under the Confidentiality Agreement.

15

55.    Under the Confidentiality Agreement, William Blair was obligated to hold Plaintiffs' confidential information in confidence and not disclose such information without Plaintiffs' prior written consent.

56.    In the Engagement Letter, William Blair reaffirmed its obligation under the Confidentiality Agreement.

57.    On information and belief, William Blair breached its obligations and, contrary to Plaintiffs' repeated instructions, revealed to Valeant Plaintiffs' confidential information regarding, *inter alia*, at least, Plaintiffs' plans to file an ANDA for a generic fluorouracil product and Plaintiffs' bioequivalence testing.

58.    This breach of the Confidentiality Agreement has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT II

### BREACH OF CONTRACT
### AGAINST WILLIAM BLAIR
### (THE ENGAGEMENT LETTER)

59.    Plaintiffs incorporate by reference paragraphs 1-58 as if fully set forth herein.

60.    Plaintiffs have performed all of their obligations under the Engagement Letter.

61.    In the Engagement Letter, William Blair reaffirmed its obligation under the Confidentiality Agreement to keep confidential all information communicated to it during the performance of its duties and obligations pursuant to that engagement.

16

62.     In addition, under the terms of the Engagement Letter, William Blair was obligated to inform Plaintiffs if it had any preexisting business relationship with any party requesting to evaluate the transaction.  William Blair did not disclose the nature and extent of its business relationship with Valeant.

63.     On information and belief, William Blair breached its obligations by failing to disclose the nature and extent of its business relationship with Valeant and by revealing to Valeant Plaintiffs' confidential information regarding, *inter alia*, Plaintiffs' plans for a future FDA filing and Plaintiffs' bioequivalence testing.

64.     This breach of the Engagement Letter has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT III

## BREACH OF CONTRACT AGAINST VALEANT
## (THE EVALUATION AGREEMENT)

65.     Plaintiffs incorporate by reference paragraphs 1-64 as if fully set forth herein.

66.     Valeant and William Blair intended that Plaintiffs benefit from the Evaluation Agreement and specifically identified Plaintiffs as third-party beneficiaries of that Agreement.

67.     The benefit of the Evaluation Agreement to Plaintiffs was in furtherance of a pre-existing obligation that William Blair owed Plaintiffs under various agreements.

68.     The benefit of the Evaluation Agreement to Plaintiffs was a material part of Defendants' purpose in entering into the Evaluation Agreement, *i.e.*, the confidential

disclosure of information, and the evaluation thereof, in connection with the possible purchase of Plaintiffs' tretinoin product line.

69.    Valeant was obligated under the Evaluation Agreement, *inter alia*, to keep confidential all information communicated to it, either by William Blair or Plaintiffs, during the evaluation of the proposed transaction and to use the confidential information provided to it only for such evaluation.

70.    On information and belief, Valeant breached its obligation and, *inter alia*, used Plaintiffs' confidential information as a basis for filing its Citizen Petition with the FDA and as a basis for determining its own strategies with respect to the launch of an "authorized generic" product.

71.    This breach of the Evaluation Agreement has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT IV

### BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING
### AGAINST WILLIAM BLAIR

72.    Plaintiffs incorporate by reference paragraphs 1-71 as if fully set forth herein.

73.    On information and belief, William Blair and Valeant had previously partnered in substantial financial transactions.  On information and belief, these transactions included, at least, William Blair serving as an investment banker for Valeant.   As of September 30, 2004, the William Blair Growth Fund held over $1.7 million in Valeant stock.

18

74. On information and belief, William Blair, through its agent, Scullion, disclosed Plaintiffs' confidential information with respect to Plaintiffs' upcoming ANDA filing and its bioequivalence testing.

75. Under the Engagement Letter and the Confidentiality Agreement, William Blair had an implied obligation of good faith and fair dealing to Plaintiffs.

76. On information and belief, William Blair breached its obligation of good faith and fair dealing by communicating Plaintiffs' confidential information concerning its upcoming fluorouracil cream, USP 5% product ANDA filing to Valeant, a known competitor, with whom William Blair had previous financial dealings, and which it knew to be the seller of the corresponding brand Efudex® product, and by delivering to Plaintiffs a sham offer from Valeant to purchase Plaintiffs' tretinoin product line that was made in bad faith. Specifically, the Valeant offer was made with the objective of permitting Valeant to obtain additional confidential information about Plaintiffs' competitive product and plans.

77. On information and belief, William Blair, through Scullion, communicated this information to Valeant in an attempt to enrich both itself and Valeant at the expense of Plaintiffs by warning Valeant of the threat to its monopoly on the sale of Efudex®. Both Valeant and William Blair were in fact so enriched.

78. This breach of the implied covenant of good faith and fair dealing has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT V

## TRADE SECRET MISAPPROPRIATION AGAINST DEFENDANTS

79.    Plaintiffs incorporate by reference paragraphs 1-78 as if fully set forth herein.

80.    The information relating to the bioequivalence study and the nature and timing of its ANDA filing constituted Plaintiffs' trade secrets.

81.    Plaintiffs took reasonable precautions to protect their trade secrets, by, *inter alia*, requiring that any company evaluating the proposed transaction, including Valeant, as well as, William Blair, agree in writing to keep such information confidential and to use it only for the purposes for which it was revealed.

82.    Plaintiffs communicated their trade secrets to William Blair, and, on information and belief, William Blair communicated those trade secrets to Valeant.

83.    The confidentiality obligations undertaken by William Blair and Valeant were in full force and effect from at least the time Plaintiffs disclosed their trade secrets to William Blair to at least the time Valeant filed its Citizen Petition with the FDA challenging the adequacy of a bioequivalence study of the type conducted by Plaintiffs.

84.    On information and belief, William Blair misappropriated Plaintiffs' trade secrets by disclosing confidential information about Plaintiffs' generic fluorouracil product, including, *inter alia*, details concerning the bioequivalence study and the timing of the ANDA filing, to Valeant without Plaintiffs' prior written consent, and Valeant misappropriated Plaintiffs' trade secrets by using them for a purpose other than evaluation of the purchase of the

20

Plaintiffs' tretinoin product line, in violation of one or more of the following statutes: 6 Del. C. § 2001, et seq. (Delaware Trade Secrets Act), and 765 I.L.C.S. 1065 (Illinois Trade Secrets Act).

85.    This misappropriation of the Plaintiffs' trade secrets has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT VI

## UNJUST ENRICHMENT AGAINST VALEANT

86.    Plaintiffs incorporate by reference paragraphs 1-85 as if fully set forth herein.

87.    Valeant has been enriched as a result of its improper use of Plaintiffs' confidential information because, *inter alia*, Valeant's filing of its Citizen Petition has operated to delay approval of Plaintiffs' ANDA thereby resulting in the extension of Valeant's monopoly hold on the Efudex® market and Valeant's subsequent successful startup of Oceanside, its authorized generic, enabling Valeant to benefit substantially from being the first generic entrant to the market and positioning Valeant for long term benefit.

88.    As a result of Valeant's enrichment, Plaintiffs have been harmed by not being able to capitalize on their investment in the research and development and capital expenditures that were incurred to support and file their ANDA.

89.    Plaintiffs' losses are directly related to, and, in fact, are a direct result of, the actions Valeant took after, on information and belief, it acquired Plaintiffs' confidential information.

90.    There is no justification for Valeant's actions.

91.    The losses Plaintiffs have suffered as a result of Valeant's actions and consequential enrichment are not addressable by a remedy at law.

## COUNT VII

## <u>NEGLIGENCE AGAINST WILLIAM BLAIR</u>

92.    Plaintiffs incorporate by reference paragraphs 1-91 as if fully set forth herein.

93.    William Blair represented that the firm had extensive experience in locating and developing potential purchasers and/or backers for pharmaceutical based investments.

94.    As a result of its extensive experience, Plaintiffs put special trust in William Blair to protect their interests and advise them with respect to the proposed transaction.

95.    As a firm of professionals, holding themselves out as specialists in the applicable field, in addition to the duties and obligations required under the various contracts, William Blair owed Plaintiffs a duty to, *inter alia*, protect their confidential information and to act in the best interests of their clients, Plaintiffs.

96.    William Blair breached its duty of care by, *inter alia*, negligently and in a grossly negligent fashion:  (a) failing to disclose the nature and extent of its preexisting business relationship with Valeant; (b) on information and belief, revealing the Plaintiffs' confidential information to a known competitor; and (c) delivering to Plaintiffs an offer from Valeant for the tretinoin product line that, on information and belief, William Blair knew or should have known was made in bad faith.

