# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SPEAR PHARMACEUTICALS, INC. and SPEAR DERMATOLOGY PRODUCTS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 07-821-JJF |
| v. | ) ) | |
| WILLIAM BLAIR & COMPANY, L.L.C., and VALEANT PHARMACEUTICALS INTERNATIONAL, | ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANT WILLIAM BLAIR & COMPANY, L.L.C.'S
## OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
## THE SUPPLEMENTAL COMPLAINT

Of Counsel:
Walter C. Carlson
Hille R. Sheppard
Kevin C. Pecoraro
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Dated: July 9, 2008

Gregory V. Varallo (#2242)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
920 King Street
Wilmington, Delaware 19801
Varallo@rlf.com
Fineman@rlf.com
(302) 651-7700
Attorneys for Defendant
William Blair & Company, L.L.C.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ......................................................................................................... 1

NATURE AND STAGE OF THE PROCEEDING............................................................ 2

SUMMARY OF ARGUMENT ....................................................................................... 3

STATEMENT OF FACTS ............................................................................................. 3

      A.      Plaintiffs' ANDA ................................................................................. 3

      B.      Valeant's Citizen Petition ................................................................... 4

      C.      Blair's Engagement To Sell Plaintiffs' Tretinoin Products ...................... 5

      D.      Blair's Knowledge Of Plaintiffs' Development Of A Generic Version Of Efudex ............................................................................................... 6

ARGUMENT ............................................................................................................... 7

I.      PLAINTIFFS' ALLEGATIONS LACK SUFFICIENT FACTS TO SHOW THAT PLAINTIFFS HAVE ANY PLAUSIBLE ENTITLEMENT TO RELIEF ............. 7

II.     ALL OF PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE BLAIR'S ALLEGED BREACH COULD NOT, AS A MATTER OF LAW, BE THE PROXIMATE CAUSE OF PLAINTIFFS' INJURY. ........................................... 11

CONCLUSION ........................................................................................................... 17

# TABLE OF AUTHORITIES

## CASES

*Adkins v. Rumsfeld,*
    450 F. Supp. 2d 440 (D. Del. 2006)................................................................5

*Baraka v. McGreevey,*
    481 F.3d 187 (3d Cir. 2007), *cert. denied,* 128 S. Ct. 612 (2007)............................7

*Barr Labs., Inc. v. Quantum Pharmics, Inc.,*
    827 F. Supp. 111 (E.D.N.Y. 1993) ...................................................................14

*Barr Labs., Inc. v. Quantum Pharmics, Inc.,*
    No. 90-CV-4406, 1994 WL 1743983 (E.D.N.Y. Feb. 7, 1994) ............................14

*Barr Labs., Inc. v. Thompson,*
    238 F. Supp. 2d 236 (D.D.C. 2002) ................................................................16

*Bell Atlantic Corp. v. Twombly,*
    127 S. Ct. 1955 (2007)........................................................................ *passim*

*Bielek v. Allegheny Ludlum Corp.,*
    No. 2:04-cv-1910, 2006 U.S. Dist. LEXIS 73335 (W.D. Pa. Sept. 22, 2006)...........9

*Bristol-Myers Squibb Co. v. Shalala,*
    923 F. Supp. 212 (D.D.C. 1996) ....................................................................12

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997).........................................................................4

*City of Columbia v. Omni Outdoor Adver., Inc.,*
    499 U.S. 365 (1991)....................................................................................14

*DM Research, Inc. v. College of American Pathologists,*
    170 F.3d 53 (1st Cir. 1999).......................................................................8, 10

*Doe v. Northwestern Univ.,*
    682 N.E.2d 145 (Ill. App. Ct. 1997) ..............................................................11

*Dow Chemical Co. v. Exxon Corp.,*
    30 F. Supp. 2d 673 (D. Del. 1998).................................................................15

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961)....................................................................................13

*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,*
    637 F.2d 105 (3d Cir. 1980)..........................................................................9

ii

*Egervary v. Young,*
   366 F.3d 238 (3d Cir. 2004) ........................................................................13

*Eli Lilly & Co. v. Roussel Corp.,*
   23 F. Supp. 2d 460 (D.N.J. 1998) ...........................................................14, 15

*Exxon Co., U.S.A. v. Sofec, Inc.,*
   517 U.S. 830 (1996) ....................................................................................11

*F.E. Myers Co. v. Pipe Maint. Servs., Inc.,*
   599 F. Supp. 697 (D. Del. 1984) ................................................................11

*Fisons Corp. v. Shalala,*
   860 F. Supp. 859 (D.D.C. 1994) .................................................................12

*Galen v. County of Los Angeles,*
   477 F.3d 652 (9th Cir. 2007) ......................................................................13

*Massachusetts School of Law at Andover, Inc. v. Am. Bar Ass'n,*
   937 F. Supp. 435 (E.D. Pa. 1996) ..............................................................14

*Pfizer Inc. v. Shalala,*
   182 F.3d 975 (D.C. Cir. 1999) ....................................................................16

*Phillips v. County of Allegheny,*
   515 F.3d 224 (3d Cir. Feb. 5, 2008) ..........................................................7, 8

*Schering Corp. v. FDA,*
   51 F.3d 390 (3d Cir. 1995) .........................................................................12

*Townes v. City of New York,*
   176 F.3d 138 (2d Cir. 1999) .......................................................................13

*United Mine Workers of Am. v. Pennington,*
   381 U.S. 657 (1965) ....................................................................................13

## OTHER AUTHORITIES

21 U.S.C. § 355(j)(2)(A)(iv) ..............................................................................4, 12

21 U.S.C. § 355(j)(4)(A) .......................................................................................12

21 U.S.C. § 355(j)(8) ..............................................................................................4

21 U.S.C. § 393(b) ...........................................................................................12, 16

28 U.S.C. § 1332 .....................................................................................................3

21 C.F.R. § 320.1 ....................................................................................................4

RLF1-3300797-1

Restatement (Second) of Contracts § 351................................................................................11

Restatement (Second) of Torts § 440.....................................................................................13

iv

Defendant William Blair & Company, L.L.C. ("Blair"), respectfully submits this opening brief in support of its motion to dismiss the supplemental complaint.

## INTRODUCTION

This case arises from plaintiffs' frustration with respect to the U.S. Food and Drug Administration's ("FDA") review of their Abbreviated New Drug Application ("ANDA") for a generic version of the drug Efudex. Efudex is a branded (*i.e.*, non-generic) drug manufactured by defendant Valeant Pharmaceuticals International ("Valeant"). Plaintiffs are two related drug companies that developed a generic version of Efudex. Blair provided investment banking services to plaintiffs when plaintiffs sold an unrelated line of business to another company.

In their supplemental complaint, plaintiffs speculate -- without any factual basis -- that Blair leaked confidential information to Valeant concerning plaintiffs' development of the generic version of Efudex, and that Valeant responded to this information by filing a "Citizen Petition" with the FDA concerning the nature of the proof the agency should require in deciding whether to approve a generic version of Efudex. Plaintiffs do not allege that Valeant's Citizen Petition lacked a valid scientific basis, that Valeant presented false information to the FDA, or that Valeant improperly sought to influence the FDA in any way.

Plaintiffs have sued both Blair and Valeant on a variety of tort and contract theories, all of which are based on this supposed leak of confidential information from Blair to Valeant and Valeant's supposed use of this information in its Citizen Petition to the FDA. Plaintiffs assert that approval of their ANDA was improperly delayed as a result of Valeant's Citizen Petition. Plaintiffs seek damages based on alleged lost sales of their generic drug due to the alleged delay of its FDA approval.

Plaintiffs' supplemental complaint is fundamentally deficient and should be dismissed for two basic reasons. *First*, plaintiffs have not alleged sufficient facts to show that they have any

1

plausible entitlement to relief. Plaintiffs offer nothing other than conjecture and coincidence in support of their claims. Plaintiffs' speculative theory -- that Blair leaked confidential information to Valeant and that Valeant in turn misused that information in filing its Citizen Petition with the FDA -- is wholly dependent on unwarranted factual inferences that this Court should not accept as true on a motion to dismiss. Plaintiffs cannot state a claim simply by speculating, with no factual support, that Blair leaked information to Valeant.

*Second*, plaintiffs' claims fail because the FDA's exercise of its independent judgment and discretion in evaluating plaintiffs' ANDA is the direct and proximate cause of the alleged delay in approval. The FDA is the federal regulator charged with the responsibility of ensuring the safety and efficacy of plaintiffs' drug. Regardless of whether Blair and Valeant did or did not act as plaintiffs allege, the FDA exercised its own judgment and discretion in determining when and how to conduct its review of plaintiffs' ANDA. The FDA's independent actions and decisions sever, as a matter of law, any causal connection between Blair's and Valeant's alleged conduct and plaintiffs' alleged injury. Given the FDA's role as decision maker, there can be no proximate causation, which is an essential element of all of plaintiffs' claims. The supplemental complaint therefore should be dismissed.

## NATURE AND STAGE OF THE PROCEEDING

Plaintiffs filed their original complaint on December 17, 2007. Defendants moved for dismissal on February 15, 2008. On April 11, 2008, the FDA approved plaintiffs' ANDA and denied Valeant's Citizen Petition. Plaintiffs filed the supplemental complaint incorporating this development on April 18, 2008.[1] The supplemental complaint purports to state claims against

---

[1] Subsequent to the filing of the supplemental complaint, Valeant filed an action against the FDA in the Central District of California for an injunction to suspend the approval of the ANDA. *See infra* p. 5.

