# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SPEAR PHARMACEUTICALS, INC.,  )
and SPEAR DERMATOLOGY  )
PRODUCTS, INC.,  )
                )
      Plaintiffs,  )
                )
     v.  )     Civil Action No. 07-821-JJF
                )
WILLIAM BLAIR & COMPANY, L.L.C.,  )
and VALEANT PHARMACEUTICALS  )
INTERNATIONAL,  )
                )
      Defendants.  )

## DECLARATION OF LISA PHILLIPS

I, Lisa Phillips, declare and state as follows:

1.      I am an associate with the firm of Rothwell, Figg, Ernst & Manbeck, co-counsel to Plaintiffs, Spear Pharmaceuticals, Inc. and Spear Dermatology Products, Inc. (collectively, "Spear"), in the above-captioned matter.

2.      This declaration is submitted for the purpose of placing before the Court certain documents relevant to Plaintiffs' Answering Brief in Opposition to the Motion to Dismiss of Defendant Valeant Pharmaceuticals International and Plaintiffs' Answering Brief in Opposition to the Motion to Dismiss of Defendant William Blair & Company, L.L.C.

3.      Attached as **Exhibit A** is a true and correct copy of the Supplemental Complaint in this action, filed on April 18, 2008.

4.      Attached as **Exhibit B** is a true and correct copy of the Findings of Fact and Conclusions of Law, entered by the United States District Court for the Central District of California on June 18, 2008 in *Valeant Pharms. Int'l v. Leavitt*, Action No. 08-00449.

5.      Attached as **Exhibit C** is a true and correct copy of the product insert for Taro Pharmaceutical Industries Ltd.'s fluorouracil topical solution USP, 2% and 5%, issued November 2003.

6.      Attached as **Exhibit D** is a true and correct copy of the preface to the 28th Edition of the Food and Drug Administration Center for Drug Evaluation and Research Approved Drug Products with Therapeutic Equivalence Evaluations (commonly known as the "Orange Book"), accessible at http://www.fda.gov/cder/ob/docs/preface/ecpreface.htm, created on January 30, 2008, last accessed on September 2, 2008.

7.      Attached as **Exhibit E** is a true and correct copy of a Department of Health and Human Services Office of the Inspector General report entitled "The Food and Drug Administration's Generic Drug Review Process," issued in June 2008.


I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements are true and correct of my own knowledge.


Executed this 2nd day of September, 2008


Lisa Phillips

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2008 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to:.

> Richard L. Horwitz, Esquire
> David E. Moore, Esquire
> POTTER ANDERSON & CORROON LLP
>
> Gregory V. Varallo, Esquire
> Steven J. Fineman, Esquire
> RICHARDS, LAYTON & FINGER, P.A.

I further certify that I caused to be served copies of the foregoing document on September 2, 2008 upon the following in the manner indicated:

Richard L. Horwitz, Esquire                      *VIA ELECTRONIC MAIL*
David E. Moore, Esquire                          *and HAND DELIVERY*
POTTER ANDERSON & CORROON LLP
Hercules Plaza – 6th Floor
1313 North Market Street
Wilmington, DE  19801

Richard de Bodo, Esquire                         *VIA ELECTRONIC MAIL*
Siegmund Gutman, Esquire
David G. Chang, Esquire
HOGAN & HARTSON L.L.P.
1999 Avenue of the Stars – Suite 1400
Los Angeles, CA  90067

Michael L. Kidney, Esquire                       *VIA ELECTRONIC MAIL*
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, DC  20004-1109

Gregory V. Varallo, Esquire                      *VIA ELECTRONIC MAIL*
Steven J. Fineman, Esquire                       *and HAND DELIVERY*
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 King Street
Wilmington, DE  19801

Walter C. Carlson, Esquire
Hille R. Sheppard, Esquire
Kevin C. Pecoraro, Esquire
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL  60603

*VIA ELECTRONIC MAIL*

Jack B. Blumenfeld (#1014)

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SPEAR PHARMACEUTICALS, INC. and SPEAR DERMATOLOGY PRODUCTS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 07-821-JJF |
| v. | ) ) | |
| WILLIAM BLAIR & COMPANY, L.L.C., and VALEANT PHARMACEUTICALS INTERNATIONAL, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

### SUPPLEMENTAL COMPLAINT

Plaintiffs, Spear Pharmaceuticals, Inc. and Spear Dermatology Products, Inc. (collectively, "Plaintiffs"), by their undersigned attorneys, hereby allege the following for their Supplemental Complaint against Defendants, William Blair & Company, L.L.C. ("William Blair") and Valeant Pharmaceuticals International ("Valeant") (collectively, "Defendants"):

### NATURE OF THE ACTION

1.     This is an action by Plaintiffs for breach of contract, breach of the implied covenant of good faith and fair dealing, trade secret misappropriation, unjust enrichment, and negligence against Defendants arising from, *inter alia*, the improper disclosure by William Blair to Valeant of Plaintiffs' confidential information concerning the fluorouracil product that Plaintiffs had under development and Valeant's subsequent misuse of that information.

### THE PARTIES

2.     Spear Pharmaceuticals, Inc. ("Spear") is a corporation organized and existing under the laws of the State of Florida, having its principal place of business at 11924

Fairway Lakes Drive, Fort Myers, Florida 33913. Spear is a small company specializing in the development of generic pharmaceutical products in the dermatological area. Spear was founded in 1993 by Dr. K.L. Spear ("Dr. Spear"), who still serves as its President. Dr. Spear was a practicing dermatologist from 1983 through 2001, when he decided to leave clinical practice to work full time in the research and development of prescription dermatologic generic drugs. Since its founding, Spear has successfully developed and obtained United States Food & Drug Administration ("FDA") approval for seven pharmaceutical products -- an unusually successful track record for a company of its small size and youth.

3.     Spear Dermatology Products, Inc. ("SDP") is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at 1247 Sussex Turnpike, Suite 120, Randolph, New Jersey 07869. SDP was established in 2001 and is now the exclusive seller of the products developed by Spear. Dr. Spear also serves as President of SDP and has since its inception.

4.     Upon information and belief, Defendant William Blair is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business at 222 W. Adams Street, Chicago, Illinois 60606. Upon information and belief, William Blair is a leading investment firm with a net worth of more than $144 million.

5.     Upon information and belief, Defendant Valeant is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 1 Enterprise, Aliso Viejo, California, 92656. Valeant is engaged in the manufacture and marketing of pharmaceutical products worldwide, with 2006 annual sales totaling $907 million.

2

Dbt f !2;18.dw11932.KKG!!!!!Epdvn f ou29!!!!!!Gjrhe!15029G3119!!!!!Qbhf !4!pg35

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1332(a)(1) and (c)(1).    As set forth below, the amount in controversy exceeds $75,000.00, exclusive of interest and costs and complete diversity exists among the parties.

7.    Venue is proper in this judicial district pursuant to the provisions of 28 U.S.C. §§ 1391(a) and (c).

8.    Defendants William Blair and Valeant are Delaware corporations and, on information and belief, are conducting business and/or business-related activities within the State of Delaware.

9.    This Court has personal jurisdiction over Defendants.

## FACTUAL BACKGROUND

**A.    Plaintiffs' Tretinoin Products**

10.    Spear developed and was the first to obtain FDA approvals for generic versions of the brand name Retin-A® tretinoin cream products used in the treatment of acne. Spear filed three Abbreviated New Drug Applications ("ANDA's") for 0.025%, 0.05% and 0.1% cream strengths, respectively, and all were approved by the FDA on December 24, 1998.

11.    After the successful development and approval of the three tretinoin cream products, Spear pursued FDA approval for the manufacture and sale of other generic dermatological tretinoin products.    On February 22, 2000, Spear was the first to receive FDA approval to manufacture and sell a 0.025% gel, a generic version of Johnson and Johnson's Ortho Dermatological Division's Retin-A® Gel for the treatment of acne.    Subsequently, on June 11, 2002, Spear was the first to receive FDA approval to market a 0.01% strength generic

3

Dbt f !2;18.dw11932.KKG!!!!!Epdvn f ou29!!!!!!Gjrrie!15029031119!!!!!Qbhf !5!pg35

version of the Retin-A® Gel for the treatment of acne.  Also, on September 15, 2005, Spear was

the first to receive FDA approval to market a 0.05% strength generic version of the brand name

Renova® (tretinoin emollient cream) product.  All told, Spear received five FDA approvals for

the first generic versions of Retin-A® creams and gels, as well as FDA approval for the first

generic version of the Renova® emollient cream product.

**B.    Plaintiffs' Decision to Begin Pursuing FDA Approval of a Generic Equivalent to Efudex® and the Continued Efforts Towards that End**

12.    In approximately February 1999, Plaintiffs began the process of

developing a generic equivalent to Defendant Valeant's fluorouracil cream, USP 5% product,

sold under the tradename Efudex®.

13.    According to the Efudex® package insert, the product is approved for and

"indicated" in the treatment of actinic keratosis ("AK") and is also "useful" in the treatment of

superficial basal cell carcinoma ("sBCC") when conventional methods are impractical, such as

with multiple lesions or difficult treatment sites.  AK is a lesion of the epidermis, the outer layer

of the skin.  It is considered pre-cancerous and requires treatment according to the American

Academy of Dermatology.  Pre-cancerous AK lesions are common and are most often caused by

over-exposure to sunlight.  sBCC, on the other hand, is a skin cancer which is localized in the

epidermis.  Over 98% of the prescriptions written for Efudex® are used for patients with AK.

The patents covering Efudex® expired over twenty years ago and, upon information and belief,

Plaintiffs were the first to develop and seek approval of a generic fluorouracil product.

14.    For ANDAs with multiple uses, the FDA requires that only one indication

need be studied to prove bioequivalence.  During the fluorouracil product's development phase,

beginning in June 1999, Plaintiffs consulted directly with the FDA in an effort to ensure that the

Dbt f !2;18.dw 11932. KKG!!!!!Epdvn f ou29!!!!!!Gjrhe!15029013119!!!!!Qbhf !6!pg35

clinical trial performed in support of the proposed ANDA was correctly designed and would be performed in accordance with the rigorous standards required. Because Efudex® is used overwhelmingly for AK, Plaintiffs proposed a clinical trial in the treatment of AK, and the FDA agreed that such a trial would prove bioequivalence to the brand product with respect to both treatment indications, AK and sBCC. Once they had received that guidance from the FDA, Plaintiffs planned, developed and implemented the clinical trial.

15.    In connection with the development and clinical testing of the fluorouracil cream, USP 5% product, Plaintiffs have invested more than $6 million over the past eight years.

**C.    The Decision to Sell the Tretinoin Line to a Third Party and the Engagement of William Blair**

16.    During the Spring of 2004, while Plaintiffs were actively engaged in the development of the generic Efudex® product, they decided that they wished to sell the Retin-A® generic tretinoin product line (that is, all three of the cream product strengths and the two gel product strengths) to a third party.

17.    In pursuit of this end goal, on or about April 27, 2004, Dr. Spear began to communicate with Defendant William Blair through one of its Vice Presidents, Brian Scullion, M.D. ("Scullion").

18.    After discussion of general information about the Plaintiff companies and the business, Dr. Spear determined that, in order to disclose fully the information and trade secrets necessary for Defendant William Blair to evaluate the opportunity, a confidentiality agreement should be executed.

19.    On May 6, 2004, Dr. Spear, on behalf of Plaintiff companies, and Scullion, on behalf of Defendant William Blair, executed a confidentiality agreement

5

Dbt f !2;18.dw.11932.KKG!!!!!Epdvn f ou29!!!!!!Gjrhe!15Œ9Œ3119!!!!!Qbhf !7!pg35

("Confidentiality Agreement").  The purpose of the Confidentiality Agreement was to permit Plaintiffs to disclose their confidential information to Defendant William Blair, through its officer, Scullion, in connection with its evaluation of a potential transaction, with the assurance that William Blair would protect the confidentiality of the disclosed information.

20.    In the Confidentiality Agreement, Defendant William Blair agreed, through Scullion, "that all Confidential Information will be held and treated by you, your agents and employees in confidence and will not, except as required by law or as hereinafter provided, without the prior written consent of the [Plaintiffs], be disclosed by you or your agents or employees, in any manner whatsoever, in whole or in part, and will not be used by you or your agents or employees other than in connection with your evaluation of a possible transaction." Confidentiality Agreement, at p. 1.

21.    On the morning of May 10, 2004, Dr. Spear sent Scullion an e-mail specifically stating, "[a]s you are thinking of the presentation and how to promote and sell to other companies, I request that you not include Information to any of them on our pipeline that I had mentioned to you.  I wish to keep confidential in this very connected industry our Pipeline."

22.    Later that same afternoon, Scullion responded by e-mail to Dr. Spear's request with one simple word -- "[u]nderstood."

23.    In an e-mail on May 24, 2004, Dr. Spear stated that, in the presentation and discussion with the companies considering the opportunity, "we do not say what the R and D products are or where they are" in the development process.

6

24. Just two days later, in an e-mail dated May 26, 2004, Dr. Spear again stressed to Scullion, that he was "very ill at ease to let companies 'peek under the curtain' at our R and D line."

25. On August 2, 2004, Scullion, on behalf of Defendant William Blair, sent an e-mail with an attached letter to Plaintiffs detailing the terms of its engagement (the "Engagement Letter") for "render[ing] certain investment banking services in connection with a possible sale of tretinoin related assets of the company to another party or with the possible business combination . . . of the [Plaintiffs] with another party or a recapitalization of the [Plaintiffs] or similar restructuring." Engagement Letter, p. 1.

26. In the Engagement Letter, William Blair reaffirmed its obligations under the Confidentiality Agreement signed on May 6, 2004. Further, William Blair also represented, in the Engagement Letter, "that its healthcare investment banking group is not as of the date of this letter engaged to advise or represent any of the parties contemplated as of this date as potential parties to the Possible Transaction. Should it become so engaged by any of the parties that submit an indication of interest, it will inform Spear." *Id.* at ¶ 8.

**D.    William's Blair's Process for Screening and Eventually Choosing Proposed Purchasers for the Spear Tretinoin Line of Products**

27. In the Engagement Letter, William Blair set forth its plan with regard to the services that would be rendered in connection with the proposed transaction. Specifically, William Blair and Scullion undertook the responsibility, *inter alia*, to assist Plaintiffs "in (i) developing a strategy for pursuing a Possible Transaction involving the [Plaintiffs] and a list of possible participants in the Possible Transaction . . . (ii) preparing a descriptive memorandum

Dbtf !2;18.dw.11932.KKG!!!!Epdvn f ou29!!!!!!Gjrhe!150290119!!!!!Qbhf !9!pg35

. . . and (iii) contacting and eliciting interest from those possible participants expressly approved by the [Plaintiffs]." *Id.* at ¶ 1b.

28.    Further, in the Engagement Letter, William Blair set forth its expectation that Scullion would "lead and supervise the Possible Transaction." *Id.* at ¶ 1c.

29.    Plaintiffs' trust in Scullion was so strong that Plaintiffs negotiated and won inclusion of a specific term that permitted, in the event that Scullion did not continue with William Blair and Plaintiffs decided to terminate the engagement, the required cooling off period before Plaintiffs could sign with another company to be cut by half to nine months to permit Plaintiff to follow Scullion to any new employer. Engagement Letter, ¶ 5.

30.    As part of the process of screening possible purchasers, Scullion forwarded what he called the "A-list parties" *via* e-mail on September 3, 2004. Among those companies was Defendant Valeant. William Blair did not disclose the nature and extent of its business relationship with Valeant at that time. Upon information and belief, William Blair had an investment banking relationship with Valeant and followed Valeant stock closely. Indeed, according to the Quarterly Schedule of Portfolio Holdings (Form N-Q) filed with the Securities and Exchange Commission on November 22, 2004, the William Blair Growth Fund held over $1.7 million in Valeant stock as of September 30, 2004.

31.    During the search for a possible participant in the proposed transaction, Scullion sent to Plaintiffs, on a regular (*i.e.*, weekly, or near weekly) basis, a list of contacts he had made in furtherance of his search. Additionally, as required by the Engagement Letter, Plaintiffs expressly approved the specific possible participants prior to the disclosure of any confidential information to them. *See* Engagement Letter, ¶ 1b.

8

Dbt f !2;18.dw.11932.KKG!!!!!Epdvn f ou29!!!!!!Gjrhe!15029031 19!!!!!Qbhf !: !pg35

**E.     Valeant's Evaluation Agreement and Refusal of the Opportunity**

32.     On September 23, 2004, William Blair, through its officer Scullion executed an agreement with Defendant Valeant in order to permit Valeant's evaluation of Plaintiffs' confidential information with a guarantee that Valeant would hold such information secret and would not use such information for any other purpose than to evaluate the proposed transaction (the "Evaluation Agreement").

33.     Specifically, by executing the Evaluation Agreement, Valeant agreed, *inter alia*, "to treat any information, knowledge or data concerning the [Plaintiffs] which is furnished to [it] by or on behalf of [Plaintiffs], whether furnished before, on or after the date of this Agreement [defined as the "Evaluation Material"], in accordance with the provisions of this Agreement. . . . [T]he Evaluation Material will be used by you solely for the purpose of evaluating a Possible Transaction between the [Plaintiffs] and you. In addition, you agree not to disclose the Evaluation Material to any person and agree to keep the evaluation material confidential." Evaluation Agreement, p. 1.

34.     As evidenced by the Evaluation Agreement, it was Defendants' intent that Plaintiffs be third party beneficiaries to the Evaluation Agreement and the obligations set forth therein. Indeed, the Evaluation Agreement specifically provided that Plaintiffs were third-party beneficiaries of the Evaluation Agreement. Evaluation Agreement, p. 2 ("The terms, conditions and covenants of this Agreement shall be binding upon you, your Agents, and each of your respective successors, and *is for the benefit of Company [i.e., Plaintiffs]* and William Blair. . . ") (emphasis added).

9

Dbt f !2;18.dw.11932.KKG!!!!!Epdvn f ou29!!!!!!Gjrfe!15Œ29Œ3119!!!!!Qbhf !21!pg35

35.     On October 11, 2004, Scullion sent, as part of the status update, a list of prospective participants to Plaintiffs. The list noted that Valeant had received the memorandum and was assessing its interest in the opportunity. Further, the status chart identified October 14, 2004, as the "Indication Due Date" for Valeant.

36.     On or about October 15, 2004, during a discussion with Dr. Spear, Scullion stated that Valeant was interested in the opportunity but had dropped out because of the price.

37.     On October 18, 2004, Plaintiffs received an updated status chart from Scullion. This update included an indication that since the last update, and in keeping with the "Indication Due Date" set forth in the previous update, Valeant had "declined" the offer.

**F.     Plaintiffs' Communication of Confidential Information to Scullion and Plaintiffs' Subsequent Filing of Their ANDA**

38.     Following execution of the Confidentiality Agreement, on May 13, 2004, at their first face-to-face meeting in Ft. Myers, Florida, Plaintiffs provided Scullion with confidential information that the generic Efudex® product was in Spear's product development pipeline. Additional information about the pipeline was presented to Scullion -- at his request -- during a July 28, 2004 meeting in Chicago between Spear and Scullion. On October 31, 2004, Dr. Spear sent Scullion an e-mail that included additional confidential information revealing that the generic Efudex® fluorouracil cream, USP 5% product was in development, that a "318 patient Bioequivalence study [was] completed," and that Plaintiffs expected that an ANDA for the product would be filed in late November 2004. *Id.* Dr. Spear prefaced this information with the comment that he didn't "really want to talk about the next two but for your information." *Id.* Dr. Spear also told Scullion that the clinical trial was for actinic keratosis. Thus, by October 31,

10

Dbt f !2;18.dw.11932.KKG!!!!!Epdvn f ou29!!!!!!Gjrhe!15C29C3119!!!!!Qbhf !22!pg35

2004, Scullion knew not only Spear's anticipated ANDA filing date but key details concerning Spear's bioequivalence study -- and that Plaintiffs had conducted only a single study.

39.    On information and belief, throughout the summer and fall of 2004 (at which time the William Blair Growth Fund held over $1.7 Million in Valeant stock), Scullion repeatedly flew to California to meet with Valeant on the Spear opportunity, as well as other business relationships. Scullion was familiar with upper level management at Valeant and, on information and belief, had worked with them before on other matters.

40.    Plaintiffs filed their ANDA with the FDA seeking approval to manufacture and sell their fluorouracil cream, USP 5% product, a generic version of Valeant's Efudex® product, on January 3, 2005, and it was accepted for filing by the FDA on January 6, 2005.

**G.    Valeant's Filing of a Citizen's Petition to Block Approval**

41.    On information and belief, prior to December 21, 2004, Scullion communicated to Valeant the confidential information he had received from Dr. Spear concerning Plaintiffs' expected filing of their ANDA seeking approval to manufacture and market the generic fluorouracil cream, USP 5% product. On December 21, 2004, Valeant filed a Citizen's Petition in an attempt to block the approval of a generic equivalent to its Efudex® product.

42.    The December 21, 2004 Citizen's Petition filed by Valeant was the first and only instance in the more than twenty years since Efudex® had gone off patent (thus opening the product up for generic competition) that Valeant had filed a Citizen's Petition with respect to

11

Dbtf!2;18.dw11932.KKG!!!!!Epdvnfou29!!!!!!Gjr/he!15029031119!!!!!Qbhf!23!pg35

Efudex®. On information and belief, the timing of the Citizen's Petition was not coincidental -- it was reflective of the confidential information that had been improperly leaked to Valeant.

43.    In the Citizen's Petition, Valeant requested that the FDA "[r]efrain from approving an [Abbreviated New Drug] application unless an application includes a sBCC study." The specificity of the requested relief reflects that Valeant had learned not only of Plaintiffs' confidential information with respect to Plaintiffs' plan for filing an ANDA, but also the precise nature of the clinical trial they had conducted.

44.    Congress has recognized that the Citizen Petition process has been used by certain pharmaceutical companies for the improper purpose of delaying FDA approval of generic products, as evidenced by the recent introduction, passage and enactment into law on September 27, 2007 of amendments to the Federal Food, Drug, and Cosmetic Act directing the FDA not to delay approval of ANDAs based on the filing of a Citizen Petition. *See* Food and Drug Administration Amendments Act of 2007 § 914(a), 21 U.S.C. § 355. Remedying past abuse of the Citizen Petition process was a primary motivation for passage of the legislation, as evidenced by the following comments from the legislative history of the Act and other related legislation before Congress at the time:

From legislative history of Food and Drug Administration Amendments Act of 2007:

> "Let us be clear: The citizen petition provision is designed to address attempts to derail generic drug approvals. Those attempts, when successful, hurt consumers and the public health." 153 Cong. Rec. S11841 (daily ed. Sept. 20, 2007) (statement of Sen. Kennedy).

> "The bill also takes action on the abuse of citizen petitions. . . . This procedure should be used to protect public health -- but too often, it is subverted by those who seek only to delay the entry onto the market of generic drugs. Even if the petitions are found to be meritless, they will have accomplished their mission -- delaying access for consumers to safe and lower cost medicines." 153 Cong. Rec. S11938 (daily ed. Sept. 21, 2007) (statement of Sen. Kennedy).

12

Dbt f !2;18.dw.11932.KKG!!!!!Epdvn f ou29!!!!!Gjrhe!150290311!!!!!Qbhf !24!pg35

From legislative history of the Citizen Petition Fairness and Accuracy Act of 2007 -- introduced on January 4, 2007:

> "The legislation I introduce today . . . targets one particularly pernicious practice by brand name drug companies to impeded or block the marketing of generic drugs -- abuse of the FDA citizen petition process." 153 Cong. Rec. S64 (daily ed. Jan. 4, 2007) (statement of Sen. Kohl).

> "While this citizen petition process was put in place for a laudable purpose, unfortunately in recent years it has been abused by frivolous petitions submitted by brand name drug manufacturers (or individuals acting on their behest) whose only purpose is to delay the introduction of generic competition." 153 Cong. Rec. S64 (daily ed. Jan. 4, 2007) (statement of Sen. Kohl).

> "Indeed, brand name drug manufacturers often wait to file citizen petitions until just before the FDA is about to grant the application to market the new generic drug solely for the purpose of delaying the introduction of the generic competitor for the maximum amount of time possible. This gaming of the system should not be tolerated." 153 Cong. Rec. S65 (daily ed. Jan. 4, 2007) (statement by Sen. Kohl).

> "Of the 21 citizen petitions for which the FDA has reached a decision since 2003, 20 -- or 95 percent of them -- have been found to be without merit. Of these, ten were identified as "eleventh hour petitions," defined as those filed less than 6 months prior to the estimated entry date of the generic drug. None of these ten "eleventh hour petitions" were found to have merit, but each caused unnecessary delays in the marketing of the generic drug by months or over a year. . . ." 153 Cong. Rec. S65 (daily ed. Jan. 4, 2007) (statement by Sen. Kohl).

## H.     Valeant's Change of Heart With Respect to the Tretinoin Product Opportunity

45.     Only eight days after Valeant filed its Citizen Petition, on December 29, 2004, Valeant submitted a "preliminary, non-binding indication of interest" to William Blair, through its officer Scullion, to purchase Plaintiffs' tretinoin product line (the "Offer Letter"). Scullion subsequently presented the Offer Letter to Plaintiffs. The Offer Letter included general terms for the purchase of the assets, offering an up front payment as well as royalties based on sales milestones for the five years following the proposed purchase.

13

46.    This Offer Letter was sent more than two months after Valeant declined the proposed transaction and a mere eight days after it had filed its Citizen Petition on December 21, 2004. Upon information and belief, this offer was a pretense so that Valeant could gain more information on Spear -- the potential competitor to Valeant's Efudex 5% cream product, which represented Valeant's single largest revenue-producing product in the United States in 2004. At the time the Offer Letter was sent, Plaintiffs were already in negotiations with another company to sell the tretinoin product line, and Valeant's offer was rejected.

## I.    Plaintiffs' Discovery of the Citizen Petition and Activity Thereafter

47.    Plaintiffs first learned of Valeant's Citizen Petition from the FDA on April 19, 2005, when they called the FDA to check on the status of their application. Plaintiffs were told by the FDA on that date that Valeant had filed a Citizen Petition requesting that no ANDA be approved if the bioequivalence study supporting the ANDA had been done only in AK patients, and that the FDA was reviewing that Citizen Petition.

48.    Given that the FDA had reviewed, provided guidance and approved Plaintiffs' planned clinical trial addressing treatment of AK and agreed that such a trial would be sufficient to demonstrate bioequivalence to the brand product, the news of the Citizen Petition was a shock to Plaintiffs.

49.    Because of the delay caused by Valeant's filing of its Citizen Petition, Plaintiffs have been awaiting FDA approval for their generic fluorouracil cream, USP 5% product since January 6, 2005 -- over three years -- more than twice the 16.6 month average time for approval of such applications. Had Valeant not filed its Citizen Petition, Plaintiffs' ANDA would have been approved long ago.

14

Dbt f !2;18. dw 11932. KKG!!!!!Epdvn f ou29!!!!!!Gjrfne!15029031 19!!!!!Qbhf !26!pg35

50.    In December 2006, Valeant launched an authorized generic fluorouracil cream, USP 5% product through Oceanside, another generic pharmaceutical company.  Because of the delay in FDA approval for the Spear product caused by the filing of Valeant's Citizen Petition, the Valeant-sponsored Oceanside generic remains the only generic Efudex ® equivalent approved for marketing by the FDA.   Upon information and belief, Valeant launched this authorized generic product only because of its access to Plaintiffs' confidential information.

**J.    Approval of the Spear Fluorouracil ANDA and Denial of Valeant's Citizen Petition**

51.    On April 11, 2008, more than three years after its filing, the FDA approved the Spear Fluorouracil ANDA because the ANDA was supported by "adequate information . . . to demonstrate that the drug is safe and effective for use in the submitted labeling" (*see* Exhibit A).

52.    On that same day, the FDA denied Valeant's Citizen Petition (*see* Exhibit B).

**COUNT I**

**BREACH OF CONTRACT
AGAINST WILLIAM BLAIR
(THE CONFIDENTIALITY AGREEMENT)**

53.    Plaintiffs incorporate by reference paragraphs 1-52 as if fully set forth herein.

54.    Plaintiffs    performed    their    obligations    under    the    Confidentiality Agreement.

15

Dbt f !2;18.dw.11932.KKG!!!!!Epdvn f ou29!!!!!!Gjrfe!15029®3119!!!!!Qbhf l27!pg35

55.    Under the Confidentiality Agreement, William Blair was obligated to hold Plaintiffs' confidential information in confidence and not disclose such information without Plaintiffs' prior written consent.

56.    In the Engagement Letter, William Blair reaffirmed its obligation under the Confidentiality Agreement.

57.    On information and belief, William Blair breached its obligations and, contrary to Plaintiffs' repeated instructions, revealed to Valeant Plaintiffs' confidential information regarding, *inter alia*, at least, Plaintiffs' plans to file an ANDA for a generic fluorouracil product and Plaintiffs' bioequivalence testing.

58.    This breach of the Confidentiality Agreement has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

### COUNT II

### BREACH OF CONTRACT
### AGAINST WILLIAM BLAIR
### (THE ENGAGEMENT LETTER)

59.    Plaintiffs incorporate by reference paragraphs 1-58 as if fully set forth herein.

60.    Plaintiffs have performed all of their obligations under the Engagement Letter.

61.    In the Engagement Letter, William Blair reaffirmed its obligation under the Confidentiality Agreement to keep confidential all information communicated to it during the performance of its duties and obligations pursuant to that engagement.

16

Dbt f !2;18.dw.11932.KKG!!!!!Epdvn f ou29!!!!!!Gjmfe!15029031191!!!!Qbhf !28!pg35

62.    In addition, under the terms of the Engagement Letter, William Blair was obligated to inform Plaintiffs if it had any preexisting business relationship with any party requesting to evaluate the transaction.  William Blair did not disclose the nature and extent of its business relationship with Valeant.

63.    On information and belief, William Blair breached its obligations by failing to disclose the nature and extent of its business relationship with Valeant and by revealing to Valeant Plaintiffs' confidential information regarding, *inter alia*, Plaintiffs' plans for a future FDA filing and Plaintiffs' bioequivalence testing.

64.    This breach of the Engagement Letter has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT III

### BREACH OF CONTRACT AGAINST VALEANT (THE EVALUATION AGREEMENT)

65.    Plaintiffs incorporate by reference paragraphs 1-64 as if fully set forth herein.

66.    Valeant and William Blair intended that Plaintiffs benefit from the Evaluation Agreement and specifically identified Plaintiffs as third-party beneficiaries of that Agreement.

67.    The benefit of the Evaluation Agreement to Plaintiffs was in furtherance of a pre-existing obligation that William Blair owed Plaintiffs under various agreements.

68.    The benefit of the Evaluation Agreement to Plaintiffs was a material part of Defendants' purpose in entering into the Evaluation Agreement, *i.e.*, the confidential

17

disclosure of information, and the evaluation thereof, in connection with the possible purchase of Plaintiffs' tretinoin product line.

69.     Valeant was obligated under the Evaluation Agreement, *inter alia*, to keep confidential all information communicated to it, either by William Blair or Plaintiffs, during the evaluation of the proposed transaction and to use the confidential information provided to it only for such evaluation.

70.     On information and belief, Valeant breached its obligation and, *inter alia*, used Plaintiffs' confidential information as a basis for filing its Citizen Petition with the FDA and as a basis for determining its own strategies with respect to the launch of an "authorized generic" product.

71.     This breach of the Evaluation Agreement has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT IV

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST WILLIAM BLAIR

72.     Plaintiffs incorporate by reference paragraphs 1-71 as if fully set forth herein.

73.     On information and belief, William Blair and Valeant had previously partnered in substantial financial transactions.  On information and belief, these transactions included, at least, William Blair serving as an investment banker for Valeant.  As of September 30, 2004, the William Blair Growth Fund held over $1.7 million in Valeant stock.