97.    The breach of the duty of care committed by William Blair proximately caused substantial damage to Plaintiffs, in an amount exceeding $125 million.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, Spear Pharmaceuticals, Inc. and Spear Dermatology Products, Inc., pray that the Court award them the following relief:

A.    a judgment that William Blair has breached the Confidentiality Agreement;

B.    a judgment that William Blair has breached the Engagement Letter;

C.    a judgment that Valeant has breached the Evaluation Agreement;

D.    a judgment that William Blair has breached the implied duty of good faith and fair dealing;

E.    a judgment that Defendants misappropriated Plaintiffs' trade secrets;

F.    a judgment that Defendant Valeant was unjustly enriched;

G.    a judgment that William Blair was negligent;

H.    an award of compensatory damages in the amount of $125 million;

I.    an award of punitive damages in an amount to be determined at trial;

J.    an award of reasonable attorneys' fees and costs; and

K.    such further relief as this Court may deem necessary, just, and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs hereby demand a jury trial on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Plaintiffs Spear Pharmaceuticals, Inc.*
*and Spear Dermatology Products, Inc.*

OF COUNSEL:

Steven Lieberman
Jason M. Shapiro
Lisa N. Phillips
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K Street, N.W.
Suite 800
Washington, DC  20005
(202) 783-6040

April 16, 2008

# TAB A

ANDA 77-524



# OFFICE OF GENERIC DRUGS

Food and Drug Administration
HFD-600, Metro Park North II
7500 Standish Place, Room 150
Rockville, MD 20855-2773
Fax: 240-276-9327

## FAX TRANSMISSION COVER SHEET

APPLICANT: Spear Pharmaceuticals, Inc.          TEL: (631) 476-5860

ATTN: David Christ                              FAX: (631) 476-5860

FROM: Rosalyn Adigun                            PROJECT MANAGER: (240) 276-8518

Dear Sir:

This facsimile is in reference to your abbreviated new drug application dated December 22, 2004, submitted pursuant to Section 505(j) of the Federal Food, Drug, and Cosmetic Act for Fluorouracil Cream USP, 5%.


We are pleased to inform you that this application is APPROVED!

THIS DOCUMENT IS INTENDED ONLY FOR THE USE OF THE PARTY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, OR PROTECTED FROM DISCLOSURE UNDER APPLICABLE LAW.
If received by someone other than the addressee or a person authorized to deliver this document to the addressee, you are hereby notified that any disclosure, dissemination, copying, or other action to the content of this communication is not authorized. If you have received this document in error, please immediately notify us by telephone and return it to us by mail at the above address.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
Rockville, MD 20857

ANDA 77-524

Spear Pharmaceuticals, Inc.
Attention: K.L. Spear, M.D.
            President,
14882 Belleza Lane
Naples, FL 34110

Dear Sir:

This is in reference to your abbreviated new drug application
(ANDA) dated December 22, 2004, submitted pursuant to section
505(j) of the Federal Food, Drug, and Cosmetic Act (the Act),
for Fluorouracil Cream USP, 5 %.

Reference is also made to your amendments dated July 11, 2005,
August 2, 2005, August 18, 2005, January 9, 2006, January 16,
2006, January 26, 2007 and March 14, 2007.

We have completed the review of this ANDA and have concluded
that adequate information has been presented to demonstrate that
the drug is safe and effective for use as recommended in the
submitted labeling. Accordingly the ANDA is approved. The
Division of Bioequivalence has determined your Fluorouracil
Cream USP, 5 % to be bioequivalent and, therefore,
therapeutically equivalent to the reference listed drug,
Efudex Topical Cream, 5%, of Valeant Pharmaceuticals
International.

Under section 506A of the Act, certain changes in the conditions
described in this ANDA require an approved supplemental
application before the change may be made.

Postmarketing reporting requirements for this ANDA are set forth
in 21 CFR 314.80-81 and 314.98. The Office of Generic Drugs
should be advised of any change in the marketing status of this
drug.

Promotional materials may be submitted to FDA for comment prior
to publication or dissemination. Please note that these

submissions are voluntary. If you desire comments on proposed launch promotional materials with respect to compliance with applicable regulatory requirements, we recommend you submit, in draft or mock-up form, two copies of both the promotional materials and package insert(s) directly to:

> Food and Drug Administration
> Center for Drug Evaluation and Research
> Division of Drug Marketing, Advertising, and Communications
> 5901-B Ammendale Road
> Beltsville, MD 20705

We call your attention to 21 CFR 314.81(b)(3) which requires that all promotional materials be submitted to the Division of Drug Marketing, Advertising, and Communications with a completed Form FDA 2253 at the time of their initial use.

> Sincerely yours,
>
> {See appended electronic signature page}
>
> Gary Buehler
> Director
> Office of Generic Drugs
> Center for Drug Evaluation and Research

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

/s/
-----------------------
Gary Buehler
4/11/2008 10:08:06 AM

TAB B



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

_____

Food and Drug Administration
Rockville MD 20857

Kim D. Lamon, M.D., Ph.D.                              APR 1 1 2008
Greg J. Kricorian, M.D.
Valeant Pharmaceuticals International
3300 Hyland Avenue
Costa Mesa, CA 92626

                        Re:    Docket No. 2004P-0557/CP1

Dear Dr. Lamon and Dr. Kricorian:

This letter responds to the citizen petition submitted to the Food and Drug Administration (FDA)
by Valeant Pharmaceuticals International (Valeant) on December 21, 2004 (Petition). The
petition requests that FDA refrain from approving any abbreviated new drug application
(ANDA) submitted under section 505(j) of the Federal Food, Drug, and Cosmetic Act (the Act)
(21 U.S.C. 355(j)) for a generic version of Efudex (fluorouracil) Cream, unless the application
contains data from an adequately designed comparative clinical study conducted in patients with
superficial basal cell carcinoma.[1]

Valeant submitted additional correspondence to the docket on October 21, 2005, April 3, 2006,
and July 13, 2006. On November 7, 2006, Hogan & Hartson LLP submitted supplemental
information on behalf of Valeant. The law firm of Rothwell, Figg, Ernst and Manbeck, P.C.,
submitted comments to the docket in opposition to the petition on September 16, 2005,
January 3, 2006, and May 5, 2006.

We have carefully considered the issues raised in your petition, your additional correspondence,
and the comments submitted to the docket. For the reasons stated below, your petition is
denied.[2]

## I.      BACKGROUND

### A.      Efudex Cream

In 1970, Efudex (fluorouracil) Cream, 5%, and Solution, 2% and 5%, (NDA 16-831) were
approved for the topical treatment of multiple actinic (or solar) keratoses (AK). AKs are
precancerous growths in the epidermis and may protrude into the upper dermis. Rarely, AKs
may progress to squamous cell carcinoma.

_____

[1] As noted in your petition, your request also applies to any new drug application (NDA) submitted under section
505(b)(2) of the Act that references Efudex Cream for its currently approved uses. Because there are many
possibilities and variations for 505(b)(2) applications that might rely on our findings of safety or effectiveness for
Efudex Cream, we are unable to anticipate what we would require for each of these types of applications.
Therefore, we deny the 505(b)(2) aspect of your request and we do not address it further in this response.

[2] Today, we are approving an ANDA for a generic fluorouracil cream, 5%, consistent with the analysis described in
this petition response.

Docket No. 2004P-0557/CP1

In 1976, we also approved Efudex Cream, 5%, and Solution, 5%, for the treatment of superficial basal cell carcinomas (sBCC) when conventional methods are impractical, such as with multiple lesions or difficult treatment sites. Like AK, basal cell carcinoma occurs in the epidermis and may protrude into the dermis. Product labeling for the sBCC indication states that "[t]he diagnosis should be established prior to treatment, since this method has not been proven effective in other types of basal cell carcinomas. With isolated, easily accessible basal cell carcinomas, surgery is preferred since success with such lesions is almost 100 [percent]. The success rate with Efudex Cream and Solution is approximately 93 [percent], based on 113 lesions in 54 patients. Twenty-five lesions treated with the solution produced 1 failure and 88 lesions treated with the cream produced 7 failures."

The importance of patient follow-up after completing treatment is emphasized under *Dosage and Administration*:

> Actinic or Solar Keratosis: "Complete healing of the lesions may not be evident for 1 to 2 months following cessation of Efudex therapy."

> Superficial Basal Cell Carcinomas: "As in any neoplastic condition, the patient should be followed for a reasonable period of time to determine if a cure has been obtained."

### B.    Statutory and Regulatory Basis for ANDA Approval

The Drug Price Competition and Patent Term Restoration Act of 1984 (Public Law 98-417) (the Hatch-Waxman Amendments) created section 505(j) of the Federal Food, Drug, and Cosmetic Act (the Act), which established the current ANDA approval process. To obtain approval, an ANDA applicant is not required to submit evidence to establish the clinical safety and effectiveness of the drug product; instead, an ANDA relies on FDA's previous finding that the RLD[3] is safe and effective. Under the Hatch-Waxman Amendments, to rely on a previous finding of safety and effectiveness, an ANDA applicant must demonstrate, among other things, that its generic[4] drug is bioequivalent to the RLD.[5] In addition, a drug product described in an

---

[3] A reference listed drug or RLD is "the listed [i.e., approved] drug identified by FDA as the drug product upon which an applicant relies in seeking approval of its abbreviated application" (21 CFR 314.3). RLDs are identified in FDA's "Approved Drug Products With Therapeutic Equivalence Evaluations," which is generally known as the "Orange Book."

[4] For purposes of this response, the term *generic drug* refers to new drug products for which approval is sought in an ANDA submitted under section 505(j) of the Act.