Blair for breach of contract, breach of the implied covenant of good faith and fair dealing, trade secret misappropriation, and negligence. Plaintiffs assert that this Court has jurisdiction over their claims pursuant to 28 U.S.C. §§ 1332(a)(1) and (c)(1). This motion is Blair's first responsive filing to the supplemental complaint.

## SUMMARY OF ARGUMENT

1.      The supplemental complaint should be dismissed because plaintiffs fail to allege sufficient facts to show that they have any plausible entitlement to relief. Plaintiffs' conclusory allegations do not meet the basic standard of plausibility because they rest on unwarranted factual inferences that this Court should not accept as true.

2.      The supplemental complaint should be dismissed because the FDA's actions in reviewing plaintiffs' ANDA involved the exercise of the agency's independent judgment. The FDA is the superseding cause of plaintiffs' alleged injury. As a matter of law, any causal connection between Blair's and Valeant's alleged conduct and plaintiffs' alleged injury is severed and proximate causation, a required element of all of plaintiffs' claims, cannot be established.[2]

## STATEMENT OF FACTS

### A.      Plaintiffs' ANDA

Plaintiffs developed a generic version of Valeant's Efudex cream product. (Supp. Compl. ¶ 12). Efudex is a prescription topical drug used to treat two different conditions: actinic keratosis ("AK"), which is a pre-cancerous lesion of the epidermis, and superficial basal cell carcinoma ("sBCC"), which is a skin cancer that is localized in the epidermis. (*Id.* ¶ 13).

---

[2] Plaintiffs' individual counts are defective for other, independent reasons as well. Because the two deficiencies of the supplemental complaint discussed in the brief are so fundamental, Blair will not present the Court with unnecessary count-specific arguments in this motion.

3

Plaintiffs allege that they consulted with the FDA in designing the clinical trial used to support their ANDA for their generic version of Efudex. (*Id.* ¶ 14). Plaintiffs allege that, because Efudex is primarily used to treat AK, plaintiffs proposed a clinical trial involving only AK and that the FDA "agreed" that such a trial would suffice to establish that plaintiffs' generic version of Efudex is bioequivalent to brand name Efudex with respect to both AK and sBCC.[3] (*Id.*). Plaintiffs thereafter apparently conducted a 318-patient clinical trial focused on AK, and did not conduct a clinical trial for sBCC. (*See id.* ¶¶ 14, 38). Plaintiffs filed their ANDA for their generic version of Efudex with the FDA on January 3, 2005. (*Id.* ¶ 40).

**B.    Valeant's Citizen Petition**

On December 21, 2004, Valeant filed a Citizen Petition with the FDA requesting that any ANDA for generic versions of Efudex be supported by a study involving sBCC, which Valeant characterized as the most difficult condition to treat for which Efudex has been approved, and a condition with a different, and deeper, site of drug action than AK. (*Id.* ¶¶ 41-43; Valeant Citizen Petition at 8-13 (attached as Exhibit A).[4]) Plaintiffs contend that the FDA's consideration of Valeant's Citizen Petition resulted in the FDA delaying its approval of plaintiffs' ANDA. (Supp. Compl. ¶¶ 41, 47, 49).

---

[3] A generic drug is "bioequivalent" to its brand name analog if it delivers the same amount of the active ingredient at the site(s) of drug action at the same rate as the brand name drug. 21 U.S.C. § 355(j)(8); 21 C.F.R. § 320.1(a).

[4] The Citizen Petition is a public document, accessible from the FDA's docket website at: http://www.fda.gov/ohrms/dockets/dockets/04p0557/04p0557.htm (last visited July 1, 2008). The Court may consider the Citizen Petition, which is integral to the supplemental complaint, without converting the instant motion into a motion for summary judgment. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

On June 14, 2005, the FDA informed Valeant that it had "not yet resolved the issues raised" in Valeant's Citizen Petition. (FDA interim response (attached as Exhibit B).[5]) The FDA stated that the reason it had "been unable to reach a decision on [the] petition was because it raises complex issues requiring extensive review and analysis by Agency officials." (*Id.*). The FDA further stated that it would "respond to your [Valeant's] petition as soon as we have reached a decision on your request." (*Id.*).

On April 11, 2008, the FDA approved plaintiffs' ANDA. (Supp. Compl. ¶ 51). On that same day, the FDA entered an order denying Valeant's Citizen Petition. (*Id.* ¶ 52). Shortly thereafter, Valeant filed an action against the FDA in the Central District of California, seeking to undo the approval of plaintiffs' ANDA. *Valeant Pharmaceuticals International v. Leavitt*, No. SA CV 08-00449-AG (filings therein hereinafter identified by Docket Number). The FDA sought a stay of that litigation, which was granted, in order for it to reconsider its approval of plaintiffs' ANDA. (Docket 26, 31, 58, 61). After more than a four-week review, the FDA re-approved plaintiffs' ANDA, and the district court thereafter denied Valeant's motion for a preliminary injunction. (Docket 82, 124).

### C.   Blair's Engagement To Sell Plaintiffs' Tretinoin Products

In 2004, plaintiffs engaged Blair to assist them in selling their line of tretinoin products (generic versions of Retin-A) to another pharmaceutical company. (Supp. Compl. ¶¶ 16-17, 27-28). On May 6, 2004, plaintiffs and Blair executed a confidentiality agreement, under the terms of which plaintiffs agreed to provide confidential business information to Blair and Blair agreed to use such information only in connection with the proposed sale of plaintiffs' tretinoin products

---

[5] The FDA's interim response is a public document available on the FDA's docket website. *Supra* note 4. The Court may consider the FDA's interim response without converting the instant motion into one for summary judgment. *Adkins v. Rumsfeld*, 450 F. Supp. 2d 440, 444 (D. Del. 2006).

and to disclose it only with the prior written consent of plaintiffs. (*Id.* ¶¶ 19-20). Plaintiffs and Blair subsequently executed an agreement setting the terms of the engagement. (*Id.* ¶¶ 25-28).

As part of the process of marketing plaintiffs' tretinoin products, Blair identified a number of possible purchasers, including defendant Valeant. (*Id.* ¶ 30). Plaintiffs approved the disclosure of plaintiffs' confidential information to Valeant. (*Id.* ¶ 31). Valeant executed an Evaluation Agreement on September 23, 2004, whereby it agreed to limit its use of the confidential information to assessing a possible purchase of plaintiffs' tretinoin products. (*Id.* ¶ 32). In mid-October 2004, Valeant communicated to Blair that, although it was "interested in the opportunity" to purchase plaintiffs' tretinoin products, it declined to bid because of the asking price. (*Id.* ¶¶ 35-37). Later, on December 29, 2004, Valeant submitted an "indication of interest" to purchase plaintiffs' tretinoin products, but plaintiffs rejected Valeant's indication because they were already in negotiations with another company to sell the tretinoin products. (*Id.* ¶¶ 45-46).

**D.    Blair's Knowledge Of Plaintiffs' Development Of A Generic Version Of Efudex**

Blair Vice President Brian Scullion ("Scullion") was plaintiffs' principal contact at Blair. (*Id.* ¶¶ 17, 28-29). Plaintiffs allege that plaintiffs' founder and President, Dr. K.L. Spear ("Spear"), provided Scullion on May 13 and July 28, 2004 with unspecified confidential information that a generic Efudex product was in plaintiffs' product development pipeline. (*Id.* ¶ 38). Plaintiffs further allege that, on October 31, 2004, Spear sent Scullion an email stating that plaintiffs intended to file an ANDA for generic Efudex at the end of November 2004 and that a "318 patient Bioequivalence study" had been completed. (*Id.*) Spear allegedly informed Scullion that the clinical trial was for AK in a separate communication, although plaintiffs do not identify the time, place, or manner of such communication in their complaint. (*Id.*) Based solely

on the timing of Valeant's Citizen Petition -- filed December 21, 2004 -- and plaintiffs' ANDA --

filed January 3, 2005 -- plaintiffs now allege "on information and belief" that Scullion leaked

plaintiffs' confidential information to Valeant some time prior to December 21, 2004, and that

Valeant misused that information in filing its Citizen Petition with the FDA. (*Id.* ¶¶ 41-43).

## ARGUMENT

**I.   PLAINTIFFS' ALLEGATIONS LACK SUFFICIENT FACTS TO SHOW THAT PLAINTIFFS HAVE ANY PLAUSIBLE ENTITLEMENT TO RELIEF.**

All of plaintiffs' claims fail because the allegations of the supplemental complaint do not

show plaintiffs to have a plausible entitlement to relief. The Supreme Court has made it clear

that, even under the generous standards of notice pleading, a complaint must state a plausible, as

opposed to merely possible, entitlement to relief. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct.

1955, 1965-66, 1974 (2007). In order to meet the basic requirement of plausibility, a complaint

must provide the grounds for any claimed entitlement to relief and must contain "enough factual

matter" to "raise a right to relief above the speculative level." *Id.* at 1965; *see also Phillips v.*

*County of Allegheny*, 515 F.3d 224, 234-35 (3d Cir. 2008) (a claimant must make a "sufficient

showing of enough factual matter" "to justify moving the case beyond the pleadings to the next

stage of litigation").

Plaintiffs' allegations fail to satisfy this basic standard. Plaintiffs allege some

background facts, but all the central allegations regarding Blair's alleged disclosure of plaintiffs'

confidential information, and how it allegedly led to plaintiffs' injury, are pure speculation.

They rest on unwarranted factual inferences that are pleaded solely on information and belief.

Although plaintiffs are entitled to have reasonable inferences drawn in their favor, courts are not

required to accept as true unsupported conclusions or unwarranted inferences cast in the form of

factual allegations. *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir.), *cert. denied*, 128 S. Ct.