18

Dbt f !2;18.dw.11932.KKG!!!!!Epdvn f ou29!!!!!!Gjrfie!15029031119!!!!!Qbhf !2: !pg35

74.    On information and belief, William Blair, through its agent, Scullion, disclosed Plaintiffs' confidential information with respect to Plaintiffs' upcoming ANDA filing and its bioequivalence testing.

75.    Under the Engagement Letter and the Confidentiality Agreement, William Blair had an implied obligation of good faith and fair dealing to Plaintiffs.

76.    On information and belief, William Blair breached its obligation of good faith and fair dealing by communicating Plaintiffs' confidential information concerning its upcoming fluorouracil cream, USP 5% product ANDA filing to Valeant, a known competitor, with whom William Blair had previous financial dealings, and which it knew to be the seller of the corresponding brand Efudex® product, and by delivering to Plaintiffs a sham offer from Valeant to purchase Plaintiffs' tretinoin product line that was made in bad faith. Specifically, the Valeant offer was made with the objective of permitting Valeant to obtain additional confidential information about Plaintiffs' competitive product and plans.

77.    On information and belief, William Blair, through Scullion, communicated this information to Valeant in an attempt to enrich both itself and Valeant at the expense of Plaintiffs by warning Valeant of the threat to its monopoly on the sale of Efudex®. Both Valeant and William Blair were in fact so enriched.

78.    This breach of the implied covenant of good faith and fair dealing has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

Dbt f !2;18.dw.11932.KKG!!!!!Epdvn f ou29!!!!!!Gjrne!15029031119!!!!!Qbhf !31!pg35

## COUNT V

### TRADE SECRET MISAPPROPRIATION AGAINST DEFENDANTS

79.   Plaintiffs incorporate by reference paragraphs 1-78 as if fully set forth herein.

80.   The information relating to the bioequivalence study and the nature and timing of its ANDA filing constituted Plaintiffs' trade secrets.

81.   Plaintiffs took reasonable precautions to protect their trade secrets, by, *inter alia*, requiring that any company evaluating the proposed transaction, including Valeant, as well as, William Blair, agree in writing to keep such information confidential and to use it only for the purposes for which it was revealed.

82.   Plaintiffs communicated their trade secrets to William Blair, and, on information and belief, William Blair communicated those trade secrets to Valeant.

83.   The confidentiality obligations undertaken by William Blair and Valeant were in full force and effect from at least the time Plaintiffs disclosed their trade secrets to William Blair to at least the time Valeant filed its Citizen Petition with the FDA challenging the adequacy of a bioequivalence study of the type conducted by Plaintiffs.

84.   On information and belief, William Blair misappropriated Plaintiffs' trade secrets by disclosing confidential information about Plaintiffs' generic fluorouracil product, including, *inter alia*, details concerning the bioequivalence study and the timing of the ANDA filing, to Valeant without Plaintiffs' prior written consent, and Valeant misappropriated Plaintiffs' trade secrets by using them for a purpose other than evaluation of the purchase of the

Dbt f !2;18.dw.11932.KKG!!!!!Epdvn f ou29!!!!!!Gjrhe!150290311 9!!!!!Qbhf !32!pg35

Plaintiffs' tretinoin product line, in violation of one or more of the following statutes: 6 Del. C. § 2001, et seq. (Delaware Trade Secrets Act), and 765 I.L.C.S. 1065 (Illinois Trade Secrets Act).

85.   This misappropriation of the Plaintiffs' trade secrets has resulted in substantial damage to Plaintiffs, in an amount exceeding $125 million.

## COUNT VI

### UNJUST ENRICHMENT AGAINST VALEANT

86.   Plaintiffs incorporate by reference paragraphs 1-85 as if fully set forth herein.

87.   Valeant has been enriched as a result of its improper use of Plaintiffs' confidential information because, *inter alia*, Valeant's filing of its Citizen Petition has operated to delay approval of Plaintiffs' ANDA thereby resulting in the extension of Valeant's monopoly hold on the Efudex® market and Valeant's subsequent successful startup of Oceanside, its authorized generic, enabling Valeant to benefit substantially from being the first generic entrant to the market and positioning Valeant for long term benefit.

88.   As a result of Valeant's enrichment, Plaintiffs have been harmed by not being able to capitalize on their investment in the research and development and capital expenditures that were incurred to support and file their ANDA.

89.   Plaintiffs' losses are directly related to, and, in fact, are a direct result of, the actions Valeant took after, on information and belief, it acquired Plaintiffs' confidential information.

90.   There is no justification for Valeant's actions.

21

Dbt f !2;18.dw.11932.KKG!!!!!Epdvn f ou29!!!!!!Gjfhe!15฿฿3119!!!!!Qbhf !33!pg35

91. The losses Plaintiffs have suffered as a result of Valeant's actions and consequential enrichment are not addressable by a remedy at law.

## COUNT VII

### NEGLIGENCE AGAINST WILLIAM BLAIR

92. Plaintiffs incorporate by reference paragraphs 1-91 as if fully set forth herein.

93. William Blair represented that the firm had extensive experience in locating and developing potential purchasers and/or backers for pharmaceutical based investments.

94. As a result of its extensive experience, Plaintiffs put special trust in William Blair to protect their interests and advise them with respect to the proposed transaction.

95. As a firm of professionals, holding themselves out as specialists in the applicable field, in addition to the duties and obligations required under the various contracts, William Blair owed Plaintiffs a duty to, *inter alia*, protect their confidential information and to act in the best interests of their clients, Plaintiffs.

96. William Blair breached its duty of care by, *inter alia*, negligently and in a grossly negligent fashion: (a) failing to disclose the nature and extent of its preexisting business relationship with Valeant; (b) on information and belief, revealing the Plaintiffs' confidential information to a known competitor; and (c) delivering to Plaintiffs an offer from Valeant for the tretinoin product line that, on information and belief, William Blair knew or should have known was made in bad faith.

22

Dbt f !2;18.dw.11932.KKG!!!!!Epdvn f ou29!!!!!!Gjrfhe!15029©3119!!!!!Qbhf !34!pg35

97.    The breach of the duty of care committed by William Blair proximately caused substantial damage to Plaintiffs, in an amount exceeding $125 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Spear Pharmaceuticals, Inc. and Spear Dermatology Products, Inc., pray that the Court award them the following relief:

A.    a judgment that William Blair has breached the Confidentiality Agreement;

B.    a judgment that William Blair has breached the Engagement Letter;

C.    a judgment that Valeant has breached the Evaluation Agreement;

D.    a judgment that William Blair has breached the implied duty of good faith and fair dealing;

E.    a judgment that Defendants misappropriated Plaintiffs' trade secrets;

F.    a judgment that Defendant Valeant was unjustly enriched;

G.    a judgment that William Blair was negligent;

H.    an award of compensatory damages in the amount of $125 million;

I.    an award of punitive damages in an amount to be determined at trial;

J.    an award of reasonable attorneys' fees and costs; and

K.    such further relief as this Court may deem necessary, just, and proper.

Dbt f !2;18.dw.11932.KKG!!!!!Epdvn f ou29!!!!!!Gjme!1502903119!!!!!Qbhf !35!pg35

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Plaintiffs Spear Pharmaceuticals, Inc.*
*and Spear Dermatology Products, Inc.*

OF COUNSEL:

Steven Lieberman
Jason M. Shapiro
Lisa N. Phillips
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K Street, N.W.
Suite 800
Washington, DC 20005
(202) 783-6040

April 16, 2008

# EXHIBIT B

"O"

1  WINSTON & STRAWN LLP
   Gail J. Standish (SBN: 166334)
2  e-mail: gstandish@winston.com
   Peter E. Perkowski (SBN 199491)
3  e-mail: pperkowski@winston.com
   333 South Grand Avenue, 38th Floor
4  Los Angeles, California 90071-1543
   Telephone: (213) 615-1700
5  Facsimile: (213) 615-1750

6  ROTHWELL, FIGG, ERNST & MANBECK, P.C.
   Steven Lieberman (admitted *pro hac vice*)
7  Minaksi Bhatt (SBN: 151312)
   Lisa N. Phillips (admitted *pro hac vice*)
8  1425 K Street, N.W.
   Washington, D.C. 20005
9  Telephone: 202-783-6040
   Facsimile: 202-783-6031

10

11 Attorneys For Intervenor Defendant
   SPEAR PHARMACEUTICALS, INC.

12              UNITED STATES DISTRICT COURT

13           FOR THE CENTRAL DISTRICT OF CALIFORNIA

14               SOUTHERN DIVISION – SANTA ANA

15 VALEANT PHARMACEUTICALS          )  Case No. SACV08-449 AG (AGRx)
16 INTERNATIONAL,                   )
                                    )  The Honorable Andrew J. Guilford
17          Plaintiff,              )
                                    )  ~~PROPOSED FINDINGS OF FACT~~
18          v.                      )  ~~AND CONCLUSIONS OF LAW~~
                                    )  ~~SUBMITTED BY DEFENDANT~~
19 MICHAEL O. LEAVITT, et al.,      )  ~~SPEAR PHARMACEUTICALS,~~
                                    )  ~~INC.~~
20          Defendants.             )
                                    )
21 and                             )
                                    )
22                                  )
   SPEAR PHARMACEUTICALS, INC.      )
23                                  )
          Intervenor Defendant.     )
24

25

26

27

28

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

JUN 18 2008

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

*(left margin)* Winston & Strawn LLP / 333 South Grand Avenue / Los Angeles, CA 90071-1543

*Any finding of fact which may be deemed a conclusion of law is incorporated into the "Conclusions of law" section, and any conclusion of law which may be deemed a finding of fact is*

1    ~~These proposed findings of fact and conclusions of law are submitted by~~ *incorporated into the "Findings of fact" section.*

2    ~~Defendant Spear Pharmaceuticals, Inc. ("Spear") pursuant to this Court's June 10,~~

3    ~~2008 Order.~~

4    ## FINDINGS OF FACT

5    **I.    BACKGROUND REGARDING THE POTENTIAL CONFLICT OF**

6    **INTERESTED ISSUE**

7    1.    This is an action under the Administrative Procedures Act ("APA").

8    Complaint ¶1.  Valeant Pharmaceuticals International ("Valeant") seeks a preliminary

9    injunction ordering the United States Food and Drug Administration ("FDA") to

10    suspend the approval of the Abbreviated New Drug Application ("ANDA") of Spear

11    for 5-fluorouracil cream.  Complaint ¶B.  Valeant alleges that FDA's approval was

12    arbitrary and capricious because the approval was based on bioequivalence studies in

13    actinic keratosis ("AK"), and did not include bioequivalence studies in superficial

14    basal cell carcinoma ("sBCC").  Complaint ¶¶11-35.

15    2.    Valeant sells a product called Efudex® cream that includes the active

16    ingredient 5-fluorouracil.  Complaint ¶1.  The Court granted Spear's motion to

17    intervene as a defendant in this action.  Both Spear and the FDA oppose Valeant's

18    motion for a preliminary injunction.

19    3.    During the pendency of this action, the FDA requested, and the Court

20    granted, a stay in order to assess a potential conflict of interest that it discovered

21    during its assembly of the administrative record in order to avoid even the appearance

22    of any impropriety.  The FDA subsequently requested, and the Court granted, an

23    administrative stay pursuant to 21 C.F.R. §§10.33 and 10.35 in order to complete its

24    review of the conflict issue and also to reconsider Spear's approval in view of a

25    scientific issue.

26    ~~4.    Shortly after the FDA became aware of the potential conflict issue, the~~

27    Office of the General Counsel for ~~the Department~~ of Health and Human Services,

28    ~~Food and Drug Division referred the potential conflict of interest issue to FDA's~~

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1

1  Office of Internal Affairs, Office of Criminal Investigations.  Declaration of Thomas

2  P. Doyle ("Doyle Dec.") ¶1.

3      5.    The Office of Internal Affairs assigned the matter to the Office of

4  Investigations for the Department of Health and Human Services, Office of the

5  Inspector General.  Doyle Dec. ¶3.

6      6.    The Office of the Inspector General conducted an investigation and

7  determined that there was no conflict of interest.  Declaration of Scott A. Vantrease

8  ("Vantrease Dec.") ¶¶4-5.

9      7.    Mr. Vantrease concluded that:

10     the referral did not provide sufficient information to support that Dr.

11     Wilkin knew that his letter would be presented to the agency, as

12     required by 18 U.S.C. §207(a)(1).  In addition (and even if he did

13     know that the letter would be presented to FDA), I concluded that the

14     information showed that Dr. Wilkin was two supervisory levels above

15     the Medical Officer conducting the review, and that there was nothing

16     else indicating that he was personally and substantially involved in the

17     matter at hand, as required for the permanent restriction relating to

18     former employees under 18 U.S.C. §207(a)(1)(B).  The one-year

19     restriction in 18 U.S.C. §207(c) on communicating to the government

20     would not apply to Dr. Wilkin (regardless of whether he qualified as a

21     senior personnel) because he left HHS in 2005, and his expert opinion

22     was written on March 14, 2007.

23  Vantrease Dec. ¶4.

24     8.    Mr. Vantrease determined "that no further investigation of this matter

25  was warranted."  Vantrease Dec. ¶5.

26     9.    Mr. Doyle notified the Office of the General Counsel "that neither

27  HHS/OIG nor the Office of Internal Affairs would take any action against Dr.

28  Wilkin."  Doyle Dec. ¶5.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

2

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

10.    In addition, pursuant to this Court's Order, the FDA undertook reconsideration of the Spear ANDA approval.  Pursuant to that reconsideration, the FDA reaffirmed the approval of the Spear ANDA on May 30, 2008.  AR1088-1225

11.    The reaffirmation of Spear's approval was documented in memoranda by senior FDA officials, including a 12-page memorandum by Dr. Douglas Throckmorton, Deputy Director of the Center for Drug Evaluation AR1081-1225. The Administrative Record does not reflect any involvement by Dr. Throckmorton in the original approval of Spear's ANDA.    AR938-1086 (original approval documentation, which contains no reference to or indication of any role played by Dr. Throckmorton).  Dr. Throckmorton conducted a scientific review of the record and his memorandum provides a fresh perspective concerning the scientific issues that had been studied by the FDA.  Dr. Throckmorton recommended that "the approval of [Spear's] ANDA . . . be affirmed as both scientifically and procedurally correct." AR1091.

## II.    THE HATCH-WAXMAN STATUTE

12.    Valeant's motion for a temporary restraining order relates to the statutory provisions of the Federal Food, Drug, and Cosmetic Act (the "FDCA") and the agency regulations that pertain to approvals of new drug applications ("NDAs") and abbreviated new drug applications ("ANDAs").  See 21 U.S.C. §301 et seq. (2005)

13.    Under the FDCA, an NDA must contain, among other things, clinical studies demonstrating that the drug is safe and effective.  See 21 U.S.C. §355(b)(1).

14.    The procedures for obtaining FDA approval of generic drugs are set forth in the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98- 417, 98 Stat. 1585, 21 U.S.C. §355(j) (the "Hatch-Waxman Amendments").  In the Hatch-Waxman Amendments, Congress recognized the strong public interest in stimulating generic competition for brand-name patented drugs immediately upon expiration of relevant patents and created a streamlined procedure for the FDA to approve generic drugs more quickly. "Congress sought to get generic drugs into the

3

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1    hands of patients at reasonable prices -- fast." In re Barr Labs., Inc., 930 F.2d 72, 76

2    (D.C. Cir.), cert. denied, 502 U.S. 906 (1991).

3        15.    As part of the streamlined generic drug approval process mandated by

4    Congress, ANDAs do not have to include separate clinical data showing safety and

5    efficacy of the drug, but instead may rely on the safety and efficacy data in the

6    corresponding NDA.    In order to obtain the FDA's approval, an ANDA must

7    demonstrate, inter alia, that the generic drug is "bioequivalent" to the corresponding

8    innovator drug. See 21 U.S.C. §355(j)(2)(A)(iv); 21 C.F.R. §§314.127(a)(6)(i),

9    314.94(a)(7).

10       16.    Bioequivalence is established by proving that "the rate and extent of

11   absorption of the drug do not show a significant difference from the rate and extent of

12   absorption of the listed drug," for drugs that are absorbed into the blood stream. See

13   21 U.S.C. §355(j)(8)(B)(i).  For drugs that are not absorbed into the bloodstream, such

14   as topical ointments (including Efudex®), Congress has expressly given the FDA

15   authority to "establish alternative, scientifically valid methods to show

16   bioequivalence." See 21 U.S.C. §355(j)(8)(C).  Under this statutory provision, the

17   FDA has the authority to permit an ANDA applicant to use any methods the FDA

18   deems appropriate for the determination of bioequivalence of non-systemic drugs as

19   long as the "the alternative methods are expected to detect a significant difference

20   between the [generic] drug and the listed drug in safety and therapeutic effect." Id.

21       17.    The provision of the FDCA granting FDA express authority to develop

22   alternative methods of establishing bioequivalence for non-systemic (i.e., locally-

23   acting) drug products was enacted by Congress as part of The Access to Affordable

24   Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement and

25   Modernization Act of 2003 ("MMA").    See 21 U.S.C. §355(j)(8)(C).    This

26   amendment codified the approach set forth in the FDA's regulation regarding the

27   determination of bioequivalence for drugs not intended to be absorbed into the

28

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

4

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    bloodstream, as well as the nearly two-decades-old practice with respect to these types

2    of drugs. 21 C.F.R. §320.24(b)(6).

3        18.   Prior to commencing clinical testing to support an ANDA submission, a

4    prospective applicant can communicate with the FDA and agree to "the parameters

5    and design . . . of a bioavailability and bioequivalence stud[y] of a drug." 21 U.S.C.

6    §355(j)(3)(C).

7    ~~III.   CONGRESS, THE FDA, AND THE FTC HAVE ALL RECOGNIZED~~

8           **THAT THE CITIZEN PETITION PROCESS HAS BEEN USED (AND**

9           **ABUSED) BY NDA-HOLDERS WHO FILE CITIZEN PETITIONS FOR**

10          **THE PURPOSE OF CAUSING DELAY IN THE APPROVAL OF ANDAS**

11       19.   Congress has recognized that the Citizen Petition process has been used

12   by certain pharmaceutical companies for the improper purpose of delaying FDA

13   approval of generic products, as evidenced by the recent introduction, passage and

14   enactment into law on September 27, 2007 of amendments to the Federal Food, Drug,

15   and Cosmetic Act directing the FDA not to delay approval of ANDAs based on the

16   filing of a Citizen Petition. <u>See</u> Food and Drug Administration Amendments Act of

17   2007 §914(a), 21 U.S.C. §355(q). Remedying past abuse of the Citizen Petition

18   process was a primary motivation for passage of the legislation, as evidenced by the

19   following comments in the legislative history of the Citizen Petition Fairness and

20   Accuracy Act of 2007 that was introduced on January 4, 2007.

21       20.   "The legislation I introduce today. . . targets one particularly pernicious

22   practice by brand name drug companies to impede or block the marketing of generic

23   drugs - abuse of the FDA citizen petition process." 153 Cong. Rec. S64 (daily ed. Jan.

24   4, 2007) (statement of Sen. Kohl).

25       21.   "While this citizen petition process was put in place for a laudable

26   purpose, unfortunately in recent years it has been abused by frivolous petitions

27   ~~submitted by brand name drug manufacturers (or individuals acting on their behest)~~

28

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

*19. The FDA must perform its duties with care but without unnecessary delay, and Congress enacted the Hatch-Waxman Act "to get generic drugs into the hands of patients at reasonable prices — fast." In re*

1  ~~whose only purpose is to delay the introduction of generic competition." 153 Cong.~~

2  Rec. S64 (daily ed. Jan. 4, 2007) (statement of Sen. Kohl).

3      22.  "Indeed, brand name drug manufacturers often wait to file citizen

4  petitions until just before the FDA is about to grant the application to market the new

5  generic drug solely for the purpose of delaying the introduction of the generic

6  competitor for the maximum amount of time possible.  This gaming of the system

7  should not be tolerated." 153 Cong. Rec. S65 (daily ed. Jan. 4, 2007) (statement by

8  Sen. Kohl).

9      23.  "Of the 21 citizen petitions for which the FDA has reached a decision

10 since 2003, 20 -- or 95 percent of them -- have been found to be without merit.  Of

11 these, ten were identified as "eleventh hour petitions," defined as those filed less than

12 6 months prior to the estimated entry date of the generic drug.  None of these ten

13 "eleventh hour petitions" were found to have merit, but each caused unnecessary

14 delays in the marketing of the generic drug by months or over a year. . ." 153 Cong.

15 Rec. S65 (daily ed. Jan. 4, 2007) (statement by Sen. Kohl).

16     24.  In addition, FDA officials have acknowledged that there is a problem.

17 For example, FDA's Chief Counsel Sheldon Bradshaw has stated that "Sometimes,

18 stakeholders try to use this mechanism to unnecessarily delay approval of a

19 competitor's products . . . [we've] already seen several examples of citizen petitions

20 designed not to raise timely concerns with respect to legality or timeliness of the drug

21 application, but rather to delay approvals by compelling the agency to consider

22 arguments raised in the petition."

23     25.  Other federal agencies have also recognized the potential for abuse in the

24 citizen petition process and proposed ways in which to prospectively prevent it.  Jon

25 Leibowitz, FTC Commissioner, has stated that "where the cost of filing an improper

26 petition is trivial compared to the value of securing even a brief delay in a rival's

27 ~~entry, there's certainly an incentive to misbehave." (emphasis added). Declaration of~~

28 *Bar Labs, Inc., 930 F.2d at 76. This Court will not unnecessarily delay a process that has already taken almost ten years.*

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1  ~~Minaksi Bhatt Ex. 5.[1]   Thus, the potential for abuse — and indeed, the actual abuse~~

2  by brand companies to delay generic entry using the citizen petition process, was

3  recognized by the legislature, the FDA and other governmental agencies, and led to

4  the enactment of the Food and Drug Administration Amendments Act 2007.  See 21

5  ~~U.S.C. §355(q).~~

6  **IV.   SPEAR'S 5-FLUOROURACIL CREAM ANDA**

7       **A.   FDA Approved Spear's Bioequivalence Clinical Study Design**

8       26.   In 1999, Spear submitted a proposed bioequivalence clinical study design

9  to the FDA for its approval.  AR955-71.  The bioequivalence clinical study involved

10  the determination of bioequivalence in subjects with precancerous AK because

11  Efudex® is used overwhelmingly in the treatment of AK.  Declaration of K.L. Spear

12  ¶12.[2]

13      27.   The FDA engaged in extensive internal scientific deliberations and

14  ultimately determined that, as a matter of science, a study in AK would demonstrate

15  that Spear's product was bioequivalent and communicated that determination to

16  Spear.  AR938-98.

17      28.   The FDA's deliberations included three documents on which the name

18  Dr. Jonathan Wilkin appears.  Dr. Wilkin was at that time a Division Director in the

19  Office of Generic Drugs.  AR947.  The first document is a November 8, 1999 email

20  from Dr. Wilkin to Dr. Mary Fanning in the Office of Generic Drugs and Dr. Hon-

21  Sum Ko in the Office of New Drugs in which Dr. Wilkin asks whether an email from

22  Dr. Fanning "look[s] like a consult request."  Doyle Dec. Att. A.

23      29.   The second document is a three page memorandum dated November 9,

24  1999 from Dr. Ko to Dr. Fanning on which Dr. Wilkin was copied.  AR947-49.  In the

25  memorandum, there is a single paragraph in which Dr. Ko discusses whether a

26  bioequivalence clinical study in sBCC is needed.  AR949.  The document was sent

27

28

---

[1] The Bhatt Declaration was filed on April 28, 2008.

[2] The Spear Declaration was filed on April 28, 2008.

7

1  "through" Dr. Wilkin, and he signed it ten days after it was written by Dr. Ko.

2  AR947.

3      30.  The third and final document is a January 27, 2000 memorandum from

4  Dr. Ko to Dr. Fanning on which Dr. Wilkin is copied. AR977-82. This memorandum

5  does not discuss whether an sBCC study should be conducted. In Dr. Fanning's letter

6  to Dr. Ko, Dr. Fanning refers to Dr. Ko's earlier memorandum as a "brief consult."

7  AR978.

8      31.  Based upon the FDA approval of its AK clinical study, Spear conducted

9  a clinical bioequivalence study in patients with AK that demonstrated that Spear's 5-

10  fluorouracil cream was bioequivalent to Valeant's Efudex® product. AR1059-86.

11      32.  Spear has not conducted a study in subjects with sBCC. ~~Tr at~~

12  ~~33.  Designing and conducting such a study, including patient recruitment,~~

13  ~~could take two or more years. Tr at ____.~~ This is in part due to the fact that the

14  overwhelming ~~majority of sBCC~~ patients (98%) have ~~this~~ condition treated by

15  ~~surgery, rather than through the use of Efudex®. Tr. ____.~~

16  **B.  On January 6, 2005, Spear Filed its ANDA**

17      34.  Upon successful completion of its clinical study demonstrating

18  bioequivalence of its 5-fluorouracil cream product, Spear filed ANDA 77-524.

19  AR1001.

20  **V.  VALEANT FILED A CITIZEN PETITION ARGUING THAT AN ANDA**

21        **FOR A 5-FLUOROURACIL CREAM PRODUCT SHOULD INCLUDE**

22        **STUDIES IN BOTH AK AND SBCC**

23      35.  On December 21, 2004, Valeant filed a Citizen Petition with the FDA in

24  which it argued that the FDA should require ANDAs for 5-fluorouracil cream

25  products to include clinical studies that demonstrate bioequivalence in both AK and

26  sBCC. AR1-138.

27  ~~³ Spear requested an expedited Transcript of the Preliminary Injunction Hearing;~~
28  ~~however, the Court Reporter was not able to provide it before the Proposed Findings of Fact and Conclusions of Law were due. Should the Court so desire, Spear will provide the Court with an updated document as soon as it receives the transcript.~~

8

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1    36.    Spear through its counsel submitted letters in response to Valeant's

2  Citizen Petition in which it explained that a clinical study in AK would demonstrate

3  bioequivalence in both AK and sBCC. AR141-88, AR450-70, AR502-28.

4    37.    Valeant submitted additional letters to the FDA in support of its Citizen

5  Petition. AR190-449, AR472-88, AR530-71.

**VI.    FDA REJECTED VALEANT'S SCIENTIFIC ARGUMENTS AND**

7  **APPROVED SPEAR'S ANDA**

8    38.    The 1,125 page administrative record indicates that FDA engaged in

9  extensive deliberations in its consideration of Spear's ANDA and Valeant's Citizen

10  Petition.    AR1-1125.    The following portions of the administrative record are

11  particularly relevant to the issues raised in this litigation.

12    **A.    The Hixon Memorandum Discusses, Inter Alia, That AK and sBCC**

13    **Have the Same Site of Action in the Skin, That the Stratum Corneum**

14    **Is the Primary Barrier to Topical Drug Delivery and Is Thickened in**

15    **AK, and Addresses the Arguments Made by Each of the Three**

16    **Valeant Experts**

17    39.    In a February 20, 2007 21-page memorandum, Dr. Dena Hixon,

18  Associate Director for Medical Affairs in the Office of Generic Drugs, provided a

19  detailed discussion of Valeant's Citizen Petition arguments and the responses of the

20  Office of Generic Drugs to those arguments. AR636-56. (This memorandum was

21  written before Dr. Spear submitted the Wilkin letter to the FDA.)

22    40.    The Office of Generic Drugs is responsible for reviewing ANDAs and

23  determining whether the proposed generic drug is bioequivalent. AR at

24    41.    In her memorandum, Dr. Hixon discusses in detail the site of action for

25  AK and sBCC. See AR638, AR640 and AR645. The memorandum contains multiple

26  references to scientific literature on these issues. See, e.g., AR638 at nn.3-4, AR640

27  at nn.5-7. Dr. Hixon concludes in her memorandum that AK and sBCC arise in the

28  same location in the skin. See AR638, AR640 and AR645.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

9

1    42.    In her memorandum, Dr. Hixon concluded that "the stratum corneum, the
2    most superficial sublayer, is widely considered to be the predominant barrier to topical
3    drug delivery" and discusses the fact that the stratum corneum is thickened in AK.
4    AR645-46.

5    43.    In addition, Dr. Hixon's memorandum discusses and addresses
6    arguments made by each of the three experts retained by Valeant to make submissions
7    in support of its Citizen's Petition.    See AR651-53 (discussing declarations of Drs.
8    Maibach, Tran and Fisher).

9    44.    As part of the review of Spear's ANDA and Valeant's Citizen Petition,
10    the Office of Generic Drugs consulted with dermatologists in the Office of New
11    Drugs. AR627-739.  The Office of New Drugs is responsible for reviewing NDAs
12    and determining whether new drug products that are the subject of such applications
13    are safe and effective.  Tr. 64 ⁄⁄  The Office of New Drugs does not make
14    bioequivalence determinations in its review of NDAs. Tr. 64 ⁄⁄

15    45.    Dr. Hixon's memorandum also addresses the Office of Generic Drugs'
16    views regarding issues raised by the Office of New Drugs during the consultation.
17    AR653-66.  The record of the consultation between the Office of Generic Drugs and
18    the Office of New Drugs indicates that some of the doctors in the Office of New
19    Drugs are not familiar with the regulations that relate to ANDAs.  For example, Dr.
20    Hixson's memorandum addresses issues raised by Dr. Markham Luke of the Division
21    of Dermatology and Dental Products ("DDDP"), pointing out, inter alia, that Dr.
22    Luke's analysis did not comport with the FDA's regulations regarding the approval of
23    a generic drug product – as opposed to a new drug product.  See AR653.

24    **B.    Spear Submits The Wilkin Letter In Support of Its ANDA Approval**

25    46.    On March 14, 2007, Spear submitted a two page letter from Dr. Jonathan
26    Wilkin (who had retired from the FDA in 2005) in support of its ANDA. AR1047-58.
27    Dr. Wilkin opined that a clinical study in patients with AK would demonstrate
28    bioequivalence because "the greatest barrier to penetration through the skin is the

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

10

1   stratum corneum," the stratum corneum in sBCC is compromised, and the stratum

2   corneum in AK is thickened.  AR1048.  Dr. Wilkin concluded that "the substantially

3   greater barrier with AKs provides for an assay with greater sensitivity to detect a

4   subtle, even clinically unimportant, difference between test and reference products."

5   AR1048.  Dr. Wilkin's two-page letter contained no references or citations to any

6   scientific studies or published articles.  AR1047-48.

7       47.     There is no evidence that Spear knew at the time that it retained Dr.

8   Wilkin that Dr. Wilkin had had any involvement in the consideration of Spear's

9   clinical study proposal when he was employed by the FDA.

10      **C.     The December 3, 2007 Beitz Memorandum**

11      48.     Dr. Julie Beitz, an oncologist and internist, was asked to review the

12  scientific debate between the Office of Generic Drugs and the Office of New Drugs

13  and provide her conclusions.  In a December 3, 2007, twelve-page memorandum, Dr.

14  Beitz concluded that "a single clinical study in AK would be sufficient to demonstrate

15  bioequivalence of Efudex® 5-fluorouracil cream, 5%, and Spear's 5-fluorouracil

16  cream, 5%, for both the AK and sBCC indications."  AR736.

17      49.     Dr. Beitz's memorandum contains a detailed discussion of the site of

18  action for AK and sBCC, citing the scientific literature on this subject.  See AR732-34

19  and notes 7-11.  Dr. Beitz concludes that:

20          Based upon my review of the data and information describing actinic

21          keratoses and superficial basal cell carcinomas, I conclude that both

22          are characterized by an abnormal proliferation of cells within the

23          epidermis, which may be involved either in part or in its entirety.  I

24          also conclude that both conditions may protrude minimally into the

25          upper dermis while maintaining continuity with the epidermis.  Thus

26          the site of action for a topical product to treat each of these conditions

27          is the epidermis and upper dermis.

28  AR734.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

11

50.  Dr. Beitz's memorandum also found that "the stratum corneum is the predominant barrier to topical drug delivery." AR734. This language is almost identical to the language in Dr. Hixon's February 20, 2007 memorandum. AR645.