[5] See, e.g., section 505(j)(2)(A)(iv) of the Act (requiring "information to show that the new drug is bioequivalent to the listed drug referred to in clause (i) [i.e., listed drug]..."); 21 CFR 314.3 (defining *reference listed drug*); 21 CFR 314.94(a)(7) (requiring, as part of ANDA content and format, information to show that the drug product is bioequivalent to the reference listed drug upon which the applicant relies); 21 CFR 314.127(a)(6)(i)(providing that FDA will refuse to approve an ANDA if information submitted is insufficient to show that the drug product is

Docket No. 2004P-0557/CP1

ANDA generally must contain the same active ingredient,[6] conditions of use,[7] route of administration, dosage form, strength,[8] and (with certain permissible differences) labeling[9] as the RLD, unless a petition for certain changes is approved by the Secretary[10] (sections 505(j)(2)(A), (j)(2)(C), and (j)(4) of the Act). Drug products that meet the approval requirements under section 505(j) and are both bioequivalent and pharmaceutically equivalent[11] to the RLD are considered by FDA to be therapeutically equivalent to the RLD. Therapeutically equivalent drugs generally may be substituted for each other with the expectation that the substituted product will produce the same clinical effect and safety profile when used according to the labeling.[12]

To obtain approval of a generic drug, an ANDA applicant must demonstrate that its proposed drug product is bioequivalent to the RLD (section 505(j)(2)(A)(iv) of the Act). Section 505(j)(8)(B)(i) of the Act states that a generic drug is bioequivalent to the RLD if:

> . . . the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses . . . .[13]

In 21 CFR 320.1(e), FDA defines bioequivalence (in part) as:

> . . . the absence of a significant difference in the rate and extent to which the active ingredient or active moiety . . . becomes available at the site of drug action

---

bioequivalent to the listed drug referred to in the ANDA); and the Orange Book at ix (defining *reference listed drug*).

[6] See, e.g., 21 CFR 314.94(a)(5).

[7] See, e.g., 21 CFR 314.94(a)(4).

[8] See, e.g., 21 CFR 314.94(a)(6).

[9] See, e.g., 21 CFR 314.94(a)(8).

[10] An applicant may submit an ANDA for a drug that has a different active ingredient, route of administration, dosage form, or strength from the RLD if the applicant has submitted a petition to the Agency (known as a *suitability petition*) requesting permission to file such an application and has received the Agency's approval (see section 505(j)(2)(C) of the Act and 21 CFR 314.93).

[11] Pharmaceutically equivalent drug products have identical dosage forms that contain identical amounts of the identical active drug ingredient and meet the identical compendial or other applicable standard of identity, strength, quality, and purity, including potency and, where applicable, content uniformity, disintegration times, and/or dissolution rates. They do not necessarily contain the same inactive ingredients and may also differ in characteristics such as shape, scoring, release mechanism, and, within certain limits, labeling (see 21 CFR 320.1 and the Orange Book, Introduction at p. vii).

[12] See Orange Book, Introduction at p.viii.

[13] See also 21 CFR 320.1(e) and 320.23(b).

Docket No. 2004P-0557/CP1

when administered at the same molar dose under similar conditions in an appropriately designed study.

Because a generic drug must contain the same active ingredient as the RLD, a showing that the active ingredient or therapeutic ingredient in the proposed generic drug reaches the site of action at a rate and extent that is not significantly different from that of the RLD, along with other information required for approval, permits FDA to conclude that the proposed generic drug can be expected to behave the same way in the body as the RLD. One purpose of bioequivalence testing is to determine whether differences in formulation (i.e., inactive ingredients) between a proposed generic drug and the RLD have an impact on the rate and extent to which the active ingredient becomes available at the site of action.

The determination of bioequivalence of drug products whose primary mechanism of action depends on systemic absorption (i.e., two solid oral dosage forms) generally rests on a comparison of drug and/or metabolite concentrations in an accessible biologic fluid, such as blood or urine, after administration of a single or multiple doses of each drug product to healthy volunteers. When this methodology is not appropriate, for example, because a drug product is locally acting, FDA may, as described in provisions of the Act and 21 CFR part 320, rely on other in vivo and in vitro methods to assess bioequivalence. FDA regulations describe these methods in descending order of accuracy, sensitivity, and reproducibility, including (1) in vivo pharmacodynamic effect studies, (2) clinical trials, (3) in vivo animal studies, and (4) in vitro studies.[14]

FDA generally has relied on in vivo pharmacodynamic or clinical studies to assess bioequivalence of drug products that do not produce measurable concentrations of drug or metabolite in an accessible biologic fluid. For example, for many years, FDA has used pharmacodynamic effect studies to approve generic topical corticosteroid drug products. Studies evaluating blanching or vasoconstriction of the skin microvasculature provide evidence for the amount of drug entering the skin and thus serve as the basis for comparing drug delivery from two potentially equivalent topical corticosteroid formulations.[15] With few exceptions, these products are indicated for the treatment of a broad range of conditions, i.e., for inflammatory and pruritic manifestations of corticosteroid-responsive dermatoses. Some of the more responsive conditions include atopic dermatitis, seborrheic dermatitis, and lichen simplex chronicus, conditions that are characterized by epidermal and dermal involvement.[16] For these products, FDA has determined that it is not necessary to test for bioequivalence in every clinical indication.

---

[14] 21 CFR 320.24.

[15] See the guidance for industry on *Topical Dermatologic Corticosteroids: In vivo bioequivalence*, available on the Internet at http://www.fda.gov/cder/guidance/index.htm.

[16] Walter F. Lever and Gundula Schaumburg-Lever (eds.). Histopathology of the Skin, 7th Edition, JB Lippincott Company, Philadelphia, 1990. Chapter 7, Noninfectious Vesicular and Bullous Diseases.

Docket No. 2004P-0557/CP1

In the case of locally acting topical fluorouracil (5-FU) products, there are no pharmacodynamic endpoints that can be readily measured; hence, decisions regarding the bioequivalence of two potentially equivalent 5-FU formulations are to be based on evidence of comparative efficacy and safety in clinical trials. However, even when clinical trials are needed, it has not been the Agency's policy to require that bioequivalence be shown in every indication if drug release from the dosage form and appearance at the site or sites of activity has been demonstrated.[17] The choice of which study design to use is based on the ability of the design to compare the drug delivered by the two products at the particular site of action of the drug. The courts have expressly upheld FDA's regulatory implementation of the Act's bioequivalence requirements.[18]

## II.    DISCUSSION

Your petition makes several arguments in support of your request that FDA refrain from approving any ANDA submitted under section 505(j) of the Act for a generic version of Efudex (fluorouracil) Cream, unless the application contains data from an adequately designed comparative clinical study conducted in patients with superficial basal cell carcinoma. These arguments, and the Agency's responses, are discussed in this section of the response.

### A.    Comparative Clinical Studies To Demonstrate the Bioequivalence of 5-FU Products

You state that FDA "has yet to define a validated methodology by which sponsors may establish the bioequivalence of topical dermatological products [other than corticosteroids] through the use of pharmacokinetic measures." In the absence of suitable pharmacokinetic or pharmacodynamic endpoints, you argue that the sponsor of a generic topical 5-FU product must conduct at least one comparative clinical study to establish bioequivalence of its product to the RLD.[19]

The Act does not require comparative clinical studies to demonstrate bioequivalence; in fact, it gives FDA the authority to "establish alternative, scientifically valid methods to show bioequivalence if the alternative methods are expected to detect a significant difference between the drug and the listed drug in safety and therapeutic effect" (section 505(j)(8)(C)). Although clinical bioequivalence studies are not necessarily required for locally acting topical formulations, in the absence of pharmacodynamic endpoints, it has generally been FDA's policy to use clinical studies to evaluate bioequivalence (except for solutions). After considering the specific characteristics of Efudex, including the indications for which it is approved, we agree

---

[17] See, e.g., Citizen Petition Response 2003P-0140/CP1 (November 7, 2003) at 3 and Footnote 6.

[18] See, e.g., *Schering Corp. v. FDA*, 51 F.3d 390 at 397-400 (3rd Cir. 1995); *Fisons Corp. v. Shalala*, 860 F. Supp. 859 (D.D.C. 1994).

[19] Petition at 7-8.

5

Docket No. 2004P-0557/CP1

that a sponsor of a generic topical 5-FU cream must conduct at least one comparative clinical study to establish bioequivalence to Efudex Cream.

**B.    Demonstrating Bioequivalence of 5-FU Products**

You cite to FDA's regulations stating that "for drug products that are not intended to be absorbed into the bloodstream, bioavailability may be assessed by measurements intended to reflect the rate and extent to which the active ingredient or active moiety becomes available at the site of action." You state that AK and sBCC are different conditions that occur in different sites within the epidermis: AK is a precancerous condition that occurs in the stratum spinosum, while sBCC is a malignancy that occurs in the deeper stratum basale. In addition, you argue that sBCCs may grow downward into the dermis and are encased in a fibrovascular stroma; together, these features may further decrease the absorption and penetration of topical 5-FU into sBCC lesions.[20]

You argue that sponsors should either conduct separate comparative clinical bioequivalence studies for each site of drug action, or they should conduct a single study for that site from which it is reasonable to extrapolate equivalence for the remaining sites. In your view, if one study is conducted, it should be in patients with sBCC because (1) the site of action is deeper within the epidermis than the squamous sublayer, and (2) a comparative clinical trial that shows equivalence with respect to the basal sublayer may be sufficient to demonstrate, by implication, equivalence to the squamous sublayer. You further argue that, because generic drugs are required to carry the same labeling as their RLDs, a generic drug sponsor may not omit the sBCC indication from the labeling of its product to avoid having to conduct a comparative clinical study in sBCC patients.[21]

*a.    Site of Action*

We have conducted a thorough review of the medical literature related to AK and sBCC. The relevant scientific evidence supports the conclusion that AK and sBCC are characterized by an abnormal proliferation of cells within the epidermis, which may be involved either in part or in its entirety.[22] In addition, both conditions may protrude minimally into the upper dermis while

---

[20] Petition at 8-9.