612 (2007). Such speculative allegations cannot suffice, absent "further factual enhancement," to propel plaintiffs' supplemental complaint across "the line between possibility and plausibility of entitlement to relief." *Twombly*, 127 S. Ct. at 1966 (quotation marks and alteration omitted); *see also Phillips*, 515 F.3d at 234 ("the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims"). Because plaintiffs have not crossed the threshold of plausibility, their claims should be dismissed. "[T]he price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome. Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition." *DM Research, Inc. v. College of American Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) (emphasis in original).

The thin, insubstantial quality of plaintiffs' key allegations, all of which rest on unsupported conclusions and unwarranted factual inferences, is plain. According to plaintiffs, Valeant's Citizen Petition *must* have been triggered by Valeant acquiring knowledge of *plaintiffs'* planned ANDA, and the source of that knowledge *must* have been Blair. But those inferences are wholly unwarranted and rest only on: (1) the fact that Valeant's Citizen Petition was filed on December 21, 2004, after plaintiffs allegedly had provided Blair with information about their clinical trial (Supp. Compl. ¶¶ 38, 41), and (2) plaintiffs' contention that Valeant's Citizen Petition requested "specific[]" relief that "reflect[ed] that Valeant had learned not only of Plaintiffs' confidential information with respect to Plaintiffs' plan for filing an ANDA, but also the precise nature of the clinical trial they had conducted" (*id.* ¶ 43).

These are hardly sufficient grounds to plead a plausible basis for relief. *First*, plaintiffs' allegation, "on information and belief," that "the timing of the Citizen's Petition was not

8

coincidental" (*id.* ¶ 42) is patently insufficient under *Twombly* because the facts alleged provide *no* reason to believe that the timing of the Citizen Petition was *anything but coincidental.  See Twombly*, 127 S. Ct. at 1965-66.  To infer from the mere fact that the Citizen Petition was filed on December 21, 2004 that it had anything to do with information that allegedly was previously provided to Blair is to engage in the logical fallacy of *post hoc ergo propter hoc*:  "reasoning from sequence to consequence, [and] assuming a causal connection between two events merely because one follows the other."  *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 116 (3d Cir. 1980); *see also Bielek v. Allegheny Ludlum Corp.*, No. 2:04-cv-1910, 2006 U.S. Dist. LEXIS 73335, at *49 n.4 (W.D. Pa. Sept. 22, 2006) ("[t]he mere temporal sequence of events is not evidence of causation under the law").  Unreasoned conjecture of this type cannot be the basis for a plausible claim.

*Second*, the fact that Valeant suggested to the FDA that any generic versions of Efudex should demonstrate bioequivalence through a clinical study treating sBCC does not provide any support for plaintiffs' contentions that Valeant had knowledge of the "precise nature" (Supp. Compl. ¶ 43) of plaintiffs' clinical trial (*i.e.*, that it involved only AK), or that Valeant's Citizen Petition was filed in anticipation of plaintiffs' (as opposed to some other drug maker's) ANDA, let alone that Blair was the source of Valeant's alleged knowledge of plaintiffs' plans.[6]  The fact that Valeant filed its Citizen Petition could reasonably support the inference that Valeant

---

[6] Significantly, the October 31 email from Spear to Scullion that included some details regarding plaintiffs' clinical trial does *not* mention that the clinical trial was for AK.  (Supp. Compl. ¶ 38). The supplemental complaint does not indicate when, where, or in what manner Spear allegedly told Scullion that plaintiffs' clinical trial was for AK only, even though that information (a) clearly is within the knowledge of plaintiffs and (b) serves as one of the linchpins of plaintiffs' theory connecting Valeant's Citizen Petition to Blair.

anticipated that *some* competitor might file an ANDA for generic Efudex.[7]  But any further inference is unwarranted.

The "specific[]" relief requested in the Citizen Petition does not support the conclusion that Valeant knew of plaintiffs' ANDA.  The Citizen Petition simply requested that the FDA not allow any generic version of Efudex cream on the market unless the bioequivalence of the generic drug had been demonstrated in patients with sBCC, the more serious and most difficult to treat condition for which Efudex is approved, and the condition with a deeper site of drug action.[8]  (Ex. A at 8-13).  The fact that Valeant requested that the FDA set a higher, rather than lower, bar for potential manufacturers of generic versions of Efudex does not in the least indicate that Valeant knew plaintiffs were pursuing their ANDA, that Valeant knew that plaintiffs' clinical trial was for AK only, or that Blair had disclosed plaintiffs' confidential information to Valeant.  Drawing any other conclusion requires pure speculation, and the law is clear that "the discovery process is not available where, at the complaint stage, a plaintiff has nothing more than unlikely speculations." *DM Research*, 170 F.3d at 56.

---

[7] Plaintiffs' contention that Valeant's petition was necessarily aimed at blocking *their* ANDA is belied by the fact that Valeant had good reason to believe that *other* competitors might try to obtain FDA approval for generic versions of Efudex cream.  Taro Pharmaceuticals had already obtained approval of ANDAs for its generic versions of Efudex 2% and 5% topical solution. *See* FDA Orange Book at: htttp://www.accessdata.fda.gov/scripts/cder/ob/docs/obdetail.cfm? Appl_No= 076526& TABLE1=OB_Rx (last visited June 26, 2008) (searchable at http://www.fda.gov/ cder/ob/docs/queryai.htm (search term: fluorouracil)) (attached as Ex. C). The Court may take judicial notice of public records such as the FDA's Orange Book without converting the instant motion into a motion for summary judgment. *See supra* note 5.

[8] Given that sBCC is a skin cancer, while AK is not (Supp. Compl. ¶ 13), a requirement that generic versions of Efudex demonstrate their effectiveness with respect to sBCC makes sense.  If an sBCC patient were prescribed a generic version of Efudex that had been tested for bioequivalence to the brand name drug only with respect to AK, and it were subsequently determined that the generic version did not treat sBCC as well as the brand name drug, the sBCC patient would have received suboptimal treatment of his skin cancer, with potentially serious consequences. (Ex. A at 14).

In sum, all of plaintiffs' key allegations linking Blair's alleged disclosure to Valeant's Citizen Petition are dependent upon unwarranted factual inferences and supported only by plaintiffs' speculation. Such allegations are inadequate to make the requisite "showing" of a plausible entitlement to relief. *Twombly*, 127 S. Ct. at 1965 n.3. Accordingly, the supplemental complaint should be dismissed.

## II.    ALL OF PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE BLAIR'S ALLEGED BREACH COULD NOT, AS A MATTER OF LAW, BE THE PROXIMATE CAUSE OF PLAINTIFFS' INJURY.

Not only do plaintiffs' wholly speculative allegations with respect to Blair fail to state a claim under *Twombly*, but plaintiffs' allegations regarding the FDA's independent actions also demonstrate that plaintiffs have no claim.

All of plaintiffs' claims against Blair sound in tort and contract. In order to prevail on any of their claims, plaintiffs must establish that Blair's alleged breach was the proximate cause of their injury. *E.g., Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 839-40 (1996) ("Although the principles of legal causation sometimes receive labels in contract analysis different from the 'proximate causation' label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well."); *F.E. Myers Co. v. Pipe Maint. Servs., Inc.*, 599 F. Supp. 697, 703 (D. Del. 1984) ("burden remains on the claimant to establish a 'proximate causal relationship' between any breach of the agreement and the damages caused"); *Doe v. Northwestern Univ.*, 682 N.E.2d 145, 155 (Ill. App. Ct. 1997) (in both tort and contract a defendant is liable only for consequences that are the proximate results of its conduct); Restatement (Second) of Contracts § 351 Comment a ("the requirement of foreseeability is a more severe limitation of liability than is the requirement of substantial or 'proximate' cause in the case of an action in tort"). Plaintiffs' allegations make clear that plaintiffs cannot establish proximate causation for any of their claims. To the contrary, plaintiffs' allegations establish as a

11

matter of law that any connection between Blair's alleged breach (the supposed provision of confidential information to Valeant) and plaintiffs' alleged injury (alleged lost sales due to the FDA's evaluation of their ANDA taking longer than the average time of 16.6 months) is severed by the intervening actions of the FDA.

The immediate and direct cause of plaintiffs' alleged injury was the FDA's careful evaluation of plaintiffs' ANDA. The FDA regulates drugs in accordance with its broad mission to promote and protect the American public's health and safety. 21 U.S.C. § 393(b). The FDA will not approve an ANDA for a generic drug until the applicant has proven, to the FDA's satisfaction, that the generic drug is the "bioequivalent" of a branded drug that already has been shown to be safe and efficacious. 21 U.S.C. § 355(j)(2)(A)(iv). Applicants also must prove that they can manufacture the drug according to specifications and without impurities. 21 U.S.C. § 355(j)(4)(A). The FDA has considerable discretion in how it chooses to fulfill its mandate and in how it assesses bioequivalence. *Schering Corp. v. FDA*, 51 F.3d 390, 399-400 (3d Cir. 1995); *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 217 (D.D.C. 1996); *Fisons Corp. v. Shalala*, 860 F. Supp. 859, 865 (D.D.C. 1994). The FDA's deliberate process of evaluating plaintiffs' ANDA demonstrates how seriously the agency takes its statutory obligation to exercise its independent judgment, expertise, and discretion to ensure the safety of all generic versions of approved drugs. Regardless of whether the FDA's approval process was lengthened by Valeant's Citizen Petition, it was the FDA's decision to devote considerable time and resources to the health and safety issues presented by plaintiffs' generic drug that was the superseding cause of plaintiffs' alleged injury. Any claims against Blair therefore fail for lack of proximate causation.