51.  Dr. Beitz also found that "[i]n many skin disorders, including tumors, the stratum corneum is compromised, and barrier resistance decreased.  As treatment progresses, the condition improves, and the barrier function of the tissue is restored thereby decreasing drug delivery. In contrast, in actinic keratosis the stratum corneum is often thickened." AR734-35 (emphasis in original). Dr. Beitz cited the scientific literature that supports these findings. AR735-36 and n.13.

52.  Dr. Beitz concludes with eight reasons why "a single clinical study in AK would be sufficient to demonstrate bioequivalence of Efudex® 5-fluorouracil cream, 5%, and Spear's 5-fluorouracil cream, 5%, for both the AK and sBCC indications." AR736-37.

53.  In her description of the documents that were submitted to the FDA in connection with the Citizen Petition, Dr. Beitz states in a footnote, "[o]n March 14, 2007, Spear Pharmaceuticals submitted to its ANDA the expert opinion of Jonathan Wilkin, MD, supporting the adequacy of Spear's AK study to support approval of their product. Dr. Wilkin was Director of DDDP from 1994 to 2005. Dr. Wilkin does not appear to have been involved in this matter during his tenure at FDA." AR730 at n.6. The Beitz memorandum makes no other reference to Dr. Wilkin and does not state that Dr. Beitz relied on Dr. Wilkin's opinion, nor does Dr. Beitz's memorandum cite to or rely on the Wilkin letter in support of any of her conclusions.

**D.  The 39-Month Internal Scientific Debate Within FDA Concludes with Approval of Spear's ANDA and Denial of Valeant's Citizen Petition**

54.  After 39 Months of internal scientific deliberation, FDA concluded as a matter of science that a clinical study in AK would demonstrate bioequivalence in both AK and sBCC. AR599-626, AR1084-86.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

12

55.     The doctors involved in the internal debate included both representatives from the Office of New Drugs and the Office of Generic Drugs.  The doctors in the Office of New Drugs included dermatologists and an oncologist, Dr. Beitz. *Id.* at __. The Office of New Drugs is responsible for determining the safety and efficacy of new drug applications; it does not determine bioequivalence as part of the process of reviewing and approving new drugs.  The Office of Generic Drugs is responsible for determining whether the proposed generic drug is bioequivalent to the referenced new drug.  Thus, the Office of Generic Drugs is expert in determining bioequivalence.

56.     On April 11, 2008, FDA approved Spear's ANDA and denied Valeant's Citizen Petition.  AR599-626, AR1084-86.

57.     Valeant's citizen petition delayed the approval of Spear's ANDA. *Id.* at __.

## VII.     AFTER FAILING TO CONVINCE THE FDA TO REQUIRE SPEAR TO CONDUCT A BIOEQUIVALENCE CLINICAL STUDY IN SBCC, VALEANT FILED A COMPLAINT AND APPLICATION FOR A TRO

58.     On April 25, 2008, two weeks after Spear's ANDA was approved and Valeant's Citizen Petition was denied, Valeant filed a complaint against the FDA and an application for a TRO to suspend Spear's approval.

59.     On April 28, 2008, Spear filed a motion to intervene and an opposition to Valeant's application for a TRO.

60.     On April 28, 2008, FDA filed an opposition to Valeant's application for a TRO.

61.     On April 30, 2008, Valeant filed a reply in support of its application for a TRO, and on May 30, 2008, Valeant filed a supplemental memorandum in support of its application.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

13

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

**VIII. FDA REQUESTED A STAY IN ORDER TO INVESTIGATE A POTENTIAL CONFLICT OF INTEREST AND AVOID EVEN THE APPEARANCE OF ANY IMPROPRIETY AND LATER REQUESTED AN ADMINISTRATIVE STAY IN ORDER TO ADDRESS THE POTENTIAL CONFLICT ISSUE AND A SCIENTIFIC ISSUE**

62.    On April 30, 2008, the FDA requested a two week stay of proceedings so that it could consider "newly-discovery matters pertaining to the administrative record." FDA sought the stay in order to investigate a "potential conflict of interest (or the appearance thereof) concerning a former FDA employee." On May 1, 2008, the Court granted FDA's application for a stay of proceedings.

63.    During the two week stay, FDA requested an administrative stay pursuant to 21 C.F.R. §§10.33(a) and (h) and 10.35(a). FDA asked the Court to refer the matter back to the agency for administrative reconsideration and stay the proceedings pending resolution of the previously-identified issue and the agency's administrative reconsideration involving a scientific issue. On May 16, 2008, the Court granted the FDA's application for an administrative stay of proceedings.

**IX.    UPON RECONSIDERATION, FDA DETERMINED (A) THAT SPEAR'S ANDA WAS APPROVABLE WITHOUT THE WILKIN LETTER, (B) ADDITIONAL SCIENTIFIC INFORMATION WAS NOT NECESSARY, AND REAFFIRMED SPEAR'S APPROVAL; THIS DETERMINATION WAS REVIEWED AND APPROVED BY DR. THROCKMORTON WHO WAS NOT INVOLVED IN THE INITIAL APPROVAL OF THE SPEAR ANDA**

64.    On May 30, 2008, the FDA submitted to the Court memoranda that comprised FDA's decision reaffirming Spear's approval. AR1088-225.

65.    The memoranda included (1) a memorandum from Dr. Julie Beitz, Director, Office of New Drugs, to Dr. Douglas Throckmorton, Deputy Director of the Center for Drug Evaluation; (2) a twelve-page memorandum from Dr. Throckmorton

14

1  to Dr. Janet Woodcock, Director of the Center for Drug Evaluation; (3) a

2  memorandum from Dr. Woodcock to Dr. Andrew von Eschenbach, the Commissioner

3  of the FDA; (4) and the Decision on Administrative Reconsideration signed by Dr.

4  von Eschenbach. AR1088-225.

5      66.   Dr. Beitz in her May 29, 2008 memorandum stated that at the time she

6  wrote her December 3, 2007 memorandum she "was not aware that Dr. Wilkin had

7  been involved in this matter during his tenure at FDA." AR1107. Dr. Beitz was

8  asked "whether [she] would have reached the same conclusion as stated in [her]

9  December 3, 2007 decision, even if Dr. Wilkin had not made his March 14, 2007

10  submission in support of Spear's ANDA." AR1107. Dr. Beitz stated that "[r]emoval

11  of Dr. Wilkin's March 14, 2007 submission from consideration does not alter any of

12  the conclusions that I reached in my December 3, 2007 memo regarding the adequacy

13  of Spear's AK study to support approval of its product." AR1107.

14      67.   Dr. Beitz addressed Dr. Wilkin's statement that the stratum corneum was

15  the greatest barrier to penetration. Dr. Beitz stated that her review of the literature

16  indicated that this "observation is widely held" and cited numerous scientific

17  references for this proposition. AR1107 n.1. She also stated that the Office of

18  Generic Drugs was aware of "this well-known fact" before Dr. Wilkin's letter, citing

19  the Hixon memorandum. AR1107. Valeant has not challenged the scientific

20  correctness of Dr. Beitz's statement that this observation is widely held in the

21  literature.

22      68.   Dr. Beitz also stated that the thickness of the stratum corneum in AK and

23  sBCC is described in the scientific literature cited in her December 3, 2007

24  memorandum and in the Williams reference submitted by Valeant in support of its

25  Citizen Petition. AR1107-08. Valeant has not challenged the scientific correctness of

26  Dr. Beitz's statements that these facts were well-known in the scientific literature.

27      69.   Dr. Throckmorton, the Deputy Director of the Center for Drug

28  Evaluation and Research, then reviewed Dr. Beitz's analysis.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

70. Dr. Throckmorton had not been involved in the earlier consideration and approval of Spear's ANDA. See AR 938-1086.

71. In a twelve page memorandum, Dr. Throckmorton recommended "that the approval of ANDA 77-524 be affirmed as both scientifically and procedurally correct." AR1091.

72. Dr. Throckmorton's memorandum described in detail the scientific debate within FDA regarding the need for bioequivalence studies in both AK and sBCC. AR1092-95.

73. Dr. Throckmorton stated that "the statements made by Dr. Wilkin were based on information that is generally available and could reasonably have been derived from other submitted materials" and concluded that "omitting Dr. Wilkin's statement from the record does not change the conclusion regarding the approvability of the Spear ANDA." AR1096.

74. Dr. Throckmorton reviewed the record and concluded that FDA's "earlier decision that a single study in AK is adequate to establish bioequivalence for these products is scientifically and procedurally sound." AR1096.

75. Dr. Throckmorton also addressed the scientific issue that caused the FDA to request the administrative stay so that it could reconsider the approval. AR1099-1101. He concluded that pharmacokinetic and additional efficacy information was not required for approval of Spear's ANDA. AR1100-01.

76. Dr. Woodcock reviewed Dr. Throckmorton's memorandum and agreed "that the approval of ANDA 77-524 be affirmed as both scientifically and procedurally correct." AR1089. She stated that the "statements made by Dr. Wilkin were based on information that is generally available and could reasonably have been derived from other submitted materials." AR1090. She further stated that "Spear's clinical endpoint bioequivalence study in patients with AK was adequate to demonstrate bioequivalence" and "no additional pharmacokinetic data are needed to

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    support approval." AR1090.  Dr. Woodcock recommended "that approval of ANDA

2    77-524 be affirmed."  AR1090.

3        77.    Dr. von Eschenbach's Decision on Administrative Reconsideration states

4    that he "reconsidered the approval of Spear's ANDA 77-524 for 5-fluorouracil cream,

5    5%, and based [on] Dr. Woodcock's recommendation, the approval of the ANDA 77-

6    534 is hereby affirmed."  AR1088.  There is no indication in the administrative record

7    that Dr. von Eschenbach was involved in the initial approval of the Spear ANDA.  <u>See</u>

8    AR938-1086.

9    ~~X.    THE    FDA'S    ETHICS    INVESTIGATION    OF    DR.    WILKIN~~

10   ~~CONCLUDED THAT THERE WAS NO CONFLICT OF INTEREST~~

11       ~~78.    After finding three documents in the administrative record that included~~

12   some reference to Dr. Wilkin, the Office of the General Counsel for the Department of

13   Health and Human Services, Food and Drug Division referred the potential conflict of

14   interest issue to FDA's Office of Internal Affairs, Office of Criminal Investigations.

15   Doyle Dec. ¶1.

16       79.    The Office of Internal Affairs referred the matter to the Office of

17   Investigations for the Department of Health and Human Services, Office of the

18   Inspector General.  Doyle Dec. ¶3.

19       80.    The Office of the Inspector General determined that there was no conflict

20   of interest.  Vantrease Dec. ¶¶4-5.

21       81.    Mr. Vantrease concluded that:

22       the referral did not provide sufficient information to support that Dr.

23       Wilkin knew that his letter would be presented to the agency, as

24       required by 18 U.S.C. §207(a)(1).  In addition (and even if he did

25       know that the letter would be presented to FDA), I concluded that the

26       information showed that <u>Dr. Wilkin was two supervisory levels above</u>

27       <u>the Medical Officer conducting the review, and that there was nothing</u>

28       ~~else indicating that he was personally and substantially involved in the~~

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

17

73. Valeant has not made a sufficient showing of an ethical violation.

1    ~~matter at hand, as required for the permanent restriction relating to~~

2    ~~former employees under 18 U.S.C. §207(a)(1)(B). The one-year~~

3    ~~restriction in 18 U.S.C. §207(c) on communicating to the government~~

4    ~~would not apply to Dr. Wilkin (regardless of whether he qualified as a~~

5    ~~senior personnel) because he left HHS in 2005, and his expert opinion~~

6    ~~was written on March 14, 2007.~~

7    Vantrease Dec. ¶4 (emphasis added).

8        82.   Mr. Vantrease determined "that no further investigation of this matter

9    was warranted." Vantrease Dec. ¶5.

10        83.   Mr. Doyle notified the Office of the General Counsel "that neither

11    HHS/OIG nor the Office of Internal Affairs would take any action against Dr.

12    Wilkin." Doyle Dec. ¶5.

13    **XI.   IN VIEW OF AN FDA WARNING LETTER THAT DESCRIBES**

14           **VALEANT'S EFUDEX® PRODUCT AS "ADULTERATED," THERE IS**

15           **A RISK THAT VALEANT WILL BE FORCED TO CEASE SELLING**

16           **ITS EFUDEX® PRODUCT**

17        84.   On May 7, 2008, the company that manufacturers Valeant's Efudex®

18    product (in a plant that it purchased from Valeant in 2007) received a Warning Letter

19    from the FDA advising that Valeant's Efudex® product was not manufactured in

20    accordance with Current Good Manufacturing Practices ("CGMP"), thus "rendering

21    the drug adulterated" within the meaning of the Federal Food, Drug, and Cosmetic

22    Act. Declaration of Lisa N. Phillips ("Phillips Dec.") Ex. F.[4]

23        85.   The FDA warning letter found that "the manufacture and processing of

24    the [Valeant] drug do not conform with CGMP to assure that the drug product meets

25    the requirements of the Act as to safety, and has the identity and strength and meets

26    the quality and purity characteristics that it purports or is represented to possess."

27    Phillips Dec. Ex. F.

28

---

[4] ~~The Phillips Declaration was filed on June 6, 2008.~~

18

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

86.    These adulterated batches of Efudex® are currently within their expiration labeling and presumably are still on distributor shelves.

87.    According to the FDA's Warning Letter, the manufacturing problems with respect to Valeant's Efudex® product have been ongoing since August 2005, when Valeant still owned the plant.  Phillips Dec. Ex. F at p. 1.  These issues have been reported to the FDA in various Field Alert Reports and have indicated "a pattern of variability in key quality attributes of [the] Efudex® Topical Cream 5% drug product."  Id. at p. 1.

Since August 2005 your analyses of retained lots (as part of complaint investigations) and stability samples (as part of your ongoing stability program) revealed at least 11 instances of failure to meet specifications for assay, appearance and/or . . . content . . . your manufacturing process is not well-controlled and/or is not designed to ensure that all dosage units within a lot are of appropriate quality throughout their expiry period.

Id. at pp. 1-2 (emphasis added).

88.    During the first one year and nine months of the manufacturing problems, Valeant was directly responsible for addressing those problems to the FDA's satisfaction.  The FDA stated in its Warning Letter that Valeant "observed anomalies" prior to April 2007 in manufacturing and control records but "did not take the next step necessary to correct this problem on a process-wide level."  Phillips Dec. Ex. F at p. 2.

89.    Based on the repeated problems discussed above with manufacturing, variability and stability issues, the FDA conducted an inspection of the Puerto Rico manufacturing facility from September 10-28, 2007.  Phillips Dec. Ex. F at p. 1.  As a result of that inspection, the FDA concluded:

The inspection revealed that your firm's manufacture, processing, packaging or holding of the human drug product Efudex® Topical Cream

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

19

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  ~~5% deviates from the Current Good Manufacturing Practice (CGMP)~~

2  Regulations as stated within 21 CFR Parts 210 and 211, rendering the

3  drug adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B) . . . The

4  manufacture and processing of the drug do not conform with CGMP to

5  assure that the drug product meets the requirements of the Act as to

6  safety, and has the identity and strength and meets the quality and purity

7  characteristics that it purports or is represented to possess.

8  Id. (emphasis added).

9       90.    FDA's regulations provide that because CGMP have not been followed

10  during the manufacturing of the Efudex® cream product, it may be subject to recall or

11  seizure. 21 C.F.R. §7.40(a).

12      91.    Multiple batches of adulterated product are within their expiry dates and,

13  in the absence of a recall, are presumably still sitting on the shelf waiting to fill

14  patient's prescriptions.    Specifically, the FDA cites eight lots with various

15  manufacturing issues, three of which are still well within their expiry dates. Phillips

16  Dec. Ex. F at pp. 4-5. These lots included one listed in a Field Alert Report submitted

17  as recently as January 17, 2008. Id. at p. 4.

18       As patients apply this cream daily to their lesion(s), it is their reasonable

19      expectation that all portions of the cream in every tube are homogeneous

20      and equally potent.   Our inspection found that the consistency and

21      uniformity of your drug product's quality is not assured.

22  Id. at p. 5 (emphasis added).

23      92.    Valeant has not even attempted to explain to this Court why its product is

24  not adulterated, stating only that it will respond in due course to the FDA Warning

25  Letter. Valeant gave this Court no assurance that its Efudex® product will remain on

26  the market.

27

28

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

20

**CONCLUSIONS OF LAW**

**I.     THE APPLICABLE LAW**

    **A.     The Preliminary Injunction Standard**

    1.     To be entitled to issuance of a preliminary injunction, a plaintiff must "demonstrate[] either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in [its] favor." Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005) (emphasis in original) (citation omitted).

    2.     "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." Id. (citations omitted).

    3.     "Under any formulation of the test, the moving party must demonstrate a significant threat of irreparable injury." Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987) (emphasis added) (citation omitted). See also, Whittier College v. ABA, No. 07-1817, 2007 U.S. Dist. LEXIS 43707, at *16 (C.D. Cal. May 7, 2007).

    4.     Injunctive relief "is a drastic and extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Avila v. Stearns Lending, Inc., No. 08-0419, 2008 U.S. Dist. LEXIS 31813, at *2 (C.D. Cal. Apr. 7, 2008) (Guilford, J.).

    5.     The burden remains on Valeant even though this Court has granted it temporary relief. Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, 415 U.S. 423, 442-43 (1974).

    6.     "When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party.'" Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1320 (9th Cir. 1994), cert. denied, 528 U.S. 1022 (1999) (citation omitted).

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1   7.    "It is well established . . . [that] monetary injury is not normally

2   considered irreparable." Los Angeles Memorial Coliseum Comm'n. v. NFL, 634 F.2d

3   1197, 1202 (9th Cir. 1980).

4   8.    "To successfully shoehorn potential economic loss into the irreparable

5   harm requirement, a plaintiff must establish that the economic harm is so severe as to

6   cause extreme hardship to the business or threaten its very existence." Apotex, Inc. v.

7   FDA, No. 06-0627, 2006 U.S. Dist. LEXIS 20894, at *54-56 (D.D.C. Apr. 19, 2006)

8   (internal quotations and citation omitted).

9   9.    "Speculative injury does not constitute irreparable injury." Goldie's

10  Bookstore, Inc. v. Super. Ct. of Cal., 739 F.2d 466, 472 (9th Cir. 1984) (citation

11  omitted). See also, CKE Rest. v. Jack in the Box, Inc., 494 F. Supp. 2d 1139, 1148

12  (C.D. Cal. 2007) (Guilford, J.).

**B.    The Standard of Review under the APA**

13

14  10.    Administrative decisions can only be overturned if they are "arbitrary,

15  capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

16  §706(2)(A).

17  11.    Under the APA, "[t]he ultimate standard of review is a narrow one. The

18  court is not empowered to substitute its judgment for that of the agency." Zeneca, Inc.

19  v. Shalala, 213 F.3d 161, 167 (4th Cir. 2000) (citation omitted). See also, Bristol-

20  Myers Squibb Co. v. Shalala, 923 F. Supp. 212, 216 (D.D.C. 1996).

21  12.    In order for agency action to be overturned as arbitrary and capricious,

22  there must have been "no rational basis for the action" taken. Friends of the Earth v.

23  Hintz, 800 F.2d 822, 831 (9th Cir. 1986) (citation omitted).

24  13.    "[T]he court must consider whether the decision was based on a

25  consideration of the relevant factors and whether there has been a clear error of

26  judgment." Id. (internal quotation and citation omitted). Such review is

27  accomplished not by "de novo review of the action itself [but by] focus instead on the

28

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1    agency's decisionmaking process." Ranchers Cattlemen Action Legal Fund United

2    Stockgrowers of Am. v. USDA, 499 F.3d 1108, 1117 (9th Cir. 2007).

3        14.    Agency action is not in accordance with the law if it (1) "is based upon

4    an erroneous interpretation or misapplication of relevant statutory provisions"

5    (Louisville & N.R. Co. v. U.S., 268 F. Supp. 71, 75 (W.D. Ky. 1967), rev'd on other

6    grounds, sub nom. Am. Comm. Lines, Inc. v. Louisville & N.R. Co., 392 U.S. 571

7    (1968)); (2) "violates a published regulation" (Washington Mechanical Contractors,

8    Inc. v. U.S. Dept. of Navy, 612 F. Supp. 1243, 1248 (N.D. Cal. 1984)); or, (3) is not in

9    accordance with case law directly bearing on the legal question at issue (Whitaker v.

10    Thompson, 248 F. Supp. 2d at 1, 13 (D.D.C. 2002)).

11        C.    The Conflict of Interest Rules

12        15.    Former governmental employees are restricted from certain activities

13    once they have left public service.  See 18 U.S.C. §207.  If the former employee

14    "participated personally and substantially" in a matter while a public servant, he may

15    not "knowingly make . . . with the intent to influence, any communication to or

16    appearance before any officer or employee of any . . . agency. . . of the United States .

17    . . on behalf of another person." Id.

18        16.    In order to have participated "personally," the former employee must

19    have participated "directly" in the matter while employed by the government.  5

20    C.F.R. §2637.201(d)(1).

21        17.    Participation is not "substantial" as required by the statute unless "the

22    employee's involvement [was] of significance to the matter, or form[ed] a basis for a

23    reasonable appearance of such significance." 5 C.F.R. §2637.201(d)(1).  Substantial

24    participation "requires more than official responsibility, knowledge, perfunctory

25    involvement, or involvement on an administrative or peripheral issue." Id.

26        18.    "'Personal and substantial participation' is different from 'official

27    responsibility.'" 5 C.F.R. § 2637.201(d)(3).  Official responsibility "is defined as 'the

28    direct administrative or operating authority, whether intermediate or final, and either

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

23

1  exercisable alone or with others, and either personally or through subordinates, to

2  approve, disapprove, or otherwise direct Government action.'" CNA Corp. v. U.S.,

3  No. 08-249, 2008 U.S. Claims LEXIS 121, at *27 (Fed. Cl. Apr. 30, 2008) (quoting

4  18 U.S.C. § 202; 5 C.F.R. § 2637.202(b)).

5  **D.    The Administrative Record after Reconsideration Includes the**

6  **Documents Relating to the Reconsideration**

7    19.    When the FDA initiates reconsideration of a decision pursuant to 21

8  C.F.R. §10.33(a), "[t]he administrative record of the proceeding is to include <u>all</u>

9  <u>additional documents</u> relating to such reconsideration."    21 C.F.R. §10.33(h)

10  (emphasis added).

11  **E.    Government Officials Are Presumed to Have Acted Correctly and in**

12  **Good Faith**

13    20.    "[T]here is a presumption of legitimacy accorded to the Government's

14  official conduct." <u>National Archives & Records Admin. v. Favish</u>, 541 U.S. 157, 174

15  (2004) (citing <u>United States Dep't of State v. Ray</u>, 502 U.S. 164, 178-79 (1991)).

16    21.    In order to displace the presumption, clear evidence to the contrary must

17  be present. <u>Id.</u>

18    22.    Moreover, "[g]overnment officials . . . are presumed to have acted in

19  good faith." <u>Seattle Audubon Society v. Lyons</u>, 871 F. Supp. 1291, 1318 (W.D.

20  Wash. 1994) (citing <u>Hoffman v. U.S.</u>, 894 F.2d 380, 385 (Fed. Cir. 1990)).

21  ~~F.    Recall Is Appropriate Only When the FDA Has Determined That~~

22  ~~There Is a Risk of Illness or Injury or Gross Consumer Deception~~

23  ~~and It Is Necessary to Protect the Public Health and Welfare~~

24  ~~23.    The FDA may request that a drug company recall a consumer product~~

25  ~~only if the FDA has determined that a product "presents a risk of illness or injury or~~

26  ~~gross consumer deception" and "agency action is necessary to protect the public~~

27  ~~health and welfare." 21 C.F.R. §7.45(a)(1).~~

28

**II.    VALEANT HAS NOT DEMONSTRATED THAT IT HAS A LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE THE FDA'S REAFFIRMATION OF SPEAR'S APPROVAL WAS NOT ARBITRARY AND CAPRICIOUS OR NOT IN ACCORDANCE WITH LAW**

> **A.    The FDA's Scientific Determinations Are Within the Agency's Area of Expertise and Are Accorded Great Deference by Courts**

24.    Following an exhaustive and comprehensive review of the administrative record, the FDA on May 30, 2008 concluded that Spear's 5-fluorouracil product is safe, effective, and bioequivalent and reaffirmed Spear's approval.

25.    Because determinations regarding safety, efficacy, and bioequivalence are within the FDA's area of scientific expertise, the FDA's reaffirmance of Spear's ANDA approval is accorded great deference by this Court. See, e.g. Zeneca, Inc. v. Shalala, 213 F.3d 161 (4th Cir. 2000) (ANDA approval upheld based on the FDA's scientific assessment and application of its express regulations); Warner-Lambert Co. v. Shalala, 202 F.3d 326 (D.C. Cir. 2000) (ANDA approval upheld based on FDA's determinations and regulations regarding the definition of a "dosage form"); Serono Labs. v. Shalala, 158 F.3d 1313 (D.C. Cir. 1998) (ANDA approval upheld based on FDA's determination that in vitro testing was sufficient to demonstrate bioequivalency); Schering Corp. v. FDA, 51 F.3d 390, 399 (3d Cir.), cert. denied, 516 U.S. 907 (1995) (ANDA approval upheld because, although bioequivalence is required by statute, Congress did not intend "to limit the discretion of the FDA in determining when drugs were bioequivalent for purposes of ANDA approval"); Biovail Corp. v. FDA, 519 F. Supp. 2d 39, 47 (D.D.C. 2007) (ANDA approval upheld based on the FDA's "scientific research and judgment" regarding the generic drug's safety and effectiveness and determination that the proposed labeling was proper); Somerset Pharms. v. Shalala, 973 F. Supp. 443, 453 (D. Del. 1997) (ANDA approval upheld based on the FDA's wide discretion in what types of testing are required to demonstrate bioequivalence); Upjohn Co. v. Kessler, 938 F. Supp. 439, 444 (W.D.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

25

1    Mich. 1996) (denying request for a preliminary injunction prohibiting the FDA from

2    approving applicant's ANDA based on the FDA's safety analysis and determinations);

3    Bristol-Myers Squibb Co. v. Shalala, 923 F. Supp. 212, 220 (D.D.C. 1996) (ANDA

4    approval upheld based on the FDA's wide discretion regarding the type of testing

5    required to demonstrate bioequivalence); Fisons Corp. v. Shalala, 860 F. Supp. 859

6    (D.D.C. 1994) (ANDA approval without submission of certain in vivo testing upheld).

7        26.    Congress has assigned the task of evaluating ANDAs to the FDA. It has

8    also established a process by which generic drugs are approved – a process that does

9    not require ANDAs to be reviewed in the same fashion as are applications for new

10   drug products.

11       27.    The FDA is an agency with scientists and scientific expertise. ~~This Court~~

12   ~~does not have the expertise to make the scientific and medical judgments inherent in~~

13   ~~the approval of a generic pharmaceutical product.~~ The FDA has trained personnel

14   able to evaluate the scientific merits of issues like whether sBCC and AK occur at the

15   same site, whether an active ingredient that reaches that site of action in AK patients

16   will also do so in sBCC patients, which condition is "easier to treat" and – ultimately

17   – whether the Spear and Valeant products are bioequivalent.

18       28.    Valeant is asking this Court to order the FDA to suspend its approval of

19   Spear's ANDA and to evaluate, using its scientific expertise, certain scientific and

20   medical issues. But as described in great detail in the May 30, 2008 memorandum by

21   Dr. Throckmorton, the FDA has done just that. And the result of its scientific and

22   medical examination was a conclusion rejecting each of the scientific arguments

23   advanced by Valeant and reaffirming the FDA's earlier conclusion that the Spear

24   product is safe, effective, and bioequivalent and that Spear's ANDA was properly

25   approved. This Court will not disturb that scientific judgment.

26       29.    The FDA's decision reaffirming Spear's approval responds to the

27   arguments made by Valeant in its Citizen Petition and to this Court. Valeant argues

28   that sBCC originates in a different layer of the skin than AK and that it is therefore not

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

26

1    reasonable to conclude that successful treatment of AK indicates equivalence in

2    treatment of sBCC, citing the opinion of Dr. Khanh P. Tran submitted by Valeant

3    during the citizen petition process. In its decision, the FDA cites "ample evidence in

4    the literature" that the two conditions arise in "adjacent layers of the epidermis" and

5    that because the real barrier to penetration is the stratum corneum, which is thickened

6    in AK and compromised in sBCC, an AK study is more likely to provide more

7    suitable information regarding bioequivalency. AR1096-97.

8        30.    Valeant argues that sBCC is the more "serious condition" and requires

9    more drug since the FDA required labeling contains the caution that only the 5%

10   strength should be used in the treatment of sBCC. The FDA responded that Valeant's

11   expert, Dr. Dennis Fisher, M.D., presents hypothetical dose-response curves and has

12   provided "no clinical data showing that sBCC actually requires exposure to higher

13   concentrations of 5-FU than are needed to treat AK." AR1098. The FDA also

14   determined that, because there is a higher clearance rate for sBCC when treated with

15   Efudex® cream than there is for AK, based on the success rates in each condition,

16   neither is "difficult to treat." AR1097.

17       31.    Valeant argues that the FDA "disregarded" the opinion of its expert Dr.

18   Howard Maibach who stated that AK studies are inherently unreliable because they

19   are based on objective physician diagnosis and determination of treatment success.

20   The FDA responded that "Dr. Maibach fail[ed] to discuss the variability of sBCC . . .

21   [both in its] diagnosis and in terms of the duration of therapy required for treatment."

22   AR1097. In addition, the FDA stated that, even if his assertions were valid, "the study

23   conducted by Spear was designed to lessen the impact of such variability . . . [and

24   was] robust and carefully planned (with FDA input)." AR1097, AR1099.

25       32.    Valeant argues that the FDA offered a study which "demonstrates" that

26   doses at 0.5 and 5% fluorouracil cream were equally effective in treating AK and then

27   allegedly contradicted itself by determining that a clinical study directed at treatment

28   of AK is sufficient to demonstrate bioequivalence in both AK and sBCC.   The FDA

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

27

1    responded that the statement it made in the denial of the citizen petition was taken out

2    of context and that the paper itself cannot support the conclusion Valeant suggests

3    because it suffers from numerous deficiencies in the study design and unknown effects

4    on the results by uncontrolled variables.  AR1097-98.

5        33.    Valeant argues that the Office of Generic Drugs ignored the opinions of

6    the expert dermatologists in the Office of New Drugs citing memoranda authored by

7    Dr. Markham Luke. AR627-30, AR633-35.  The administrative record indicates that

8    there was a spirited scientific debate among the scientists at DDDP and the Office of

9    Generic Drugs, as well as their supervisors and that the opinions upon which Valeant

10    relies were considered.  However, it was ultimately determined by the experts in

11    bioequivalence in the Office of Generic Drugs that an sBCC clinical study was not

12    required.    Moreover, Valeant ignores the fact that Dr. Beitz, an oncologist and

13    internist in the Office of New Drugs and the supervisor of the dermatologists in the

14    Office of New Drugs (including the much more junior Dr. Luke), was of the opinion

15    that an sBCC study was not needed.

16        34.    The Court of Appeals for the District of Columbia in Serono, 158 F.3d

17    1313, was faced with a factually similar argument.  The company that sold the brand

18    name drug filed a citizen petition asking the FDA not to approve generic drug

19    applications based on certain scientific arguments. Serono, 158 F.3d at 1316-17. The

20    FDA denied the citizen petition, and the brand name drug company sought a

21    preliminary injunction ordering FDA to suspend the approval of the generic drug

22    company.  Serono, 158 F.3d at 1317.  The district court granted the preliminary

23    injunction, and the court of appeals reversed because "[t]he district court appeared to

24    grant the FDA's determination less than this usual deference because internal FDA

25    memoranda indicated there was some disagreement among FDA chemists . . .