[21] Petition at 10-11.

[22] See, e.g., Lever and Schaumburg-Lever (eds.). Chapter 26, Tumors and Cysts of the Epidermis; CJ Cockerell. Histopathology of incipient intraepidermal squamous cell carcinoma ("actinic keratosis"). *J Am Acad Dermatol* January 2000; 42: S11-17. Publication submitted by Valeant on October 21, 2005; Lever and Schaumburg-Lever (eds.). Chapter 27, Tumors of the Epidermal Appendages; MT Bastiaens, JJ Hoefnagel, JA Bruijn, RGJ Westendorp, BJ Vermeer, and JN Bouwes Bavinck. Differences in age, site distribution, and sex between nodular and superficial basal cell carcinomas indicate different types of tumors. *J Invest Dermatol* 1998; 110:880-884; U Bertheim, PA Hofer, A Engstrom-Laurent, and S Hellstrom. The stromal reaction in basal cell carcinomas. A prerequisite for tumour progression and treatment strategy. Brit Assoc Plastic Surgeons 2004; 57:429-439.

Docket No. 2004P-0557/CP1

maintaining continuity with the epidermis.[23]  Therefore, the site of action for a topical product to treat each of these conditions is the epidermis and the upper dermis.  We disagree with your claims that, because AK and sBCC occur in different layers of the epidermis (stratum spinosum versus stratum basale), the site of action is different.  We note that the epidermis is only 0.06 to 0.8 millimeters thick and, as explained below, there is no reason to conclude that if the formulation provides the active ingredient to the stratum spinosum, it would not also provide the active ingredient to the stratum basale.

### b.    Topical Delivery of 5-FU

There is general consensus that the stratum corneum is the predominant barrier to topical drug delivery.  In many skin disorders, including tumors, the stratum corneum is compromised, and barrier resistance decreased.  As treatment progresses, the condition improves, and the barrier function of the tissue is restored, thereby decreasing drug delivery.[24]  In contrast to other skin disorders, in AK, the stratum corneum is often thickened.[25]

Regarding the cutaneous penetration of topical 5-FU, the view has been expressed that "despite decades of experience with products such as fluorouracil cream, we still lack data on the amount of active ingredient actually delivered to AK or sBCC action sites."[26]  A review of the published literature uncovered limited data regarding delivery of topical 5-FU in AK patients.  Perhaps more important was the lack of information regarding what minimum amount of active drug would need to be delivered to result in effective treatment.

According to the literature, systemic absorption of topical 5-FU varied widely, presumably as a function of the underlying skin disease, integrity of the dermal barrier, and extent and location of the involved skin.  In vitro characterizations of the availability of active drug to the different layers of the epidermis and dermis are limited by the use of nondiseased skin and must be interpreted with caution, but they offer guidance.  An in vitro study of the permeation of Efudex cream, 5%, through human cadaver skin demonstrated that the product was delivered to the epidermis and dermis, and that only 54 percent of the product was retained in the skin after 24

---

[23] Conditions that involve abnormal proliferations of cells embedded within the dermis (e.g., squamous cell carcinoma or nodular BCC) are not relevant to this petition and are conditions for which topical 5-FU is not indicated.

[24] Adrian Williams.  Transdermal and Topical Drug Delivery, The Pharmaceutical Press, London, 2003.  Chapter 1, Structure and Function of Human Skin.  Reference submitted by Valeant on December 21, 2004.

[25] Vinkay Kumar, Abul K. Abbas, and Nelson Fausto (eds.).  Robbins and Cotran Pathologic Basis of Disease, 7th Edition, Elsevier Saunders, Philadelphia, 2005.  Chapter 25, The Skin:  Premalignant and Malignant Epidermal Tumors.

[26] Declaration of Howard I. Maibach, MD, in support of the Citizen Petition of Valeant Pharmaceuticals International, submitted to the docket on October 21, 2005.

Docket No. 2004P-0557/CP1

hours, suggesting the potential for systemic absorption.[27] In an in vivo study of AK patients, following topical administration of Efudex cream, 5%, plasma fluorouracil concentrations were measurable in 9 of 12 of the patients.[28] In these two studies, a greater percentage of Efudex cream, 5%, appeared to be absorbed in the systemic circulation as compared to a differently formulated 0.5% fluorouracil cream. Despite this finding, a multicenter study showed that the 0.5% cream was as effective as the higher concentration formulation, suggesting that either the 0.5% formulation was better at targeting the skin, *or that higher doses were not needed* to effectively treat AK.[29]

Both the reference Efudex (fluorouracil) Cream, 5%, and Efudex Solution, 5%, have been approved for the treatment of AK and sBCC. These products have combined labeling, which provides no restrictions on the use of one 5% formulation or the other to treat these conditions. Thus, the presumption is that they may be used interchangeably to treat either condition. This argues against some critical formulation issue that could meaningfully affect the ability of these topical 5-FU products to deliver drug to the site of action for the approved uses.

We conclude that if a topical 5-FU formulation penetrates the skin to treat AK, which often involves a thickened stratum corneum, then that formulation would also penetrate the skin to treat sBCC, which usually involves a compromised stratum corneum.[30] The Agency's review of the relevant scientific studies suggests that the thickened stratum corneum in AK could provide a greater barrier to cutaneous penetration of topical 5-FU than the compromised stratum corneum in sBCC. Therefore, if a study demonstrated efficacy for a topical 5-FU formulation to treat AK, this would provide assurance that the formulation would penetrate the skin sufficiently to treat sBCC.

    *c.*    *Required Clinical Study*

Based upon the Agency's thorough review of the record and the available scientific data related to AK and sBCC, we conclude that a single clinical study in AK would be sufficient to demonstrate that a generic topical 5-FU product is bioequivalent to Efudex Cream for both the AK and sBCC indications. As noted above, the published literature supports the contention that the extent of skin involvement, and thereby the sites of action, for AK and sBCC are the same

---

[27] S Levy, K Furst, and W Chern. A comparison of the skin permeation of three topical 0.5% fluorouracil formulations with that of a 5% formulation. *Clin Ther* 2001; 23:901-907.

[28] S Levy, K Furst, and W Chern. A pharmacokinetic evalution of 0.5% and 5% fluorouracil topical cream in patients with actinic keratosis. *Clin Ther* 2001; 23:908-920.

[29] K Loven, L Stein, K Furst, et al. Evaluation of the efficacy and tolerability of 0.5% fluorouracil cream and 5% fluorouracil cream applied to each side of the face in patients with actinic keratosis. *Clin Ther* 2002; 24:990-1000.

[30] Similarly, we do not believe that the actual location of the skin involved (face versus chest, back, and arms) is relevant in this case to determining differences in formulation. We believe that a demonstration of equivalent efficacy in treating AK will ensure bioequivalence of the formulations.

Docket No. 2004P-0557/CP1

(i.e., the epidermis and the upper dermis), and the stratum corneum is the predominant barrier to topical drug delivery for the sites of action especially for AK. In addition, erosion or compromise of the skin in sBCC can result in greater drug exposure than in AK.

In light of these factors, and in the absence of scientific evidence to the contrary, the Agency concludes an AK bioequivalence study is sufficient to establish that the generic topical 5-FU formulation will be available in the epidermis and the upper dermis to act on both AK and sBCC lesions to an extent that is comparable to Efudex Cream.[31] In addition, we agree that a generic drug sponsor may not omit the sBCC indication from the labeling of its product, absent a listed patent or exclusivity for the RLD that protects the use of the drug to treat sBCC.

### C. Relevance of the Most Difficult-to-Treat Condition in Bioequivalence of 5-FU Cream Products

You argue that a proposed generic version of Efudex Cream must be shown to be equivalent in the most difficult-to-treat condition for which the drug is approved. In support of your argument, you cite to a citizen petition response, which stated that "generally, bioequivalence testing for topical products using clinical studies with clinical endpoints relies on a single study in one indication, usually the one that is most difficult to treat."[32] For topical products with multiple indications, you argue that bioequivalence may be established by extrapolating from the most difficult condition to all other related conditions. You reason that use of the most difficult-to-treat condition is intended to challenge the proposed generic drug and to prevent a poorly performing product from appearing to be equivalent in a simple-to-treat condition. With simple-to-treat conditions, virtually all patients will experience high cure rates, regardless of the tested products. You claim that the use of the most difficult-to-treat condition is intended to ensure that the studies that are conducted are able to discriminate differences in the reference and generic formulations.

The statement from the citizen petition response cited in your letter was taken out of context and is not relevant to the bioequivalence evaluation of 5-FU cream. The citizen petition response referenced an earlier response in FDA Docket Number 88P-0369/CP regarding bioequivalence requirements for mebendazole, an anthelminthic. In that response, it was stated that pinworm (enterobius) infestation would not be an acceptable bioequivalence test "because the dose of 100 mg mebendazole twice a day for 3 days would eradicate a pinworm infestation, even for relatively bioinequivalent products." That is, a condition with a lower cure rate would be more sensitive in detecting efficacy differences between formulations. However, a study in a condition for which the cure rate is very low would also lack sensitivity to detect formulation differences, because even a product that is relatively non-equivalent would likely show an equally low cure rate.