12

The law is clear that when the immediate and direct cause of a claimant's injury is a decision by a judge or agency exercising independent judgment -- here, the FDA's determination to review plaintiffs' ANDA with care -- any causal connection between the claimant's alleged injury and a defendant's allegedly wrongful conduct that led to the governmental decision is severed. *E.g.*, *Galen v. County of Los Angeles*, 477 F.3d 652, 663 (9th Cir. 2007) (defendant police officers were not proximate cause of unconstitutionally excessive bail: "a judicial officer's exercise of independent judgment in the course of his official duties is a superseding cause that breaks the chain of causation linking law enforcement personnel to the officer's decision"); *Egervary v. Young*, 366 F.3d 238, 250 (3d Cir. 2004) (defendant attorneys were not proximate cause of legally erroneous court ruling: "the actions of the defendants, while clearly a cause of the plaintiff's harm, do not create liability because of the intervention of independent judicial review, a superseding cause"); *Townes v. City of New York*, 176 F.3d 138, 146-47 (2d Cir. 1999) (defendant police officers who committed unconstitutional search and seizure were not proximate cause of plaintiff's conviction and incarceration: "[t]he state trial court's exercise of independent judgment in deciding not to suppress the evidence, though later ruled to be erroneous, broke the chain of causation"); Restatement (Second) of Torts § 440 Comment b (superseding cause relieves actor from liability; "if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated, there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm").[9]

---

[9] The principle that government action breaks causation also underlies the well-established *Noerr-Pennington* doctrine. When a party exercises its First Amendment rights to petition the government, and the government's resulting action injures a competitor, the proximate cause of the injury is the government's action, and not the actions of the original petitioner. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961); *United Mine*

The very type of government action that is the direct cause of the alleged injury here -- FDA consideration of a generic drug application -- has been held to be a superseding cause precluding liability for the defendant whose misconduct was alleged to have been the originating cause of the plaintiff's injury. For example, in *Barr Laboratories, Inc. v. Quantum Pharmics, Inc.*, 827 F. Supp. 111 (E.D.N.Y. 1993), a generic drug maker alleged that it had wrongfully been deprived of market share because the defendant had entered the market with a competing generic drug by means of a fraudulent ANDA. The FDA had approved the defendant's ANDA, but subsequently rescinded the approval after determining that the ANDA had contained inaccurate information. The court dismissed the complaint, holding that the alleged fraudulent acts were not the proximate cause of the plaintiff's injury because the "alleged losses do not stem from the allegedly false ANDAs filed with the FDA. Those losses depend on the intervening actions of the FDA .... The FDA had discretion in deciding whether or not to issue the licenses to [the defendant]." *Id.* at 116.[10] The same reasoning was applied in *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460 (D.N.J. 1998), in which the court dismissed claims because the defendant competitor's alleged fraud to the FDA in a generic drug application was not the proximate cause of the plaintiff drug company's injury. Rather, the plaintiff's lost sales were the

---

*Workers of Am. v. Pennington*, 381 U.S. 657, 671 (1965); *see also Massachusetts School of Law at Andover, Inc. v. Am. Bar Ass'n*, 937 F. Supp. 435, 439 (E.D. Pa. 1996) (*citing* Areeda & Hovenkamp, *Antitrust Law* § 201 at 14 (1994 Supp.)). Under *Noerr-Pennington*, a party cannot be liable for injuries that indirectly result from its petitioning activity, even if the objective of such activity was to obtain a competitive advantage. *See City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 380-81 (1991).

[10] In denying the subsequent motion for reconsideration, the *Barr* court reaffirmed its determination that the FDA's decision was the superseding cause of the injury, and rejected the plaintiff's argument that the special "'market dynamics' of generic drug sales" justified any departure from the well-established rules of proximate causation. *Barr Labs., Inc. v. Quantum Pharmics, Inc.*, No. 90-CV-4406, 1994 WL 1743983, at *4 (E.D.N.Y. Feb. 7, 1994).

14

result of many intervening causes, including that the FDA had approved the application. *Id.* at 483-85.

As another example, in *Dow Chemical Co. v. Exxon Corp.*, 30 F. Supp. 2d 673 (D. Del. 1998), Judge Robinson held that the plaintiff's injuries resulted from "intervening acts of the PTO [Patent and Trademark Office]." *Id.* at 695. In that case, the plaintiff chemical company alleged that the defendant competitor had made fraudulent misrepresentations before the PTO in order to obtain patent rights, which the PTO granted, causing the plaintiff to suffer lost sales of its competing product. Judge Robinson held that proximate causation was lacking, explaining that "[t]he PTO has discretion whether or not to grant patent property rights and declare interferences and it is only those intervening decisions that connect [the defendant's] allegedly fraudulent misrepresentations to the losses suffered by [the plaintiff]." *Id.*

In contrast to these cases -- which hold that even someone who affects an agency's decision through fraudulent actions is not the proximate cause of an injury caused by the agency's decision -- plaintiffs here do not allege that the FDA's review of their ANDA was flawed or that the integrity of the agency's process was compromised in any manner. For example, plaintiffs do not allege that Valeant's Citizen Petition contained false information or was objectively baseless. To the contrary, there is no basis to conclude that the issues that Valeant raised in the Citizen Petition should not have been given serious consideration by the FDA. The FDA explained as much in its interim response to the Citizen Petition, stating that it could not reach a rapid decision on the Petition because it raised "complex issues requiring extensive review and analysis by Agency officials." (Ex. B).

Thus, even if one were to assume sufficient for pleading purposes plaintiffs' speculative and purely conclusory allegations that (a) Blair breached its confidentiality agreement with

15

plaintiffs, (b) Valeant thereafter improperly used the information it allegedly obtained from Blair by filing its Citizen Petition (and Valeant thus breached its Evaluation Agreement), and (c) review of Valeant's Citizen Petition was the sole reason why plaintiffs' generic version of Efudex was not approved more quickly, the fact remains that the direct cause of plaintiffs' injury was the *FDA's* decision not to issue a hasty approval of plaintiffs' ANDA. That decision was a product of the FDA's independent judgment and discretion. As a matter of law, the FDA's decision is the superseding cause of plaintiffs' alleged injury and any causal connection between the injury and Blair's alleged breach is severed.[11]

In sum, plaintiffs' allegations do not plead that the FDA's independent actions with regard to the ANDA were based on anything other than legitimate scientific and medical concerns and in accordance with the agency's mission to "promote the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products in a timely manner; [and] with respect to such products, protect the public health by ensuring that ... drugs are safe and effective." 21 U.S.C. § 393(b). The FDA's actions with respect to the ANDA involved the agency's discretion, independent judgment, and scientific expertise. Accordingly, as a matter of law the agency is the superseding cause of plaintiffs' alleged injury and all of plaintiffs' speculative claims fail for lack of proximate cause.

---

[11] The allegation that the FDA supposedly had "agreed" previously that bioequivalence to Efudex could be adequately demonstrated through an AK study (Supp. Compl. ¶ 14) does not disturb this conclusion of law. Even if the FDA had signaled such agreement, that would not ensure approval of the ANDA; demonstrating bioequivalence is only one of several requirements for obtaining ANDA approval. An unsatisfactory result at any of the steps in the process can result in a delay or denial of an ANDA. (*See generally* the interactive flow chart detailing the steps in the ANDA approval process at: http://www.fda.gov/cder/handbook/anda.htm (last visited July 1, 2008).) Moreover, as the FDA's recent reconsideration of the ANDA shows, any such agreement or approval would have been at most provisional, and always subject to revision or rescission by the FDA. *See Pfizer Inc. v. Shalala*, 182 F.3d 975, 980 (D.C. Cir. 1999); *Barr Labs., Inc. v. Thompson*, 238 F. Supp. 2d 236, 246-47, 253 (D.D.C. 2002).

16

## CONCLUSION

For all of the foregoing reasons, defendant William Blair & Company, L.L.C., respectfully requests that the Court enter an order dismissing the supplemental complaint with prejudice.

Of Counsel:
Walter C. Carlson
Hille R. Sheppard
Kevin C. Pecoraro
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Dated: July 9, 2008

Gregory V. Varallo (#2242)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
920 King Street
Wilmington, Delaware 19801
Varallo@rlf.com
Fineman@rlf.com
(302) 651-7700
Attorneys for Defendant
William Blair & Company, L.L.C.

17

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2008, I electronically filed the foregoing document with

the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

Jack B. Blumenfeld, Esquire                  Richard L. Horowitz, Esquire
Morris, Nichols, Arsht & Tunnell LLP         David E. Moore, Esquire
1201 North Market Street                     Potter Anderson & Corroon LLP
P.O. Box 1347                                1313 North Market Street
Wilmington, DE 19899-1347                    P.O. Box 951
                                             Wilmington, DE  19899

I hereby certify that on July 9, 2008, I have sent by Federal Express, the foregoing

document to the following non-registered participant:

Steven Lieberman, Esquire
Rothwell, Figg, Ernst & Manbeck, P.C.
1425 K Street, N.W.
Suite 800
Washington, DC 2005

Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
fineman@rlf.com

RLF1-3300797-1

# EXHIBIT A



International Headquarters
3300 Hyland Avenue  Costa Mesa, CA 92626
714.545.0100  FAX 714.556.0131
www.valeant.com

December 21, 2004

*BY HAND DELIVERY*

Division of Dockets Management
Food and Drug Administration
5630 Fishers Lane, Room 1061
Rockville, Maryland  20852

## CITIZEN PETITION

On behalf of Valeant Pharmaceuticals International ("Valeant"), the undersigned submit this petition under section 505 of the Food, Drug, and Cosmetic Act ("FDCA") and 21 CFR 10.30, among other provisions of law, to ensure that any abbreviated new drug application ("ANDA") for a generic version of Efudex® (fluorouracil) Cream includes data from a comparative clinical study conducted in patients with superficial basal cell carcinoma ("sBCC").