26    deference is owed to the decisionmaker authorized to speak on behalf of the agency,

27    not to each individual agency employee." Serono, 158 F.3d at 1321 (internal citations

28    omitted).  The court of appeals noted that "were we to hold otherwise, we would

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

28

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1  effectively empower any individual employee not just to veto the views of the agency
2  head, but to preclude any deference to the agency at all, since we would have no basis
3  for deciding to whose view we should defer." <u>Serono,</u> 158 F.3d at 1321.  The court of
4  appeals concluded that it owed deference to the view of the agency's authorized
5  decision maker.  <u>Serono,</u> 158 F.3d at 1321.  In this case, the authorized decision maker
6  in connection with Spear's original approval was the Office of Generic Drugs, not the
7  dermatologists in the Office of New Drugs, and the authorized decision makers in
8  connection with the reaffirmation of Spear's approval were Drs. Throckmorton,
9  Woodcock, and von Eschenbach.

10  ~~35.  Valeant argues that in June 2006 Dr. Beitz was of the view that an sBCC~~
11  study was needed, citing the minutes of a meeting that was attended by numerous
12  representatives from the Office of New Drugs and the Office of Generic Drugs.
13  AR631-32.  The statements in the minutes are not attributed to anyone in particular
14  and there is no indication that Dr. Beitz agreed or disagreed with the conclusion.
15  Moreover, Valeant's arguments are contradicted by a later memorandum by Dr. Luke
16  concerning the need for an sBCC study.  AR633-35.  If Dr. Beitz and others were
17  convinced that an sBCC study was necessary at the time of the June 2006 meeting,
18  then there would have been no need for Dr. Luke's September 2006 memorandum.

19  36.  Valeant argues that Dr. Hixon's memorandum was rejected by the
20  dermatologists in the Office of New Drugs, including Dr. Beitz, citing a memorandum
21  by Dr. Luke and Dr. Patricia Brown, a Medical Officer, to the Office of Generic
22  Drugs.  AR657-61.  The memorandum is "through" Dr. Beitz and Dr. Susan Walker,
23  Division Director; however, there is no indication that they agreed with the views of
24  Drs. Luke and Brown.  For example, while the authors signed the memorandum,
25  neither Dr. Beitz nor Dr. Walker signed.

26  37.  Valeant argues that Dr. Wilkin's letter convinced Dr. Beitz and others
27  that an sBCC study was not necessary; however, Valeant has failed to point to
28  ~~evidence in the record that Dr. Beitz's view was influenced, or in any way affected, by~~

29

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1   ~~the two page letter submitted by Dr. Wilkin.   As demonstrated above, Valeant has~~
2   only been able to identify ~~evidence that mere~~ junior doctors in the Office of New
3   ~~Drugs who reported to Dr. Beitz were of the view that an sBCC study was necessary.~~

4       38.    Valeant argues that FDA should require Spear to submit pharmacokinetic

5   data in support of its ANDA approval.   The FDA's decision to reaffirm Spear's

6   approval is within its area of expertise and, as such, is entitled to great deference from

7   any reviewing court.   See, e.g., Biovail Corp., 519 F. Supp. 2d at 47; Allergan, Inc. v.

8   Crawford, 398 F. Supp. 2d 13, 22 (D.D.C. 2005) (internal quotations and citation

9   omitted).   See also, Zeneca, 213 F.3d at 170; Schering Corp., 51 F.3d at 399;

10  Somerset Pharms., 973 F. Supp. at 453; Upjohn, 938 F. Supp. at 444; Bristol-Myers

11  Squibb Co., 923 F. Supp. at 220; Fisons, 860 F. Supp. at 966-67.

12  **B.**    **Valeant's Argument That FDA's Procedure on Reconsideration Was**
13          **Tainted Is Without Merit**

14      39.    Valeant has argued that FDA's procedure on reconsideration was tainted

15  because the same FDA personnel who were involved in the original approval of

16  Spear's ANDA were also involved in its reconsideration.   This argument is factually

17  incorrect because Dr. Douglas Throckmorton was involved in the reconsideration, but

18  was not involved in the original ANDA approval process.

19      40.    FDA took the responsible course of action and requested a stay of

20  proceedings in order to assess the effect, if any, of a potential conflict of interest and

21  to determine whether any additional scientific data were needed in support of Spear's

22  ANDA approval.   Four high-ranking FDA officials were involved in the review

23  process (two of whom – Drs. Throckmorton and von Eschenbach – were not involved

24  in the original approval) and they unanimously agreed that Spear's approval should be

25  reaffirmed.   National Archives & Records Admin., 541 U.S. at 174 (citing United

26  States Dep't of State, 502 U.S. at 178-79) ("there is a presumption of legitimacy

27  accorded to the Government's official conduct."); Seattle Audubon Society, 871 F.

28

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    Supp. at 1318 (citing Hoffman, 894 F.2d at 385) (Moreover, "[g]overnment officials .

2    . . are presumed to have acted in good faith.").

3        41.    Furthermore, there is no legal requirement that "new" agency personnel

4    must be involved in the reconsideration process.

5        42.    Valeant's argument that the procedure was tainted because of the

6    potential conflict of interest concerning the Wilkin letter must fail for the additional

7    reason that the FDA Office of Internal Affairs and the Office of the Inspector General

8    in the Department of Health and Human Services have now determined that there was

9    no ethical violation.   Even if this Court were of the view that a different procedure

10   should be followed, there has been no harm done since, upon examination of

11   the facts by the FDA officials charged with applying the conflict of interest

12   regulations, they determined that there was no underlying ethical violation.  Therefore,

13   no purpose would be served by a remand to the agency for review by additional

14   agency personnel who were not involved in the consideration of Spear's ANDA or

15   Valeant's Citizen Petition.

16       43.    Valeant argues that Dr. Beitz's May 2008 memorandum constitutes "post

17   hoc rationalization."   The District Court for the District of Columbia in Alpharma, Inc.

18   v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006), rejected a similar argument from the

19   plaintiff there because "if it is appropriate for a court to remand for further

20   explanation, it is incumbent upon the court to consider that explanation when it

21   arrives."   The court further explained that the rule against "post hoc rationalization"

22   bars reliance by the agency on "rationalizations offered for the first time in litigation

23   affidavits and arguments of counsel," but "does not prohibit the agency from

24   submitting an amplified articulation of the distinctions it sees."   Alpharma, 460 F.3d

25   at 6-7 (citation omitted).   Thus, in this case, it was permissible for the FDA in its

26   reconsideration of Spear's approval to request that Dr. Beitz review her work and

27   prepare her May 2008 memorandum and it was equally permissible for Drs.

28

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

31

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   Throckmorton to evaluate and concur in that memorandum and Drs. Woodcock and

2   von Eschenbach to rely on Dr. Throckmorton's conclusions.

3       44.    Valeant's argument that Dr. Beitz must have relied on Dr. Wilkin's letter

4   because of the similarity in the language in the two documents ignores the fact that Dr.

5   Beitz's twelve page memorandum includes citations to the scientific literature and

6   detailed analysis that do not appear anywhere in Dr. Wilkin's two page letter.  It also

7   ignores the fact that similar language is found in the pre-Wilkin Hixon memorandum.

8   **III.    THE PUBLIC WILL BE HARMED IF A PRELIMINARY INJUNCTION**

9   **IS ENTERED**

10      45.    Congress has determined that the American people benefit from the

11  availability of a substitute generic product because such availability results in

12  significant cost savings to the public.    In re Barr Labs, Inc., 930 F. 2d at 76.  ~~The~~

13  ~~Spear 5 fluorouracil cream product is the first genuine generic Efudex® product,~~

14  AR1065 (no other ANDA submissions have been made with Efudex® cream 5% as

15  the reference listed drug).  The product sold by Oceanside (a wholly-owned subsidiary

16  of Valeant) is an authorized generic that offers no real cost savings to the public.  As

17  discussed below, unlike the Spear product, the other fluorouracil products on the

18  market are not substitutable for Efudex® (that is, not "AB-rated").  See, e.g., AR1163

19  (listing Fluoroplex® and Carac® as NDA products, thus not substitutable as generics

20  to Efudex®); Tr. at ____.

21      46.    The finding in the FDA's Warning Letter to Valeant that the Valeant

22  product is adulterated has a potentially serious impact on this Court's evaluation of the

23  public interest.    The Spear product has been found by the FDA to be safe and

24  effective.  By contrast, Valeant has now had, for several years, serious manufacturing

25  problems with its product.  It is possible that at some point in the near future Valeant,

26  which has seemingly been unable or unwilling to fix its manufacturing problems, will

27  be barred from continued sales of its product.  If that were to happen, and this Court

28  ~~were to grant the requested preliminary injunction, then the American public would be~~

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1 | entirely deprived of the 5% fluorouracil cream product that all agree is an effective

2 | treatment for patients with sBCC and AK.

3 |     47.    At the preliminary injunction hearing, Valeant presented attorney

4 | argument that in the event that Spear's approval is suspended and Valeant's product is

5 | recalled that the public will not be harmed because there are four other 5-fluorouracil

6 | products available – Aldara®, Carac®, Fluoroplex®, and a solution product sold by

7 | Taro. Tr. at ____. (Valeant provided no evidence that any of these products would be

8 | an adequate substitute.)

9 |     48.    None of these products are substitutes for Spear's generic 5-fluorouracil

10 | cream product and Valeant's Efudex® product. The active ingredient in Aldara® is

11 | imiquimod, not 5-fluorouracil. Tr. at ____. Carac® is a 0.5% 5-fluorouracil cream

12 | and Fluoroplex® is a 1% 5-fluorouracil cream, while the Spear and Valeant products

13 | contain 5% fluorouracil. AR1163; Tr. at ____. Taro sells a solution product, not a

14 | cream product. Solutions that contain 5-fluorouracil are not substitutable for, and are

15 | much more irritating than, cream products. Tr. at ____. Because of the irritation

16 | patients experience with the solution product, only one 5-fluorouracil solution

17 | prescription is written for every one hundred 5-fluorouracil cream prescriptions. Tr. at

18 |

19 | **IV.**    **SPEAR WILL BE IRREVOCABLY HARMED IF AN INJUNCTION IS**

20 |         **ENTERED**

21 |     49.    The harm to Spear in the event that a preliminary injunction issues is a

22 | threat to the survival of the company both in terms of revenue and reputation. Spear's

23 | generic fluorouracil product is one of only two products it sells and constitutes 80% of

24 | Spear's projected sales for 2008. Declaration of K.L. Spear ("Spear Dec.") ¶2.[5] In

25 | contrast, Efudex® accounts for less than 10% of Valeant's sales.

26 |     50.    Further, if such an order were to issue, Spear would not be able to fill

27 | reorders which have been piling up since the first stay was initiated at the end of

28 |

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

---

[5] The Spear Declaration was filed on June 6, 2008.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  April.   Spear Dec. ¶3.   The blow to Spear's ability to fill reorders and meet the

2  demand for its generic product will damage Spear's reputation – a harm that will make

3  it difficult for a small company with only two products to survive.  Spear Dec. ¶3.

4      51.   Valeant argues that its goodwill will suffer if patients are dispensed

5  Spear's generic product.  This argument ignores the fact that the FDA has determined

6  that Spear's product is safe, effective, and bioequivalent, and Valeant has failed to

7  identify any scientific evidence to the contrary.

8      52.   Valeant's argument also does not give the consuming public enough

9  credit.  While the Valeant product is dispensed in a tube that bears the brand name,

10 Efudex®, and the Valeant name, the Spear product is dispensed in a tube that includes

11 the generic name of the active pharmaceutical ingredient, 5-fluorouracil, and the name

12 of its manufacturer, Spear.

13 **V.    THE HARM TO SPEAR WOULD GREATLY EXCEED THE HARM TO**

14     **VALEANT**

15     53.   Valeant receives less than 10% of its revenues from the sale of Efudex®.

16 Declaration of Minaksi Bhatt Ex. 3.[6]   Valeant has also authorized a generic company

17 (Oceanside) to sell an "authorized generic" version of Efudex®.   Declaration of K.L.

18 Spear ¶20.[7]  Thus, if sale of the Spear product were to resume, Valeant would likely

19 lose, at most, 4% of its revenues.  While the Court does not wish to diminish the

20 significance of any lost revenue, a 4% revenue loss – particularly on a product that has

21 been off-patent for more than a decade and for which competition could reasonably be

22 expected – is far outweighed by the significance of an 80% loss of revenue to a

23 fledgling company.

24 **VI.    VALEANT IS NOT ENTITLED TO A PRELIMINARY INJUNCTION**

25     **ORDERING THE FDA TO SUSPEND SPEAR'S APPROVAL.**

26     54.   Valeant has not established a likelihood of success on the merits.

27

28 [6] The Bhatt Declaration was filed on April 28, 2008.

[7] The Spear Declaration was filed on April 28, 2008.

34

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

55. The entry of a preliminary injunction is not in the public interest.

56. The harm to Valeant is ~~speculative and is~~ outweighed by the harm to Spear.

57. Therefore, Valeant is not entitled to a preliminary injunction ordering the FDA to suspend Spear's approval.

~~58. For the reasons set forth above, a preliminary injunction should not be entered.~~ However, if the Court decides to enter a preliminary injunction, then the ~~following sections are relevant.~~

## ~~VII. IN THE EVENT THAT A PRELIMINARY INJUNCTION IS ENTERED~~ AND SPEAR'S ANDA APPROVAL IS SUSPENDED, A RECALL IS NOT REQUIRED

1. FDA regulations provide for recall only if the FDA determines that a product "presents a risk of illness or injury or gross consumer deception" and that "agency action is necessary to protect the public health and welfare." 21 C.F.R. § 7.45(a)(1).

2. Even if this Court enters a preliminary injunction, it will only have the effect of suspending the approval. A recall is not necessary absent findings related to illness, injury, deception, or protection of public health and welfare. Such findings are not warranted based on the administrative record before the Court.

## VIII. IN THE EVENT THAT A PRELIMINARY INJUNCTION IS GRANTED, VALEANT SHOULD BE ORDERED TO POST A BOND

1. Spear projects monthly sales, absent a preliminary injunction, of $2.05M. Spear's incremental profit margin on those sales is in excess of 90%.

2. In the Ninth Circuit, the average time from filing of the Notice of Appeal to disposition is approximately seventeen months.

3. Therefore, Valeant is required to post security in the amount of $31.4M to pay the cost and damages sustained by Spear if it is found that the preliminary injunction was wrongfully issued.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    ~~4.    If the Valeant product is recalled or if further sales by Valeant are halted~~
2    ~~Spear would be the sole source for 5-fluorouracil cream, USP 5%. If Spear is the sole~~
3    ~~source, it projects monthly sales, absent a preliminary injunction, of $4.3M.~~
4    ~~5.    Therefore, if the Valeant is product is recalled or if further sales of~~
5    ~~Efudex® are halted, Valeant is ordered to increase this order to $65.8M within 48~~
6    ~~hours of any such action by the FDA. This increased bond is necessary to pay the cost~~
7    ~~and damages sustained by Spear if it is found that the preliminary injunction was~~
8    ~~wrongfully issued.~~
9    **58. The Temporary Restraining Order is EXTINGUISHED and the Court DENIES the preliminary injunction.**
10   ~~Dated: June 17, 2008    Respectfully submitted,~~

11                        **WINSTON & STRAWN LLP**
12
13
14            By:  /s/ Gail J. Standish
                   Gail J. Standish (State Bar No. 166334)
15                 E-mail: gstandish@winston.com
                   Peter E. Perkowski (State Bar No. 199491)
16                 E-mail: pperkowski@winston.com
                   **WINSTON & STRAWN LLP**
17                 333 South Grand Avenue, 38th Floor
                   Los Angeles, California 90071-1543
18                 Telephone: 213-615-1700
                   Facsimile: 213-615-1750
19
                   Steven Lieberman (admitted *pro hac vice*)
20                 Minaksi Bhatt (SBN 151312)
                   Lisa N. Phillips (admitted *pro hac vice*)
21                 **ROTHWELL, FIGG, ERNST & MANBECK**
                   1425 K Street, N.W.
22                 Washington, D.C. 20005
                   Telephone: 202-783-6040
23                 Facsimile: 202-783-6031
24                 Attorneys for Intervenor Defendant
                   ~~Spear Pharmaceuticals, Inc.~~
25   1501911_1
26   Dated: June 18, 2008
27                        _Andrew _____
                          United States District Court
28

                                    36

# EXHIBIT C

# Fluorouracil Topical Solution USP, 2% and 5%

Rx only

For Topical Dermatological Use Only – Not For Ophthalmic Use or Intravaginal Use

**DESCRIPTION:** Fluorouracil Solutions are topical preparations containing the fluorinated pyrimidine 5-fluorouracil, an antineoplastic antimetabolite.

Fluorouracil Solution consists of 2% or 5% fluorouracil on a weight/weight basis, compounded with propylene glycol, tromethamine, hydroxypropyl cellulose, parabens (methyl and propyl), edetate disodium and purified water.

Chemically, fluorouracil is 5-fluoro-2,4(1-*H*,3*H*)-pyrimidinedione. It is a white to practically white, crystalline powder which is sparingly soluble in water and slightly soluble in alcohol. One gram of fluorouracil is soluble in 100 mL of propylene glycol. The molecular weight of 5-fluorouracil is 130.08 and the structural formula is:



**CLINICAL PHARMACOLOGY:** There is evidence that the metabolism of fluorouracil in the anabolic pathway blocks the methylation reaction of deoxyuridylic acid to thymidylic acid. In this manner fluorouracil interferes with the synthesis of deoxyribonucleic acid (DNA) and to a lesser extent inhibits the formation of ribonucleic acid (RNA). Since DNA and RNA are essential for cell division and growth, the effect of fluorouracil may be to create a thymine deficiency which provokes unbalanced growth and death of the cell. The effects of DNA and RNA deprivation are most marked on those cells which grow more rapidly and take up fluorouracil at a more rapid rate. The catabolic metabolism of fluorouracil results in degradation products (e.g., CO2, urea, α-fluoro-β-alanine) which are inactive.

Systemic absorption studies of topically applied fluorouracil have been performed on patients with actinic keratoses using tracer amounts of 14C-labeled fluorouracil added to a 5% preparation. All patients had been receiving nonlabeled fluorouracil until the peak of the inflammatory reaction occurred (2 to 3 weeks), ensuring that the time of maximum absorption was used for measurement. One gram of labeled preparation was applied to the entire face and neck and left in place for 12 hours. Urine samples were collected. At the end of 3 days, the total recovery ranged between 0.48% and 0.94% with an average of 0.76%, indicating that approximately 5.98% of the topical dose was absorbed systemically. If applied twice daily, this would indicate systemic absorption of topical fluorouracil to be in the range of 5 to 6 mg per daily dose of 100 mg. In an additional study, negligible amounts of labeled material were found in plasma, urine and expired CO2 after 3 days of treatment with topically applied 14C-labeled fluorouracil.

**INDICATIONS AND USAGE:** Fluorouracil is recommended for the topical treatment of multiple actinic or solar keratoses. In the 5% strength it is also useful in the treatment of superficial basal cell carcinomas when conventional methods are impractical, such as with multiple lesions or difficult treatment sites. Safety and efficacy in other indications have not been established.

The diagnosis should be established prior to treatment, since this method has not been proven effective in other types of basal cell carcinomas. With isolated, easily accessible basal cell carcinomas, surgery is preferred since success with such lesions is almost 100%. The success rate with Fluorouracil Topical Solution is approximately 93%, based on 113 lesions in 54 patients. Twenty-five lesions treated with the solution produced 1 failure.

**CONTRAINDICATIONS:** Fluorouracil may cause fetal harm when administered to a pregnant woman.

There are no adequate and well-controlled studies in pregnant women with either the topical or the parenteral forms of fluorouracil. One birth defect (cleft lip and palate) has been reported in the newborn of a patient using fluorouracil as recommended. One birth defect (ventricular septal defect) and cases of miscarriage have been reported when fluorouracil was applied to mucous membrane areas. Multiple birth defects have been reported in a fetus of a patient treated with intravenous fluorouracil.

Animal reproduction studies have not been conducted with fluorouracil. Fluorouracil administered parenterally has been shown to be teratogenic in mice, rats, and hamsters when given at doses equivalent to the usual human intravenous dose; however, the amount of fluorouracil absorbed systemically after topical administration to actinic keratoses is minimal (see **CLINICAL PHARMACOLOGY**). Fluorouracil exhibited maximum teratogenicity when given to mice as single intraperitoneal injections of 10 to 40 mg/kg on Day 10 or 12 of gestation. Similarly, intraperitoneal doses of 12 to 37 mg/kg given to rats between Days 9 and 12 of gestation and intramuscular doses of 3 to 9 mg/kg given to hamsters between Days 8 and 11 of gestation were teratogenic and/or embryotoxic (i.e., resulted in increased resorptions or embryolethality). In monkeys, divided doses of 40 mg/kg given between Days 20 and 24 of gestation were not teratogenic. Doses higher than 40 mg/kg resulted in abortion.

Fluorouracil is contraindicated in women who are or may become pregnant during therapy. If this drug is used during pregnancy, or if the patient becomes pregnant while using this drug, the patient should be apprised of the potential hazard to the fetus.

Fluorouracil is also contraindicated in patients with known hypersensitivity to any of its components.

**WARNINGS:** Application to mucous membranes should be avoided due to the possibility of local inflammation and ulceration. Additionally, cases of miscarriage and a birth defect (ventricular septal defect) have been reported when fluorouracil was applied to mucous membrane areas during pregnancy.

Occlusion of the skin with resultant hydration has been shown to increase percutaneous penetration of several topical preparations. If any occlusive dressing is used in treatment of basal cell carcinoma, there may be an increase in the severity of inflammatory reactions in the adjacent normal skin. A porous gauze dressing may be applied for cosmetic reasons without increase in reaction.

Exposure to ultraviolet rays should be minimized during and immediately following treatment with fluorouracil because the intensity of the reaction may be increased.

**PRECAUTIONS:** *General:* There is a possibility of increased absorption through ulcerated or inflamed skin.

*Information for Patients:* Patients should be forewarned that the reaction in the treated areas may be unsightly during therapy and, usually, for several weeks following cessation of therapy. Patients should be instructed to avoid exposure to ultraviolet rays during and immediately following treatment with fluorouracil because the intensity of the reaction may be increased. If fluorouracil is applied with the



fingers, the hands should be washed immediately afterward. Fluorouracil should not be applied on the eyelids or directly into the eyes, nose or mouth because irritation may occur.
*Laboratory Tests:* Solar keratoses which do not respond should be biopsied to confirm the diagnosis. Follow-up biopsies should be performed as indicated in the management of superficial basal cell carcinoma.

*Carcinogenesis, Mutagenesis, Impairment of Fertility:* Adequate long-term studies in animals to evaluate carcinogenic potential have not been conducted with fluorouracil. Studies with the active ingredient 5-fluorouracil, have shown positive effects in *in vitro* tests for mutagenicity and on impairment of fertility.

5-Fluorouracil was positive in three *in vitro* cell neoplastic transformation assays. In the C3H/10T½ clone 8 mouse embryo cell system, the resulting morphologically transformed cells formed tumors when inoculated into immunosuppressed syngeneic mice.

While no evidence for mutagenic activity was observed in the Ames test (3 studies), fluorouracil has been shown to be mutagenic in the survival count rec-assay with *Bacillus subtilis* and in the *Drosophila* wing-hair spot test. Fluorouracil produced petite mutations in *Saccharomyces cerevisiae* and was positive in the micronucleus test (bone marrow cells of male mice).

Fluorouracil was clastogenic *in vitro* (i.e., chromatid gaps, breaks and exchanges) in Chinese hamster fibroblasts at concentrations of 1 and 2 μg/mL and has been shown to increase sister chromatid exchange *in vitro* in human lymphocytes. In addition, 5-fluorouracil has been reported to produce an increase in numerical and structural chromosome aberrations in peripheral lymphocytes of patients treated with this product.

Doses of 125 to 250 mg/kg, administered intraperitoneally, have been shown to induce chromosomal aberrations and changes in chromosome organization of spermatogonia in rats. Spermatogonial differentiation was also inhibited by fluorouracil, resulting in transient infertility. However, in studies with a strain of mouse which is sensitive to the induction of sperm head abnormalities after exposure to a range of chemical mutagens and carcinogens, fluorouracil was inactive at oral doses of 5 to 80 mg/kg/day. In female rats, fluorouracil administered intraperitoneally at doses of 25 and 50 mg/kg during the preovulatory phase of oogenesis significantly reduced the incidence of fertile matings, delayed the development of preimplantation and postimplantation embryos, increased the incidence of preimplantation lethality and induced chromosomal anomalies in these embryos. Single dose intravenous and intraperitoneal injections of 5-fluorouracil have been reported to kill differentiated spermatogonia and spermatocytes (at 500 mg/kg) and to produce abnormalities in spermatids (at 50 mg/kg) in mice.

*Pregnancy: Teratogenic Effects: Pregnancy Category X:* See **CONTRAINDICATIONS** section.

*Nursing Mothers:* It is not known whether fluorouracil is excreted in human milk. Because there is some systemic absorption of fluorouracil after topical administration (see **CLINICAL PHARMACOLOGY**), because many drugs are excreted in human milk, and because of the potential for serious adverse reactions in nursing infants, a decision should be made whether to discontinue nursing or to discontinue use of the drug, taking into account the importance of the drug to the mother.

*Pediatric Use:* Safety and effectiveness in pediatric patients have not been established.

**ADVERSE REACTIONS:** The most frequent adverse reactions to fluorouracil occur locally and are often related to an extension of the pharmacological activity of the drug. These include burning, crusting, allergic contact dermatitis, erosions, erythema, hyperpigmentation, irritation, pain, photosensitivity, pruritus, scarring, rash, soreness and ulceration. Ulcerations, other local reactions, cases of miscarriage and a birth defect (ventricular septal defect) have been reported when fluorouracil was applied to mucous membrane areas. Leukocytosis is the most frequent hematological side effect.

Although a causal relationship is remote, other adverse reactions which have been reported infrequently are:

*Central Nervous System:* Emotional upset, insomnia, irritability.

*Gastrointestinal:* Medicinal taste, stomatitis.

*Hematological:* Eosinophilia, thrombocytopenia, toxic granulation.

*Integumentary:* Alopecia, blistering, bullous pemphigoid, discomfort, ichthyosis, scaling, suppuration, swelling, telangiectasia, tenderness, urticaria, skin rash.

*Special Senses:* Conjunctival reaction, corneal reaction, lacrimation, nasal irritation.

*Miscellaneous:* Herpes simplex.

**OVERDOSAGE:** There have been no reports of overdosage with fluorouracil.

The oral LD$_{50}$ for the 5% topical cream was 234 mg/kg in rats and 39 mg/kg in dogs. These doses represented 11.7 and 1.95 mg/kg of fluorouracil, respectively. Studies with a 5% topical solution yielded an oral LD$_{50}$ of 214 mg/kg in rats and 28.5 mg/kg in dogs, corresponding to 10.7 and 1.43 mg/kg of fluorouracil, respectively. The topical application of the 5% cream to rats yielded an LD$_{50}$ of greater than 500 mg/kg.

**DOSAGE AND ADMINISTRATION:** When fluorouracil is applied to a lesion, a response occurs with the following sequence: erythema, usually followed by vesiculation, desquamation, erosion and reepithelialization.

Fluorouracil should be applied preferably with a nonmetal applicator or suitable glove. If fluorouracil is applied with the fingers, the hands should be washed immediately afterward.

*Actinic or Solar Keratosis:* Apply solution twice daily in an amount sufficient to cover the lesions. Medication should be continued until the inflammatory response reaches the erosion stage, at which time use of the drug should be terminated. The usual duration of therapy is from 2 to 4 weeks. Complete healing of the lesions may not be evident for 1 to 2 months following cessation of fluorouracil therapy.

*Superficial Basal Cell Carcinomas:* Only the 5% strength is recommended. Apply solution twice daily in an amount sufficient to cover the lesions. Treatment should be continued for at least 3 to 6 weeks. Therapy may be required for as long as 10 to 12 weeks before the lesions are obliterated. As in any neoplastic condition, the patient should be followed for a reasonable period of time to determine if a cure has been obtained.

**HOW SUPPLIED:** Fluorouracil Solution is available in 10-mL drop dispensers containing either 2% (NDC 51672-4092-1) or 5% (NDC 51672-4093-1) fluorouracil on a weight/weight basis compounded with propylene glycol, tromethamine, hydroxypropyl cellulose, parabens (methyl and propyl), edetate disodium and purified water.

Store at 25°C (77°F); excursions permitted to 15°-30°C (59°-86°F).

Mfd. by: Taro Pharmaceutical Industries Ltd., Haifa Bay, Israel 26110
Dist. by: Taro Pharmaceuticals U.S.A., Inc., Hawthorne, NY 10532
Issued: November 2003    90105-1103-0    307

# EXHIBIT D



FDA Home Page | CDER Home Page | CDER Site Info | Contact CDER | What's New @ CDER

CDER Home | About CDER | Drug Information | Regulatory Guidance | CDER Calendar | Specific Audiences | CDER Archives

Search [_____] GO  powered by Google™

**Food and Drug Administration**
**Center for Drug Evaluation and Research**
**Approved Drug Products**
**with**
**Therapeutic Equivalence Evaluations**

## 28th Edition

## PREFACE

The publication, *Approved Drug Products with Therapeutic Equivalence Evaluations* (the List, commonly known as the Orange Book), identifies drug products approved on the basis of safety and effectiveness by the Food and Drug Administration (FDA) under the Federal Food, Drug, and Cosmetic Act (the Act). Drugs on the market approved only on the basis of safety (covered by the ongoing Drug Efficacy Study Implementation [DESI] review [e.g., Donnatal® Tablets and Librax® Capsules] or pre-1938 drugs [e.g., Phenobarbital Tablets]) are not included in this publication. The main criterion for the inclusion of any product is that the product is the subject of an application with an effective approval that has not been withdrawn for safety or efficacy reasons. Inclusion of products on the List is independent of any current regulatory action through administrative or judicial means against a drug product. In addition, the List contains therapeutic equivalence evaluations for approved multisource prescription drug products. These evaluations have been prepared to serve as public information and advice to state health agencies, prescribers, and pharmacists to promote public education in the area of drug product selection and to foster containment of health care costs. Therapeutic equivalence evaluations in this publication are not official FDA actions affecting the legal status of products under the Act.

*Background of the Publication.* To contain drug costs, virtually every state has adopted laws and/or regulations that encourage the substitution of drug products. These state laws generally require either that substitution be limited to drugs on a specific list (the positive formulary approach) or that it be permitted for all drugs except those prohibited by a particular list (the negative formulary approach). Because of the number of requests in the late 1970s for FDA assistance in preparing both positive and negative formularies, it became apparent that FDA could not serve the needs of each state on an individual basis. The Agency also recognized that providing a single list based on common criteria would be preferable to evaluating drug products on the basis of differing definitions and criteria in various state laws. As a result, on May 31, 1978, the Commissioner of the Food and Drug Administration sent a letter to officials of each state stating FDA's intent to provide a list of all prescription drug products that are approved by FDA for safety and effectiveness, along with therapeutic equivalence determinations for multisource prescription products.

The List was distributed as a proposal in January 1979. It included only currently marketed

prescription drug products approved by FDA through new drug applications (NDAs) and abbreviated new drug applications (ANDAs) under the provisions of Section 505 of the Act.

The therapeutic equivalence evaluations in the List reflect FDA's application of specific criteria to the multisource prescription drug products on the List approved under Section 505 of the Act. These evaluations are presented in the form of code letters that indicate the basis for the evaluation made. An explanation of the code appears in the Introduction.

A complete discussion of the background and basis of FDA's therapeutic equivalence evaluation policy was published in the *Federal Register* on January 12, 1979 (44 FR 2932). The final rule, which includes FDA's responses to the public comments on the proposal, was published in the *Federal Register* on October 31, 1980 (45 FR 72582). The first publication, October 1980, of the final version of the List incorporated appropriate corrections and additions. Each subsequent edition has included the new approvals and made appropriate changes in data.