---

[31] We note that this conclusion is based on the specific characteristics of this topical product and the indications at issue. Factors involved in the assessment of other topical products may warrant a different result.

[32] Citizen Petition 1995P-0379 at 4.

9

Docket No. 2004P-0557/CP1

The ideal clinical endpoint bioequivalence study should be conducted in the indication which will be the most sensitive in discriminating formulation differences. The optimal indication is generally one with the least variability in the disease state and expected course of disease and for which the recommended duration of treatment is the same for all patients. This is often, but not necessarily, the most difficult-to-treat condition. Furthermore, the shortest duration of treatment for which a significant treatment effect is expected is likely to be the most discriminatory, since extending the duration of therapy may result in a higher probability of success for all study groups and less ability to differentiate between products.

The sBCC indication may not be the indication that is the most sensitive in discriminating formulation differences between 5-FU products  According to the Efudex product label, the recommended treatment duration for AK is 2 to 4 weeks, although complete healing may not be evident for 1 to 2 months following cessation of therapy. For sBCC, the recommended treatment duration is at least 3 to 6 weeks, but treatment may be required for as long as 10 to 12 weeks. Therefore, a comparative study in the treatment of sBCC is likely to be less discriminatory in detecting a difference between products. Furthermore, although management of sBCC is more complicated from a clinical practice perspective, the reported cure rate of sBCC with 5-FU treatment is actually higher than that of AK. The success rate for sBCC is 93 percent, compared with the 84 percent success rate reported in clinical studies of AK. The sBCC success rate is based on 113 lesions in 54 patients, pooling together those treated with 5-FU solution and those treated with 5-FU cream. This finding strongly suggests that the formulation of 5-FU was not considered especially significant in evaluating the efficacy of 5-FU in the treatment of sBCC, and is another reason why sBCC may not be a particularly sensitive condition in which to evaluate the bioequivalence of 5-FU formulations.

Although certain sites involved with sBCC may be more difficult to treat and would not be amenable to treatment with either the reference or a generic topical 5-FU product, the success of treatment (i.e., complete clearance rate) with the reference 5-FU product when *used as indicated in appropriately selected patients* is excellent for both AK and sBCC. If "difficult to treat" is gauged by the likelihood of treatment success with topical 5-FU, then neither condition is "difficult to treat." Therefore, the Agency concludes an AK bioequivalence study is sufficient to establish that the generic topical 5-FU formulation will be available in the epidermis and the upper dermis to act on both AK and sBCC lesions to an extent that is comparable to Efudex Cream.

### D.    The Design of Comparative Clinical Studies

You argue that the design of a comparative clinical bioequivalence sBCC study must reflect the Agency's current standards for the conduct of a well-controlled study in this patient population. You offer as an example the two double-blind, vehicle-controlled clinical studies conducted in support of Aldara Cream, in which 364 patients with primary sBCC were treated with Aldara Cream or vehicle five times a week for six weeks. FDA agrees that if a comparative clinical

Docket No. 2004P-0557/CP1

sBCC study were to be conducted to demonstrate bioequivalence of a generic topical 5-FU cream, its design should reflect current clinical dermatology management of the disease. However, as discussed above, the Agency has concluded that one comparative clinical AK study is sufficient to establish bioequivalence to Efudex Cream. We note that the sponsor of the generic topical 5-FU cream we are approving conducted a clinical trial to demonstrate bioequivalence between the generic drug and Efudex Cream in the complete clearance of AKs. The study also demonstrated the superiority of both formulations to vehicle and showed that the safety profiles of the two 5-FU formulations were similar and considered acceptable.

## III.    CONCLUSION

For the reasons discussed above, FDA will not require that ANDAs for a generic version of Efudex Cream contain data from comparative clinical studies conducted in patients with sBCC. Therefore, your petition is denied.

Sincerely,

Janet Woodcock
Director
Center for Drug Evaluation and Research

11

EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SPEAR PHARMACEUTICALS, INC. and SPEAR DERMATOLOGY PRODUCTS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Civil Action No. 07-821-JJF |
| v. | ) ) | |
| WILLIAM BLAIR & COMPANY, L.L.C., and VALEANT PHARMACEUTICALS INTERNATIONAL, | ) ) ) | **JURY TRIAL DEMANDED** |
| | ) ) | |
| Defendants. | ) | |

### SUPPLEMENTAL COMPLAINT

Plaintiffs, Spear Pharmaceuticals, Inc. and Spear Dermatology Products, Inc. (collectively, "Plaintiffs"), by their undersigned attorneys, hereby allege the following for their Supplemental Complaint against Defendants, William Blair & Company, L.L.C. ("William Blair") and Valeant Pharmaceuticals International ("Valeant") (collectively, "Defendants"):

### NATURE OF THE ACTION

1.     This is an action by Plaintiffs for breach of contract, breach of the implied covenant of good faith and fair dealing, trade secret misappropriation, unjust enrichment, and negligence against Defendants arising from, *inter alia*, the improper disclosure by William Blair to Valeant of Plaintiffs' confidential information concerning the fluorouracil product that Plaintiffs had under development and Valeant's subsequent misuse of that information.

## THE PARTIES

2.      Spear Pharmaceuticals, Inc. ("Spear") is a corporation organized and existing under the laws of the State of Florida, having its principal place of business at 11924 Fairway Lakes Drive, Fort Myers, Florida 33913.  Spear is a small company specializing in the development of generic pharmaceutical products in the dermatological area.  Spear was founded in 1993 by Dr. K.L. Spear ("Dr. Spear"), who still serves as its President.  Dr. Spear was a practicing dermatologist from 1983 through 2001, when he decided to leave clinical practice to work full time in the research and development of prescription dermatologic generic drugs. Since its founding, Spear has successfully developed and obtained United States Food & Drug Administration ("FDA") approval for ~~six~~seven pharmaceutical products -- an unusually successful track record for a company of its small size and youth.

3. Spear Dermatology Products, Inc. ("SDP") is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at 1247 Sussex Turnpike, Suite 120, Randolph, New Jersey 07869.  SDP was established in 2001 and is now the exclusive seller of the products developed by Spear.  Dr. Spear also serves as President of SDP and has since its inception.

4.      Upon information and belief, Defendant William Blair is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business at 222 W. Adams Street, Chicago, Illinois~~,~~ 60606.  Upon information and belief, William Blair is a leading investment firm with a net worth of more than $144 million.

5.      Upon information and belief, Defendant Valeant is a corporation organized and existing under the laws of the state of Delaware, having its principal place of

2

business at 1 Enterprise, Aliso Viejo, California, 92656.  Valeant is engaged in the manufacture and marketing of pharmaceutical products worldwide, with 2006 annual sales totaling $907 million.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1332(a)(1) and (c)(1).  As set forth below, the amount in controversy exceeds $75,000.00, exclusive of interest and costs and complete diversity exists among the parties.

7.      Venue is proper in this judicial district pursuant to the provisions of 28 U.S.C. §§ 1391(a) and (c).

8.      Defendants William Blair and Valeant are Delaware corporations and, on information and belief, are conducting business and/or business-related activities within the State of Delaware.

9.      This Court has personal jurisdiction over Defendants.

## FACTUAL BACKGROUND

A.      **Plaintiffs' Tretinoin Products**

10.     Spear developed and was the first to obtain FDA approvals for generic versions of the brand name Retin-A® tretinoin cream products used in the treatment of acne. Spear filed three Abbreviated New Drug Applications ("ANDA's") for 0.025%, 0.05% and 0.1% cream strengths, respectively, and all were approved by the FDA on December 24, 1998.

11.     After the successful development and approval of the three tretinoin cream products, Spear pursued FDA approval for the manufacture and sale of other generic dermatological tretinoin products.  On February 22, 2000, Spear was the first to receive FDA

3

approval to manufacture and sell a 0.025% gel, a generic version of Johnson and Johnson's
Ortho Dermatological Division's Retin-A® Gel for the treatment of acne.  Subsequently, on June
11, 2002, Spear was the first to receive FDA approval to market a 0.01% strength generic
version of the Retin-A® Gel for the treatment of acne.  Also, on September 15, 2005, Spear was
the first to receive FDA approval to market a 0.05% strength generic version of the brand name
Renova® (tretinoin emollient cream) product.  All told, Spear received five FDA approvals for
the first generic versions of Retin-A® creams and gels, as well as FDA approval for the first
generic version of the Renova® emollient cream product.

**B.    Plaintiffs' Decision to Begin Pursuing FDA Approval of a Generic Equivalent to Efudex® and the Continued Efforts Towards that End**

12.    In approximately February 1999, Plaintiffs began the process of
developing a generic equivalent to Defendant Valeant's fluorouracil cream, USP 5% product,
sold under the tradename Efudex®.

13.    According to the Efudex® package insert, the product is approved for and
"indicated" in the treatment of actinic keratosis ("AK") and is also "useful" in the treatment of
superficial basal cell carcinoma ("sBCC") when conventional methods are impractical, such as
with multiple lesions or difficult treatment sites.  AK is a lesion of the epidermis, the outer layer
of the skin.  It is considered pre-cancerous and requires treatment according to the American
Academy of Dermatology.  Pre-cancerous AK lesions are common and are most often caused by
over-exposure to sunlight.  sBCC, on the other hand, is a skin cancer which is localized in the
epidermis.  Over 98% of the prescriptions written for Efudex® are used for patients with AK.
The patents covering Efudex® expired over twenty years ago and, upon information and belief,
Plaintiffs were the first to develop and seek approval of a generic fluorouracil product.