Efudex® Cream is approved for use in the treatment of sBCC when conventional methods of treatment are impractical, and in the treatment of multiple actinic keratoses ("AK").  sBCC occurs in the stratum basale, the deepest sublayer of the epidermis.  AK, by contrast, occurs in the more superficial stratum spinosum, a different site of drug action within the skin.

Under the FDCA, the bioavailability of topical drug products may be assessed "by scientifically valid measurements intended to reflect the rate and extent to which the active ingredient . . . becomes available at *the site of drug action*." 21 USC 355(j)(8)(A)(ii) (emphasis added).  For a product such as Efudex® Cream, which is approved for use at two different sites of action, bioequivalence must be established for each applicable site.  As demonstrated below, an ANDA for a generic version of Efudex® Cream, based solely on a comparative clinical study conducted in patients with AK, would not meet the statutory standard for approval. *See* 21 USC 355(j)(4)(F).

In addition, the Food and Drug Administration ("FDA") has determined that the bioequivalence of topical products approved for multiple uses must generally be established in the most difficult to treat condition. *See* Citizen

Division of Dockets Management
December 21, 2004
Page 2


Petition Response, Docket No. 1995P-0379 (May 22, 2002). Here, as well, a bioequivalence study conducted in patients with AK would not meet the agency's standard. sBCC requires a longer period of treatment, is prone to recur, and is generally regarded as a more difficult condition than AK to treat. A study in the more challenging sBCC population is needed to provide the sensitivity to detect differences between the proposed generic product and the listed drug.

For this reason we submit the following petition.

I.      **ACTION REQUESTED**

The undersigned hereby request that the Commissioner of Food and Drugs refrain from approving any ANDA submitted under section 505(j) of the FDCA for a generic version of Efudex® Cream, unless the application contains data from an adequately designed comparative clinical study conducted in patients with sBCC. *See* 21 USC 355(j). This request also applies to any new drug application ("NDA") submitted under section 505(b)(2) of the FDCA that references Efudex® Cream for its currently approved uses. *See id.* at 355(b)(2).

II.     **STATEMENT OF GROUNDS**

A.      **Factual and Scientific Background**

1.      *Efudex® Cream and Related Products*

Efudex® is approved for use in the topical treatment of multiple actinic or solar keratoses, pre-cancerous growths within the stratum spinosum caused by overexposure to the sun. The product is available in 2% and 5% topical solutions and as a 5% cream. *See* Efudex® Labeling (2004) (attached at Tab A).

The 5% topical solution and cream are also approved for use in the treatment of patients with superficial basal cell carcinoma when conventional methods of treatment are impractical, such as with multiple lesions or difficult treatment sites. *See id.* Basal cell carcinoma is the most common form of cancer in humans. Like AK, it occurs in areas of chronic sun exposure. Unlike AK, however, it originates in the stratum basale, the deepest sublayer of the epidermis. sBCC tumors are also known to grow downward into the dermis and typically are encased in an additional layer of cells. *See* P.G. Lang and J.C. Maize, Sr., *Basal Cell Carcinoma*, in Cancer of the Skin at 101, 109-10 (D.S. Rigel *et al.*, eds. 2005) ("Basal Cell Carcinoma") (attached at Tab B).

Division of Dockets Management
December 21, 2004
Page 3

Two other fluorouracil ("5-FU") products are approved for use in the topical treatment of AK:

- Fluoroplex® (fluorouracil) Cream, 1.0%, is approved for twice daily use in the treatment of multiple actinic (solar) keratoses. *See* Flouroplex® Labeling (2003).

- Carac™ (fluorouracil) Cream, 0.5%, is approved for once daily use in the treatment of multiple actinic or solar keratoses of the face and anterior scalp. *See* Carac™ Labeling (2003).

Neither of these products, however, is approved for use in the treatment of sBCC. A third product, Aldara™ (imiquimod) Cream, 5.0%, was previously approved for use in the treatment of clinically typical AK on the face or scalp in immuno-competent adults. Only recently, on the basis of additional clinical studies, was Aldara™'s sponsor able to gain approval for its use in the treatment of certain cases of biopsy-confirmed, primary sBCC. *See* Aldara™ Labeling (2004).[1]

2.    *Human Skin Physiology*

The human skin is a complex organ that performs several vital functions. It serves as a protective barrier that regulates body temperature and fluid loss, detects sensation and, most importantly, shields the body and internal organs from external harmful agents. This protective effect exists on a variety of levels, because human skin is composed of multiple layers and sublayers, with each site acting as a protective barrier for deeper layers and, ultimately, for the internal organs. The three main sections of the skin, from outermost to innermost, are the epidermis, the dermis, and the hypodermis. *See* A. Williams, *Transdermal and Topical Drug Delivery – From Theory to Clinical Practice* at 2 (2003) ("Topical Drug Delivery") (attached at Tab C).[2]

---

[1]   Aldara™ Cream is also approved for use in the treatment of external genital and perianal warts/condyloma acuminata in individuals 12 years old and above. *See* Aldara™ Labeling.

[2]   The dermis is composed primarily of collagen, elastin fibers, capillaries, lymph nodes, sebaceous glands, sweat glands, and hair follicles. *See* Topical Drug Delivery at 2-5. Relative to the epidermis, permeation of the dermis is generally not as challenging even though the dermis is the thickest layer of the skin. The hypodermis is the deepest layer of the skin and is composed primarily of fat cells that insulate the body and absorb physical shock. *See id.* at 2.

Division of Dockets Management
December 21, 2004
Page 4


The epidermis ranges from 0.06 mm to 0.8 mm in thickness, depending on its location on the body. It is the thinnest of the three layers in the skin, but is considered the most difficult barrier for drugs to permeate. The epidermis itself contains four distinct sites, or sublayers, consisting of cells at different stages of differentiation – the regenerative process by which skin cells mature, die, and are eventually shed:

- The stratum corneum, or the horny sublayer, is the uppermost sublayer of the epidermis. This site consists of flattened, dead keratinocyte cells that have hardened into proteins (keratins);

- Below this is the stratum granulosum, also known as the granular sublayer, where cellular shape flattens, enzymes degrade cell nuclei, and lipids begin to form between cells;

- Below this is the stratum spinosum, or the squamous sublayer, which is composed of several layers of irregularly-shaped cells; and

- Finally, the stratum basale, or the basal sublayer, is the deepest layer of the epidermis, where living cells known as keratinocytes continuously generate new cells through division.

*See id.* at 5-13. These four sublayers are illustrated in the figure below:



**Figure 1. Diagram of the Epidermis**

Division of Dockets Management
December 21, 2004
Page 5

The effective delivery of topical drugs requires drug molecules to permeate these different layers and sublayers of the skin to the target site of action. The rate and extent to which drugs "diffuse" through human skin is therefore critical. "Diffusion" describes the movement of drug molecules along a concentration gradient – from higher concentrations of drug (in the formulation) to lower concentrations (across skin layers and sublayers). In other words, diffusion refers to the active ingredient's permeation through the different layers and sublayers of the skin to the site of action.

The intricate structure of human skin – particularly the resistant nature of the epidermis – can complicate drug uptake. The affinity of cell membranes to the lipid bilayers occupying the intercellular space in the horny sublayer creates a tightly stacked and cohesive "brick-and-mortar" formation. For this reason, the stratum corneum is considered the predominant barrier to topical drug delivery. *See id.* at 5, 9-10. It is, however, not the exclusive barrier. Drug molecules must also permeate or navigate around the cells below the stratum corneum to reach the deeper sublayers and sites of action within the epidermis.

## B.    Statutory and Regulatory Background

Under the FDCA, a sponsor seeking approval of a generic drug must demonstrate that the proposed product is "the same as" a reference listed drug ("RLD") with respect to active ingredient, dosage form, route of administration, strength, and labeling. 21 USC 355(j)(2)(A). A generic drug also must be shown to be "bioequivalent" to the RLD. *Id.* at 355(j)(2)(A)(iv); 21 CFR 314.94(a)(7).

Generally, a proposed generic drug is considered bioequivalent to the RLD if the rate and extent of absorption of the generic drug do not show a significant difference from the rate and extent of absorption of the RLD when administered under similar experimental conditions. *See* 21 USC 355(j)(8)(B)(i).

Because most drugs are intended to be absorbed into the systemic circulation, bioequivalence typically is demonstrated by pharmacokinetic measures, such as the rate and extent to which the active ingredient is absorbed into the bloodstream. Such measures assess bioequivalence *before* the active ingredient reaches any site of action. For this reason, pharmacokinetic measures act as surrogates for the rate and extent to which the drug becomes available at the site of action. *See generally Approved Drug Products with Therapeutic Equivalence Evaluations* (2004) at Preface 1.3. For a systemically absorbed drug with multiple

Division of Dockets Management
December 21, 2004
Page 6

sites of action, one pharmacokinetic study is generally considered sufficient to establish bioequivalence.

The Medicare Prescription Drug, Improvement, and Modernization Act ("MMA") amended the FDCA to address the issue of bioequivalence for drugs that are not intended to be absorbed into the bloodstream. *See* Pub. L. No. 108-173, 117 Stat. 2066 (2003). As amended, the FDCA allows FDA to establish "alternative, scientifically valid methods" to demonstrate the bioequivalence of such drugs, if those methods are expected to detect a significant difference in safety and therapeutic effect. 21 USC 355(j)(8)(C).