On September 24, 1984, the President signed into law the Drug Price Competition and Patent Term Restoration Act (1984 Amendments). The 1984 Amendments require that FDA, among other things, make publicly available a list of approved drug products with monthly supplements. The ***Approved Drug Products with Therapeutic Equivalence Evaluations*** publication and its monthly Cumulative Supplements satisfy this requirement. The <u>Addendum</u> to this publication identifies drugs that qualify under the 1984 Amendments for periods of exclusivity (during which ANDAs or applications described in Section 505(b)(2) of the Act for those drugs may not be submitted for a specified period of time and, if allowed to be submitted, would be tentatively approved) and provides patent information concerning the listed drugs which also may delay the approval of ANDAs or Section 505(b)(2) applications. The <u>Addendum</u> also provides additional information that may be helpful to those submitting a new drug application to the Agency.

The Agency intends to use this publication to further its objective of obtaining input and comment on the publication itself and related Agency procedures. Therefore, if you have comments on how the publication can be improved, please send them to the Director, Division of Labeling and Program Support HFD-610, Office of Generic Drugs, Center for Drug and Evaluation and Research, 7500 Standish Place, Rockville, MD 20855. Comments received are publicly available to the extent allowable under the Freedom of Information regulations.

# INTRODUCTION

## Content and Exclusion

The List is composed of four parts: (1) approved prescription drug products with therapeutic equivalence evaluations; (2) approved over-the-counter (OTC) drug products for those drugs that may not be marketed without NDAs or ANDAs because they are not covered under existing OTC monographs; (3) drug products with approval under Section 505 of the Act administered by the Center for Biologics Evaluation and Research; and (4) a cumulative list of approved products that have never been marketed, are for exportation, are for military use, have been discontinued from marketing, or have had their approvals withdrawn for other than safety or efficacy reasons subsequent to being discontinued from marketing. [Note: Newly approved products are added to parts 1, 2, or 3 of the List, depending on the dispensing requirements (prescription or OTC) or approval authority, unless the Orange Book staff is otherwise notified before publication.]

This publication also includes indices of prescription and OTC drug products by trade or

established name (if no trade name exists) and by applicant name (holder of the approved application). All established names for active ingredients generally conform to official compendial names or *United States Adopted Names* (USAN) as prescribed in (21 CFR 299.4(e)). The latter list includes applicants' names as abbreviated in this publication; in addition, a list of uniform terms is provided. An *Addendum* contains drug patent and exclusivity information for the Prescription, OTC, Discontinued Drug Product Lists, and for the Drug Products with Approval under Section 505 of the Act Administered by the Center for Biologics Evaluation and Research. The publication may include additional information that the Agency deems appropriate to disseminate.

Prior to the 6th Edition, the publication had excluded OTC drug products and drug products with approval under Section 505 of the Act administered by the Center for Biologics Evaluation and Research because the main purpose of the publication was to provide information to states regarding FDA's recommendation as to which generic prescription drug products were acceptable candidates for drug product selection. The 1984 Amendments required the Agency to begin publishing an up-to-date list of all marketed drug products, OTC as well as prescription, that have been approved for safety and efficacy and for which new drug applications are required.

Under the 1984 Amendments, some drug products were given tentative approvals. Prior to the effective date, the Agency will not include drug products with tentative approval in the List; however, they are available at http://www.fda.gov/cder/ogd/approvals/default.htm. When the tentative approval becomes a full approval through a subsequent action letter to the application holder, the Agency will list the drug product and the final, effective approval date in the appropriate approved drug product list.

Distributors or repackagers of products on the List are not identified. Because distributors or repackagers are not required to notify FDA when they shift their sources of supply from one approved manufacturer to another, it is not possible to maintain complete information linking product approval with the distributor or repackager handling the products.

## Therapeutic Equivalence-Related Terms

*Pharmaceutical Equivalents*. Drug products are considered pharmaceutical equivalents if they contain the same active ingredient(s), are of the same dosage form, route of administration and are identical in strength or concentration (e.g., chlordiazepoxide hydrochloride, 5mg capsules). Pharmaceutically equivalent drug products are formulated to contain the same amount of active ingredient in the same dosage form and to meet the same or compendial or other applicable standards (i.e., strength, quality, purity, and identity), but they may differ in characteristics such as shape, scoring configuration, release mechanisms, packaging, excipients (including colors, flavors, preservatives), expiration time, and, within certain limits, labeling.

*Pharmaceutical Alternatives*. Drug products are considered pharmaceutical alternatives if they contain the same therapeutic moiety, but are different salts, esters, or complexes of that moiety, or are different dosage forms or strengths (e.g., tetracycline hydrochloride, 250mg capsules vs. tetracycline phosphate complex, 250mg capsules; quinidine sulfate, 200mg tablets vs. quinidine sulfate, 200mg capsules). Data are generally not available for FDA to make the determination of tablet to capsule bioequivalence. Different dosage forms and strengths within a product line by a single manufacturer are thus pharmaceutical alternatives, as are extended-release products when compared with immediate-release or standard-release formulations of the same active ingredient.

*Therapeutic Equivalents*. Drug products are considered to be therapeutic equivalents only if they are pharmaceutical equivalents and if they can be expected to have the same clinical effect

and safety profile when administered to patients under the conditions specified in the labeling.

FDA classifies as therapeutically equivalent those products that meet the following general criteria: (1) they are approved as safe and effective; (2) they are pharmaceutical equivalents in that they (a) contain identical amounts of the same active drug ingredient in the same dosage form and route of administration, and (b) meet compendial or other applicable standards of strength, quality, purity, and identity; (3) they are bioequivalent in that (a) they do not present a known or potential bioequivalence problem, and they meet an acceptable *in vitro* standard, or (b) if they do present such a known or potential problem, they are shown to meet an appropriate bioequivalence standard; (4) they are adequately labeled; (5) they are manufactured in compliance with Current Good Manufacturing Practice regulations. *The concept of therapeutic equivalence, as used to develop the List, applies only to drug products containing the same active ingredient(s) and does not encompass a comparison of different therapeutic agents used for the same condition (e.g., ibuprofen vs. naproxen for the treatment of pain).* Any drug product in the List repackaged and/or distributed by other than the application holder is considered to be therapeutically equivalent to the application holder's drug product even if the application holder's drug product is single source or coded as non-equivalent (e.g., **BN**). Also, distributors or repackagers of an application holder's drug product are considered to have the same code as the application holder. Therapeutic equivalence determinations are not made for unapproved, off-label indications.

FDA considers drug products to be therapeutically equivalent if they meet the criteria outlined above, even though they may differ in certain other characteristics such as shape, scoring configuration, release mechanisms, packaging, excipients (including colors, flavors, preservatives), expiration date/time and minor aspects of labeling (e.g., the presence of specific pharmacokinetic information) and storage conditions. When such differences are important in the care of a particular patient, it may be appropriate for the prescribing physician to require that a particular brand be dispensed as a medical necessity. With this limitation, however, FDA believes that products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product.

*Bioavailability*. This term means the rate and extent to which the active ingredient or active moiety is absorbed from a drug product and becomes available at the site of action. For drug products that are not intended to be absorbed into the bloodstream, bioavailability may be assessed by measurements intended to reflect the rate and extent to which the active ingredient or active moiety becomes available at the site of action.

*Bioequivalent Drug Products*. This term describes pharmaceutical equivalent or alternative products that display comparable bioavailability when studied under similar experimental conditions. Section 505 (j)(7)(B) of the Act describes one set of conditions under which a test and reference listed drug shall be considered bioequivalent:

> the rate and extent of absorption of the test drug do not show a significant difference from the rate and extent of absorption of the reference drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses; or

> the extent of absorption of the test drug does not show a significant difference from the extent of absorption of the reference drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses

and the difference from the reference drug in the rate of absorption of the drug is intentional, is reflected in its proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use, and is considered medically insignificant for the drug.

Where these above methods are not applicable (e.g., for drug products that are not intended to be absorbed into the bloodstream), other *in vivo* or *in vitro* test methods to demonstrate bioequivalence may be appropriate.

Bioequivalence may sometimes be demonstrated using an *in vitro* bioequivalence standard, especially when such an *in vitro* test has been correlated with human *in vivo* bioavailability data. In other situations, bioequivalence may sometimes be demonstrated through comparative clinical trials or pharmacodynamic studies.

## Statistical Criteria for Bioequivalence

Under the Drug Price Competition and Patent Term Restoration Act of 1984, manufacturers seeking approval to market a generic drug product must submit data demonstrating that the drug product is bioequivalent to the pioneer (innovator) drug product. A major premise underlying the 1984 law is that bioequivalent drug products are therapeutically equivalent and, therefore, interchangeable.

Bioavailability refers to the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug product and becomes available at the site of drug action (Federal Food, Drug and Cosmetic Act, section 505(j)(8)). Bioequivalence refers to equivalent release of the same drug substance from two or more drug products or formulations. This leads to an equivalent rate and extent of absorption from these formulations. Underlying the concept of bioequivalence is the thesis that, if a drug product contains a drug substance that is chemically identical and is delivered to the site of action at the same rate and extent as another drug product, then it is equivalent and can be substituted for that drug product. Methods used to define bioequivalence can be found in 21 CFR 320.24, and include (1) pharmacokinetic (PK) studies, (2) pharmacodynamic (PD) studies, (3) comparative clinical trials, and (4) in-vitro studies. The choice of study used is based on the site of action of the drug and the ability of the study design to compare drug delivered to that site by the two products.

The standard bioequivalence (PK) study is conducted using a two-treatment crossover study design in a limited number of volunteers, usually 24 to 36 adults. Alternately, a four-period, replicate design crossover study may also be used. Single doses of the test and reference drug products are administered and blood or plasma levels of the drug are measured over time. Pharmacokinetic parameters characterizing rate and extent of drug absorption are evaluated statistically. The PK parameters of interest are the resulting area under the plasma concentration-time curve (AUC), calculated to the last measured concentration ($AUC_{(0-t)}$) and extrapolated to infinity ($AUC_{(0-inf)}$), for extent of absorption; and the maximum or peak drug concentrations (Cmax), for rate of absorption. Crossover studies may not be practical in drugs with a long half-life in the body, and a parallel study design may be used instead. Alternate study methods, such as in-vitro studies or equivalence studies with clinical or pharmacodynamic endpoints, are used for drug products where plasma concentrations are not useful to determine delivery of the drug substance to the site of activity (such as inhalers, nasal sprays and topical products applied to the skin).

The statistical methodology for analyzing these bioequivalence studies is called the two one-

sided test procedure. Two situations are tested with this statistical methodology. The first of the two one-sided tests determines whether a generic product (test), when substituted for a brand-name product (reference) is significantly less bioavailable. The second of the two one-sided tests determines whether a brand-name product when substituted for a generic product is significantly less bioavailable. Based on the opinions of FDA medical experts, a difference of greater than 20% for each of the above tests was determined to be significant, and therefore, undesirable for all drug products. Numerically, this is expressed as a limit of test-product average/reference-product average of 80% for the first statistical test and a limit of reference-product average/test-product average of 80% for the second statistical test. By convention, all data is expressed as a ratio of the average response (AUC and Cmax) for test/reference, so the limit expressed in the second statistical test is 125% (reciprocal of 80%).

For statistical reasons, all data is log-transformed prior to conducting statistical testing. In practice, these statistical tests are carried out using an analysis of variance procedure (ANOVA) and calculating a 90% confidence interval for each pharmacokinetic parameter (Cmax and AUC). The confidence interval for both pharmacokinetic parameters, AUC and Cmax, must be entirely within the 80% to 125% boundaries cited above. Because the mean of the study data lies in the center of the 90% confidence interval, the mean of the data is usually close to 100% (a test/reference ratio of 1). Different statistical criteria are sometimes used when bioequivalence is demonstrated through comparative clinical trials pharmacodynamic studies, or comparative in-vitro methodology.

The bioequivalence methodology and criteria described above simultaneously control for both, differences in the average response between test and reference, as well as the precision with which the average response in the population is estimated. This precision depends on the within-subject (normal volunteer or patient) variability in the pharmacokinetic parameters (AUC and Cmax) of the two products and on the number of subjects in the study. The width of the 90% confidence interval is a reflection in part of the within-subject variability of the test and reference products in the bioequivalence study. A test product with no differences in the average response when compared to the reference might still fail to pass the bioequivalence criteria if the variability of one or both products is high and the bioequivalence study has insufficient statistical power (i.e., insufficient number of subjects). Likewise, a test product with low variability may pass the bioequivalence criteria, when there are somewhat larger differences in the average response.

This system of assessing bioequivalence of generic products assures that these substitutable products do not deviate substantially in in-vivo performance from the reference product. The Office of Generic Drugs has conducted two surveys to quantify the differences between generic and brand name products. The first survey included 224 bioequivalence studies submitted in approved applications during 1985 and 1986. The observed average differences between reference and generic products for AUC was 3.5% (JAMA, Sept. 4, 1987, Vol. 258, No. 9). The second survey included 127 bioequivalence studies submitted to the agency in 273 ANDAs approved in 1997. The three measures reviewed include $AUC_{(0-t)}$, $AUC_{(0-inf)}$, and Cmax. The observed average differences between the reference and generic products were $\pm$ 3.47% (SD 2.84) for $AUC_{(0-t)}$, $\pm$ 3.25% (SD 2.97) for $AUC_{(0-inf)}$, and $\pm$ 4.29% (SD 3.72) for Cmax (JAMA, Dec. 1, 1999, Vol. 282, No. 21).

The primary concern from the regulatory point of view is the protection of the patient against approval of products that are not bioequivalent. The current practice of carrying out two one-sided tests at the 0.05 level of significance ensures that there is no more than a 5% chance that a generic product that is not truly equivalent to the reference will be approved.

### Reference Listed Drug (RLD)

A reference listed drug (21 CFR 314.94(a)(3)) means the listed drug identified by FDA as the drug product upon which an applicant relies in seeking approval of its ANDA.

FDA has identified in the Prescription Drug Product and OTC Drug Product Lists those reference listed drugs to which the *in vivo* bioequivalence (reference standard) and, in some instances, the *in vitro* bioequivalence of the applicant's product is compared.    By designating a single reference listed drug as the standard to which all generic versions must be shown to be bioequivalent, FDA hopes to avoid possible significant variations among generic drugs and their brand name counterpart.    Such variations could result if generic drugs were compared to different reference listed drugs.    However, in some instances when listed drugs are approved for a single drug product, a product not designated as the reference listed drug and not shown to be bioequivalent to the reference listed drug may be shielded from generic competition.    A firm wishing to market a generic version of a listed drug that is not designated as the reference listed drug may petition the Agency through the Citizen Petition procedure (see 21 CFR 10.25(a) and CFR 10.30).    When the Citizen Petition is approved, the second listed drug will be designated as an additional reference listed drug and the petitioner may submit an Abbreviated New Drug Application citing the designated reference listed drug. *Therapeutic Equivalence Evaluations Codes  Products meeting necessary bioequivalence requirements* explains the *AB, AB1, AB2, AB3* coding system for multisource drug products listed under the same heading with two reference listed drugs.

In addition, there are two situations in which two listed drugs that have been shown to be bioequivalent to each other may both be designated as reference listed drugs.  The first situation occurs when the in vivo determination of bioequivalence is self-evident and a waiver of the *in vitro* methodology.  The reference listed drug is identified by the symbol "+" in the Prescription and Over-the-Counter (OTC) Drug Product Lists.  These identified reference listed drugs represent the best judgment of the Division of Bioequivalence at this time.  The Prescription and OTC Drug Product Lists identify reference drugs for oral dosage forms, injectables, ophthalmics, otics, and topical products.  It is recommended that a firm planning to conduct an *in vivo* waiver of bioequivalence will be requested, contact the Division of Bioequivalence, Office of Generic Drugs, to confirm the appropriate reference listed drug.

## General Policies and Legal Status

The List contains public information and advice.  It does not mandate the drug products which may be purchased, prescribed, dispensed, or substituted for one another, nor does it, conversely, mandate the products that should be avoided.  To the extent that the List sets forth FDA's evaluations of the therapeutic equivalence of drug products that have been approved, it contains FDA's advice to the public, to practitioners and to the states regarding drug product selection.  These evaluations do not constitute determinations that any product is in violation of the Act or that any product is preferable to any other.  Therapeutic equivalence evaluations are a scientific judgment based upon evidence, while generic substitution may involve social and economic policy administered by the states, intended to reduce the cost of drugs to consumers.  To the extent that the List identifies drug products approved under Section 505 of the Act, it sets forth information that the Agency is required to publish and that the public is entitled to under the Freedom of Information Act.  Exclusion of a drug product from the List does not necessarily mean that the drug product is either in violation of Section 505 of the Act, or that such a product is not safe or effective, or that such a product is not therapeutically equivalent to other drug products.  Rather, the exclusion is based on the fact that FDA has not evaluated the safety, effectiveness, and quality of the product.

### Practitioner/User Responsibilities

***Professional care and judgment should be exercised in using the List.*** Evaluations of therapeutic equivalence for prescription drugs are based on scientific and medical evaluations by FDA. Products evaluated as therapeutically equivalent can be expected, in the judgment of FDA, to have equivalent clinical effect and no difference in their potential for adverse effects when used under the conditions of their labeling. However, these products may differ in other characteristics such as shape, scoring configuration, release mechanisms, packaging, excipients (including colors, flavors, preservatives), expiration date/time, and, in some instances, labeling. If products with such differences are substituted for each other, there is a potential for patient confusion due to differences in color or shape of tablets, inability to provide a given dose using a partial tablet if the proper scoring configuration is not available, or decreased patient acceptance of certain products because of flavor. There may also be better stability of one product over another under adverse storage conditions, or allergic reactions in rare cases due to a coloring or a preservative ingredient, as well as differences in cost to the patient.

FDA evaluation of therapeutic equivalence in no way relieves practitioners of their professional responsibilities in prescribing and dispensing such products with due care and with appropriate information to individual patients. In those circumstances where the characteristics of a specific product, other than its active ingredient, are important in the therapy of a particular patient, the physician's specification of that product is appropriate. Pharmacists must also be familiar with the expiration dates/times and labeling directions for storage of the different products, particularly for reconstituted products, to assure that patients are properly advised when one product is substituted for another.

***Multisource and single-source drug products.*** FDA has evaluated for therapeutic equivalence only multisource prescription drug products approved under Section 505 of the Act, which in most instances means those pharmaceutical equivalents available from more than one manufacturer. For such products, a therapeutic equivalence code is included and, in addition, product information is highlighted in bold face and underlined. Those products with approved applications that are single-source (i.e., there is only one approved product available for that active ingredient, dosage form, route of administration, and strength) are also included on the List, but no therapeutic equivalence code is included with such products. Any drug product in the List repackaged and/or distributed by other than the application holder is considered to be therapeutically equivalent to the application holder's drug product even if the application holder's drug product is single source or coded as non-equivalent (e.g., **BN**). Also, although not identified in the List, distributors or repackagers of an application holder's drug product are considered to have the same code as the application holder. The details of these codes and the policies underlying them are discussed in *Therapeutic Equivalence Evaluations Codes*.

***Products on the List are identified by the names of the holders of approved applications (applicants) who may not necessarily be the manufacturer of the product.*** The applicant may have had its product manufactured by a contract manufacturer and may simply be distributing the product for which it has obtained approval. In most instances, however, the manufacturer of the product is also the applicant. The name of the manufacturer is permitted by regulation to appear on the label, even when the manufacturer is not the marketer.

Although the products on the List are identified by the names of the applicants, circumstances, such as changing corporate ownership, have sometimes made identification of the applicant difficult. The Agency believes, based on continuing document review and communication with firms, that the applicant designations on the List are, in most cases, correct.

To relate firm name information on a product label to that on the List, the following should be noted:    the applicant's name always appears on the List.    This applies whether the applicant (firm name on the Form FDA 356h in the application) is the marketer (firm name in largest letters on the label) or not.    However, the applicant's name may not always appear on the label of the product.

If the applicant is the marketer, its name appears on the List and on the label; if the applicant is not the marketer, and the Agency is aware of a corporate relationship (e.g., parent and subsidiary) between the applicant and the marketer, the name of the applicant appears on the List and both firm names may appear on the label. Firms with known corporate relationships are displayed in Appendix B. If there is no known corporate relationship between the applicant and the marketer, the applicant's name appears on the List; however, unless the applicant is the manufacturer, packager, or distributor, the applicant's name may not appear on the label. In this case, the practitioner, from labeling alone, will not be able to relate the marketed product to an applicant cited in the List, and hence to a specific approved drug product.  In such cases, to assure that the product in question is the subject of an approved application, the firm named on the label should be contacted.

To relate trade name (proprietary name) information on a product label to that on the List, the following should be noted: if the applicant is the marketer, its name appears on the List and on the label; if the Agency is aware of a corporate relationship between the applicant and the marketer, the trade name (proprietary name) of the drug product (established drug name if no trade name exists) appears on the List.  If a corporate relationship exists between an application holder and a marketer and both firms are distributing the drug product, the FDA reserves the right to select the trade name of either the marketer or the application holder to appear on the List.  If there is no known corporate relationship between the applicant and the marketer, the established drug name appears on the List.

***Every product on the List is subject at all times to regulatory action.***  From time to time, approved products may be found in violation of one or more provisions of the Act.  In such circumstances, the Agency will commence appropriate enforcement action to correct the violation, if necessary, by securing removal of the product from the market by voluntary recall, seizure, or other enforcement actions.  Such regulatory actions are, however, independent of the inclusion of a product on the List.  The main criterion for inclusion of a product is that it has an application with an effective approval that has not been withdrawn for safety or efficacy reasons. FDA believes that retention of a violative product on the List will not have any significant adverse health consequences, because other legal mechanisms are available to the Agency to prevent the product's actual marketing.  FDA may however, change a product's therapeutic equivalence rating if the circumstances giving rise to the violation change or otherwise call into question the data upon which the Agency's assessment of whether a product meets the criteria for therapeutic equivalence was made.

## Therapeutic Equivalence Evaluations Codes

The coding system for therapeutic equivalence evaluations is constructed to allow users to determine quickly whether the Agency has evaluated a particular approved product as therapeutically equivalent to other pharmaceutically equivalent products (first letter) and to provide additional information on the basis of FDA's evaluations (second letter).  With few exceptions, the therapeutic equivalence evaluation date is the same as the approval date.

The two basic categories into which multisource drugs have been placed are indicated by the first letter as follows:

**A  Drug products that FDA considers to be <u>therapeutically equivalent</u> to other pharmaceutically equivalent products, i.e., drug products for which:**

> (1) there are no known or suspected bioequivalence problems.  These are designated **AA, AN, AO, AP, or AT,** depending on the dosage form; or

> (2) actual or potential bioequivalence problems have been resolved with adequate *in vivo* and/or *in vitro* evidence supporting bioequivalence.  These are designated **AB.**

**B  Drug products that FDA at this time, considers NOT to be therapeutically equivalent to other pharmaceutically equivalent products, i.e.,**

> drug products for which actual or potential bioequivalence problems have not been resolved by adequate evidence of bioequivalence.  Often the problem is with specific dosage forms rather than with the active ingredients.  These are designated **BC, BD, BE, BN, BP, BR, BS, BT, BX, or B\*.**

Individual drug products have been evaluated as therapeutically equivalent to the reference product in accordance with the definitions and policies outlined below:

# "A" CODES

**Drug products that are considered to be therapeutically equivalent to other pharmaceutically equivalent products.**

"A" products are those for which actual or potential bioequivalence problems have been resolved with adequate *in vivo* and/or *in vitro* evidence supporting bioequivalence.   Drug products designated with an "A" code fall under one of two main policies:

> (1) for those active ingredients or dosage forms for which no *in vivo* bioequivalence issue is known or suspected, the information necessary to show bioequivalence between pharmaceutically equivalent products is presumed and considered self-evident based on other data in the application for some dosage forms (e.g., solutions) or satisfied for solid oral dosage forms by a showing that an acceptable *in vitro* dissolution standard is met.  A therapeutically equivalent rating is assigned such products so long as they are manufactured in accordance with Current Good Manufacturing Practice regulations and meet the other requirements of their approved applications (these are designated **AA, AN, AO, AP, or AT,** depending on the dosage form, as described

below); or

    (2) for those DESI drug products containing active ingredients or dosage forms that have been identified by FDA as having actual or potential bioequivalence problems, and for post-1962 drug products in a dosage form presenting a potential bioequivalence problem, an evaluation of therapeutic equivalence is assigned to pharmaceutical equivalents only if the approved application contains adequate scientific evidence establishing through *in vivo* and/or *in vitro* studies the bioequivalence of the product to a selected reference product (these products are designated as **AB**).

There are some general principles that may affect the substitution of pharmaceutically equivalent products in specific cases. Prescribers and dispensers of drugs should be alert to these principles so as to deal appropriately with situations that require professional judgment and discretion.

There may be labeling differences among pharmaceutically equivalent products that require attention on the part of the health professional. For example, pharmaceutically equivalent powders to be reconstituted for administration as oral or injectable liquids may vary with respect to their expiration time or storage conditions after reconstitution. An FDA evaluation that such products are therapeutically equivalent is applicable only when each product is reconstituted, stored, and used under the conditions specified in the labeling of that product.

The Agency will use notes in this publication to point out special situations such as potential differences between two drug products that have been evaluated as bioequivalent and otherwise therapeutically equivalent, when they should be brought to the attention of health professionals. These notes are contained in *Description of Special Situations*.

For example, in rare instances, there may be variations among therapeutically equivalent products in their use or in conditions of administration. Such differences may be due to patent or exclusivity rights associated with such use. When such variations may, in the Agency's opinion, affect prescribing or substitution decisions by health professionals, a note will be added to *Description of Special Situations*.

Also, occasionally a situation may arise in which changes in a listed drug product after its approval (for example, a change in dosing interval) may have an impact on the substitutability of already approved generic versions of that product that were rated by the Agency as therapeutically equivalent to the listed product. When such changes in the listed drug product are considered by the Agency to have a significant impact on therapeutic equivalence, the Agency will change the therapeutic equivalence ratings for other versions of the drug product unless the manufacturers of those other versions of the product provide additional information to assure equivalence under the changed conditions. Pending receipt of the additional data, the Agency may add a note to *Description of Special Situations*, or, in rare cases, may even change the therapeutic equivalence rating.

In some cases (e.g., Isolyte® S w/ Dextrose 5% in Plastic Container and Plasma-Lyte® 148 and Dextrose 5% in Plastic Container), closely related products are listed as containing the same active ingredients, but in somewhat different amounts. In determining which of these products are pharmaceutically equivalent, the Agency has considered products to be pharmaceutically equivalent with labeled strengths of an ingredient that do not vary by more than 1%.

Different salts and esters of the same therapeutic moiety are regarded as pharmaceutical

alternatives. For the purpose of this publication, such products are not considered to be therapeutically equivalent. There are no instances in this List where pharmaceutical alternatives evaluated or coded with regard to therapeutic equivalence. Anhydrous and hydrated entities, as well as different polymorphs, are considered pharmaceutical equivalents and must meet the same standards and, where necessary, as in the case of ampicillin/ampicillin trihydrate, their equivalence is supported by appropriate bioavailability/bioequivalence studies.

The codes in this book are not intended to preclude health care professionals from converting pharmaceutically different concentrations into pharmaceutical equivalents using accepted professional practice.

Where package size variations have therapeutic implications, products so packaged have not been considered pharmaceutically equivalent. For example, some oral contraceptives are supplied in 21-tablet and 28-tablet packets; the 28-tablet packets contain 7 placebo or iron tablets. These two packaging configurations are not regarded as pharmaceutically equivalent; thus, they are not designated as therapeutically equivalent.

Preservatives may differ among some therapeutically equivalent drug products. Differences in preservatives and other inactive ingredients do not affect FDA's evaluation of therapeutic equivalence except in cases where these components may influence bioequivalence or routes of administration.

The specific sub-codes for those drugs evaluated as therapeutically equivalent and the policies underlying these sub-codes follow:

## AA  Products in conventional dosage forms not presenting bioequivalence problems

Products coded as **AA** contain active ingredients and dosage forms that are not regarded as presenting either actual or potential bioequivalence problems or drug quality or standards issues. However, all oral dosage forms must, nonetheless, meet an appropriate *in vitro* bioequivalence standard that is acceptable to the Agency in order to be approved.

## AB, AB1, AB2, AB3...  Products meeting necessary bioequivalence requirements

Multisource drug products listed under the same heading (i.e., identical active ingredients(s), dosage form, and route(s) of administration) and having the same strength (see *Therapeutic Equivalence-Related Terms, Pharmaceutical Equivalents*) generally will be coded **AB** if a study is submitted demonstrating bioequivalence.

In certain instances, a number is added to the end of the **AB** code to make a three character code (i.e., **AB1, AB2, AB3, etc.**). Three-character codes are assigned only in situations when more than one reference listed drug of the same strength has been designated under the same heading. Two or more reference listed drugs are generally selected only when there are at least two potential reference drug products which are not bioequivalent to each other. If a study is submitted that demonstrates bioequivalence to a specific listed drug product, the generic product will be given the same three-character code as the reference listed drug it was compared against. For example, Adalat® CC (Miles) and Procardia XL® (Pfizer), extended-release tablets, are listed under the active ingredient nifedipine. These drug products, listed under the same heading, are not bioequivalent to each other. Generic drug products deemed

by FDA to be bioequivalent to Adalat® CC and Procardia XL® have been approved, Adalat® CC and Procardia XL® have been assigned ratings of **AB1** and **AB2,** respectively. The generic drug products bioequivalent to Adalat® CC would be assigned a rating of **AB1** and those bioequivalent to Procardia XL® would be assigned a rating of **AB2.** (The assignment of an **AB1** or **AB2** rating to a specific product does not imply product preference.) Even though drug products of distributors and/or repackagers are not included in the List, they are considered therapeutically equivalent to the application holder's drug product if the application holder's drug product is rated either with an **AB** or three-character code or is single source in the List. Drugs coded as **AB** under a heading are considered therapeutically equivalent only to other drugs coded as **AB** under that heading. Drugs coded with a three-character code under a heading are considered therapeutically equivalent only to other drugs coded with the same three-character code under that heading.

**AN  Solutions and powders for aerosolization**

Uncertainty regarding the therapeutic equivalence of aerosolized products arises primarily because of differences in the drug delivery system. Solutions and powders intended for aerosolization that are marketed for use in any of several delivery systems are considered to be pharmaceutically and therapeutically equivalent and are coded **AN**. Those products that are compatible only with a specific delivery system or those products that are packaged in and with a specific delivery system are coded **BN**, unless they have met an appropriate bioequivalence standard. Solutions or suspensions in a specific delivery system will be coded **AN** if the bioequivalence standard is based upon *in vitro* methodology, if bioequivalence needs to be demonstrated by *in vivo* methodology then the drug products will be coded **AB**.

**AO  Injectable oil solutions**

The absorption of drugs in injectable (parenteral) oil solutions may vary substantially with the type of oil employed as a vehicle and the concentration of the active ingredient. Injectable oil solutions are therefore considered to be pharmaceutically and therapeutically equivalent only when the active ingredient, its concentration, and the type of oil used as a vehicle are all identical.

**AP  Injectable aqueous solutions and, in certain instances, intravenous non-aqueous solutions**

It should be noted that even though injectable (parenteral) products under a specific listing may be evaluated as therapeutically equivalent, there may be important differences among the products in the general category, *Injectable; Injection.* For example, some injectable products that are rated therapeutically equivalent are labeled for different routes of administration. In addition, some products evaluated as therapeutically equivalent may have different preservatives or no preservatives at all. Injectable products available as dry powders for reconstitution, concentrated

sterile solutions for dilution, or sterile solutions ready for injection are pharmaceutically alternative drug products. They are not rated as therapeutically equivalent (AP) to each other even if these pharmaceutical alternative drug products are designed to produce the same concentration prior to injection and are similarly labeled. Consistent with accepted professional practice, it is the responsibility of the prescriber, dispenser, or individual administering the product to be familiar with a product's labeling to assure that it is given only by the route(s) of administration stated in the labeling.