4

14.     For ANDAs with multiple uses, the FDA requires that only one indication need be studied to prove bioequivalence.  During the fluorouracil product's development phase, beginning in June 1999, Plaintiffs consulted directly with the FDA in an effort to ensure that the clinical trial performed in support of the proposed ANDA was correctly designed and would be performed in accordance with the rigorous standards required.  Because Efudex® is used overwhelmingly for AK, Plaintiffs proposed a clinical trial in the treatment of AK, and the FDA agreed that such a trial would prove bioequivalence to the brand product with respect to both treatment indications, AK and sBCC.  Once they had received that guidance from the FDA, Plaintiffs planned, developed and implemented the clinical trial.

15.     In connection with the development and clinical testing of the fluorouracil cream, USP 5% product, Plaintiffs have invested more than $6 million over the past eight years.

**C.    The Decision to Sell the Tretinoin Line to a Third Party and the Engagement of William Blair**

16.     During the Spring of 2004, while Plaintiffs were actively engaged in the development of the generic Efudex® product, they decided that they wished to sell the Retin-A® generic tretinoin product line (that is, all three of the cream product strengths and the two gel product strengths) to a third party.

17.     In pursuit of this end goal, on or about April 27, 2004, Dr. Spear began to communicate with Defendant William Blair through one of its Vice Presidents, Brian Scullion, M.D. ("Scullion").

18.     After discussion of general information about the Plaintiff companies and the business, Dr. Spear determined that, in order to disclose fully the information and trade

secrets necessary for Defendant William Blair to evaluate the opportunity, a confidentiality agreement should be executed.

19.    On May 6, 2004, Dr. Spear, on behalf of Plaintiff companies, and Scullion, on behalf of Defendant William Blair, executed a confidentiality agreement ("Confidentiality Agreement").  The purpose of the Confidentiality Agreement was to permit Plaintiffs to disclose their confidential information to Defendant William Blair, through its officer, Scullion, in connection with its evaluation of a potential transaction, with the assurance that William Blair would protect the confidentiality of the disclosed information.

20.    In the Confidentiality Agreement, Defendant William Blair agreed, through Scullion, "that all Confidential Information will be held and treated by you, your agents and employees in confidence and will not, except as required by law or as hereinafter provided, without the prior written consent of the [Plaintiffs], be disclosed by you or your agents or employees, in any manner whatsoever, in whole or in part, and will not be used by you or your agents or employees other than in connection with your evaluation of a possible transaction." Confidentiality Agreement, at p. 1.

21.    On the morning of May 10, 2004, Dr. Spear sent Scullion an e-mail specifically stating, "[a]s you are thinking of the presentation and how to promote and sell to other companies, I request that you not include Information to any of them on our pipeline that I had mentioned to you.  I wish to keep confidential in this very connected industry our Pipeline."

22.    Later that same afternoon, Scullion responded by e-mail to Dr. Spear's request with one simple word -- "[u]nderstood."

23.     In an e-mail on May 24, 2004, Dr. Spear stated that, in the presentation and discussion with the companies considering the opportunity, "we do not say what the R and D products are or where they are" in the development process.

24.     Just two days later, in an e-mail dated May 26, 2004, Dr. Spear again stressed to Scullion, that he was "very ill at ease to let companies 'peek under the curtain' at our R and D line."

25.     On August 2, 2004, Scullion, on behalf of Defendant William Blair, sent an e-mail with an attached letter to Plaintiffs detailing the terms of its engagement (the "Engagement Letter") for "render[ing] certain investment banking services in connection with a possible sale of tretinoin related assets of the company to another party or with the possible business combination . . . of the [Plaintiffs] with another party or a recapitalization of the [Plaintiffs] or similar restructuring." Engagement Letter, p. 1.

26.     In the Engagement Letter, William Blair reaffirmed its obligations under the Confidentiality Agreement signed on May 6, 2004.  Further, William Blair also represented, in the Engagement Letter, "that its healthcare investment banking group is not as of the date of this letter engaged to advise or represent any of the parties contemplated as of this date as potential parties to the Possible Transaction.  Should it become so engaged by any of the parties that submit an indication of interest, it will inform Spear." *Id.* at ¶ 8.

**D.     William's Blair's Process for Screening and Eventually Choosing Proposed Purchasers for the Spear Tretinoin Line of Products**

27.     In the Engagement Letter, William Blair set forth its plan with regard to the services that would be rendered in connection with the proposed transaction.  Specifically, William Blair and Scullion undertook the responsibility, *inter alia*, to assist Plaintiffs "in (i)

7

developing a strategy for pursuing a Possible Transaction involving the [Plaintiffs] and a list of possible participants in the Possible Transaction . . . (ii) preparing a descriptive memorandum . . . and (iii) contacting and eliciting interest from those possible participants expressly approved by the [Plaintiffs]." *Id.,* at ¶ 1b.

28.    Further, in the Engagement Letter, William Blair set forth its expectation that Scullion would "lead and supervise the Possible Transaction." *Id.,* at ¶ 1c.

29.    Plaintiffs' trust in Scullion was so strong that Plaintiffs negotiated and won inclusion of a specific term that permitted, in the event that Scullion did not continue with William Blair and Plaintiffs decided to terminate the engagement, the required cooling off period before Plaintiffs could sign with another company to be cut by half to nine months to permit Plaintiff to follow Scullion to any new employer.  Engagement Letter, ¶ 5.

30.    As part of the process of screening possible purchasers, Scullion forwarded what he called the "A-list parties" *via* e-mail on September 3, 2004.  Among those companies was Defendant Valeant.  William Blair did not disclose the nature and extent of its business relationship with Valeant at that time.  Upon information and belief, William Blair had an investment banking relationship with Valeant and followed Valeant stock closely.  Indeed, according to the Quarterly Schedule of Portfolio Holdings (Form N-Q) filed with the Securities and Exchange Commission on November 22, 2004, the William Blair Growth Fund held over $1.7 million in Valeant stock as of September 30, 2004.

31.    During the search for a possible participant in the proposed transaction, Scullion, sent to Plaintiffs, on a regular (*i.e.*, weekly, or near weekly) basis, a list of contacts he had made in furtherance of his search.  Additionally, as required by the Engagement Letter,

Plaintiffs expressly approved the specific possible participants prior to the disclosure of any confidential information to them.  *See* Engagement Letter, ¶ 1b.

**E.    Valeant's Evaluation Agreement and Refusal of the Opportunity**

32.    On September 23, 2004, William Blair, through its officer Scullion, executed an agreement with Defendant Valeant in order to permit Valeant's evaluation of Plaintiffs' confidential information with a guarantee that Valeant would hold such information secret and would not use such information for any other purpose than to evaluate the proposed transaction (the "Evaluation Agreement").

33.    Specifically, by executing the Evaluation Agreement, Valeant agreed, *inter alia*, "to treat any information, knowledge or data concerning the [Plaintiffs] which is furnished to [it] by or on behalf of [Plaintiffs], whether furnished before, on or after the date of this Agreement [defined as the "Evaluation Material"], in accordance with the provisions of this Agreement. . . .   [T]he Evaluation Material will be used by you solely for the purpose of evaluating a Possible Transaction between the [Plaintiffs] and you.  In addition, you agree not to disclose the Evaluation Material to any person and agree to keep the evaluation material confidential."  Evaluation Agreement, p. 1.

34.    As evidenced by the Evaluation Agreement, it was Defendants' intent that Plaintiffs be third party beneficiaries to the Evaluation Agreement and the obligations set forth therein.  Indeed, the Evaluation Agreement specifically provided that Plaintiffs were third-party beneficiaries of the Evaluation Agreement.  Evaluation Agreement, p. 2 ("The terms, conditions and covenants of this Agreement shall be binding upon you, your Agents, and each of your

respective successors, and *is for the benefit of Company [i.e., Plaintiffs]* and William Blair. . . .") (emphasis added).

35.     On October 11, 2004, Scullion sent, as part of the status update, a list of prospective participants to Plaintiffs.  The list noted that Valeant had received the memorandum and was assessing its interest in the opportunity.  Further, the status chart identified October 14, 2004, as the "Indication Due Date" for Valeant.

36.     On or about October 15, 2004, during a discussion with Dr. Spear, Scullion stated that Valeant was interested in the opportunity but had dropped out because of the price.

37.     On October 18, 2004, Plaintiffs received an updated status chart from Scullion.  This update included an indication that since the last update, and in keeping with the "Indication Due Date" set forth in the previous update, Valeant had "declined" the offer.

## F.    Plaintiffs' Communication of Confidential Information to Scullion and Plaintiffs' Subsequent Filing of Their ANDA

38.     Following execution of the Confidentiality Agreement, on May 13, 2004, at their first face-to-face meeting in Ft. Myers, Florida, Plaintiffs provided Scullion with confidential information that the generic Efudex® product was in Spear's product development pipeline.  Additional information about the pipeline was presented to Scullion -- at his request -- during a July 28, 2004 meeting in Chicago between Spear and Scullion.  On October 31, 2004, Dr. Spear sent Scullion an e-mail that included additional confidential information revealing that the generic Efudex® fluorouracil cream, USP 5% product was in development, that a "318 patient Bioequivalence study [was] completed," and that Plaintiffs expected that an ANDA for the product would be filed in late November 2004.  *Id.*  Dr. Spear prefaced this information with

10

the comment that he didn't "really want to talk about the next two but for your information." *Id.* Dr. Spear also told Scullion that the clinical trial was for actinic keratosis. Thus, by October 31, 2004, Scullion knew not only Spear's anticipated ANDA filing date but key details concerning Spear's bioequivalence study -- and that Plaintiffs had conducted only a single study.