The MMA also amended the FDCA to provide that FDA may assess the bioavailability of non-systemically absorbed drugs "by scientifically valid measurements intended to reflect the rate and extent to which the active ingredient or therapeutic ingredient becomes available at *the site of drug action*." *Id.* at 355(j)(8)(A)(ii) (emphasis added); *see also* 21 CFR 320.1 (defining "bioavailability" and "bioequivalence" based on the rate and extent to which an active ingredient becomes available at the site of drug action).

In contrast to systemically absorbed drugs, the bioequivalence of non-systemic drugs generally cannot be assessed through pharmacokinetic measures. The agency therefore generally requires appropriately designed comparative clinical studies to demonstrate the bioequivalence of such drugs, including topical products. *See* 21 CFR 320.24(b)(4). Unlike pharmacokinetic measures, clinical endpoints assess bioequivalence *after* the drug has reached the site of action and produced a therapeutic effect. As such, a clinical endpoint acts as a surrogate only for the rate and extent to which the drug becomes available at the particular site of action studied.

This fundamental difference in the bioequivalence testing of oral and topical drug products was illustrated in a slide presentation by Dale P. Conner, Pharm.D., Director of the Division of Bioequivalence of the Office of Generic Drugs, on March 12, 2003. *See* Advisory Committee for Pharmaceutical Science ("ACPS") Transcript at 173-78; *compare* Slide 7 *with* Slide 8 (slide presentation attached at Tab D). In short, for a non-systemic drug with more than one "site of drug action," more than one set of "scientifically valid measurements" may be needed to satisfy the statutory standard.

Division of Dockets Management
December 21, 2004
Page 7

III.    **ARGUMENT**

A.    **Comparative Clinical Studies Are Needed To Demonstrate The Bioequivalence Of 5-FU Cream Products**

The agency has yet to define a validated methodology by which sponsors may establish the bioequivalence of topical products through the use of pharmacokinetic measures. *See* 21 CFR 320.24(b)(1). In a 1993 publication, Vinod P. Shah, Ph.D., and other current and former agency officials examined the deficiencies of bioequivalence methods for topical products. *See* V.P. Shah *et al.*, *Bioequivalence of Topical Dermatological Products*, in Topical Drug Bioavailability, Bioequivalence, and Penetration at 393-412 (V.P. Shah & H.I. Maibach eds.) ("Topical Dermatological Products") (attached at Tab E).

The authors observed that, for topical dermatological products other than corticosteroids, suitable pharmacokinetic or pharmacodynamic measures are not available to allow the development of an alternate methodology to assess bioavailability and bioequivalence. *See id.* at 411. For that reason, "comparative clinical studies between the generic and pioneer [topical] products are now required by the FDA to document bioequivalence." *Id.* Similarly, the former director of FDA's Office of Generic Drugs stated in 1998 that "[t]he real important thing [for topical products] is equivalent safety and efficacy which really should be shown in comparative clinical trials." ACPS Transcript (Oct. 23, 1998) (statement of Roger L. Williams, M.D.).

More than a decade after Dr. Shah's article, FDA still has not developed an adequate bioequivalence methodology using pharmacokinetic measures for topical products. As another FDA official stated, "[w]e have struggled for the last 12 years trying to develop a method for assessing the bioequivalence to drugs applied to the skin and we have not been successful in trying to move the decision forward in a consensus way." ACPS Transcript (Mar. 12, 2003) (statement of Ajaz S. Hussain, Ph.D.).[3] And, earlier this year, an Office of Generic Drugs

---

[3]    FDA previously issued a Draft Guidance for Industry: *Topical Dermatological Drug Product NDAs and ANDAs – In Vivo Bioavailability, Bioequivalence, In Vitro Release, and Associated Studies* (June 1998). This document attempted to define an objective method, known as dermatopharmacokinetics ("DPK"), to establish the bioequivalence of topical products through measurement of the active moiety in the stratum corneum. The guidance was withdrawn in 2002 after questions were raised regarding the reproducibility of the methodology and its applicability to products used to treat diseases in different sites in the skin. *See* 67 FR 35122 (May 17, 2002).

Division of Dockets Management
December 21, 2004
Page 8

official confirmed that "[t]he current state of topical bioequivalence is that . . . for
almost all locally acting dermatological products clinical trials are necessary to
demonstrate bioequivalence." ACPS Transcript (Apr. 14, 2004) (statement of Robert
A. Lionberger, Ph.D.).

   Thus, FDA's position could not be clearer:  For locally acting topical
drug products, comparative clinical studies, with clinical endpoints, remain the
norm.  *See* 21 CFR 320.24(b)(4).[4]  As applied here, the sponsor of a generic topical 5-
FU product must conduct at least one comparative clinical study to establish the
bioequivalence of its product to the listed drug.

### B.  The Bioequivalence Of 5-FU Products Must Be Demonstrated For Each Site Of Drug Action

   The FDCA provides FDA with authority to assess the bioavailability of
topical drug products "by scientifically valid measurements intended to reflect the
rate and extent to which the active ingredient . . . becomes available at *the site of
drug action*." 21 USC 355(j)(8)(A)(ii) (emphasis added).  FDA's regulations likewise
require that sponsors demonstrate the bioavailability of topical products for the site
of action:

> For drug products that are not intended to be absorbed into the
> bloodstream, bioavailability may be assessed by measurements
> intended to reflect the rate and extent to which the active ingredient or
> active moiety becomes available at *the site of action.*

21 CFR 320.1(a) (emphasis added); *see id.* at 320.1(e) (defining bioequivalence).

   This focus on the site of drug action is scientifically and medically
appropriate because a single topical product may be intended for use in different
sites of action.  As discussed above, while the bioequivalence of systemically
absorbed drug products may be assessed before the active ingredient reaches any
site (or sites) of action, the bioequivalence of topical products is assessed only *after*

---

[4] In limited circumstances, FDA may waive its requirement for *in vivo* bioequivalence
documentation where equivalence is considered "self-evident."  For example, the agency may
waive the requirement for products in solution, including topical solutions, provided the products
contains no inactive ingredients or other changes in formulation that may significantly affect the
absorption of the active ingredients.  *See* 21 CFR 320.22(b)(3).  On November 5, 2003, FDA
approved ANDA 76-526 for a generic version of Efudex® 2% and 5% topical solution on the basis
of such a waiver.  The issues presented by that approval are not the subject of this petition.

Division of Dockets Management
December 21, 2004
Page 9

the active ingredient has reached a specific site of action. *See supra* at section II.B.
To the extent that FDA is required to assess bioequivalence at the site of action,
products with multiple sites of action may require multiple demonstrations of
equivalence.

   In this case, AK and sBCC are different conditions that occur in
different sites within the skin. AK is a pre-cancerous condition that occurs in the
stratum spinosum. By contrast, sBCC is an actual malignancy that continually
grows, is capable of invading local tissues, and in rare instances may metastasize to
other parts of the body. It occurs in the stratum basale, a sublayer deeper within
the epidermis, close to the dermis. *See id; see also* Basal Cell Carcinoma at 101.
Thus, the treatment of sBCC requires the penetration of 5-FU to the basal sublayer
of the epidermis, rather than simply to the more superficial squamous sublayer, as
with the treatment of AK.[5]

   The agency itself has recognized that the stratum corneum and other
sublayers of the skin function as different sites of action. *See, e.g.*, ACPS Transcript
(Apr. 14, 2004) (statement of Ajaz S. Hussain, Ph.D.) ("Now, if the site of action is
the stratum corneum or the dermis or the follicles, and so forth, clearly that is
important from an efficacy perspective."); *see also id.* (statement of Robert A.
Lionberger, Ph.D.). One of the reasons FDA's DPK guidance document was
withdrawn was the concern that the method could not effectively "assess the
bioequivalence of topical dermatological drug products because the products are
used to treat a variety of diseases in *different parts of the skin*, not just the *stratum
corneum . . . .*" 67 FR at 35123 (first emphasis added).[6]

   In addition, the cell of origin is not only deeper in sBCC than in AK,
but the growth pattern of sBCC is such that the tumors actually grow *downward*
into the papillary dermis, to a much deeper level than where AK is found. *See*

---

[5]   These two conditions also occur on different parts of the body. AK is commonly found on the face.
sBCC more commonly occurs on the chest, back, and arms. The absorption of drugs through the
skin is known to differ among different regions of the body. Generally, skin on the head and neck
is more permeable than skin on the trunk (*i.e.*, the torso), which is more permeable than skin on
the arms and legs. *See* Topical Drug Delivery at 16.

[6]   *See also* Topical Dermatological Products at 401 ("Because a topical dermatological product will
generally be applied to diseased skin, formulation/excipient factors may play a much larger role
in how the drug moves to *the primary site of action within the epidermis or dermis* than in the
case of a solid oral dosage form, for which drug-excipient interactions after absorption are
generally thought not to occur.") (emphasis added).

Division of Dockets Management
December 21, 2004
Page 10

Basal Cell Carcinoma at 109-110. The islands of tumor cells also demonstrate "palisading" on their periphery, meaning that the outer layer of each nest of cells aligns in a parallel array approximately one to three cells thick. These islands are then encased in a thickened dermis (called the fibrovascular stroma) that consists of fibroblasts and mucin, as well as inflammatory cells such as lymphocytes and histiocytes. *See id.* Together, these features may further decrease the absorption and penetration of 5-FU into sBCC tumors. AK remains in the upper epidermis and does not exhibit a growth pattern that creates these additional impediments to absorption.