Certain commonly used large volume intravenous products in glass containers are not included on the List (e.g., dextrose injection 5%, dextrose injection 10%, sodium chloride injection 0.9%) since these products are on the market without FDA approval and the FDA has not published conditions for marketing such parenteral products under approved NDAs. When packaged in plastic containers, however, FDA regulations require approved applications prior to marketing. Approval then depends on, among other things, the extent of the available safety data involving the specific plastic component of the product. All large volume parenteral products are manufactured under similar standards, regardless of whether they are packaged in glass or plastic. Thus, FDA has no reason to believe that the packaging container of large volume parenteral drug products that are pharmaceutically equivalent would have any effect on their therapeutic equivalence.

The strength of parenteral drugs products is defined as the total drug content of the container. Until recently the strength of liquid parenteral drug products in the Orange Book have not been displayed. The concentration of the liquid parenteral drug product in the Orange Book has been shown as xmg/ml. The amount of dry powder or freeze dried powder in a container has always been identified as the strength.

With the finalization of the Waxman-Hatch amendments that characterized each strength of a drug product as a listed drug it became evident that the format of the Orange Book should be changed to reflect each strength of a parenteral solution. To this end the OGD has started to display the strength of all new approvals of parenteral solutions. Previously we would have displayed only the concentration of an approved parenteral solution, e.g. 50mg/ml. If this drug product had a 20 ml and 60 ml container approved the two products would be shown as 1Gm / 20ml (50mg/ml) and 3Gm / 60ml (50mg/ml).

## AT  Topical products

There are a variety of topical dosage forms available for dermatologic, ophthalmic, otic, rectal, and vaginal administration, including creams, gels, lotions, oils, ointments, pastes, solutions, sprays and suppositories. Even though different topical dosage forms may contain the same active ingredient and potency, these dosage forms are not considered pharmaceutically equivalent. Therefore, they are not considered therapeutically equivalent. All solutions and DESI drug products containing the same active ingredient in the same topical dosage form for which a waiver of *in vivo* bioequivalence has been granted and for which chemistry and manufacturing processes are adequate to demonstrate bioequivalence, are considered therapeutically equivalent and coded **AT**. Pharmaceutically equivalent topical products that raise questions of bioequivalence, including all post-1962 non-solution topical drug products, are coded **AB** when supported by adequate bioequivalence

data, and **BT** in the absence of such data.

# "B" CODES

**Drug products that FDA, at this time, considers <u>not to be therapeutically equivalent</u> to other pharmaceutically equivalent products.**

"**B**" products, for which actual or potential bioequivalence problems have not been resolved by adequate evidence of bioequivalence, often have a problem with specific dosage forms rather than with the active ingredients. Drug products designated with a "**B**" code fall under one of three main policies:

> (1) the drug products contain active ingredients or are manufactured in dosage forms that have been identified by the Agency as having documented bioequivalence problems or a significant potential for such problems and for which no adequate studies demonstrating bioequivalence have been submitted to FDA; or

> (2) the quality standards are inadequate or FDA has an insufficient basis to determine therapeutic equivalence; or

> (3) the drug products are under regulatory review.

The specific coding definitions and policies for the "**B**" sub-codes are as follows:

**B\*  Drug products requiring further FDA investigation and review to determine therapeutic equivalence**

> The code **B\*** is assigned to products previously assigned an A or B code when FDA receives new information that raises a significant question regarding therapeutic equivalence that can be resolved only through further Agency investigation and/or review of data and information submitted by the applicant. The **B\*** code signifies that the Agency will take no position regarding the therapeutic equivalence of the product until the Agency completes its investigation and review.

**BC  Extended-release dosage forms (capsules, injectables and tablets)**

> Extended-release tablets are formulated in such a manner as to make the contained medicament available over an extended period of time following ingestion.

> Although bioavailability studies have been conducted on these dosage forms, they may be subject to bioavailability differences, primarily because firms developing extended-release products for the same active ingredient rarely employ the same formulation approach. FDA, therefore, does not consider different extended-release dosage forms containing the same active ingredient in equal strength to be therapeutically equivalent unless equivalence between individual products in both rate and extent has been specifically demonstrated through appropriate

bioequivalence studies. Extended-release products for which such bioequivalence data have not been submitted are coded **BC**, while those for which such data are available have been coded **AB**.

## BD  Active ingredients and dosage forms with documented bioequivalence problems

The **BD** code denotes products containing active ingredients with known bioequivalence problems and for which adequate studies have not been submitted to FDA demonstrating bioequivalence. Where studies showing bioequivalence have been submitted, the product has been coded **AB**.

## BE  Delayed-release oral dosage forms

Where the drug may be destroyed or inactivated by the gastric juice or where it may irritate the gastric mucosa, the use of "enteric" coatings is indicated. Such coatings are intended to delay the release of the medication until the tablet has passed through the stomach. Drug products in delayed-release dosage forms containing the same active ingredients are subject to significant differences in absorption. Unless otherwise specifically noted, the Agency considers different delayed-release products containing the same active ingredients as presenting a potential bioequivalence problem and codes these products **BE** in the absence of *in vivo* studies showing bioequivalence. If adequate *in vivo* studies have demonstrated the bioequivalence of specific delayed-release products, such products are coded **AB**.

## BN  Products in aerosol-nebulizer drug delivery systems

This code applies to drug solutions or powders that are marketed only as a component of, or as compatible with, a specific drug delivery system. There may, for example, be significant differences in the dose of drug and particle size delivered by different products of this type. Therefore, the Agency does not consider different metered aerosol dosage forms containing the same active ingredient(s) in equal strengths to be therapeutically equivalent unless the drug products meet an appropriate bioequivalence standard, such products are coded **AB**.

## BP  Active ingredients and dosage forms with potential bioequivalence problems

FDA's bioequivalence regulations (21 CFR 320.33) contain criteria and procedures for determining whether a specific active ingredient in a specific dosage form has a potential for causing a bioequivalence problem. It is FDA's policy to consider an ingredient meeting these criteria as having a potential bioequivalence problem even in the absence of positive data demonstrating inequivalence. Pharmaceutically equivalent products containing these ingredients in oral dosage forms are coded **BP** until adequate *in vivo* bioequivalence data are submitted, such products are coded **AB**. Injectable suspensions containing an active ingredient suspended in an aqueous or oleaginous vehicle have also been coded **BP**. Injectable suspensions are subject to bioequivalence problems because differences in particle size, polymorphic structure of the suspended active ingredient, or the suspension formulation can significantly affect the rate of release and absorption. FDA does not consider pharmaceutical equivalents of these products bioequivalent without adequate evidence of bioequivalence, such products would be coded **AB**.

## BR  Suppositories or enemas that deliver drugs for systemic absorption

The absorption of active ingredients from suppositories or enemas that are intended
to have a systemic effect (as distinct from suppositories administered for local effect)
can vary significantly from product to product. Therefore, FDA considers
pharmaceutically equivalent systemic suppositories or enemas bioequivalent only if
*in vivo* evidence of bioequivalence is available. In those cases where *in vivo*
evidence is available, the product is coded **AB**. If such evidence is not available, the
products are coded **BR**.

## BS  Products having drug standard deficiencies

If the drug standards for an active ingredient in a particular dosage form are found by
FDA to be deficient so as to prevent an FDA evaluation of either pharmaceutical or
therapeutic equivalence, all drug products containing that active ingredient in that
dosage form are coded **BS**. For example, if the standards permit a wide variation in
pharmacologically active components of the active ingredient such that
pharmaceutical equivalence is in question, all products containing that active
ingredient in that dosage form are coded **BS**.

## BT  Topical products with bioequivalence issues

This code applies mainly to post-1962 dermatologic, ophthalmic, otic, rectal, and
vaginal products for topical administration, including creams, ointments, gels,
lotions, pastes, and sprays, as well as suppositories not intended for systemic drug
absorption. Topical products evaluated as having acceptable clinical performance,
but that are not bioequivalent to other pharmaceutically equivalent products or that
lack sufficient evidence of bioequivalence, will be coded **BT**.

## BX  Drug products for which the data are insufficient to determine therapeutic equivalence

The code **BX** is assigned to specific drug products for which the data that have been
reviewed by the Agency are insufficient to determine therapeutic equivalence under
the policies stated in this document. In these situations, the drug products are
presumed to be therapeutically inequivalent until the Agency has determined that
there is adequate information to make a full evaluation of therapeutic equivalence.

## Description of Special Situations

Certain drugs listed in the Orange Book present special situations that merit further discussion.
Following is a description of those special situations:

***Amino Acid and Protein Hydrolysate Injections***. These products differ in the amount and kinds
of amino acids they contain and, therefore, are not considered pharmaceutical equivalents. For
this reason, these products are not considered therapeutically equivalent. At the same time, the
Agency believes that it is appropriate to point out that where nitrogen balance is the sole
therapeutic objective and individual amino acid content is not a consideration, pharmaceutical
alternatives with the same total amount of nitrogen content may be considered therapeutically
equivalent.

*Follitropin Alfa and Beta.*   Based on available data derived from physico-chemical tests and bioassay, follitropin alfa and follitropin beta are indistinguishable.

*Gaviscon®.*   Gaviscon® is an OTC product which has been marketed since September 1970. The active ingredients in this product, aluminum hydroxide and magnesium trisilicate, were reviewed by the Agency's OTC Antacid Panel and were considered to be safe and effective ingredients (Category I) by that Panel.   However, the tablet failed to pass the antacid test which is required of all antacid products.   The Agency, therefore, placed the tablet in Category III for lack of effectiveness.   A full NDA with clinical studies was submitted by Marion Laboratories, Inc., and approved by FDA on December 9, 1983.   Gaviscon® 's activity in treating reflux acidity is made possible by the physical-chemical properties of the inactive ingredients, sodium bicarbonate and alginic acid.   Therefore, *all ANDAs which cite Gaviscon® tablets as the listed drug must contain the inactive ingredients sodium bicarbonate and alginic acid.*   A full NDA will be required to support the effectiveness of the drug product if different inactive ingredients are to be substituted for sodium bicarbonate or alginic acid or if different proportions of these ingredients are to be used.

*Levothyroxine Sodium.*   Because there are multiple reference listed drugs of levothyroxine sodium tablets and some reference listed drugs' sponsors have conducted studies to establish their drugs' therapeutic equivalence to other reference listed drugs, FDA has determined that its usual practice of assigning two or three character TE codes may be potentially confusing and inadequate for these drug products.   Accordingly, FDA provides the following explanation and chart of therapeutic equivalence evaluations for levothyroxine sodium drug products.

Levothyroxine Sodium (Mylan ANDA 76187), tablets have been determined to be therapeutically equivalent to corresponding strengths of Unithroid (Jerome Stevens NDA 021210) tablets.

Levo-T (Alara NDA 021342), Levothyroxine Sodium (Mylan ANDA 76187), Unithroid (Jerome Stevens NDA 021210) and Levothyroxine Sodium (Genpharm ANDA 76752)tablets have been determined to be therapeutically equivalent to corresponding strengths of Synthroid (Abbott NDA 021402) tablets.

Levo-T (Alara NDA 021342), Unithroid (Jerome Stevens NDA 021210), Levothyroxine Sodium (Mylan ANDA 076187) and Levothyroxine Sodium (Genpharm ANDA 76752) tablets have been determined to be therapeutically equivalent to corresponding strengths of Levoxyl (King Pharms NDA 021301) tablets.

Levothyroxine Sodium (Mylan ANDA 76187) tablets have been determined to be therapeutically equivalent to corresponding strengths of Levothroid (Lloyd NDA 021116) tablets.

Levothroid (Lloyd NDA 021116) requires further investigation and review to establish therapeutic equivalence to corresponding strengths of any other levothyroxine sodium drug products and is rated BX.

The chart outlines TE codes for all 0.025mg products with other products being similar.  Therapeutic equivalence has been established between products that have the same AB+number TE code.   More than one TE code may apply to some products.   One common TE code indicates therapeutic equivalence between products.

| Trade Name | Applicant | Potency | TE Code | Appl No | Product No |
|---|---|---|---|---|---|
| UNITHROID | STEVENS J | 0.025MG | AB1 | 21210 | 001 |
| LEVOTHYROXINE SODIUM | MYLAN | 0.025MG | AB1 | 76187 | 001 |
| LEVOXYL | KING PHARMS | 0.025MG | AB1 | 21301 | 001 |
| SYNTHROID | ABBOTT | 0.025MG | AB1 | 21402 | 001 |
| | | | | | |
| SYNTHROID | ABBOTT | 0.025MG | AB2 | 21402 | 001 |
| LEVOTHYROXINE SODIUM | MYLAN | 0.025MG | AB2 | 76187 | 001 |
| LEVO-T | ALARA PHARM | 0.025MG | AB2 | 21342 | 001 |
| UNITHROID | STEVENS J | 0.025MG | AB2 | 21210 | 001 |
| LEVOTHYROXINE SODIUM | GENPHARM | 0.025MG | AB2 | 76752 | 001 |
| | | | | | |
| LEVOXYL | KING PHARMS | 0.025MG | AB3 | 21301 | 001 |
| LEVO-T | ALARA PHARM | 0.025MG | AB3 | 21342 | 001 |
| UNITHROID | STEVENS J | 0.025MG | AB3 | 21210 | 001 |
| LEVOTHYROXINE SODIUM | MYLAN | 0.025MG | AB3 | 76187 | 001 |
| LEVOTHYROXINE SODIUM | GENPHARM | 0.025MG | AB3 | 76752 | 001 |
| | | | | | |
| LEVOTHROID | LLOYD | 0.025MG | AB4 | 21116 | 001 |
| LEVOTHYROXINE SODIUM | MYLAN | 0.025MG | AB4 | 76187 | 001 |

***Patent Certification(s) Reference Listed Drug based upon a suitability petition.*** An abbreviated new drug application that refers to a Reference Listed Drug (RLD) approved pursuant to a suitability petition must demonstrate that the proposed product is bioequivalent to the RLD, and it must include appropriate patent certification(s) and an exclusivity statement with respect to the listed drug which served as the basis for the approved suitability petition. This concept also applies to an ANDA applicant that cites a RLD that was based upon an NDA that is still covered by patent (s) and/or exclusivity, e.g. a second RLD that was selected when the in vivo determination of bioequivalence of the original RLD is self evident and the waiver of the in vivo determination of bioequivalence may be granted.

***Waived exclusivity.*** If a new drug application (NDA) submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (Act) qualifies for exclusivity under sections 505(c)(3)(D) and 505(j)(5)(D), the exclusivity is listed in the Patent and Exclusivity Section of the Orange Book. If a drug product has received this exclusivity, the FDA will delay the approval of a 505 (b)(2) application or an abbreviated new drug application (ANDA) under section 505(j) of the Act until the expiration of the exclusivity. If the listed drug is also protected by one or more patents, the approval date for the 505(b)(2) application or ANDA will be determined by the latest expiring patent or exclusivity listed in the Orange Book. However, the holder of the NDA may waiver its exclusivity as to any or all 505(b)(2) and ANDA applications referencing the protected drug product. If an NDA sponsor waivers its right to the exclusivity protection, qualified 505(b) (2) or ANDA applications may be approved without regard to the NDA holder's exclusivity. An NDA for which the holder has waived its exclusivity as to all 505(b)(2) and ANDA applications will be coded with a W in the Patent and Exclusivity Section of the Orange Book and be referred to this section. The applicant referencing this listed drug should indicate in the exclusivity statement that the holder of the listed drug has waived its exclusivity.

## Therapeutic Equivalence Code Change for a Drug Entity

The Agency will use the following procedures when, in response to a petition or on its own initiative, it is considering a change in the therapeutic equivalence code for approved multi-source drug products. Such changes will generally occur when the Agency becomes aware of new scientific information affecting the therapeutic equivalence of an entire category of drug products in the List (e.g., information concerning the active ingredient or the dosage form), rather than information concerning a single drug product within the category. These procedures will be used when a change in therapeutic equivalence code is under consideration for all drug products found in the Prescription Drug Product List under a specific drug entity and dosage form. The change may be from the code signifying that the drug does not present a bioequivalence problem (e.g., **AA**) to a code signifying a bioequivalence problem (e.g., **BP**), or vice versa. This procedure does not apply to a change of a particular product code (e.g., a change from **BP** to **AB** or from **AB** to **BX**).

Before making a change in a therapeutic equivalence code for an entire category of drugs, the Agency will announce in the *Introduction* that it is considering the change, and will invite comment. Comments, along with scientific data, may be sent to the Director, Division of Bioequivalence, Office of Generic Drugs, Center for Drug Evaluation and Research, (MPN-2) HFD-650, 7500 Standish Place, Rockville, MD 20855. The comment period will generally be 60 days in length, and the closing date for comments will be listed in the description of the proposed change for each drug entity.

The most useful type of scientific data submission is an *in vivo* bioavailability/bioequivalence study conducted on batches of the subject drug products. These submissions should present a full description of the analytical procedures and equipment used, a validation of the analytical methodology, including the standard curve, a description of the method of calculating results, and a description of the pharmacokinetic and statistical models used in analyzing the data. Anecdotal or testimonial information is the least useful to the Agency, and such submissions are discouraged. Copies of supporting reports published in the scientific literature or unpublished material, however, are welcome.

## Change of the Therapeutic Equivalence Evaluation for a Single Product

The aforementioned procedure does not apply to a change in a single drug product code. For example, a change in a single drug product's code from **BP** to **AB** as a result of the submission of a bioequivalence study ordinarily will not be the subject of notice and comment. Likewise, a change in a single drug product's code from **AB** to **BX** (e.g., as a result of new information raising a significant question as to bioequivalence) does not require notice and comment. The Agency's responsibility to provide the public with the Agency's most current information related to therapeutic equivalence may require a change in a drug product's code prior to any formal notice and opportunity for the applicant to be heard. The publication in the *Federal Register* of a proposal to withdraw approval of a drug product will ordinarily result in a change in a product's code from **AB** to **BX** if this action has not already been taken.

## Discontinued Section

Those drug products in the Discontinued Section of the Orange Book in which a determination has already been made that the products were not withdrawn for safety or efficacy reasons have "**Federal Register determination that product was not discontinued or withdrawn for safety or efficacy reasons**" following the product strength. Those drug products are only reflective of citizen petitions approved since 1995. The identification of these drug products in the

Discontinued Section of the Orange Book should avoid the submission of multiple citizen petitions for the same drug product. FR notices no longer applicable are removed from the Annual Edition (i.e., there is a currently marketed Reference Listed Drug and no applicable patent or exclusivity). http://www.fda.gov/cdeR/ogd/OrangeBook FRSafetyorEffectivenessDeterminations List.pdf lists products that have current and removed notices. The list is updated periodically throughout the year. Notices issued during the year are added to the Electronic Orange Book Query in the month they become effective.

Generally, approved products are added to the Discontinued Section of the Orange Book when the applicant holder notifies the Orange Book staff of the products' not marketed status. Products may also be added if annual reports indicate the product is no longer marketed or other Agency administrative action (e.g., Withdrawal of an Application). Changes to the Orange Book are not affected by the drug registration and listing requirements of Section 510 of the Act.

## Changes to the Orange Book

Every effort is made to ensure the Annual Edition is current and accurate. Applicant holders are requested to inform the FDA Orange Book Staff (OBS) of any changes or corrections. Please inform the OBS when products are no longer marketed. Notification of the Orange Book staff to include the newly approved product in the Discontinued Drug Product List rather than parts 1, 2 or 3 of the List (as discussed in Section 1.1) must occur by the end of the month in which the product is approved to ensure that the product is not included in the "active" portions of the next published Orange Book update

We can be contacted by email at drugproducts@cder.fda.gov. Send Changes by FAX: 240-276-8974; mail to:

> FDA/CDER Orange Book Staff
> Office of Generic Drugs, HFD-610
> 7500 Standish Place
> Rockville , MD 20855-2773

### Availability of the Edition

Commencing with the 25th edition, the Annual Edition and current monthly Cumulative Supplements are available in a Portable Document Format (PDF) at the EOB home page, http://www.fda.gov/cder/ob/default.htm, by clicking on the Publications. The PDF annual format duplicates previous paper versions except for the Orphan Products Designations and Approvals List. An annual subscription of the PDF format may be obtained from the U.S. Government Printing Office, 866-512-1800.

# HOW TO USE THE DRUG PRODUCT LISTS

### Key Sections for Using the Drug Product Lists

This publication contains illustrations, along with Drug Product Lists, indices, and lists of abbreviations and terms which facilitate their use.

*Illustrations.* The annotated Drug Product Illustration, see Section 2.2, and the Therapeutic Equivalence Evaluations Illustration, see Section 2.3, are offered to provide further clarification. These depict the format found in the Prescription Drug Product List (the only list in which therapeutic equivalence evaluation codes are displayed).

*Drug Product Lists.* Drug Product Lists. The Prescription and OTC Drug Product Lists, arranged alphabetically by active ingredient(s), contain product identification information (active ingredients, dosage forms, routes of administration, product names, application holders, strengths) for single and multiple ingredient drug products. Also shown are the application number and drug product number (FDA internal computer data use only) and approval dates for those drug products approved on or after January 1, 1982 .

The Discontinued Product List, arranged alphabetically by active ingredient(s), contain product identification information (dosage form, product name, strength, and application number).

If a prescription drug product is available from more than one source (multisource), a therapeutic equivalence code will appear in front of the applicant's name. If a product is therapeutically equivalent to one or more products or to an appropriate reference, it will be designated with a code beginning with "A" and the entry will be underlined and printed in bold font for emphasis.

Active ingredient headings for multiple ingredient (combination) drug products are arranged alphabetically. For purposes of this publication, this alphabetical sort takes precedence over United States Pharmacopeia official monograph order (i.e., Reserpine, Hydralazine Hydrochloride, Hydrochlorothiazide). For example, product information labeled as Reserpine, Hydrochlorothiazide and Hydralazine Hydrochloride appears under the active ingredient heading Hydralazine Hydrochloride; Hydrochlorothiazide; Reserpine. A cross-reference to the product information (for prescription and OTC products) appears for each additional active ingredient in the product. For combination drug products, the ingredient strengths are separated by semicolons and appear in the same relative sequence as the ingredients in the heading. Available strengths of the dosage form from an applicant appear on separate lines.

To use the Drug Product Lists, determine by alphabetical order the ingredient under which the product information is listed, using the Product Name Index, if necessary. Then, find the ingredient in the applicable Drug Product List. Proceed to the dosage form and route of administration and compare products within that ingredient heading only. Therapeutic equivalence or inequivalence for prescription products is determined on the basis of the therapeutic equivalence codes provided within that specific dosage form and route heading. The OTC Drug Product List, Discontinued Drug Product List, and Drug Products with Approval under Section 505 of the Act Administered by the Center for Biologics Evaluation and Research List have their data arranged similarly.

*The Discontinued Drug Product List* contains approved products that have never been marketed, have been discontinued from marketing, are for military use, or have had their approvals withdrawn for other than safety or efficacy reasons subsequent to being discontinued from marketing. All products having a "@" in the 12th Cumulative Supplement of the 26th Edition List have been added to the Discontinued Drug Product List appearing in the 27th Edition. In addition, approved drug products that are not in the commercial distribution channel e.g., approved drug products in applications for export only are also listed in the Discontinued Section of the Orange Book.

## PATENT AND EXCLUSIVITY INFORMATION ADDENDUM

This Addendum identifies drugs that qualify under the Drug Price Competition and Patent Term Restoration Act (1984 Amendments) for periods of exclusivity, during which abbreviated new drug applications (ANDAs) and applications described in Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act (the Act) for those drug products may, in some instances, not be submitted or made effective as described below, and provides patent information concerning these listed drug products. Those drugs that have qualified for Orphan Drug Exclusivity pursuant to Section 527 of the Act and those drugs that have qualified for Pediatric Exclusivity pursuant to Section 505A are also included in this Addendum. This section is arranged in alphabetical order by active ingredient name followed the trade name. Active ingredient headings for multiple ingredient (combination) drug products are arranged alphabetically. For an explanation of the codes used in the Addendum, see the Patent and Exclusivity Terms Section. Exclusivity prevents the submission or effective approval of ANDAs or applications described in Section 505(b)(2) of the Act. It does not prevent the submission or approval of a second 505(b)(1) application except in the case of Orphan Drug exclusivity. Applications qualifying for periods of exclusivity are:

(1) A new drug application approved after September 24, 1984, for a drug product all active ingredients (including any ester or salt of the active ingredient) of which had never been approved in any other new drug application under Section 505 (b) of the Act. No subsequent ANDA or application described in Section 505(b)(2) of the Act for the same drug may be submitted for a period of five years from the date of approval of the original application, except that such an application may be submitted after four years if it contains a certification that a patent claiming the drug is invalid or will not be infringed by the product for which approval is sought.

(2) A new drug application approved after September 24, 1984, for a drug product containing an active ingredient (including any ester or salt of that active ingredient) that has been approved in an earlier new drug application and that includes reports of new clinical investigations (other than bioavailability studies). Such investigations must have been conducted or sponsored by the applicant and must have been essential to approval of the application. If these requirements are met, the approval of a subsequent ANDA or an application described in Section 505(b)(2) of the Act may not be made effective for the same drug or use, if for a new indication, before the expiration of three years from the date of approval of the original application. If an applicant has exclusivity for a new application or 505(b)(2) application for the drug product with indications or use, this does not preclude the approval of an ANDA or 505(b)(2) application not covered by the exclusivity.

(3) A supplement to a new drug application for a drug containing a previously approved active ingredient including (any ester or salt of the active ingredient) approved after September 24, 1984, that contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the supplement and conducted or sponsored by the applicant. The approval of a subsequent ANDA or 505(b)(2) application for a change approved in the supplement may not be made effective for three years from the date of approval of the original supplement.

The Act requires that patent information be filed with all newly submitted Section 505(b) drug applications. No NDA may be approved after September 24, 1984, without the submission of

patent information to the Agency. Effective August 18, 2003, this information must be filed using FDA Form 3524a "Patent Information Submitted with the Filing of an NDA, Amendment or Supplement".

Effective August 18, 2003, this information must be submitted to the agency upon approval on FDA Form 3542 "Patent Information Submitted Upon and After Approval of an NDA or Supplement". Patent information on unapproved applications or on patents beyond the scope of the Act (i.e., process or manufacturing patents) will not be published. FDA form 3542 will be the only form used for the purposes of this publication.

The patents that FDA regards as covered by the statutory provisions for submission of patent information are: patents that claim the active ingredient(s); drug product patents which include formulation/composition patents; use patents for a particular approved indication or method of using the product; and certain other patents as detailed on FDA Form 3542. This information, as provided by the sponsor on FDA form 3542, will be published as described above.

Upon approval, patent numbers and expiration dates, in addition to certain other information on appropriate patents claiming drug products that are the subject of approved applications, will be published on a daily basis in the Electronic Orange Book, http://www.fda.gov/cder/ob/default.htm. The Addendum lists patent and exclusivity information up to January of the Edition year. The monthly Cumulative Supplements to the annual edition list patent and exclusivity information changes since the Annual Edition Addendum. Since all parts of this publication are subject to changes, additions, or deletions, the Electronic Orange Book, updated daily, should be consulted for the most recent patent and exclusivity information.

---

**Search the Orange Book**

⬆ Back to Top     ↖ Orange Book

Date created: January 30, 2008

---

CDER Home Page | CDER Site Info | Contact CDER | What's New @ CDER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA/Center for Drug Evaluation and Research

# EXHIBIT E

Department of Health and Human Services

**OFFICE OF
INSPECTOR GENERAL**

# THE FOOD AND DRUG ADMINISTRATION'S GENERIC DRUG REVIEW PROCESS



Daniel R. Levinson
Inspector General

June 2008
OEI-04-07-00280

# *Office of Inspector General*

http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The Office of Audit Services (OAS) provides auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## *Office of Evaluation and Inspections*

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. These evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness of departmental programs. To promote impact, OEI reports also present practical recommendations for improving program operations.

## *Office of Investigations*

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of fraud and misconduct related to HHS programs, operations, and beneficiaries. With investigators working in all 50 States and the District of Columbia, OI utilizes its resources by actively coordinating with the Department of Justice and other Federal, State, and local law enforcement authorities. The investigative efforts of OI often lead to criminal convictions, administrative sanctions, and/or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support for OIG's internal operations. OCIG represents OIG in all civil and administrative fraud and abuse cases involving HHS programs, including False Claims Act, program exclusion, and civil monetary penalty cases. In connection with these cases, OCIG also negotiates and monitors corporate integrity agreements. OCIG renders advisory opinions, issues compliance program guidance, publishes fraud alerts, and provides other guidance to the health care industry concerning the anti-kickback statute and other OIG enforcement authorities.

 **E X E C U T I V E   S U M M A R Y**

## OBJECTIVES

1. To determine the percentage of new (i.e., original) generic drug applications approved, tentatively approved, or disapproved by the Food and Drug Administration (FDA) in 2006.

2. To determine the extent to which FDA reviewed original generic drug applications within 180 days in 2006.

3. To identify factors that affected review times for original and amended generic drug applications in 2006.

## BACKGROUND

Pharmaceutical companies must submit Abbreviated New Drug Applications (ANDA) to FDA's Office of Generic Drugs (OGD) and receive FDA's approval before marketing new generic drugs. Three OGD divisions review all ANDAs: Chemistry, Bioequivalence, and Labeling. OGD's Microbiology division also reviews some ANDAs. In addition, OGD may consult with other FDA offices during ANDA reviews. All OGD divisions involved in the ANDA review contribute to approval, but disapproval is primarily determined by Chemistry. According to FDA, almost all original ANDAs contain Chemistry deficiencies and are disapproved.

OGD generally follows a first-in, first-reviewed policy for ANDAs. However, when Chemistry identifies no deficiencies in an ANDA (i.e., the ANDA is approvable by Chemistry), the other divisions assign high priority to the ANDA's review. Pursuant to FDA policy, divisions should also assign high priority to ANDAs with minor deficiencies. In addition, some ANDA consults are assigned high priority.

FDA's timeliness in approving generic drugs has recently been a topic of scrutiny by both Congress and the media. Federal law requires that FDA approve, tentatively approve, or disapprove original ANDAs within 180 days of receipt.

We examined review times for 989 original ANDAs under review during 2006. We also surveyed OGD division reviewers assigned to a sample of 105 ANDAs with review times greater than 180 days in at least one division. Finally, we conducted structured interviews with OGD officials to determine factors affecting ANDA review times.

E X E C U T I V E    S U M M A R Y

## FINDINGS

**The Food and Drug Administration approved or tentatively approved 4 percent of original Abbreviated New Drug Applications under review in 2006; the remaining 96 percent did not meet review standards and were disapproved.** FDA approved 1 percent and tentatively approved 3 percent of original ANDAs under review in 2006. FDA disapproved 96 percent of original ANDAs under review in 2006 because they contained Chemistry deficiencies.

**The Food and Drug Administration exceeded the 180-day review requirement for nearly half of original Abbreviated New Drug Applications under review in 2006 because Chemistry reviews exceeded 180 days.** In 2006, Chemistry did not review 46 percent of original ANDAs within 180 days as required by Federal law. For ANDAs taking more than 180 days for review, the median review time was 217 days. Because almost all of these original ANDAs contained Chemistry deficiencies, Chemistry's delay in reviewing these ANDAs resulted in FDA's delay in disapproving them, regardless of the timeliness of the other divisions' reviews.

**Microbiology, Bioequivalence, and Labeling reviews of original Abbreviated New Drug Applications generally exceeded 180 days in 2006.** In 2006, the percentages of ANDAs with review times exceeding 180 days were 76 percent in Microbiology, 58 percent in Bioequivalence, and 56 percent in Labeling. For ANDAs taking more than 180 days to review, median review times were 361 days in Microbiology, 287 days in Bioequivalence, and 277 days in Labeling.

**Nearly 70 percent of sampled division reviews exceeding 180 days did not begin before the 180-day review periods expired.** In a sample of 105 ANDAs with review times exceeding 180 days, reviews for 69 percent did not begin within 180 days. Thus, the 180-day periods passed before division reviews began in most of the sample.