39.    On information and belief, throughout the summer and fall of 2004 (at which time the William Blair Growth Fund held over $1.7 Million in Valeant stock), Scullion repeatedly flew to California to meet with Valeant on the Spear opportunity, as well as other business relationships. Scullion was familiar with upper level management at Valeant and, on information and belief, had worked with them before on other matters.

40.    Plaintiffs filed their ANDA with the FDA seeking approval to manufacture and sell their fluorouracil cream, USP 5% product, a generic version of Valeant's Efudex® product, on January 3, 2005, and it was accepted for filing by the FDA on January 6, 2005.

## G.    Valeant's Filing of a Citizen's Petition to Block Approval

41.    On information and belief, prior to December 21, 2004, Scullion communicated to Valeant the confidential information he had received from Dr. Spear concerning Plaintiffs' expected filing of their ANDA seeking approval to manufacture and market the generic fluorouracil cream, USP 5% product. On December 21, 2004, Valeant filed a Citizen's Petition in an attempt to block the approval of a generic equivalent to its Efudex® product.

42.    The December 21, 2004 Citizen's Petition filed by Valeant was the first and only instance in the more than twenty years since Efudex® had gone off patent (thus opening

11

the product up for generic competition) that Valeant had filed a Citizen's Petition with respect to Efudex®. On information and belief, the timing of the Citizen's Petition was not coincidental -- it was reflective of the confidential information that had been improperly leaked to Valeant.

43.    In the Citizen's Petition, Valeant requested that the FDA "[r]efrain from approving an [Abbreviated New Drug] application unless an application includes a sBCC study." The specificity of the requested relief reflects that Valeant had learned not only of Plaintiffs' confidential information with respect to Plaintiffs' plan for filing an ANDA, but also the precise nature of the clinical trial they had conducted.

44.    Congress has recognized that the Citizen Petition process has been used by certain pharmaceutical companies for the improper purpose of delaying FDA approval of generic products, as evidenced by the recent introduction, passage and enactment into law on September 27, 2007 of amendments to the Federal Food, Drug, and Cosmetic Act directing the FDA not to delay approval of ANDAs based on the filing of a Citizen Petition. *See* Food and Drug Administration Amendments Act of 2007 § 914(a), 21 U.S.C. § 355. Remedying past abuse of the Citizen Petition process was a primary motivation for passage of the legislation, as evidenced by the following comments from the legislative history of the Act and other related legislation before Congress at the time:

From legislative history of Food and Drug Administration Amendments Act of 2007:

"Let us be clear: The citizen petition provision is designed to address attempts to derail generic drug approvals. Those attempts, when successful, hurt consumers and the public health." 153 Cong. Rec. S11841 (daily ed. Sept. 20, 2007) (statement of Sen. Kennedy).

"The bill also takes action on the abuse of citizen petitions. . . . This procedure should be used to protect public health -- but too often, it is subverted by those who seek only to delay the entry onto the market of generic drugs. Even if the petitions are found to be meritless, they will have accomplished their mission -- delaying access for consumers to

12

safe and lower cost medicines." 153 Cong. Rec. S11938 (daily ed. Sept. 21, 2007) (statement of Sen. Kennedy).

From legislative history of the Citizen Petition Fairness and Accuracy Act of 2007 -- introduced on January 4, 2007:

"The legislation I introduce today . . . targets one particularly pernicious practice by brand name drug companies to impeded or block the marketing of generic drugs -- abuse of the FDA citizen petition process." 153 Cong. Rec. S64 (daily ed. Jan. 4, 2007) (statement of Sen. Kohl).

"While this citizen petition process was put in place for a laudable purpose, unfortunately in recent years it has been abused by frivolous petitions submitted by brand name drug manufacturers (or individuals acting on their behest) whose only purpose is to delay the introduction of generic competition." 153 Cong. Rec. S64 (daily ed. Jan. 4, 2007) (statement of Sen. Kohl).

"Indeed, brand name drug manufacturers often wait to file citizen petitions until just before the FDA is about to grant the application to market the new generic drug solely for the purpose of delaying the introduction of the generic competitor for the maximum amount of time possible. This gaming of the system should not be tolerated." 153 Cong. Rec. S65 (daily ed. Jan. 4, 2007) (statement by Sen. Kohl).

"Of the 21 citizen petitions for which the FDA has reached a decision since 2003, 20 -- or 95 percent of them -- have been found to be without merit. Of these, ten were identified as "eleventh hour petitions," defined as those filed less than 6 months prior to the estimated entry date of the generic drug. None of these ten "eleventh hour petitions" were found to have merit, but each caused unnecessary delays in the marketing of the generic drug by months or over a year. . . ." 153 Cong. Rec. S65 (daily ed. Jan. 4, 2007) (statement by Sen. Kohl).

## H.   Valeant's Change of Heart With Respect to the Tretinoin Product Opportunity

45.   Only eight days after Valeant filed its Citizen Petition, on December 29, 2004, Valeant submitted a "preliminary, non-binding indication of interest" to William Blair, through its officer Scullion, to purchase Plaintiffs' tretinoin product line (the "Offer Letter"). Scullion subsequently presented the Offer Letter to Plaintiffs. The Offer Letter included general terms for the purchase of the assets, offering an up-front payment as well as royalties based on sales milestones for the five years following the proposed purchase.

13

46.    This Offer Letter was sent more than two months after Valeant declined the proposed transaction and a mere eight days after it had filed its Citizen Petition on December 21, 2004.  Upon information and belief, this offer was a pretense so that Valeant could gain more information on Spear -- the potential competitor to Valeant's Efudex 5% cream product, which represented Valeant's single largest revenue-producing product in the United States in 2004.  At the time the Offer Letter was sent, Plaintiffs were already in negotiations with another company to sell the tretinoin product line, and Valeant's offer was rejected.

**I.    Plaintiffs' Discovery of the Citizen Petition and Activity Thereafter**

47.    Plaintiffs first learned of Valeant's Citizen Petition from the FDA on April 19, 2005, when they called the FDA to check on the status of their application.  Plaintiffs were told by the FDA on that date that Valeant had filed a Citizen Petition requesting that no ANDA be approved if the bioequivalence study supporting the ANDA had been done only in AK patients, and that the FDA was reviewing that Citizen Petition.

48.    Given that the FDA had reviewed, provided guidance and approved Plaintiffs' planned clinical trial addressing treatment of AK and agreed that such a trial would be sufficient to demonstrate bioequivalence to the brand product, the news of the Citizen Petition was a shock to Plaintiffs.

49.    Because of the delay caused by Valeant's filing of its Citizen Petition, Plaintiffs have been awaiting FDA approval for their generic fluorouracil cream, USP 5% product since January 6, 2005 -- ~~nearly~~over three years -- more than twice the 16.6 month average time for approval of such applications.  Had Valeant not filed its Citizen Petition, Plaintiffs' ANDA would have been approved long ago.

14

50.     In December 2006, Valeant launched an authorized generic fluorouracil cream, USP 5% product through Oceanside, another generic pharmaceutical company.  Because of the delay in FDA approval for the Spear product caused by the filing of Valeant's Citizen Petition, the Valeant-sponsored Oceanside generic remains the only generic Efudex® equivalent approved for marketing by the FDA.   Upon information and belief, Valeant launched this authorized generic product only because of its access to Plaintiffs' confidential information.

**J.      Approval of the Spear Fluorouracil ANDA and Denial of Valeant's Citizen Petition**

51.     On April 11, 2008, more than three years after its filing, the FDA approved the Spear Fluorouracil ANDA because the ANDA was supported by "adequate information . . . to demonstrate that the drug is safe and effective for use in the submitted labeling" (*see* Exhibit A).

52.     On that same day, the FDA denied Valeant's Citizen Petition (*see* Exhibit B).

**COUNT I**

**BREACH OF CONTRACT**
**AGAINST WILLIAM BLAIR**
**(THE CONFIDENTIALITY AGREEMENT)**

51.     Plaintiffs incorporate by reference paragraphs 1-~~50~~52 as if fully set forth herein.

52.     Plaintiffs performed their obligations under the Confidentiality Agreement.

15

53.     Under the Confidentiality Agreement, William Blair was obligated to hold Plaintiffs' confidential information in confidence and not disclose such information without Plaintiffs' prior written consent.

54.     In the Engagement Letter, William Blair reaffirmed its obligation under the Confidentiality Agreement.

55.     On information and belief, William Blair breached its obligations and, contrary to Plaintiffs' repeated instructions, revealed to Valeant Plaintiffs' confidential information regarding, *inter alia*, at least, Plaintiffs' plans to file an ANDA for a generic fluorouracil product and Plaintiffs' bioequivalence testing.