Because AK and sBCC occur at two different sublayers within the skin, under the FDCA, bioequivalence must be demonstrated for each site of action. It is within the agency's discretion, however, to determine the manner in which the sponsor of a product with multiple indications may demonstrate equivalence at each site of action. *See* Citizen Petition Response, Docket No. 2003P-0140 (Nov. 7, 2002) at 3 ("The number of [bioequivalence] studies necessary for approval will depend on the specific product."). Sponsors should either conduct separate comparative clinical bioequivalence studies for each site of action, or they should conduct a single study for that site from which it is reasonable to extrapolate equivalence for the remaining sites.

With respect to a generic version of Efudex® Cream, a sponsor must conduct a comparative clinical study in patients with sBCC in either case. If FDA determines that a study at one site of action is sufficient, that site must be the stratum basale, and not the stratum spinosum. The basal sublayer is deeper within the epidermis than the squamous sublayer. *See supra* at section II.A. For an active ingredient to become available in the basal cells, it must pass around or through the squamous cells, including both healthy and diseased tissue. A comparative clinical study that shows equivalence with respect to the basal sublayer may be sufficient to demonstrate, by implication, equivalence in the squamous sublayer. This is the case because the drug must have passed through the squamous sublayer to reach the basal cells. Simply put, the same cannot be said for a study conducted only in a disease that occurs in the squamous sublayer.[7]

---

[7] The agency recently demonstrated its recognition that a drug approved as safe and effective in treating AK is not necessarily safe and effective in treating sBCC. In July 2004, FDA approved Metvixia™ (methyl aminolevulinate) Cream, in combination with a proprietary light source, for use in the treatment of AK. On or about December 3, 2004, however, FDA refused to approve Metvixia™ for use in the treatment of sBCC. *See* Photocure Press Release (Dec. 3, 2004) at cws.huginonline.com/P/131151/PR/200412/971251_5.html.

Division of Dockets Management
December 21, 2004
Page 11

Moreover, a generic sponsor may not omit the sBCC indication from the labeling of its product to avoid having to conduct a comparative clinical study in sBCC patients. Such a study is required for the sponsor to meet its burden of demonstrating bioequivalence to Efudex® Cream. Generic products are also required to carry the same labeling as their RLDs, except in certain limited circumstances. *See* 21 USC 355(j)(2)(A)(v); 21 CFR 314.94(a)(8)(iv). A "labeling carve out" based on a sponsor's refusal to demonstrate bioequivalence in all approved indications is not a recognized basis for omitting an indication. *See id.*

### C.    The Bioequivalence Of 5-FU Cream Products Must Be Demonstrated In The Most Difficult To Treat Condition

In addition to the need to establish equivalence for each site of drug action, a proposed generic version of Efudex® Cream must also be shown to be equivalent in the most difficult to treat condition for which the drug is approved. For topical products with multiple indications, bioequivalence may be established by extrapolating from the most difficult condition to all other related conditions. To proceed in the opposite direction, from a showing in the most accessible and easiest to treat condition to the most difficult, would defy sound scientific principles.

#### 1.    *Prevailing Agency Precedent*

The agency has, in fact, already explored and resolved this issue. In a citizen petition response regarding generic ammonium lactate lotion, FDA stated:

> Generally, bioequivalence testing for topical products using clinical studies with clinical endpoints relies on a single study in one indication, usually *the one that is most difficult to treat*. If the generic drug product is shown to be bioequivalent for one indication, it is expected to be bioequivalent for all related indications with the same site of action.

Citizen Petition Response, Docket No. 1995P-0379 at 4 (emphasis added).

The agency explained its focus on the most difficult to treat condition in an earlier petition response involving products approved to treat both roundworm and pinworm infections. There, FDA determined that generic sponsors seeking to demonstrate equivalence through a single study would need to conduct that study in the more difficult infection (roundworm). The agency ruled out pinworm as the

Division of Dockets Management
December 21, 2004
Page 12

test infection because the approved treatment regimen "would eradicate a pinworm infestation, even for relatively bio*in*equivalent products." Citizen Petition Response, Docket No. 1988P-0369 (July 1, 1994) at 3 (emphasis added). Use of the most difficult to treat condition is intended to challenge the proposed generic product, to prevent a poorly performing product from appearing to be equivalent in a simple to treat condition.

Underlying FDA's determination that sponsors should conduct topical bioequivalence studies in the most difficult to treat conditions is the need to ensure the sensitivity of those studies. The nature of studies with clinical endpoints is such that, with high doses or relatively simple conditions, virtually all patients will experience high cure rates, regardless of the equivalence of the tested products. *See generally* ACPS Transcript (Mar. 12, 2003) (statement of Dale P. Conner, Pharm.D.). Such a study is incapable of showing any "separation" between the test and reference products. With a more difficult to treat condition, there is a greater likelihood that differences in the bioavailability of the products will yield differences in cure rates. *See id.* (statement of Dena R. Hixon, M.D.) (describing the selection of the study population and endpoints as among the most significant challenges in conducting topical bioequivalence studies).[8]

2.    *sBCC is More Difficult to Treat*

According to Efudex® Cream's labeling, sBCC is significantly more difficult than AK to treat. For AK, the product is to be applied twice daily in an amount sufficient to cover the patient's lesions. Treatment is simply continued until the patient's inflammatory response reaches the erosion stage, at which time use of the product is stopped. The usual duration of such therapy is only two to four weeks – during which time the condition simply may self-resolve. *See* Efudex® Labeling; J.P. Callen, *Possible Precursors to Keratinocytic Epidermal Malignancies*, in Cancer of the Skin at 96 (attached at Tab F).

---

[8]  One advantage to conducting bioequivalence studies of systemically absorbed drugs in blood is that the dose-response curves are usually linear. Such studies are sensitive to differences in the bioavailability of the tested products – small changes in dose yield differences in response. Comparative clinical studies, however, "generally have a sigmoidal dose-response curve." ACPS Transcript (Mar. 12, 2003) (statement of Dale P. Conner, Pharm.D.); *see also id.* (statement of Dena R. Hixon, M.D.) (discussing a drug product for which there has been difficulty selecting the appropriate study population and endpoints). That means the sponsors must be much more selective in choosing the dose or the patient population to ensure a sufficiently sensitive comparative clinical study.

Division of Dockets Management
December 21, 2004
Page 13

For sBCC, any diagnosis must be confirmed through a biopsy before treatment may begin, because topical 5-FU has not been proven to be effective against other types of cancer. Treatment with the 5% solution or cream must then be applied twice daily for at least three to six weeks, and may be required for *10 to 12 weeks* before the patient's lesions are obliterated. Furthermore, as in any neoplastic condition, the patient must be followed for a reasonable period of time after treatment to determine whether the cancer has been cured or has recurred. *See* Efudex® Labeling; *see also* R.I. Ceilley and J.Q. Del Rosso, *Topical Chemotherapy for the Treatment of Skin Cancer*, in Cancer of the Skin at 620 ("Inadequate treatment may resolve only the superficial component and make the diagnosis of recurrence difficult.") ("Topical Chemotherapy") (attached at Tab G).

In addition, only sBCC can provide the dose-response sensitivity needed for sponsors to conduct adequate bioequivalence studies. A comparative clinical study conducted in patients with AK would not be sensitive enough to detect differences in the bioavailability of the test and reference products. *See* 21 USC 355(j)(8)(C) (providing FDA with authority to establish "scientifically valid methods" to show bioequivalence only if the methods are expected to detect a significant difference in safety and therapeutic effect).

As noted above, Efudex® is approved for use in the treatment of AK in a 2% topical solution. Two other topical 5-FU products, Carac™ Cream, 0.5% and Fluoroplex® Cream, 1.0%, are also approved to treat AK. These three products demonstrate that the use of 5% 5-FU, twice a day for two to four weeks, exposes a typical patient to *five to 10 times* the amount of drug necessary to cure the patient's AK. In a bioequivalence study conducted in AK patients, such a comparatively high dose could well produce high cure rates, even for relatively bioinequivalent products. *See* Topical Chemotherapy at 619 (describing the comparable efficacy in AK of various strengths of 5-FU). Only a study in patients with sBCC would provide the greater sensitivity necessary to detect differences in the bioavailability of the tested products, as the statute requires. *See* 21 USC 355(j)(8).

### D.    The Design Of Any Comparative Clinical sBCC Study Must Reflect The Current State Of The Art

As discussed above, whether FDA concludes that sponsors of generic 5-FU cream products must conduct one or two comparative clinical bioequivalence studies, at least one study must be conducted in patients with sBCC. *See supra* at section III.B. Further, the design of any such clinical study must reflect the

Division of Dockets Management
December 21, 2004
Page 14

agency's current standards for the conduct of a well-controlled study in this patient population. *See* 21 CFR 320.24(b)(4).

One recent example of studies deemed adequate by FDA are those that were conducted in support of Aldara™ Cream. In July 2004, FDA approved Aldara™ Cream for use in the treatment of biopsy-confirmed, primary sBCC. This approval was based on two double-blind, vehicle-controlled clinical trials, in which 364 patients with primary sBCC were treated with Aldara™ Cream or vehicle five times per week for six weeks. Patients with one biopsy-confirmed sBCC tumor were randomized in a 1:1 ratio to active treatment or vehicle (placebo). Twelve weeks after the last scheduled application of the product, the entire target tumor area was clinically assessed, excised, and examined histologically. The primary efficacy endpoint for the studies was the complete response rate, defined as the proportion of patients with clinical (visual) and histological clearance of the sBCC lesion at 12 weeks post-treatment. *See* Aldara™ Labeling.