**The Food and Drug Administration's prioritization practices affect Abbreviated New Drug Application review times.** FDA prioritization practices contribute to longer review times for ANDAs that are close to approval.

E X E C U T I V E   S U M M A R Y

## RECOMMENDATIONS

We found that FDA disapproved most original ANDAs under review in 2006 because they did not meet FDA review standards. Nearly half of Chemistry review times exceeded the 180 days required by Federal law. Moreover, many review times in other OGD divisions exceeded 180 days. In addition, for a sample of ANDA reviews exceeding 180 days, most reviews did not begin before the 180-day period expired. Finally, we found that FDA prioritization practices affect ANDA review times.

The ANDA submissions have increased at more than double the rate of review resources in the last 5 years. To better manage FDA's current ANDA review resources and potentially improve ANDA review times, we recommend that FDA:

**Identify common original Abbreviated New Drug Application deficiencies and offer more guidance to industry to decrease the percentage disapproved.**

**Increase the percentage of original Abbreviated New Drug Applications reviewed by all divisions within 180 days.**

**Identify new prioritization practices to reduce review times for Abbreviated New Drug Applications close to approval.**

## AGENCY COMMENTS

In its comments to the draft report, FDA noted that it has already identified portions of the primary recommendations and is implementing process improvements that are the same as or similar to the recommendations. Specifically, FDA agreed with our first recommendation but did not indicate whether it concurred with the two additional recommendations. However, FDA has taken actions that address our recommendations by providing guidance to assist industry in submitting more easily reviewed applications, developing a focused hiring program to increase staff and decrease review times, and prioritizing some ANDAs based on potential market entry date.

We ask that, in its final management decision, FDA more clearly indicate whether it concurs with each of our recommendations.

# ➤ T A B L E   O F   C O N T E N T S

E X E C U T I V E   S U M M A R Y ....................................... i

I N T R O D U C T I O N ........................................... 1

F I N D I N G S ................................................ 12

    FDA disapproved most original ANDAs. .................... 12

    Chemistry reviews exceeded 180 days ..................... 13

    Review times in other divisions exceeded 180 days. .......... 15

    Sampled reviews did not start within 180 days. .............. 16

    ANDAs are not prioritized ............................... 17

R E C O M M E N D A T I O N S .................................... 21

    Agency Comments. ..................................... 23

A P P E N D I X E S ............................................. 25

    A: Additional Information on Methodology. ................. 25

    B: 2006 Chemistry Review Time Ranges ................... 28

    C: 2006 Microbiology, Bioequivalence, and Labeling
       Review Time Ranges. ................................ 29

    D: Frequency Distribution of Office of Generic Drugs
       Consults Pending as of June 2007 ..................... 30

    E: Agency Comments. .................................. 31

A C K N O W L E D G M E N T S .................................... 36

◢ I N T R O D U C T I O N

## OBJECTIVES

1. To determine the percentage of new (i.e., original) generic drug applications approved, tentatively approved, or disapproved by the Food and Drug Administration (FDA) in 2006.

2. To determine the extent to which FDA reviewed original generic drug applications within 180 days in 2006.

3. To identify factors that affected review times for original and amended generic drug applications in 2006.

## BACKGROUND

A generic drug is the same as a reference-listed (i.e., brand name) drug with respect to conditions of use, active ingredient(s), route of administration, dosage form, strength, and labeling.[1] In addition, the generic drug must be bioequivalent to (i.e., perform in the same manner as) the brand name drug.

A generic drug that is therapeutically equivalent is expected to have the same clinical effect and safety profile as the brand name drug when administered under the conditions specified in the labeling. If generic drugs are determined to be therapeutically equivalent, physicians and pharmacists can substitute them for brand name drugs.

Generic drug applications are referred to as Abbreviated New Drug Applications (ANDA).[2] Pharmaceutical companies must submit ANDAs and receive FDA's approval before marketing new generic drugs.[3]

---

[1] 21 U.S.C. § 355(j)(2) (§ 505(j)(2) of the Federal Food, Drug, and Cosmetic Act); 21 CFR §§ 314.92 and 314.105(c). Some differences between generic and brand name drugs are permitted under 21 U.S.C. § 355(j)(2). See also "Abbreviated New Drug Application (ANDA) Process for Generic Drugs," Center for Drug Evaluation and Research. Available online at http://www.fda.gov/cder/regulatory/applications/ands.htm. Accessed on November 29, 2007.

[2] The term "abbreviated" is used because FDA does not require generic drug manufacturers to submit the clinical studies necessary for brand name drug applications. Instead, the ANDA must demonstrate that the generic drug is the same as a brand name drug.

[3] 21 CFR § 314.105(d).

# I N T R O D U C T I O N

FDA's timeliness in approving generic drugs has recently been a topic of scrutiny by both Congress and the media.[4][5][6]  Federal law requires that FDA approve or disapprove ANDAs within 180 days of receipt.[7]

## Abbreviated New Drug Application Review Components

Three divisions within FDA's Center for Drug Evaluation and Research (CDER), Office of Generic Drugs (OGD), review all ANDAs: the Division of Bioequivalence (Bioequivalence), the Division of Chemistry (Chemistry), and the Division of Labeling and Program Support (Labeling).[8][9]  In addition, the Microbiology team (Microbiology) reviews some ANDAs.[10]

Other offices within CDER also review ANDAs in certain instances.  For example, safety evaluations of inactive ingredients, labeling and bioequivalence protocol reviews, and statistical reviews of bioequivalence studies require OGD to consult other offices within CDER.  According to OGD officials, OGD typically sends requests for such reviews (i.e., consults) to the CDER's Office of New Drugs because it has expertise in these areas.  CDER policy provides timeframes for

---

[4] "The Generic Drug Maze:  Speeding Access to Affordable, Life Saving Drugs." Hearing of the United States Senate Special Committee on Aging. July 20, 2006. Available online at http://aging.senate.gov/hearing_detail.cfm?id=270735&. Accessed on July 24, 2007.

[5] "Appropriations for the Food and Drug Administration." Hearing of the United States House of Representatives Appropriations Committee, Agriculture, Rural Development, Food and Drug Administration and Related Agencies Subcommittee.  February 16, 2006.

[6] Kaufman, Marc. "Generic Drugs Hit Backlog at FDA." Washington Post. February 4, 2006, p. A01. Available online at http://www.washingtonpost.com/wp-dyn/content/article/2006/02/03/AR2006020302598.html. Accessed on July 25, 2007.

[7] 21 U.S.C. § 355(j)(5)(A); 21 CFR § 314.101(f)(2).  An approval becomes effective on the date of the issuance of the approval letter, except for certain approvals that have delayed effective dates.  An approval with a delayed effective date is tentative and does not become final until the effective date.  21 CFR § 314.105(d).

[8] A CDER organizational chart is available online at http://www.fda.gov/cder/cderorg.htm.  CDER provides general information on the ANDA review process online at http://www.fda.gov/cder/ogd/.  CDER's "Manuals of Policies and Procedures" (MaPP) provide official instructions to CDER staff on the drug review process. MaPP Chapter 5200 applies to OGD and is available online at http://www.fda.gov/cder/mapp.htm. Accessed on January 3, 2008.

[9] In addition, the Office of Compliance evaluates the generic drug's manufacturing, packaging, and testing facilities to determine whether they meet current Good Manufacturing Practices pursuant to 21 CFR § 211.

[10] Microbiology reviews drugs administered as injections, inhalations, or solutions to ensure their sterility.  The Microbiology staff is officially housed within the Immediate Office of the OGD Director.  When referring to OGD divisions throughout this report, Microbiology is included.

OGD to receive consult results from other CDER offices.[11]  Policy timeframes range from 15 to 90 days, based on the priority of the consult.  A consult's priority is based, in part, on how close the ANDA is to approval.

**Abbreviated New Drug Application Review Process**
OGD generally employs CDER's first-in, first-reviewed policy for ANDAs.[12]  However, OGD grants expedited reviews of ANDAs in special circumstances.[13]

When an applicant submits an original ANDA, OGD first conducts a review to determine whether the application is sufficiently complete to permit a substantive review.[14]  OGD refers to this period as the filing review.  The filing review takes approximately 60 days from the ANDA's receipt date to complete it.

If OGD determines that an ANDA is sufficiently complete, it simultaneously assigns the ANDA to Bioequivalence, Chemistry, and Labeling, as well as Microbiology (if required).[15]  Each division begins its review when the ANDA reaches the top of the division's waiting list (i.e., queue).  Regardless of the outcome of one division's review, the other divisions generally review the ANDA independently.

According to OGD officials, each division follows CDER's first-in, first-reviewed policy except when Chemistry determines that an ANDA contains no Chemistry deficiencies.  In this case, divisions that have not finished reviewing the ANDA assign high priority to it and move it to the top of their queues.

---

[11] CDER MaPP 5200.6.  "Issuing and Tracking of Consults."  Available online at http://www.fda.gov/Cder/mapp/5200-6.pdf.  Accesssed on January 11, 2007.

[12] CDER MaPP 5240.3.  "Review Order of Original ANDAs, Amendments, and Supplements."  Available online at http://www.fda.gov/Cder/mapp/5240-3R.pdf.  Accesssed on December 5, 2007.

[13] Ibid.  Expedited reviews are granted for products that respond to current and anticipated public health emergencies; are under special review programs, such as the President's Emergency Plan for AIDS Relief (PEPFAR); have been identified as nationwide shortages; and are first-generic drugs for which there are no blocking patents or exclusivities.  First generics are drugs that have never been approved before as generics and are generic products new to the market.

[14] 21 CFR § 314.101(b).

[15] An OGD official indicated that if an ANDA is not sufficiently complete, OGD rejects it and sends a "refuse-to-file" letter to the applicant.  OGD issued refuse-to-file letters for approximately 9 percent of ANDAs in fiscal year (FY) 2006.

INTRODUCTION

In addition, Chemistry's review outcome determines OGD's response to the applicant. According to FDA, Chemistry results are the primary consideration during the ANDA review because Chemistry determines pharmaceutical equivalence, which is a key concept in assessing a generic's therapeutic equivalence to a brand name drug. Chemistry's influence on OGD's response to the applicant and the review process in other divisions is explained in greater detail below.[16]

*The Office of Generic Drug's response and review process if Chemistry identifies deficiencies in the Abbreviated New Drug Application.* If an ANDA does not meet Chemistry's review standards (i.e., Chemistry finds deficiencies in the ANDA), OGD disapproves the ANDA and sends a "not-approvable" letter to the applicant.[17] The not-approvable letter summarizes the Chemistry deficiencies. According to OGD officials, most original ANDAs contain Chemistry deficiencies and are disapproved.[18][19]

Even though OGD has issued a not-approvable letter and has disapproved the ANDA based on Chemistry deficiencies, the other divisions continue processing it. If an ANDA does not meet other divisions' review standards (i.e., other divisions find deficiencies in the ANDA), they issue deficiency letters directly to the applicant summarizing the deficiencies.

---

[16] FDA provides various overviews of the ANDA review process. For example, the "Generic Drug (ANDA) Review Process" is a flowchart available online at http://www.fda.gov/cder/handbook/anda.htm. Accessed on January 3, 2008. OGD officials indicated that the current review process is not accurately reflected in many of these overviews. We provide here our understanding of the current review process based on our contact with OGD officials. Our description may be inconsistent with previous FDA overviews of the process.

[17] 21 U.S.C. § 505(j)(5)(A); 21 CFR § 314.120(a).

[18] Remarks by Scott Gottlieb, Deputy Commissioner for Medical and Scientific Affairs, FDA. Speech before the Annual Generic Drug Forum. April 7, 2006. Available online at http://www.fda.gov/oc/speeches/2006/genericdrug0407.html. Accessed on October 9, 2007. According to these remarks, 98 percent of original ANDAs were disapproved in 2004 and 93 percent were disapproved in 2005.

[19] FDA also refers to original ANDAs as ANDAs reviewed during the first review cycle. Throughout this report, our use of the term "original ANDAs" is synonymous with ANDAs reviewed during the first review cycle. Most ANDAs contain Chemistry deficiencies and are disapproved during the first review cycle.

# INTRODUCTION

Applicants do not submit new ANDAs in response to not-approvable or deficiency letters. Instead, applicants submit amendments to the appropriate division(s) to correct ANDA deficiencies.[20]

OGD classifies amendments as major or minor.[21] Major amendments contain significant new data. Major amendments have the same review priority as original, unreviewed ANDAs and are reviewed according to CDER's first-in, first-reviewed policy.[22] In contrast, minor amendments do not contain significant new data and often indicate that an ANDA is close to approval. When OGD receives a minor amendment, it assigns high priority to it. The division places the minor amendment at the top of its queue, and the reviewer assigned to the ANDA reviews it upon completing his or her current assignment.

*The Office of Generic Drugs response and review process if Chemistry does not identify deficiencies in the Abbreviated New Drug Application.* If Chemistry does not find deficiencies in an ANDA, the other divisions must review it and resolve any deficiencies before OGD sends an approval letter. After each division determines that the ANDA contains no deficiencies, it notifies Chemistry that the ANDA is approvable within that division. Unlike not-approvable letters, OGD sends an approval letter only when all division reviews are complete and the ANDA contains no deficiencies.[23]

If other divisions find deficiencies in an ANDA but Chemistry does not, OGD does not disapprove the ANDA. However, the applicant must resolve the deficiencies before OGD will approve the ANDA. Therefore, when Chemistry does not identify deficiencies in an ANDA and is ready to approve it, the other divisions assign high priority to that ANDA.

---

[20] 21 CFR § 314.96(a).

[21] CDER, Guidance for Industry. "Major, Minor, and Telephone Amendments to Abbreviated New Drug Applications." Available online at http://www.fda.gov/cder/guidance/4706fnl.pdf. Accessed on December 13, 2006.

[22] Ibid.

[23] 21 CFR § 314.105(d).

INTRODUCTION

According to CDER, 535 ANDAs (and corresponding amendments) were approved in 2006.[24]  CDER indicates that median approval time for these ANDAs and amendments was nearly 17 months.[25]

**Abbreviated New Drug Applications With Valid Patents or Exclusivities**
In some cases, OGD can only "tentatively approve" an ANDA after all divisions have deemed the ANDA approvable.[26]  For example, OGD can only tentatively approve an ANDA if valid patents or exclusive marketing rights (exclusivities) exist for brand name drugs.

The tentative-approval letter instructs the applicant to notify OGD of any updates to the ANDA within 90 days prior to the patent or exclusivity expiration date.  OGD confirms that the ANDA is approvable by all divisions and sends an approval letter to the applicant once the patent or exclusivity expires.

Patents on brand name drugs are granted by the U.S. Patent and Trademark Office and are typically valid for 20 years from the date on which the patent was submitted.[27]  Exclusivities are granted by FDA upon approval of a drug and may last up to 7 years.[28]  Generally, OGD does not prioritize ANDA reviews according to the dates on which the patents or exclusivities expire (i.e., market entry date).

---

[24] This includes ANDAs approved with delayed effective dates. "FDA 2006 Accomplishments: Thousands of Safe and Effective Health Care Products Made Available for Patients." Available online at http://www.fda.gov/oc/accomplishments/healthcare.html. Accessed on May 5, 2008.

[25] Approval time is calculated from the time OGD receives the original ANDA to the time it is approved or tentatively approved. Approval time includes filing review time as well as the time necessary for applicants to prepare and submit, and for OGD to review and approve or tentatively approve, all amendments to the ANDA. Ted Sherwood, Office of Pharmaceutical Science in CDER at FDA. "Generic Drugs: Overview of ANDA Review Process." Available online at http://www.fda.gov/cder/ audiences/iact/forum/200704_sherwood.pdf. Accessed on June 26, 2007.

[26] 21 CFR §§ 314.105(d) and 314.107. Although the term "approval letters with delayed effective dates" is cited in regulation, OGD officials referred to these letters as tentative-approval letters.

[27] U.S. Patent and Trademark Office. "General Information Concerning Patents: Nature of Patent and Patent Rights." Available online at http://www.uspto.gov/go/pac/doc/general/. Accesssed on July 27, 2007.

[28] FDA, CDER. "Frequently Asked Questions on Patents and Exclusivity." Available online at http://www.fda.gov/cder/ob/faqs.htm. Accesssed on November 8, 2007.

INTRODUCTION

**The Food and Drug Administration's 180-Day Review Requirement**
The Federal Food, Drug, and Cosmetic Act requires FDA to approve or disapprove an ANDA within 180 days of initial receipt.[29] This 180-day period is called the "review clock."[30]

The 180-day review clock starts on the date on which OGD receives an ANDA (before the filing review) and stops on the date on which OGD sends an approval letter, a tentative-approval letter, or a not-approvable letter.[31] [32] If Chemistry identifies deficiencies in an original ANDA, OGD sends a not-approvable letter, and the 180-day review clock stops. If Chemistry identifies no deficiencies in the ANDA, OGD sends an approval or a tentative-approval letter once all remaining divisions deem the application approvable. According to OGD, Bioequivalence, Labeling, and Microbiology deficiency letters do not stop the 180-day review clock.

*Proposed rule requires all divisions to meet the 180-day review clock.* FDA issued a proposed rule in 2004 that would require OGD to send a "complete response" letter to the applicant within 180 days of receipt if an ANDA contains deficiencies.[33] The proposed rule specifies that a complete response letter will describe all of the deficiencies that the applicant must address before OGD can approve the ANDA.

According to current OGD practice, all divisions must meet the 180-day review clock if Chemistry finds no deficiencies in the original ANDA. However, if Chemistry finds deficiencies, only Chemistry is required to

---

[29] Section 505(j)(5)(A) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 355(j)(5)(A)); 21 CFR § 314.100.

[30] 21 CFR § 314.100(a). The law would permit the applicant and FDA to extend this 180-day period by mutual agreement. However, OGD officials indicated that they do not extend the review clock.

[31] Ibid. If OGD deems an ANDA to be sufficiently complete under 21 CFR § 314.101(b), the 180-day review clock starts retroactively on the date of receipt. If OGD deems an ANDA not to be sufficiently complete, the 180-day review clock does not start. If OGD deems a revised and resubmitted ANDA to be sufficiently complete, the 180-day review clock retroactively starts on the date of the resubmission.

[32] Pursuant to 21 CFR § 314.100(a), FDA may also send an approvable letter under 21 CFR § 314.110 to stop the 180-day review clock. However, OGD officials stated that they no longer send approvable letters. We confirmed this practice in OGD's monthly statistics report, which provides data on OGD actions for original ANDAs in the past 5 years. According to this internal report, OGD has not sent an approvable letter since April 2004. Therefore, we did not include these letters in our review.

[33] Applications for Approval To Market a New Drug; Complete Response Letter; Amendments to Unapproved Applications, 69 Fed. Reg. 43352, 43355–43356 (proposed July 20, 2004).

INTRODUCTION

meet the 180-day review clock. Therefore, when OGD sends a not-approvable letter based on Chemistry deficiencies, the 180-day review clock stops.

In contrast, to comply with the proposed rule, all divisions will need to meet the 180-day review clock regardless of whether Chemistry finds deficiencies in the ANDA.[34]

### Review Resources at the Food and Drug Administration

The number of ANDAs submitted to OGD has increased at more than double the rate of growth of OGD's review resources for ANDAs in the last 5 years. Despite this disproportionate growth, OGD's approval times have decreased.[35]

Funding for the Generic Drugs Program has increased by 74 percent in the last 5 years, from $35.9 million in FY 2001 to $62.6 million in FY 2006.[36][37] The number of full-time-equivalent positions in OGD increased by 50 percent during this same time period, from 134 in FY 2001 to 201 in FY 2006.[38]

In contrast, according to CDER, the number of original ANDAs submitted between FYs 2001 and 2006 increased by 158 percent, from 307 to 793.[39][40]

---

[34] According to a recent Semiannual Regulatory Agenda published in the Federal Register, the Department of Health and Human Services estimated that it would publish the final rule in October 2007 (72 Fed. Reg. 22490 (Apr. 30, 2007)). Available online at http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=2007_unified_agenda_&docid=f:ua070408.wais. Accessed on August 29, 2007. As of January 16, 2008, FDA had not published the final rule.

[35] Ted Sherwood, Office of Pharmaceutical Science in CDER at FDA. "Generic Drugs: Overview of ANDA Review Process." Available online at http://www.fda.gov/cder/audiences/iact/forum/200704_sherwood.pdf. Accesssed on June 26, 2007.

[36] The Generic Drugs Program includes OGD and other FDA offices associated with the generic drug review process, such as the Office of Regulatory Affairs and CDER's Office of Compliance, Office of Regulatory Policy, and Office of New Drugs.

[37] Generic Drugs Program budget figures were obtained from FDA officials in June 2007.

[38] Gary Buehler, OGD Director. "Improving Access to Generic Drugs." Testimony before the United States Senate Special Committee on Aging. July 20, 2006. Available online at http://aging.senate.gov/events/hr161gb.pdf. Accessed on July 25, 2007.

[39] Ted Sherwood, Office of Pharmaceutical Science in CDER at FDA. "Generic Drugs: Overview of ANDA Review Process." Available online at http://www.fda.gov/cder/audiences/iact/forum/200704_sherwood.pdf. Accesssed on June 26, 2007.

[40] These 793 ANDAs were submitted to OGD in FY 2006. The number of ANDAs in our analysis—989—is greater than 793 because we included ANDAs that were submitted or were under review in calendar year 2006. Our analysis also includes ANDAs submitted before 2006.

## I N T R O D U C T I O N

FDA continues to revise the ANDA review process to improve approval times and has made progress since 2001.[41]  According to CDER, median approval time for ANDAs decreased nearly 2 months from 2001 to 2006.[42]

Currently, congressional appropriations fund ANDA reviews.  To supplement FDA's budget, the President's proposed budget for FY 2009 includes over $16 million for ANDA reviews funded through a new user fee program.[43]  User fees would support CDER's review by requiring applicants to pay fees when submitting original ANDAs.

### Related Office of Inspector General Work

In 2003, the Office of Inspector General (OIG) reviewed the CDER Office of New Drugs' management of the new drug application review process for brand name drugs.[44]  OIG found that there were general workload concerns but that the review process had several strengths.  OIG recommended ways for FDA to manage review resources, including assessing workload pressures and rejecting poor-quality applications.

In 1989, OIG reviewed FDA's generic drug approval process.[45]  OIG concluded that the process for assigning ANDAs to reviewers was arbitrary and could permit favoritism to certain applicants.  OIG recommended that FDA consistently apply its first-in, first-reviewed policy for reviewing ANDAs.  OIG also recommended that FDA uniformly apply and properly document exceptions to this policy.

---

[41] For example, "FDA Announces Initiative To Bolster Generic Drug Program." October 4, 2007.  Available online at http://www.fda.gov/bbs/topics/NEWS/2007/NEW01719.html.  Accesssed on November 2, 2007.  This particular initiative was incorporated into CDER's MaPP 5240.3 and became effective October 18, 2006.

[42] Ted Sherwood, Office of Pharmaceutical Science in CDER at FDA.  "Generic Drugs: Overview of ANDA Review Process."  Available online at http://www.fda.gov/cder/audiences/iact/forum/200704_sherwood.pdf.  Accesssed on June 26, 2007.

[43] FDA.  "Summary of FDA's FY 2009 Budget."  Available online at http://www.fda.gov/oc/factsheets/budget2009.html.  Accessed on February 28, 2008.

[44] "FDA's Review Process for New Drug Applications:  A Management Review," OEI-01-01-00590.

[45] "Vulnerabilities in the Food and Drug Administration's Generic Drug Approval Process," A-15-89-00051.

## METHODOLOGY

### Scope

We examined review times for 989 original ANDAs that were approved, tentatively approved, disapproved, or pending (i.e., the ANDAs had not been reviewed or the reviews were not complete) during 2006.[46] [47]  See Appendix A for additional information about our methodology, including criteria for excluding ANDAs from our analyses.

We surveyed OGD division reviewers and conducted structured interviews with OGD officials to determine factors that affect ANDA review times.

### Data Sources

We obtained information about FDA's generic drug review process from the following sources:

- FDA statutes, regulations, policies, procedures, and guidance documents;

- FDA's Centerwide Oracle Management Information System (COMIS);

- Surveys of OGD reviewers assigned to a sample of original ANDAs under review in 2006 with review times greater than 180 days;

- Structured interviews with OGD officials involved in the generic drug review process; and

- OGD's consult database.

### Data Collection and Analysis

We reviewed FDA law, policies, procedures, and guidance documents to understand the generic drug review process.  We compared these documents with information obtained from OGD officials regarding OGD practices.  In addition, we analyzed data obtained from COMIS to verify OGD practices.

We analyzed 989 original ANDAs to determine review times in each division.  Of the 989 original ANDAs, we identified those with review

---

[46] This includes ANDAs that were submitted in 2005 and were under review in 2006 or were submitted in 2006 but were reviewed or pending longer than 180 days in 2007.

[47] The term "original" refers to new, sufficiently complete ANDAs.  It does not include amendments.

# INTRODUCTION

times greater than 180 days in each division and selected a sample of 105 ANDAs.

We surveyed OGD reviewers responsible for reviewing the sample of 105 ANDAs. We surveyed reviewers about factors contributing to original ANDA review times exceeding 180 days.

We conducted structured interviews with 12 OGD officials involved in the administration of the generic drug review process to identify factors contributing to longer review times throughout the review process, from ANDA receipt to approval.

Finally, we examined the OGD consult database to determine the number of and review times for pending consults.

## Limitations

We did not independently verify the COMIS data or the OGD consult data to ensure their accuracy.

Almost all original ANDAs are disapproved because Chemistry finds deficiencies. Therefore, we determined the extent to which original ANDA review times exceeded the 180-day review clock by analyzing Chemistry review times. We did not determine the extent to which original ANDA review times exceeded the 180-day review clock in other divisions when Chemistry did not find deficiencies.

The results from our sample of 105 ANDAs with review times greater than 180 days are not projectable.

Shorter ANDA review times cannot be directly linked to faster market entry because of valid patents or exclusivities or applicants' marketing decisions. For example, an ANDA can be approvable by all divisions within 180 days, but valid patents or exclusivities prevent OGD from approving the ANDA. OGD can only tentatively approve ANDAs before valid patents or exclusivities expire. Once OGD approves ANDAs, applicants' marketing decisions may further delay or prevent drugs' market entry.

## Standards

We conducted this review in accordance with the "Quality Standards for Inspections" issued by the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency.

➤ **F I N D I N G S**

**The Food and Drug Administration approved or tentatively approved 4 percent of original Abbreviated New Drug Applications under review in 2006; the remaining 96 percent did not meet review standards and were disapproved**

FDA's OGD approved 1 percent and tentatively approved 3 percent of original ANDAs under review in 2006.[48] [49] OGD approves or tentatively approves ANDAs that meet each division's review standards.[50] If an ANDA does not meet all review standards (i.e., the ANDA contains deficiencies in at least one division), OGD cannot approve it.

Generally, approval status (i.e., approved, tentatively approved, or disapproved) is based on whether (1) Chemistry identifies deficiencies in the ANDA and (2) valid patents or exclusivities exist for the brand name drug.

OGD approved 1 percent of original ANDAs (9 of 989) under review in 2006. No OGD divisions found deficiencies in these ANDAs, and valid patents or exclusivities did not exist for the brand name drugs.[51] Applicants could market these generic drugs as soon as OGD approved the ANDAs.

OGD tentatively approved 3 percent of original ANDAs (34 of 989) under review in 2006. No divisions found deficiencies in these ANDAs, but valid patents or exclusivities existed for the brand name drugs.[52] Applicants cannot market generic drugs until patents or exclusivities expire or are deemed invalid through litigation.

OGD disapproved 96 percent of original ANDAs (946 of 989) under review in 2006. OGD disapproves ANDAs and sends not-approvable letters to applicants when ANDAs do not meet Chemistry's review standards.

To correct the deficiencies noted in not-approvable or deficiency letters, applicants submit major or minor amendments. OGD receives a large

---

[48] FDA approved a total of 535 ANDAs in 2006. This included approved or tentatively approved original ANDAs and those requiring amendments. In contrast, our review included only original ANDAs.

[49] These original ANDAs were approved or tentatively approved during the first review cycle.

[50] 21 CFR § 314.105(d).

[51] If Bioequivalence, Labeling, or Microbiology found deficiencies in these ANDAs, the deficiencies were resolved before OGD approved the ANDAs.

[52] If Bioequivalence, Labeling, or Microbiology found deficiencies in these ANDAs, the deficiencies were resolved before OGD tentatively approved the ANDAs.

## F I N D I N G S

number of amendments because most ANDAs do not meet OGD's review standards and are initially disapproved.  For example, OGD received 828 original ANDAs under review in 2006 but received 4,174 major or minor Chemistry amendments.[53]

Major and minor amendments compete for the same review resources as original ANDAs.  Upon receipt, major amendments are placed at the end of the same queue as original ANDAs.  Minor amendments are placed ahead of original ANDAs and major amendments in the queue.

**The Food and Drug Administration exceeded the 180-day review requirement for nearly half of original Abbreviated New Drug Applications under review in 2006 because Chemistry reviews exceeded 180 days**

Forty-six percent of original ANDA Chemistry reviews (456 of 989) exceeded the 180-day requirement in 2006.[54]  For these ANDAs, the median review time was 217 days.  Chemistry review time ranges are presented in Appendix B.

Table 1 (on the next page) provides the number of original ANDAs under review by FDA's OGD in 2006 as well as the number, percentage, and median review time for ANDAs having review times greater than 180 days.  Table 1 presents these data by ANDA approval status.  Because Chemistry found deficiencies in most original ANDAs under review in 2006 and stopped the 180-day review clock, Table 1 contains data for Chemistry only.[55]

---

[53] These 828 ANDAs were submitted to OGD in 2006.  The number of ANDAs in our analysis—989—is greater than 828 because we included ANDAs that were submitted or were under review in 2006.  Thus, our analysis includes ANDAs submitted before 2006.

[54] Our analysis of the number of original ANDAs exceeding the 180-day review clock is conservative.  Because of limitations in the COMIS database, we calculated compliance with the 180-day review clock based on Chemistry review time (from the date on which OGD received the ANDA to the date on which Chemistry completed its review) rather than OGD response time (from the date on which OGD received the ANDA to the date on which OGD sent an approval letter, a tentative-approval letter, or a not-approvable letter).  For example, if Chemistry completed its review on Day 185 and found no deficiencies and OGD sent an approval letter on Day 210 (once other divisions deemed the ANDA approvable), our calculation of Chemistry review time would be 185 days.  In contrast, pursuant to 21 CFR § 314.100, the 180-day review clock would not stop until Day 210.

[55] One ANDA was pending longer than 180 days at the time we collected the data.  FDA later indicated that this ANDA was disapproved and provided the date on which Chemistry completed its review.  We used this date to calculate review time for this ANDA, which was included in our analysis of Chemistry's ANDA review times.

F I N D I N G S

| Table 1: 2006 Chemistry Reviews of Original Abbreviated New Drug Applications |||||
|---|---|---|---|---|
| ANDA Approval Status | Number of ANDAs Reviewed | Number of ANDAs With Review Time > 180 Days | Percentage of ANDAs With Review Time > 180 Days | Median Review Time for ANDAs With Review Time > 180 Days |
| Approved | 9 | 5 | 56% | 268 days |
| Tentatively Approved | 34 | 23 | 68% | 300 days |
| Disapproved | 946 | 428 | 45% | 214 days |
| All | 989 | 456 | 46% | 217 days |

Source: OIG analysis of FDA COMIS data, 2007.

The percentage of ANDAs with review times longer than 180 days, and median review times for these ANDAs, varied according to ANDA approval status:

- *Approved Abbreviated New Drug Applications.* Five of the nine original ANDAs approved in 2006 were not reviewed within 180 days. For these five ANDAs, applicants waited a median of 268 days (i.e., almost 3 months beyond the 180-day regulatory timeframe) before they received OGD's approval and could market the drugs.

- *Tentatively Approved Abbreviated New Drug Applications.* Reviews for 23 of the 34 tentatively approved original ANDAs exceeded 180 days. Applicants waited a median of 300 days (i.e., 4 months beyond the 180-day regulatory timeframe) for OGD to tentatively approve these ANDAs.