56.     This breach of the Confidentiality Agreement has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT II

### BREACH OF CONTRACT
### AGAINST WILLIAM BLAIR
### (THE ENGAGEMENT LETTER)

57.     Plaintiffs incorporate by reference paragraphs 1-5658 as if fully set forth herein.

58.     Plaintiffs have performed all of their obligations under the Engagement Letter.

59.     In the Engagement Letter, William Blair reaffirmed its obligation under the Confidentiality Agreement to keep confidential all information communicated to it during the performance of its duties and obligations pursuant to that engagement.

16

60.    In addition, under the terms of the Engagement Letter, William Blair was obligated to inform Plaintiffs if it had any preexisting business relationship with any party requesting to evaluate the transaction.  William Blair did not disclose the nature and extent of its business relationship with Valeant.

61.    On information and belief, William Blair breached its obligations by failing to disclose the nature and extent of its business relationship with Valeant and by revealing to Valeant Plaintiffs' confidential information regarding, *inter alia*, Plaintiffs' plans for a future FDA filing and Plaintiffs' bioequivalence testing.

62.    This breach of the Engagement Letter has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT III

## BREACH OF CONTRACT AGAINST VALEANT
## (THE EVALUATION AGREEMENT)

63.    Plaintiffs incorporate by reference paragraphs 1-6264 as if fully set forth herein.

64.    Valeant and William Blair intended that Plaintiffs benefit from the Evaluation Agreement and specifically identified Plaintiffs as third-party beneficiaries of that Agreement.

65.    The benefit of the Evaluation Agreement to Plaintiffs was in furtherance of a pre-existing obligation that William Blair owed Plaintiffs under various agreements.

66.    The benefit of the Evaluation Agreement to Plaintiffs was a material part of Defendants' purpose in entering into the Evaluation Agreement, *i.e.*, the confidential

disclosure of information, and the evaluation thereof, in connection with the possible purchase of Plaintiffs' tretinoin product line.

67. Valeant was obligated under the Evaluation Agreement, *inter alia*, to keep confidential all information communicated to it, either by William Blair or Plaintiffs, during the evaluation of the proposed transaction and to use the confidential information provided to it only for such evaluation.

68. On information and belief, Valeant breached its obligation and, *inter alia*, used Plaintiffs' confidential information as a basis for filing its Citizen Petition with the FDA and as a basis for determining its own strategies with respect to the launch of an "authorized generic" product.

69. This breach of the Evaluation Agreement has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT IV

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST WILLIAM BLAIR

70. Plaintiffs incorporate by reference paragraphs 1-6971 as if fully set forth herein.

71. On information and belief, William Blair and Valeant had previously partnered in substantial financial transactions. On information and belief, these transactions included, at least, William Blair serving as an investment banker for Valeant. As of September 30, 2004, the William Blair Growth Fund held over $1.7 million in Valeant stock.

18

72.    On information and belief, William Blair, through its agent, Scullion, disclosed Plaintiffs' confidential information with respect to Plaintiffs' upcoming ANDA filing and its bioequivalence testing.

73.    Under the Engagement Letter and the Confidentiality Agreement, William Blair had an implied obligation of good faith and fair dealing to Plaintiffs.

74.    On information and belief, William Blair breached its obligation of good faith and fair dealing by communicating Plaintiffs' confidential information concerning its upcoming fluorouracil cream, USP 5% product ANDA filing to Valeant, a known competitor, with whom William Blair had previous financial dealings, and which it knew to be the seller of the corresponding brand Efudex® product, and by delivering to Plaintiffs a sham offer from Valeant to purchase Plaintiffs' tretinoin product line that was made in bad faith.  Specifically, the Valeant offer was made with the objective of permitting Valeant to obtain additional confidential information about Plaintiffs' competitive product and plans.

75.    On information and belief, William Blair, through Scullion, communicated this information to Valeant in an attempt to enrich both itself and Valeant at the expense of Plaintiffs by warning Valeant of the threat to its monopoly on the sale of Efudex®.  Both Valeant and William Blair were in fact so enriched.

76.    This breach of the implied covenant of good faith and fair dealing has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT V

## TRADE SECRET MISAPPROPRIATION AGAINST DEFENDANTS

77.    Plaintiffs incorporate by reference paragraphs 1 ~~76~~78 as if fully set forth herein.

78.    The information relating to the bioequivalence study and the nature and timing of its ANDA filing constituted Plaintiffs' trade secrets.

79.    Plaintiffs took reasonable precautions to protect their trade secrets, by, *inter alia*, requiring that any company evaluating the proposed transaction, including Valeant, as well as, William Blair, agree in writing to keep such information confidential and to use it only for the purposes for which it was revealed.

80.    Plaintiffs communicated their trade secrets to William Blair, and, on information and belief, William Blair communicated those trade secrets to Valeant.

81.    The confidentiality obligations undertaken by William Blair and Valeant were in full force and effect from at least the time Plaintiffs disclosed their trade secrets to William Blair to at least the time Valeant filed its Citizen Petition with the FDA challenging the adequacy of a bioequivalence study of the type conducted by Plaintiffs.

82.    On information and belief, William Blair misappropriated Plaintiffs' trade secrets by disclosing confidential information about Plaintiffs' generic fluorouracil product, including, *inter alia*, details concerning the bioequivalence study and the timing of the ANDA filing, to Valeant without Plaintiffs' prior written consent, and Valeant misappropriated Plaintiffs' trade secrets by using them for a purpose other than evaluation of the purchase of the

Plaintiffs' tretinoin product line, in violation of one or more of the following statutes: 6 Del. C. § 2001, et seq. (Delaware Trade Secrets Act), and 765 I.L.C.S. 1065 (Illinois Trade Secrets Act).

83.     This misappropriation of the Plaintiffs' trade secrets has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT VI

## UNJUST ENRICHMENT AGAINST VALEANT

84.     Plaintiffs incorporate by reference paragraphs 1-8385 as if fully set forth herein.

85.     Valeant has been enriched as a result of its improper use of Plaintiffs' confidential information because, *inter alia*, Valeant's filing of its Citizen Petition has operated to delay approval of Plaintiffs' ANDA thereby resulting in the extension of Valeant's monopoly hold on the Efudex® market and Valeant's subsequent successful startup of Oceanside, its authorized generic, enabling Valeant to benefit substantially from being the first generic entrant to the market and positioning Valeant for long term benefit.

86.     As a result of Valeant's enrichment, Plaintiffs have been harmed by not being able to capitalize on their investment in the research and development and capital expenditures that were incurred to support and file their ANDA.

87.     Plaintiffs' losses are directly related to, and, in fact, are a direct result of, the actions Valeant took after, on information and belief, it acquired Plaintiffs' confidential information.

88.     There is no justification for Valeant's actions.

21

89.    The losses Plaintiffs have suffered as a result of Valeant's actions and consequential enrichment are not addressable by a remedy at law.

## COUNT VII

## NEGLIGENCE AGAINST WILLIAM BLAIR

90.    Plaintiffs incorporate by reference paragraphs 1-8991 as if fully set forth herein.

91.    William Blair represented that the firm had extensive experience in locating and developing potential purchasers and/or backers for pharmaceutical based investments.

92.    As a result of its extensive experience, Plaintiffs put special trust in William Blair to protect their interests and advise them with respect to the proposed transaction.

93.    As a firm of professionals, holding themselves out as specialists in the applicable field, in addition to the duties and obligations required under the various contracts, William Blair owed Plaintiffs a duty to, *inter alia*, protect their confidential information and to act in the best interests of their clients, Plaintiffs.

94.    William Blair breached its duty of care by, *inter alia*, negligently and in a grossly negligent fashion: (a) failing to disclose the nature and extent of its preexisting business relationship with Valeant; (b) on information and belief, revealing the Plaintiffs' confidential information to a known competitor; and (c) delivering to Plaintiffs an offer from Valeant for the tretinoin product line that, on information and belief, William Blair knew or should have known was made in bad faith.

22

95.     The breach of the duty of care committed by William Blair proximately caused substantial damage to Plaintiffs, in an amount exceeding $125 million.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Spear Pharmaceuticals, Inc. and Spear Dermatology Products, Inc., pray that the Court award them the following relief:

A.     a judgment that William Blair has breached the Confidentiality Agreement;

B.     a judgment that William Blair has breached the Engagement Letter;

C.     a judgment that Valeant has breached the Evaluation Agreement;

D.     a judgment that William Blair has breached the implied duty of good faith and fair dealing;

E.     a judgment that Defendants misappropriated Plaintiffs' trade secrets;

F.     a judgment that Defendant Valeant was unjustly enriched;

G.     a judgment that William Blair was negligent;

H.     an award of compensatory damages in the amount of $125 million;

I.     an award of punitive damages in an amount to be determined at trial;

J.     an award of reasonable attorneys' fees and costs; and

K.     such further relief as this Court may deem necessary, just, and proper.

**JURY TRIAL DEMAND**

Plaintiffs hereby demand a jury trial on all issues so triable.

~~MORRIS, NICHOLS, ARSHT & TUNNELL~~MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Plaintiffs Spear Pharmaceuticals, Inc.
and Spear Dermatology Products, Inc.*

OF COUNSEL:

~~Of Counsel:~~

Steven Lieberman
Jason M. Shapiro
Lisa N. Phillips
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K Street, N.W.
Suite 800
Washington, DC  20005
(202) 783-6040

~~Dated:  December 17, 2007~~
April    , 2008

24