This represents a valid study design for proposed generic sponsors seeking to show bioequivalence through comparative clinical study. For example, because 5-FU, imiquimod, and other topical agents have only been proven safe and effective in the treatment of sBCC, diagnosis must be confirmed by biopsy before treatment begins. Treatment with 5-FU must then continue for at least three to six week, preferably for 10 to 12 weeks. Finally, because sBCC may recur after treatment, patients' clinical responses must be determined histologically, at least 12 weeks after treatment has stopped. *See, e.g.,* Efudex® Labeling.

## IV.        CONCLUSION

The inadequate treatment of sBCC can lead to serious complications for patients, including the growth of their cancer. In that light, and based on the discussion above, it is critical that FDA not make assumptions about whether a proposed generic product will be safe and effective in treating sBCC, based on a showing of comparable efficacy in patients with AK. These two conditions occur at different sites of drug action and exhibit different growth patterns. Comparable absorption of a drug to one site of action does not demonstrate comparable absorption to another, more difficult to reach site of action. Similarly, comparable efficacy in an easier to treat condition does not demonstrate comparable efficacy in a more difficult to treat condition.

Division of Dockets Management
December 21, 2004
Page 15

      For these reasons, FDA must not allow onto the market generic versions of Efudex® Cream until a demonstration of bioequivalence has been made, at a minimum, in patients with sBCC.

**V.        ENVIRONMENTAL IMPACT**

      The actions requested in this petition are subject to categorical exclusions under 21 CFR 25.31.

**VI.      ECONOMIC IMPACT**

      Information on the economic impact of this proposal will be submitted upon request of the Commissioner of Food and Drugs.

Division of Dockets Management
December 21, 2004
Page 16

**VII.**          **CERTIFICATION**

The undersigned certifies that, to the best knowledge and belief of the undersigned, this petition includes all information and views on which the petition relies, and that it includes representative data and information known to the petitioner which are unfavorable to the petition.

Respectfully submitted,

Kim D. Lamon, M.D., Ph.D.
President and Chief Scientific Officer
Valeant Pharmaceuticals International
3300 Hyland Avenue
Costa Mesa, CA  92626
Fax:  (714) 668-3139
Phone:  (714) 545-0100

Greg J. Kricorian, M.D.
Director, Medical Affairs
Valeant Pharmaceuticals International
3300 Hyland Avenue
Costa Mesa, CA  92626
Fax:  (714) 668-3139
Phone:  (714) 545-0100

cc:     David M. Fox
        Philip Katz
        Brian R. McCormick
        Hogan & Hartson LLP

# EXHIBIT B



DEPARTMENT OF H  TH & HUMAN SERVICES                    Public Health Service

_____

Food and Drug Administration
Rockville MD 20857

JUN 14 2005                              1 6 0 8   5   JUN 17 A9 :34


Kim D. Lamon, M.D., Ph.D.
Greg J. Kricorian, M.D.
Valeant Pharmaceuticals International
3300 Hyland Avenue
Costa Mesa, CA 92626

                              Re:    Docket No. 2004P-0557/CP1

Dear Dr. Lamon and Dr. Kricorian:

I am writing to inform you that the Food and Drug Administration (FDA) has not yet resolved
the issues raised in your citizen petition submitted on December 21, 2004.  Your petition
requests that the Agency refrain from approving any abbreviated new drug application
submitted under section 505(j) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C.
355(j)) for a generic version of Efudex Cream, unless the application contains data from an
adequately designed comparative clinical study conducted in patients with superficial basal cell
carcinoma.

FDA has been unable to reach a decision on your petition because it raises complex issues
requiring extensive review and analysis by Agency officials.  This interim response is
provided in accordance with FDA regulations on citizen petitions (21 CFR 10.30(e)(2)).  We
will respond to your petition as soon as we have reached a decision on your request.

                              Sincerely,

                              Jane A. Axelrad
                              Associate Director for Policy
                              Center for Drug Evaluation and Research


2004P-0557                                                      LET 1

# EXHIBIT C

Active Ingredient Search Results from "OB_Rx" table for query on "fluorouracil."

| Appl No | TE Code | RLD | Active Ingredient | Dosage Form; Route | Strength | Proprietary Name | Applicant |
|---|---|---|---|---|---|---|---|
| 016988 | | Yes | FLUOROURACIL | CREAM, TOPICAL | 1% | FLUOROPLEX | ALLERGAN HERBERT |
| 020985 | | Yes | FLUOROURACIL | CREAM; TOPICAL | 0.5% | CARAC | SANOFI AVENTIS US |
| 077524 | AB | No | FLUOROURACIL | CREAM; TOPICAL | 5% | FLUOROURACIL | SPEAR PHARMS |
| 016831 | AB | Yes | FLUOROURACIL | CREAM; TOPICAL | 5% | EFUDEX | VALEANT PHARM INTL |
| 040279 | AP | Yes | FLUOROURACIL | INJECTABLE; INJECTION | 1GM/20ML (50MG/ML) | FLUOROURACIL | ABRAXIS PHARM |
| 040278 | AP | Yes | FLUOROURACIL | INJECTABLE; INJECTION | 2.5GM/50ML (50MG/ML) | FLUOROURACIL | ABRAXIS PHARM |
| 040279 | AP | Yes | FLUOROURACIL | INJECTABLE; INJECTION | 500MG/10ML (50MG/ML) | FLUOROURACIL | ABRAXIS PHARM |
| 040278 | AP | Yes | FLUOROURACIL | INJECTABLE; INJECTION | 5GM/100ML (50MG/ML) | FLUOROURACIL | ABRAXIS PHARM |
| 040743 | AP | Yes | FLUOROURACIL | INJECTABLE; INJECTION | 1GM/20ML (50MG/ML) | FLUOROURACIL | GENERAMEDIX |
| 040798 | AP | Yes | FLUOROURACIL | INJECTABLE; INJECTION | 2.5GM/50ML (50MG/ML) | FLUOROURACIL | GENERAMEDIX |
| 040743 | AP | Yes | FLUOROURACIL | INJECTABLE; INJECTION | 500MG/10ML (50MG/ML) | FLUOROURACIL | GENERAMEDIX |
| 040798 | AP | Yes | FLUOROURACIL | INJECTABLE; INJECTION | 5GM/100ML (50MG/ML) | FLUOROURACIL | GENERAMEDIX |
| 040334 | AP | Yes | FLUOROURACIL | INJECTABLE; INJECTION | 2.5GM/50ML (50MG/ML) | FLUOROURACIL | TEVA PARENTERAL |
| 040333 | AP | Yes | FLUOROURACIL | INJECTABLE; INJECTION | 500MG/10ML (50MG/ML) | FLUOROURACIL | TEVA PARENTERAL |
| 040334 | AP | Yes | FLUOROURACIL | INJECTABLE; INJECTION | 5GM/100ML (50MG/ML) | FLUOROURACIL | TEVA PARENTERAL |
| 012209 | AP | Yes | FLUOROURACIL | INJECTABLE; INJECTION | 500MG/10ML (50MG/ML) | FLUOROURACIL | VALEANT |
| 076526 | AT | No | FLUOROURACIL | SOLUTION; | 2% | FLUOROURACIL | TARO |

| | | | TOPICAL | | | |
|---|---|---|---|---|---|---|
| 076526 AT | No | FLUOROURACIL | SOLUTION; TOPICAL | 5% | FLUOROURACIL | TARO |
| 016831 AT | Yes | FLUOROURACIL | SOLUTION; TOPICAL | 2% | EFUDEX | VALEANT PHARM INTL |
| 016831 AT | Yes | FLUOROURACIL | SOLUTION; TOPICAL | 5% | EFUDEX | VALEANT PHARM INTL |

Return to Electronic Orange Book Home Page

FDA/Center for Drug Evaluation and Research
Office of Generic Drugs
Division of Labeling and Program Support
Update Frequency:
    Orange Book Data - **Monthly**
    Generic Drug Product Information & Patent Information - **Daily**
    Orange Book Data Updated Through May, 2008
    Patent and Generic Drug Product Data Last Updated. June 20, 2008

Orange Book Detail Record Search
Case 1:07-cv-00821-JJF    Document 23-2    Filed 07/09/2008    Page 23 of 23    Page 1 of 1
Search results from the "OB_Rx" table for query on "076526."

| | |
|---|---|
| Active Ingredient: | FLUOROURACIL |
| Dosage Form;Route: | SOLUTION; TOPICAL |
| Proprietary Name: | FLUOROURACIL |
| Applicant: | TARO |
| Strength: | 2% |
| Application Number: | 076526 |
| Product Number: | 001 |
| Approval Date: | Nov 5, 2003 |
| Reference Listed Drug | No |
| RX/OTC/DISCN | RX |
| TE Code: | **AT** |

Patent and Exclusivity Info for this product: View

| | |
|---|---|
| Active Ingredient: | FLUOROURACIL |
| Dosage Form;Route: | SOLUTION; TOPICAL |
| Proprietary Name: | FLUOROURACIL |
| Applicant: | TARO |
| Strength. | 5% |
| Application Number: | 076526 |
| Product Number: | 002 |
| Approval Date: | Nov 5, 2003 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | **AT** |

Patent and Exclusivity Info for this product: View

Return to Electronic Orange Book Home Page

FDA/Center for Drug Evaluation and Research
Office of Generic Drugs
Division of Labeling and Program Support
Update Frequency:
   Orange Book Data - **Monthly**
   Generic Drug Product Information & Patent Information - **Daily**
   Orange Book Data Updated Through May, 2008
   Patent and Generic Drug Product Data Last Updated: June 20, 2008