Regardless of whether OGD reviewed these tentatively approved ANDAs within 180 days, applicants could not market these drugs immediately because of valid patents or exclusivities. For example, even though OGD tentatively approved 11 of the 34 ANDAs within 180 days, the patent expiration dates for the brand name drugs ranged from 11 months to 12 years after the date of OGD's tentative approval.[56][57][58]

---

[56] The earliest expiration date was November 22, 2007, but OGD tentatively approved this ANDA on December 29, 2006 (i.e., 11 months before the patent expired). The latest expiration date was November 14, 2018, and OGD tentatively approved this ANDA on November 6, 2006 (i.e., 12 years before the patent expired).

[57] Applicants for 2 of the 11 ANDAs were challenging the validity of the patents or exclusivities.

[58] Five of these ANDAs were expedited PEPFAR applications. Although patents prevent marketing these drugs in the United States, applicants can market them internationally.

F I N D I N G S

- *Disapproved Abbreviated New Drug Applications.* Reviews for 428 disapproved original ANDAs exceeded 180 days. For these ANDAs, applicants waited a median of 214 days (i.e., more than 1 month beyond the expiration of the 180-day review clock) before OGD notified them of the ANDA disapproval.

**Microbiology, Bioequivalence, and Labeling reviews of original Abbreviated New Drug Applications generally exceeded 180 days in 2006**

In 2006, 77 percent of original ANDAs (760 of 989) had review times exceeding 180 days in divisions other than Chemistry. Of ANDAs taking more than 180 days to review, median review times were 361 days in Microbiology, 287 days in Bioequivalence, and 277 days in Labeling. Review time ranges in each division are presented in Appendix C.

OGD does not hold these other divisions (i.e., Microbiology, Bioequivalence, and Labeling) to the 180-day review clock if Chemistry finds deficiencies in the original ANDA. However, FDA's proposed rule will require all divisions to complete reviews within 180 days, regardless of whether Chemistry finds deficiencies.[59]

Table 2 (on the next page) provides, by division, the number of original ANDAs under review in Microbiology, Bioequivalence, and Labeling in 2006 as well as the number, percentage, and median review times for ANDAs having review times greater than 180 days.[60]

---

[59] Applications for Approval To Market a New Drug; Complete Response Letter; Amendments to Unapproved Applications, 69 Fed. Reg. (proposed July 20, 2004).

[60] Data are not available in COMIS to determine the review outcome (i.e., approvable or deficient) in divisions other than Chemistry.

F I N D I N G S

| Table 2: 2006 Microbiology, Bioequivalence, and Labeling Reviews of Original Abbreviated New Drug Applications | | | | |
|---|---|---|---|---|
| OGD Division | Total Number of ANDAs Reviewed | Number of ANDAs With Review Time > 180 Days | Percentage of ANDAs With Review Time > 180 Days* | Median Review Time for ANDAs With Review Time > 180 Days** |
| Microbiology | 229 | 175 | 76% | 361 days |
| Bioequivalence | 989 | 576 | 58% | 287 days |
| Labeling | 989 | 556 | 56% | 277 days |

* Some ANDAs had reviews that exceeded 180 days in multiple divisions.

** Median review times may be underestimated because review times for pending ANDAs in these divisions were accruing when we obtained the data. Of ANDAs with review times greater than 180 days, the percentages that were pending at the time we obtained the data were: 73 percent for Microbiology (127 of 175 ANDAs), 3 percent for Bioequivalence (16 of 576 ANDAs), and 32 percent for Labeling (178 of 556 ANDAs).

Source: OIG analysis of FDA COMIS data, 2007.

**Nearly 70 percent of sampled division reviews exceeding 180 days did not begin before the 180-day review periods expired**

In our sample of ANDAs with review times exceeding 180 days, 69 percent (72 of 105) of original ANDAs were in the queue longer than 180 days.[61] Thus, the 180-day periods passed before division reviews began in most of our sample of 105 original ANDAs.

Review time in each division is calculated from the date on which OGD receives an ANDA to the date on which each division completes its review of the original ANDA. Review times can be further divided into two components: the amount of time the ANDA waited in the queue (i.e., queue time) and the amount of time each division took to determine whether the ANDA met the division's review standards (i.e., division review time).[62]

Figure 1 (on the next page) compares medians for queue time and division review time for the sample of 105 ANDAs having review times greater than 180 days in each division.

---

[61] These data are available for the sample of 105 ANDAs only. The dates on which reviewers start their reviews (i.e., the dates on which ANDAs leave the queue) are not provided in the COMIS; reviewers in our sample provided these dates in their survey responses.

[62] Queue time consists of both the filing review time and the time the ANDA awaits review in the division queue.

# FINDINGS



**FIGURE 1
Comparison
Between Queue
Time and
Division Review
Time by Division**

Source: OIG analysis of FDA COMIS data and OGD reviewer responses, 2007.

## The Food and Drug Administration's prioritization practices affect Abbreviated New Drug Application review times

FDA prioritization practices contribute to longer review times for ANDAs close to approval. ANDAs that are close to approval include those that (1) have high-priority consults; (2) do not have valid patents or exclusivities, or have patents or exclusivities that will expire in the near future; (3) are deemed approvable in multiple divisions; or (4) contain only minor deficiencies.

### The Food and Drug Administration does not review consults within policy timeframes

FDA's CDER policy indicates that OGD should receive consult results for highest-priority consults within 15 days and lowest-priority consults within 90 days. Consult priority is based, in part, on how close the ANDA is to approval. In practice, however, consult results generally are not returned to OGD within the timeframes specified in policy, which prolongs ANDA review times.

For the 100 pending OGD consults, days pending ranged from 3 to 882.[63] Of these pending consults, 78 percent (78 of 100) were not

---

[63] These consults were pending as of June 22, 2007, the date on which we received the OGD consult data.

F I N D I N G S

returned to OGD within 90 days (i.e., the longest period of time specified by CDER policy). Sixty-eight percent (68 of 100) were not returned within 180 days. The number of days pending for all 100 consults is presented in Appendix D.

**The Food and Drug Administration does not consider market entry date when prioritizing Abbreviated New Drug Applications**
FDA's OGD generally maintains a first-in, first-reviewed policy for reviewing ANDAs. FDA grants exceptions to this policy, such as for first generic drugs that do not have valid patents or exclusivities at the time of submission.[64]

However, FDA does not grant exceptions to this policy for ANDAs of non-first generic drugs without patents or exclusivities (i.e., ANDAs that are close to approval rather than tentative approval).[65] Thus, OGD reviews ANDAs with valid patents or exclusivities while ANDAs that can immediately enter the market wait in the queue.

Twenty-nine percent (291 of 989) of original ANDAs under review by OGD in 2006 could not immediately enter the market because of valid patents or exclusivities. Chemistry reviewed nearly 60 percent of these ANDAs (168 of 291) within 180 days.

In contrast, 71 percent (698 of 989) of original ANDAs under review in 2006 could enter the market as soon as OGD approved them.[66] Chemistry reviewed only 52 percent of these ANDAs (365 of 698) within 180 days.

**The Food and Drug Administration prioritizes Abbreviated New Drug Applications differently across divisions**
FDA's OGD prioritizes ANDAs with approvable reviews differently across divisions. Divisions also classify and prioritize amendments differently. Differences in prioritizing ANDAs affect ANDA review times, as described below.

---

[64] First generics are drugs that have never been approved before as generics and are new to the market.

[65] According to FDA, the second and subsequent generic drugs to enter the market effect the greatest cost savings. First generic drugs are priced only slightly lower than brand name drugs. Available online at http://www.fda.gov/cder/ogd/generic_competition.htm. Accessed on February 18, 2008.

[66] This includes ANDAs in which the applicants are challenging the validity of the patents or exclusivities.

F I N D I N G S

*Divisions in the Office of Generic Drugs do not consistently assign high priority to approvable Abbreviated New Drug Applications.* Other OGD divisions assign high priority to an ANDA after Chemistry deems the ANDA approvable. However, Chemistry maintains CDER's first-in, first-reviewed policy and does not change the priority of ANDAs deemed approvable by other divisions.

For example, if Chemistry deems an ANDA approvable before other divisions, the ANDA is designated as high priority and reviewed ahead of other ANDAs in divisions' queues.[67] In contrast, if all three non-Chemistry divisions deem an ANDA approvable, Chemistry does not assign high priority to the ANDA. Rather, Chemistry reviews the ANDA according to CDER's first-in, first-reviewed policy.

*Divisions in the Office of Generic Drugs do not consistently classify and prioritize amendments.* Federal regulation recognizes that amendments that contain significant new data will require significant additional review time.[68] Pursuant to CDER guidance, these major amendments have the same review priority as original, unreviewed ANDAs.[69] CDER guidance also directs OGD to classify all other amendments as minor. When minor amendments are received, divisions should assign high priority to them to expedite the review of ANDAs that are near approval.[70]

According to FDA, only Chemistry classifies amendments as major or minor.[71][72] In addition, during our structured interviews, an OGD official stated that amendments in non-Chemistry divisions are treated as minor amendments and prioritized ahead of original

---

[67] The other divisions also assign high priority to any amendments they receive for the ANDA.

[68] 21 CFR § 314.96(a).

[69] CDER, Guidance for Industry. "Major, Minor, and Telephone Amendments to Abbreviated New Drug Applications." Available online at http://www.fda.gov/cder/guidance/4706fnl.pdf. Accesssed on December 13, 2006.

[70] Ibid.

[71] For example, see Ted Sherwood, Office of Pharmaceutical Science in CDER at FDA. "Generic Drugs: Overview of ANDA Review Process." Available online at http://www.fda.gov/cder/audiences/iact/forum/200704_sherwood.pdf. Accesssed on June 26, 2007.

[72] We confirmed this OGD practice by examining COMIS data. A COMIS data field tracks major and minor amendments for Chemistry. Codes in other divisions do not designate amendments as major or minor.

## F I N D I N G S

ANDAs in the queue, regardless of the significance of the data contained in the amendment.

Not classifying amendments as major or minor may place ANDAs with more deficiencies ahead of those with fewer. This may dilute the effectiveness of the amendment prioritization process by delaying reviews of amendments that are truly minor and original ANDAs.

# ► RECOMMENDATIONS

Generic drugs are generally thought of as one way to rein in increasing health costs. FDA's timeliness in approving generic drugs has recently been a topic of scrutiny by both Congress and the media. Federal law requires that FDA approve or disapprove original ANDAs within 180 days of receipt.

We found that FDA disapproved most original ANDAs under review in 2006 because they did not meet FDA review standards. Nearly half of Chemistry review times exceeded the 180 days required by Federal law. Moreover, many review times in other OGD divisions exceeded 180 days. In addition, for a sample of ANDA reviews exceeding 180 days, most reviews did not begin before the 180-day periods expired. Finally, we found that FDA prioritization practices affect ANDA review times.

The ANDA submissions have increased at more than double the rate of review resources in the last 5 years. To better manage OGD's current ANDA reviews and to potentially increase the number of ANDAs reviewed and approved within 180 days, we recommend that FDA:

**Identify Common Original Abbreviated New Drug Application Deficiencies and Offer More Guidance to Industry To Decrease the Percentage Disapproved**

Without lowering review standards, FDA should identify ways to decrease the percentage of disapproved original ANDAs. Disapproving fewer original ANDAs would reduce the number of amendments that FDA's OGD receives and reviews. If OGD received fewer amendments, the queue would become smaller, and OGD could allocate more resources to review original ANDAs within 180 days.

To decrease the percentage of ANDAs originally disapproved, we suggest that OGD examine deficiency letters to identify common deficiencies in original ANDAs. The types of deficiencies that occur most frequently indicate the areas in which applicants need more guidance. FDA should create or revise guidance to address these problem areas. Expanded guidance may improve the quality of the ANDAs submitted to OGD and increase the percentage of original ANDAs approved within 180 days.

R E C O M M E N D A T I O N S

**Increase the Percentage of Original Abbreviated New Drug Applications Reviewed by All Divisions Within 180 Days**

Federal regulation requires that FDA approve or disapprove original ANDAs within 180 days of receipt. In addition, FDA's proposed rule would require that all divisions review ANDAs within the 180-day regulatory requirement, regardless of whether Chemistry identifies deficiencies in the original ANDAs.

In light of the current regulation and proposed rule, FDA should continue to revise the ANDA review process to reduce review times in all divisions. Because queue times in our sample of ANDAs were longer than division review times and the 180-day period passed while most of our sample waited in the queue, FDA should focus on reducing queue times.

**Identify New Prioritization Practices To Reduce Review Times for Abbreviated New Drug Applications Close to Approval**

ANDAs that are close to approval include those that have high-priority consults, have no valid patents or exclusivities (or have patents or exclusivities that expire soon), are deemed approvable in multiple divisions, or contain only minor deficiencies.

We recommend that FDA assign priority to and meet review timeframes for consults based on whether the ANDAs are close to approval, according to CDER's consult policy. In addition, FDA should identify ANDAs close to approval and improve the prioritization process to reduce review times for these ANDAs. These new prioritization processes would generate exceptions to CDER's first-in, first-reviewed policy for reviewing ANDAs. If implemented, OGD would need to uniformly apply and properly document these exceptions.

*Evaluate the consultation process to meet review timeframes specified by Food and Drug Administration policy*. FDA's CDER policy defines high- and low-priority consults based, in part, on whether the ANDA is close to approval. The policy also establishes review timeframes based on the consult's priority. However, we found that, in practice, consult results generally are not returned to OGD within specified timeframes, regardless of the consult's priority.

FDA should examine the ANDA consultation process to determine how consults can be returned to OGD within the timeframes specified in CDER policy, particularly consults for ANDAs close to approval. Obtaining consults within designated priority timeframes may reduce the number of ANDAs exceeding the 180-day regulatory requirement.

*Identify and assign high priority to Abbreviated New Drug Applications close to approval.* Assigning high priority to some ANDAs will reduce review times for these ANDAs but will also delay reviews for lower-priority ANDAs. In light of this, we offer the following options to FDA's OGD for identifying ANDAs that are close to approval and improving the ANDA prioritization process. We also recognize that there may be additional options to improve the prioritization process.

- *Prioritize Abbreviated New Drug Applications based on potential market entry date.* OGD could review ANDAs for generic drugs without valid patents or exclusivities ahead of those with them. OGD could assign high priority to and reduce review times for ANDAs that can be approved and marketed immediately (i.e., ANDAs without valid patents or exclusivities) or in the near future (i.e., ANDAs with valid patents or exclusivities expiring soon). However, OGD should not delay ANDA reviews if the delay violates current FDA policy (e.g., ANDAs expedited under the PEPFAR program or expedited first generic drugs).

- *Assign high priority to Abbreviated New Drug Applications with approvable reviews in multiple divisions.* OGD could prioritize ANDAs based on the number of divisions with approvable reviews. As a result, ANDAs with few deficiencies across divisions (i.e., ANDAs approvable by multiple divisions and, thus, close to approval) would be reviewed more quickly.

- *Classify amendments according to Food and Drug Administration policy and assign high priority to Abbreviated New Drug Applications with only minor deficiencies.* OGD could follow or revise amendment policies so that divisions classify and prioritize amendments similarly. In all divisions, OGD could assign high priority to ANDAs with minor deficiencies (i.e., ANDAs close to approval) and review them before ANDAs with major deficiencies.

## AGENCY COMMENTS

In its comments to the draft report, FDA noted that OGD and CDER staff have already identified portions of the primary recommendations, and FDA is implementing process improvements that are the same as or similar to the recommendations. Specifically, FDA agreed with our first recommendation but did not indicate whether it concurred with the two additional recommendations.

R E C O M M E N D A T I O N S

FDA agreed that increasing the number of original ANDAs approved (i.e., in the first review cycle) would help streamline the review process by decreasing the number of amendments and subsequent review cycles. FDA has provided guidance to assist industry in submitting more easily reviewed applications and indicated that the development of guidance is a continually evolving process.

Although FDA did not indicate whether it concurred with the second recommendation, FDA noted that it continues to alter its review process with the goals of reducing queue times and reviewing original ANDAs within 180 days. FDA has developed a focused hiring program to increase staff and anticipates that additional reviewers will eventually decrease review times. In addition, FDA is developing other approaches to increase review efficiency, including shifting responsibilities to the Project Management staff.

FDA also did not indicate whether it concurred with the last recommendation. FDA stated that a variety of external forces can affect an application's review and approval, which makes determining whether an ANDA is "close to approval" difficult. FDA also expressed some concerns about the options presented in our recommendation. However, it appears that FDA has taken some actions to address this recommendation. FDA noted that it prioritizes some ANDAs based on potential market entry date and may consider further revisions to this process. In particular, FDA indicated that a possible consideration would be to delay reviews for ANDAs with patents that expire far into the future. However, FDA noted that such a process would require a thorough examination of all related issues and policy changes within OGD.

FDA also provided several technical comments to the report. We have incorporated these comments into the report, as appropriate.

We ask that, in its final management decision, FDA more clearly indicate whether it concurs with each of our recommendations. For the full text of FDA's comments, see Appendix E.

► A P P E N D I X ~ A

## ADDITIONAL INFORMATION ON METHODOLOGY

Below we provide additional information about the methodology used to accomplish our objectives.

**Food and Drug Administration Policies, Procedures, and Guidance**
We reviewed the Food and Drug Administration's (FDA) Center for Drug Evaluation and Research (CDER) policies, procedures, and guidance on the:

- issuance and tracking of consults in the Office of Generic Drugs (OGD),

- review order of original Abbreviated New Drug Applications (ANDAs) and amendments, and

- classification of major and minor amendments.

We compared these documents to information gathered about ANDA review practices from OGD officials as well as data obtained from FDA's Centerwide Oracle Management Information System (COMIS), surveys of OGD reviewers, and structured interviews with OGD officials. We identified generic drug review practices that deviated from CDER policies, procedures, or guidance. We also identified policies and practices that affected ANDA review times (e.g., OGD does not prioritize ANDAs based on potential market entry date).

**Centerwide Oracle Management Information System Data**
We obtained COMIS data from FDA to assess each division's review times for ANDAs under review in 2006. We defined ANDAs as "under review" if they contained a date between January 1 and December 31, 2006, in any of the following COMIS fields:

- the date on which the ANDA was addressed to OGD,

- the date on which at least one division completed its review of the ANDA, or

- the date on which Chemistry acted on the ANDA.

We obtained COMIS data for all ANDAs meeting at least one of the above criteria. Although we received data from FDA for 1,619 original ANDAs, we analyzed review times for 989 original ANDAs.

We removed data for 37 ANDAs because they did not meet our criteria of being submitted, in the review queue, under review, or reviewed by at

A P P E N D I X ~ A

least one division in 2006. Additional records were removed from the
data set if at least one of the following criteria was met:

- The ANDA was closed administratively or not assigned to divisions
  based on the results of the filing review (116 ANDAs),

- COMIS did not contain data for the ANDA in all three divisions
  that review each ANDA (Bioequivalence, Chemistry, and Labeling;
  393 ANDAs), and

- The ANDA had been pending fewer than 180 days and Chemistry
  had not completed its review (84 ANDAs).

The COMIS data were analyzed using SAS,® a statistical analysis
program. ANDA review times were calculated for each of the four
divisions by subtracting the date on which OGD received the ANDA
from the date on which each division completed its review. If an
ANDA was currently pending in a division for more than 180 days, we
entered the date on which we obtained the COMIS data from FDA
(April 2, 2007) as the review completion date and assigned a pending
code to the record.

In some cases, an ANDA contained multiple records for a division
(e.g., Bioequivalence has multiple COMIS division codes that all
reflect the Bioequivalence review). To capture the total time for a
division to complete the ANDA review, the last date on which a
review was completed in the division was used as the review stop
date.

For cases in which one record for an ANDA within a division
contained a review stop date but another record within the same
division and ANDA contained no stop date, the last stop date was
used. A review stop date indicates that the review is complete, and
we did not classify these cases as pending.

**Office of Generic Drugs Reviewers**
From the COMIS data, we identified ANDAs with review times greater
than 180 days and selected a sample of 105 ANDA reviews. To obtain
this sample, we identified reviewers assigned to a subset of recently
submitted ANDAs within each division. We sampled from ANDAs in
which the 180-day review clock would have expired in the 4 months
prior to the date on which we requested the data from FDA. These
ANDAs were submitted from June through September 2006.

A P P E N D I X ~ A

We randomly selected 25 tentatively approved, disapproved, or pending ANDAs within each division. In each division, we randomly selected one ANDA review per reviewer until each reviewer was sampled once or until 25 ANDA reviews were selected. If we did not obtain 25 ANDA reviews within a division after each reviewer was sampled once, we randomly selected additional ANDA reviews in the division, 1 per reviewer, until we obtained 25 ANDAs within the division.

We also selected all ANDAs that were approved but had review times greater than 180 days. This added five ANDA reviews to Chemistry and one ANDA review to Labeling for our sample.

Therefore, we collected data from reviewers for a total of 106 ANDA reviews: 30 Chemistry, 25 Bioequivalence, 26 Labeling, and 25 Microbiology. However, one Labeling reviewer indicated that the COMIS data for his review were wrong and the ANDA was reviewed within 180 days. We removed this ANDA review from our sample. Thus, our analysis of reviewer data was based on 105 ANDA reviews.

Reviewers' survey responses indicated the date on which their review of each ANDA began as well as the factors that contributed to the ANDA reviews' exceeding 180 days within their division.

**Office of Generic Drugs Officials**
We conducted structured interviews with a division director (in all divisions except Microbiology), team leader, and project manager from each of the divisions as well as the Director of OGD. We asked these 12 individuals open-ended questions concerning factors that contribute to longer review times throughout the generic drug review process.

We used reviewers' and officials' responses to understand ANDA review practices and to identify factors that contribute to ANDA review times exceeding 180 days. In addition, data from reviewers and officials provided the basis for collecting and analyzing additional FDA data. For example, reviewers' and officials' responses prompted us to examine the OGD consult data and to compare review times for ANDAs affected by valid patents or exclusivities with those that could enter the market immediately.

 **A P P E N D I X ~ B**

| 2006 Chemistry Review Time Ranges | |
| --- | --- |
| **ANDA Approval Status** | **Review Time Range for ANDAs With Review Time > 180 Days** |
| Approved | 246–306 days |
| Tentatively Approved | 187–667 days |
| Disapproved | 181–816 days |
| **All** | **181–816 days** |

Source: Office of Inspector General analysis of FDA COMIS data, 2007.

# ➤  A P P E N D I X ~ C

| 2006 Microbiology, Bioequivalence, and Labeling Review Time Ranges | |
|---|---|
| **OGD Division** | **Review Time Range for ANDAs With Review Time > 180 Days\*** |
| Microbiology | 181–651 days |
| Bioequivalence | 181–610 days |
| Labeling | 181–627 days |

\* Review time ranges may be underestimated because review times for pending ANDAs in these divisions were accruing when we obtained the data. For ANDAs with review times greater than 180 days, the percentages that were pending at the time we obtained the data were: 73 percent for Microbiology (127 of 175 ANDAs), 3 percent for Bioequivalence (16 of 576 ANDAs), and 32 percent for Labeling (178 of 556 ANDAs).

Source: Office of Inspector General analysis of FDA COMIS data, 2007.

◣ A P P E N D I X ~ D

**Frequency Distribution of Office of Generic Drugs Consults Pending as of June 2007**



Source: Office of Inspector General analysis of FDA's consult data, 2007.

## A P P E N D I X ~ E

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

---

Food and Drug Administration
Rockville MD 20857

**DATE:**     May 1, 2008

**TO:**       Inspector General

**FROM:**     Chief of Staff, FDA

**SUBJECT:**  FDA's Comments on the Office of the Inspector General's Draft Report on the
Generic Drug Review Process (OBI-04-07-00280)

Thank you for the opportunity to review and comment on the Office of the Inspector General's
draft report for the Generic Drug Process (OEI-04-07-00280). The Food and Drug
Administration has completed its review, and comments are attached.

If you need any additional information, please have one of your staff members contact
Karen Bland-Vanison at (301) 827-6858.

Susan Winckler, RPh, Esq.

Attachment

APPENDIX ~ E

Food and Drug Administration's Response to the Office of Inspector General (OIG) Draft
Report on the Generic Drug Review Process (OEI-04-07-00280)

In preface to our comments, it is important to place review activities of the Office of
Generic Drugs (OGD) in the context of the high numbers of original applications,
amendments, supplements, annual reports as well as other review staff responsibilities,
including guidance development and sponsor educational activities. The incoming
workload has grown at a faster rate than the growth of OGD staff as the statements on
pages iii and 7 – 8 illustrate. In addition, it should be noted that, historically, the review
of abbreviated new drug applications (ANDA) was focused on the review of the
chemistry manufacturing and controls (CMC) information and labeling conformance to
the innovator product. The bioequivalence and microbiology reviews were consulted out
of the Division of Generic Drugs (precursor to the Office of Generic Drugs) earlier in the
program. Further, the official delegation of authority for 'not approving' ANDAs goes
only to the Office Director and the Directors of the Divisions of Chemistry. That
background may provide some rationale for the emphasis on the chemistry review in the
overall process.

We are pleased to note that portions of the primary recommendations have already been
identified by OGD and CDER staff and FDA is implementing process improvement
activities that are the same or similar to the recommendations.

OGD Response to Recommendations:

*Identify Common Original Abbreviated New Drug Application Deficiencies and Offer
More Guidance to Industry to Decrease the Percentage Disapproved*

This recommendation could be made clearer by adding that OGD should decrease the
percentage disapproved "on the first cycle." Findings detailed in the report state that
OGD approved or tentatively approved 4 percent of original ANDAs under review in
2006. As noted in the Technical Comments section below, this should be clarified by
further stating there were 4 percent approved "on the first cycle." We agree that
increasing the number of applications approved on the first cycle would help streamline
the review process by decreasing the number of amendments and subsequent review
cycles.

Over the years, various assessments of common deficiencies (particularly those noted in
the initial filing review) in ANDAs have been done. OGD frequently participates in
meetings, workshops, webcasts, and similar venues with the generic industry and foreign
regulators to communicate information that sponsors may use to improve the quality of
the applications, thus making them easier to review and more likely to be approved on the
first cycle. For example, in 2008, there was a webinar with the Regulatory Affairs
Professional Society in April, a labeling workshop with the Generic Pharmaceutical
Association (GPhA) in May, a two-day workshop on communication jointly sponsored
by FDA and the University of Rhode Island scheduled for the end of June, and there will

Page 1 of 4

A P P E N D I X ~ E

be a two-day technical workshop with the Generic Pharmaceutical Association (GPhA) in October.

We have found that larger more experienced firms have responded with high quality, complete, and more easily reviewed applications. Recently, however, there are increasing numbers of new, inexperienced firms submitting applications. Many will require a great deal of education even on the basic information necessary to be included in an ANDA.

The development of guidance is a continually evolving process due to the expansion of scientific knowledge and the impact of more complicated products being proposed as generic products. OGD is not always able to anticipate what products will be submitted for review and provide prospective guidance to firms. Currently, the Agency provides a number of guidance documents addressing chemistry, bioequivalence, microbiology and labeling, including a unique product-specific bioequivalence guidance which is updated periodically to add recommendations for additional products. These documents are available on the FDA website.

In addition, the Agency posts instructions and example documents for the new chemistry review paradigm, Question-based Review (QbR) on the FDA website. The QbR format tracks the Common Technical Document from the International Conference on Harmonization providing a consistent, more easily reviewed chemistry portion of an ANDA. Early indications are that the QbR can decrease review time. Example tables for display of bioequivalence data are also provided. We also provide guidance at the written request of potential sponsors whenever possible. All of these efforts assist industry to submit more easily reviewed applications.

*Increase the Percentage of Original Abbreviated New Drug Applications Reviewed by All Divisions within 180 Days*

To address review times on a broad basis, we have a focused hiring program to increase staff in critical review areas. Upon the completion of new reviewer training when the new staff become productive, it is anticipated review times will decrease.

OGD has assessed and continues to assess and alter its review processes with the goal of reducing overall queue time and completion of review within 180 days. With the increased staff, OGD will develop an additional bioequivalence review division, additional microbiology teams and additional chemistry review teams. Other approaches are being developed to increase review efficiency. For example, certain responsibilities have been identified that may be assumed by the Project Management staff. With such changes, additional reviewer time will be available for completion of scientific review. Through initiatives by the Office of Pharmaceutical Science (OPS), review of supplements is being streamlined based on a risk-based assessment of the changes proposed in the supplements. These endeavors to decrease the overall review responsibilities are expected to give reviewers additional time for review of original ANDAs decreasing queue times for those applications.

Page 2 of 4

A P P E N D I X ~ E

*Identify New Prioritization Practices to Reduce Review Time for Abbreviated New Drug Applications Close to Approval*

"Close to approval" is a relative term and cannot be easily defined due to the variety of external forces that affect the completion of review and potential approval of an application. Not only do consults, as identified by OIG, affect actions on applications, but citizen petitions, lawsuits, current Good Manufacturing Practices inspections of manufacturing facilities, the Division of Scientific Investigations of bioequivalence study sites (especially foreign inspections), the individual firm's inspectional status (e.g., a negative Official Action Indicated), and new scientific or regulatory issues that may be identified during the course of review of the ANDA affect the potential time frame for approval. OGD may prioritize certain applications but then be stopped from taking action due to external factors that could not be predicted at the time the application was prioritized. Such a prioritization results in investing review effort without the expected gain.

Basing review priority on potential market entry date is already done to a certain extent. We currently expedite any application for a first generic product received in the office that has no patents or exclusivity on the corresponding reference product at the time of submission. These applications are for products that are likely to provide a lower-cost alternative promptly upon approval. Applications for generic versions of products that are due to have patents expire are generally ready for approval at the time those patents expire. There often, however, is no clear-cut date such as patent expiry with which to forecast likely market entry. Further, generic firms may or may not start marketing a product at the time of approval of the application depending upon ongoing litigation, settlement agreements, or corporate strategies and priorities.

OGD does attempt to re-prioritize review when most review disciplines find the application approvable. When the chemistry review of an ANDA is complete and approval is recommended, that application goes to the top of the queue in microbiology (if microbiology review is needed), labeling, and in the Division of Bioequivalence. This approach has been very successful in completing the review of applications in an expeditious manner. The Office successfully coordinates this endeavor through use of an "Approval Matrix" -- a document updated on a regular basis that lists applications for which chemistry has recommended approval. In weekly "Approvals Meetings", the Project Managers from chemistry, bioequivalence, and microbiology review the listing to assure coordination of the re-prioritization and determine steps needed to bring the application to approval.

The recommendation to "classify amendments according to FDA policy and assign high priority to ANDAs with only minor deficiencies" is not clear in its intent. As noted above, due to the current workload, applications are prioritized for microbiology, labeling and bioequivalence review based upon a completed chemistry review recommending the approval of the ANDA. It does not appear that the classification of amendments in those review areas would have an overall effect on the completion of the review, especially

Page 3 of 4

A P P E N D I X ~ E

because the reviews in those areas take less time to complete than the chemistry reviews. Further, the accepted practice in OGD is that when a new bioequivalence study or similar "major" deficiency is found in another review discipline, the chemistry amendment is converted to a major amendment.

A possible consideration in terms of re-prioritization would be to delay review of applications that seek final approval only upon expiration of a patent far into the future. Such a process has not been fully explored and it would require thorough examination of all related issues as well as policy changes within OGD.

Page 4 of 4

# ► A C K N O W L E D G M E N T S

This report was prepared under the direction of Robert A. Vito, Acting Regional Inspector General for Evaluation and Inspections in the Atlanta regional office, and Dwayne F. Grant, Deputy Regional Inspector General.

Jaime Durley served as the lead analyst for this study. Other principal Office of Evaluation and Inspections staff from the Atlanta regional office who contributed to this report include Sarah Ambrose and Mina Zadeh; central office staff who contributed include Ayana Everett, Kevin Farber, Rob Gibbons, and Mark Richardson; Joyce Greenleaf from the Boston regional office also contributed.